# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW MEXICO

|  |  |  |
|---|---|---|
| NEW MEXICO ONCOLOGY AND HEMATOLOGY CONSULTANTS, Ltd., | ) ) ) ) | |
| Plaintiff, | ) ) | Civ. No. 12-526 WDS/GBW |
| v. | ) ) | |
| PRESBYTERIAN HEALTHCARE SERVICES, and PRESBYTERIAN NETWORK, INC. | ) ) ) | Jury Trial Demanded |
| Defendants. | ) ) | |

## SECOND AMENDED COMPLAINT

Plaintiff, New Mexico Oncology and Hematology Consultants, Ltd. ("NMOHC"), by and through its attorneys, for its Second Amended Complaint against Defendants, Presbyterian Healthcare Services ("Presbyterian") and Presbyterian Network, Inc., states the following:

## INTRODUCTION

### I.      Antitrust Claims

1.      Presbyterian is the dominant hospital in Albuquerque, and has monopoly power over inpatient hospital services and private health insurance services.  Presbyterian's hospitals control, on information and belief, more than 50% of the patients receiving inpatient hospital services in Albuquerque, and this market share figure understates Presbyterian's market dominance.  Presbyterian has the largest number of inpatient discharges, the largest number of staffed hospital beds, and the largest revenue of any hospital system in New Mexico.  Presbyterian also earns profits that are well above the national average in its industry.

Presbyterian also has acquired market power with respect to physician services by employing approximately 700 physicians.  None of the other hospitals in Albuquerque have the ability to prevent Presbyterian from raising prices and excluding rivals.

2.      Presbyterian is pursuing a strategy to entrench and expand its monopoly power over inpatient hospital services and health insurance services, and to attack any physician or firm that threatens its dominant market position.  Presbyterian has excluded rivals from the Albuquerque Market, deterred entry into Albuquerque by medical providers and health insurance companies, injured its existing competitors and limited their growth, raised its rivals' costs of operation, and forced physicians into employment arrangements.  Consumers in the Albuquerque Market have higher health care costs, and pay higher premiums for health insurance, than they would have, if Presbyterian had not acquired and actively maintained its monopoly power over inpatient hospital services and private health insurance.

3.      NMOHC provides oncology services at a lower cost than Presbyterian.  NMOHC built a state-of-the-art cancer center in order to provide patients improved care that patients could not otherwise obtain in Albuquerque.  Presbyterian responded by threatening to put NMOHC out of business.  When Presbyterian could effectuate that threat, it began an anticompetitive campaign against NMOHC designed to put NMOHC out of business and to force its physicians to either become Presbyterian employees or leave Albuquerque.  Eliminating NMOHC from the market would give Presbyterian a monopoly over the various oncology services provided by NMOHC and its physicians.

4.      To accomplish this goal, Presbyterian has committed, and continues to commit, a series of anticompetitive and predatory actions that have no legitimate business justification.

2

These actions are designed to eliminate NMOHC as a competitor and as a high quality alternative for patients needing oncology services.  These anticompetitive actions include, but are not limited to, Presbyterian's intimidating physicians that refer patients to NMOHC, actively discouraging and interfering with referrals to NMOHC, giving physicians financial benefits for refusing to refer patients to NMOHC, and making it difficult for physicians to even process referrals to NMOHC.  These actions have significantly reduced the number of referrals made to NMOHC by Presbyterian physicians.  Many patients living in Albuquerque are denied any practical choice with respect to where they obtain oncology services.  As a result, patients are forced to receive lower quality and more costly care from Presbyterian.

5.     Patients have been, and continue to be, injured by Presbyterian's monopolistic and anticompetitive conduct.  Patients living in Albuquerque have little choice with respect to private health insurance options given Presbyterian's consolidation of that market.  By consolidating the market for physician services, Presbyterian has limited patient choice with respect to those services.

6.     Cancer patients would suffer significant harm if Presbyterian were able to put NMOHC out of business.  First, patients would lose a lower cost provider of medical oncology and radiation oncology services.  Second, patients would lose access to NMOHC's higher quality medical oncology and radiation oncology services, which is made possible, in part, by NMOHC's integrated approach to providing such services.  Third, NMOHC's elimination from the market would deprive the vast majority of cancer patients with any real choice as to where they receive treatment.  Finally, it would further entrench and solidify Presbyterian's monopoly power over inpatient hospital services and private health insurance services.

II.    **RICO Claim**

7.      Presbyterian has used its control over health insurance services to effectuate a fraudulent scheme in which Presbyterian illegally obtains discounted chemotherapy drugs, and the related support drugs, from pharmaceutical manufacturers, and then has Presbyterian Network, Inc. force its enrollees to purchase those illegally obtained drugs from Presbyterian.

8.      Presbyterian is able to purchase discounted drugs from pharmaceutical manufacturers under a federal program commonly referred to as the 340B Program.  Presbyterian is only allowed to sell drugs it obtains under the 340B Program to Presbyterian's own patients. To qualify as a Presbyterian "patient," a Presbyterian employed physician must be responsible for managing the patient's care.

9.      Starting in 2012, every senior enrolled in Presbyterian Network, Inc.'s Medicare HMO or PPO must purchase a wide range of drugs from Presbyterian's specialty pharmacy. Presbyterian illegally sells drugs it obtains through the 340B Program to these seniors.

10.     NMOHC physicians manage and are responsible for the treatment of many seniors enrolled in these Medicare HMO and PPOs.  These NMOHC patients are nonetheless forced to purchase their chemotherapy drugs and support drugs from Presbyterian's specialty pharmacy.  They can no longer purchase these drugs from NMOHC's pharmacy.

11.     Even though NMOHC's patients are not Presbyterian patients, Presbyterian sells NMOHC patients drugs Presbyterian obtained through the 340B Program.

12.     Presbyterian's forced sale of 340B Drugs to NMOHC's patients allows Presbyterian to earn inflated profits.

13.     Presbyterian's forcing NMOHC's patients to purchase chemotherapy drugs and support drugs from Presbyterian's specialty pharmacy interferes with and disrupts NMOHC's efforts to treat its cancer patients.

14.     Presbyterian's actions have imposed needless burdens on vulnerable seniors suffering from cancer.

15.     In order to effectuate and operate its fraudulent scheme, Presbyterian has directed Presbyterian Health Network, Inc. to commit various acts of mail fraud and wire fraud.

16.     These acts of mail fraud and wire fraud represent a pattern of racketeering activity.

17.     Presbyterian's actions violate 18 U.S.C. Section 1962(c) and constitute unfair competition.

## SUBJECT MATTER JURISDICTION

18.     Jurisdiction of this Court is based on 28 U.S.C. Section 1337, which grants original jurisdiction to the district court for any civil action or proceeding arising under any act of Congress.  Jurisdiction is also based on 15 U.S.C. Sections 15 and 26, which provide for damages and injunctive relief against threatened loss or damage, for violations of Sections 1 and 2 of the Sherman Act, and for costs of suit, including reasonable attorneys' fees.  This Court has pendent jurisdiction over the claims which are not brought pursuant to the federal antitrust laws (28 U.S.C. Section 1331).

19.     Plaintiff's federal antitrust claims asserted herein arise under Sections 1 and 2 of the Sherman Act (15 U.S.C. Sections 1 and 2) and are instituted under Sections 4 and 6 of the Clayton Act (15 U.S.C. Sections 15 and 26) to (a) recover damages from Defendants, including

treble damages, costs of suit and reasonable attorneys' fees, for injuries sustained by Plaintiff to its business and property by reason of Defendants' violations of Sections 1 and 2 of the Sherman Act; and (b) obtain injunctive relief against Defendants and their respective members, divisions, officers, directors, employees, agents, subsidiaries and affiliates to restrain them from further and continued violations of Sections 1 and 2 of the Sherman Act.

20.     Plaintiff's federal RICO claim asserted herein arises under 18 U.S.C. Section 1962(c), and is instituted under 18 U.S.C. Section 1964(c) to (a) recover damages from Defendant Presbyterian Healthcare Services, including treble damages, costs of suit and reasonable attorneys' fees, for injuries sustained by Plaintiff to its business and property by reason of Defendant's violations of 18 U.S.C. Section 1962(c); and (b) obtain injunctive relief against Defendant Presbyterian Healthcare Services and its respective members, divisions, officers, directors, employees and agents to restrain them from further and continued violations of 18 U.S.C. Section 1962(c).

21.     This action is also instituted pursuant to Defendants' violation of the general common laws of New Mexico by its interfering with NMOHC's existing business relationships and the intentional interference with NMOHC's prospective business relationships, as well as Defendants' commission of common law unfair competition and injurious falsehood.

22.     Venue is proper in this District pursuant to Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. Sections 15, 22, and 26, and 28 U.S.C. Sections 1391 (b) and (c).  Venue is also proper since Defendants have their principal offices in this District and are doing business in this District.

## THE PARTIES

I. **Plaintiff**

23.     NMOHC is a professional corporation with its principal place of business located at 4901 Lang Avenue Northeast, Albuquerque, New Mexico 87109.

24.     NMOHC offers patients a full range of medical oncology and hematology services, radiation oncology services and various radiology and laboratory services.

25.     Medical oncology is the diagnosis, management and treatment of cancer.

26.     Hematology services include the diagnosis, management and treatment of benign and malignant diseases of the blood and blood forming tissues.  This includes, for example, the diagnosis and treatment of leukemia.  NMOHC also performs bone marrow biopsies and is a recognized site for the National Marrow Donor Program.

27.     NMOHC has eight physicians specializing in medical oncology and hematology.

28.     Radiation oncology services include a number of different treatment methods that use high-energy rays to kill cancer cells.  Radiation oncology is part of NMOHC's multidisciplinary approach to the treatment of cancer.

29.     NMOHC has two physicians specializing in radiation oncology.

30.     NMOHC also offers its patients services that are ancillary to its medical oncology, hematology and radiation oncology services.  These services include radiology or imaging services, laboratory services, a pharmacy dispensing clinic, genetic counseling and testing, and social work services that help families cope with the hardships created by cancer.

31.     NMOHC offers patients its medical oncology, hematology, radiation oncology and ancillary services at a free standing cancer center ("Cancer Center") that NMOHC owns and

operates.  The Cancer Center was designed to meet the special needs of cancer patients and their

families, and to allow NMOHC's physicians and staff to offer patients high quality and efficient

medical services.

32.     NMOHC is an integrated medical practice that provides a full range of oncology

related services in a coordinated, well supervised, innovative and efficient manner.

33.     NMOHC's physicians, nurses and staff work as a team when providing patients a

full range of oncology and ancillary services.  At a single site, patients can have an x-ray taken,

see their treating physician on the same day for the results, and then receive the drugs and

treatment they may need.  This allows NMOHC to coordinate the care provided to its patients,

properly time the provision of that care, more effectively supervise the care provided to patients,

and reduce patient travel needs.

34.     The Cancer Center also offers patients a Chemotherapy Infusion Center that was

designed to address the special needs of cancer patients receiving chemotherapy infusions.

35.     While NMOHC is centered in Albuquerque, it has satellite facilities in

underserved areas, including Gallup, Silver City and Ruidoso.

**II.     <u>Defendants</u>**

36.     Presbyterian Healthcare Services ("Presbyterian") is a not-for-profit corporation,

with its principle place of business at 1100 Central Avenue, S.E., Albuquerque, New Mexico

87106.

37.     Presbyterian owns, operates, and manages eight acute care hospitals, all of which

are located in New Mexico.  Three of the eight acute care hospitals are located in the

Albuquerque area: Presbyterian Hospital, Presbyterian Kaseman Hospital and Presbyterian Rust

Medical Center (located in Rio Rancho).  Presbyterian Hospital is the largest hospital in both Albuquerque and New Mexico.

38.     Presbyterian's other five hospitals are located in Clovis, Espanola, Ruidoso, Socorro and Tucumcari.

39.     Presbyterian also owns and operates Presbyterian Healthcare Services Affiliates ("PHSA").  PHSA owns Southwest Health Foundation.  Southwest Health Foundation owns Defendant Presbyterian Network Inc., which owns and controls Presbyterian Insurance Company, Inc. and Presbyterian Health Plans Inc.  Presbyterian Network, Inc. and its subsidiaries are collectively referred to as "PHP."  PHP operates, on a for-profit basis, various health maintenance organizations, preferred provider organizations and other health insurance products.

40.     The Southwest Health Foundation was designed to create a level of separation between Presbyterian and PHP.

41.     Presbyterian must keep its operations separate from PHP's operations because Presbyterian is a not-for-profit hospital corporation and PHP is for-profit health insurer.

42.     PHP is the largest health insurer in Albuquerque.

43.     Despite the legal separation between Presbyterian and PHP by the creation of the Southwest Health Foundation, Presbyterian actively controls PHP's actions.

44.     Presbyterian, through PHP, also owns and operates the largest Medicare and Medicaid managed care programs in Albuquerque.

45.     Presbyterian also owns, operates, and manages Presbyterian Medical Group ("PMG"), which employs approximately 700 physicians.  The physicians employed by PMG include primary care physicians and a wide range of specialists, including medical oncologists.

## TRADE AND COMMERCE

46.     Medical oncology and radiation oncology services (collectively referred to as "Oncology Services") represent a line of trade and commerce adversely affected by Presbyterian's anticompetitive practices.  NMOHC's provision of radiology services, laboratory services and pharmacy services constitute trade and commerce adversely affected by Presbyterian's anticompetitive practices.

47.     The violations of law alleged herein have an effect on interstate commerce. Oncology Services, radiology services, laboratory services and pharmacy services are in, and affect interstate commerce.

48.     The overwhelming majority of NMOHC's revenues come from insurance companies.

49.     During the last four years, NMOHC purchased medicines in the approximate amount of $100 million.  All of the drugs that NMOHC purchases come from out-of-state, and the linacs and imaging equipment NMOHC uses were all purchased from out-of-state suppliers.

50.     NMOHC's business is engaged directly in and affects interstate commerce.

51.     On information and belief, Presbyterian receives a not insignificant amount of revenue from insurance carriers that are located in states other than New Mexico or who otherwise do business outside of New Mexico.  These insurers included United HealthCare and Cigna.

52. On information and belief, Presbyterian has purchased a significant amount of equipment, supplies, and medicine from numerous suppliers and manufacturers that are located in states other than New Mexico.

53. Presbyterian's referral policies and other anticompetitive practices, more fully described in this Amended Complaint, have had and continue to have a substantial adverse effect on interstate commerce by (a) preventing patients from receiving Oncology Services and radiology services from NMOHC, (b) limiting NMOHC's ability to purchase supplies and equipment from suppliers located outside of New Mexico, and (c) interfering with NMOHC's ability to contract with national health insurance companies.

## ANTITRUST CLAIMS

### I.   Current Market Structure

54. Modern health care markets have three basic participants: (a) facilities, including, for example, hospitals that provide inpatient care; (b) health insurance companies; and (c) physicians.

#### A.   Hospitals

55. Only three full service hospital systems provide inpatient hospital services in Albuquerque: (a) Presbyterian Health System; (b) Lovelace (owned by Ardent Health Services); and (c) the University of New Mexico Hospital ("UNM Hospital"), which is the only state-funded hospital in Albuquerque.  No other acute care hospitals exist in Albuquerque, excluding a veterans' hospital.

56. Presbyterian is the dominant hospital system in Albuquerque, and is the largest provider of Hospital Inpatient Services.

57.     Presbyterian controls approximately 670 staffed beds in Albuquerque.  Lovelace has approximately 418 staffed beds, and UNM Hospital has approximately 517 staffed beds. Presbyterian controls at least 42% of the total staffed hospital beds in Albuquerque.

58.     Presbyterian's 42% share of the staffed hospital beds in Albuquerque understates Presbyterian's power over inpatient hospital services.  While UNM Hospital has approximately 517 staffed beds, it is the only trauma center in New Mexico and must allocate a significant percentage of its beds to trauma patients.  UNM Hospital is also a teaching hospital with a closed staff, which limits UNM Hospital's ability to attract patients and compete against Presbyterian.

59.     On information and belief, Presbyterian was responsible for approximately 50% of the actual in-patient discharges in Albuquerque in 2010 for those patients who have private health insurance.  With respect to Medicare patients, Presbyterian was responsible for more than 50% of the in-patient discharges in Albuquerque.

60.     The remaining in-patient discharges for patients with private health insurance were divided roughly equally between Lovelace and UNM Hospital.

**B.     Health Insurance**

61.     The market for private health insurance is highly concentrated in Albuquerque. The market for private health insurance is separate and distinct from the market for publicly provided health insurance such as Medicare and Medicaid.

62.     The market for private health insurance is undergoing further consolidation in Albuquerque.

63.     Both Presbyterian and Lovelace offer their own health insurance plans.  While independent private health insurers (United HealthCare, Cigna, and Blue Cross) do operate in Albuquerque, they play only a peripheral role.

64.     United HealthCare and Cigna are closely aligned with Presbyterian.  United HealthCare and Cigna will not contract, currently, with UNM Hospital or Lovelace.  United HealthCare and Cigna are adjuncts to PHP, and their market shares properly belong consolidated with PHP's market share.

65.     According to the 2009 Update of "Competition in Health Insurance", a report by the AMA derived from Interstudy data, Presbyterian is the market share leader in the combined HMO-PPO market with a 46% share.

66.     On information and belief, neither United HealthCare nor Cigna have market shares exceeding 10%.  On information and belief, when United HealthCare's and Cigna's market shares are combined with PHP's market share, Presbyterian controls well over 50% of the market for private commercial health insurance in Albuquerque.

67.     On information and belief, Blue Cross is currently considering exiting the market for private health insurance.

68.     Lovelace's health insurance plans have approximately a 27% share of the market.

**C.      Oncology Services**

       **(i)      Medical Oncology**

69.     Only four entities provide Oncology Services in Albuquerque: NMOHC, Presbyterian, UNM Hospital, and Hematology Oncology Associates ("HOA").

70.     NMOHC has eight medical oncologists on its staff.

71.     On information and belief, Presbyterian currently employs approximately 6 medical oncologists.

72.     HOA has three full-time medical oncologists and one medical oncologist who works part-time.

73.     On information and belief, UNM Hospital has 7 medical oncologists who actually see patients on a regular basis.  Many of UNM Hospital's medical oncologists teach at the University of New Mexico's medical school or are primarily involved in research.

74.     UNM Hospital uses a closed staff model.  This means that only physicians on UNM Hospital's staff can admit patients to UNM Hospital.  Independent physicians with their own private practice cannot admit patients to UNM Hospital, which deters referrals from independent physicians to UNM Hospital.  An independent physician could not effectively follow his patient's medical care, if the independent physician referred the patient to a UNM Hospital staff physician.

75.     On information and belief, UNM Hospital's oncology practice is heavily skewed towards treating patients who receive health care financing from state and federal sources, such as Medicare and Medicaid.

76.     While UNM Hospital has a cancer program, it does not have a significant competitive presence in the Albuquerque area with respect to patients who have private health insurance.

**(ii)     Radiation Oncology**

77.     Radiation Oncology Services are provided by four entities in Albuquerque: Presbyterian, NMOHC, UNM Hospital, and Radiation Oncology Associates.

14

78.     Presbyterian through an arrangement with M.D. Andersen has two radiation oncologists.

79.     NMOHC employs two radiation oncologists.

80.     UNM Hospital has 4 radiation oncologists on its staff.

81.     Radiation Oncology Associates has 4 radiation oncologists who provide Radiation Oncology Services at two locations.

82.     The same factors that limit UNM Hospital's ability to play a significant role with respect to medical oncology services also limit UNM Hospital's role with respect to radiation oncology services.

## II.     The Relevant Markets

83.     The bedrock for Presbyterian's anticompetitive practices is its monopoly power over: (a) inpatient hospital services; and (b) private health insurance.  Presbyterian's anticompetitive actions are designed, in part, to expand and solidify its monopoly power over inpatient hospital services and private health insurance.

84.     Part of Presbyterian's monopolization strategy includes its ongoing attempts to monopolize the separate market for Comprehensive Oncology Services by putting NMOHC out of business through a variety of anticompetitive and predatory actions.

### A.     Relevant Service and Product Markets

#### (i)     The Market for Comprehensive Oncology Services

85.     A relevant product market exists for Comprehensive Oncology Services.  Within this market exists a separate market for Comprehensive Oncology Services provided to patients with private health insurance.

15

86.     Comprehensive Oncology Services include medical oncology services and radiation oncology services.  Patients needing these types of services cannot substitute these medical services for other types of services.

87.     For example, patients suffering from cancer cannot substitute cardiology services for Comprehensive Oncology Services.

88.     Increases in the price of Oncology Services will not cause patients to switch to other medical services.  Cancer patients would have to pay the higher prices or not receive any medical treatment.

89.     Patients with private health insurance cannot substitute Comprehensive Oncology Services they receive through their private health plans with Comprehensive Oncology Services that are paid for by Medicare and Medicaid.  The market for private health insurance is separate and distinct from the market for government provided health insurance.

**(ii)     The Market for Private Health Insurance**

90.     A separate relevant market exists for Private Health Insurance.

91.     For the overwhelming majority of individuals, it is impossible for them to afford medical services without some form of health insurance.  Patients cannot replace health insurance with other types of insurance or other types of financial products.

92.     Increases in the price of health insurance will not cause patients, for example, to switch to other non-health insurance products.  Patients needing health insurance would have to pay the higher insurance premiums or lose the ability to pay for their healthcare expenses. Despite significant increases in the cost of private health insurance, the number of Americans under the age of 65 with private health insurance has declined only slightly.  The overwhelming

majority of patients without health insurance could not, for example, obtain Comprehensive Oncology Services.

93.    While the federal and state governments provide Medicare and Medicaid, these programs are not substitutes for Private Health Insurance.

94.    Medicare is limited generally to persons who are 65 and older.  Medicaid is only available to individuals who meet certain financial or physical criteria.

95.    Individuals who do not meet the legislatively created criteria cannot substitute Medicare or Medicaid for Private Health Insurance.  Patients with Private Health Insurance, therefore, cannot substitute Medicare or Medicaid for their current private health insurance in response to a significant increase in the price of such insurance.

96.    Further, because Medicare and Medicaid are essentially free for those individuals who meet the eligibility criteria, they will not substitute Medicare or Medicaid with private health insurance.

97.    Medical providers cannot substitute their patients with Private Health Insurance with Medicare and Medicaid patients.  Medicare and Medicaid typically pay substantially less than what private health insurers will pay.  In many instances, Medicare and Medicaid reimbursement levels are below a physician's costs.  Physicians need patients with Private Health Insurance to help subsidize the losses they incur treating Medicare and Medicaid patients.

98.    NMOHC could not remain in business, and another competitor is unlikely to enter the market for Comprehensive Oncology Services, if it were limited to Medicare and Medicaid patients.

99.     Finally, Medicare and Medicaid do not compete against Private Health Insurers with respect to price.  Because Medicare and Medicaid are free entitlement programs, they do not compete against Private Health Insurance companies for patients.

(iii)     **Market for Hospital Inpatient Services**

100.     Hospital Inpatient Services consist of a cluster of services that are essential for the treatment of a wide variety of illnesses and medical conditions.

101.     Certain medical conditions require specialized equipment and immediate access to a wide range of medical services that only a hospital can provide.  For example, open heart surgery requires specialized operating rooms, highly trained support teams, and access to a wide range of other medical services in case of complications.

102.     Patients needing Hospital Inpatient Services cannot substitute these services with outpatient services or physician services.  Increases in the price of Hospital Inpatient Services will not cause patients, for example, to switch to outpatient centers.  Patients needing Hospital Inpatient Services would have to pay the prices or forego the needed services entirely.

B.     **Relevant Geographic Market**

103.     The relevant geographic market for Comprehensive Oncology Services, Private Health Insurance, and Hospital Inpatient Services consists of the Albuquerque/Rio Rancho metropolitan area ("Albuquerque Market").

104.     New Mexico's population is largely concentrated in urban areas spread out throughout the state.  For the most part, these areas are separated from one another by considerable distances.

105.     Albuquerque is the largest city in New Mexico.

(i)     **Hospital Inpatient Services**

106.     Albuquerque has the largest hospitals in the state: Presbyterian; Lovelace; and UNM Hospital.  These hospitals provide both the most advanced and the most complete set of health care services in New Mexico.

107.     After Santa Fe, Gallup is the largest city close to Albuquerque.  Gallup is approximately 140 miles away from Albuquerque.  After Gallup, the largest close city to Albuquerque is Tucumcari, which is more than 170 miles away from Albuquerque.

108.     Patients do not leave Albuquerque to receive treatment at hospitals located in Gallup or Tucumcari.  Nor do patients living in Albuquerque travel to cities such as Clovis (approximately 217 miles) or Las Cruces (approximately 224 miles) to receive Hospital Inpatient Services.  The hospitals in these cities are significantly smaller than the hospitals located in Albuquerque.  The largest hospital in Gallup (Rehoboth McKinley Christian Health Care Services), for example, only has 80 staffed beds.  On information and belief, Rehoboth does not offer the full range of Hospital Inpatient Services provided by Presbyterian's Albuquerque hospitals.

109.     The large majority of patients will not travel long distances from their homes and families to receive Hospital Inpatient Services.  Some patients cannot travel long distances for medical treatment, and most others will not spend hours in a car to get to a hospital in a different city from where they live.  Further, patients living in Albuquerque will not travel extended distances to a hospital outside of Albuquerque that does not even provide the same mix of services provided by the hospitals located in Albuquerque.

110.    A further impediment to patients traveling to distant cities, such as Gallup, for Hospital Inpatient Services is that most physicians will not, and cannot, admit their patients to hospitals in distant cities.

111.    While Santa Fe is approximately 60 miles away from Albuquerque, its hospitals and physicians do not impose any competitive check on Presbyterian's anticompetitive activities.

112.    The primary hospital in Santa Fe is Christus St. Vincent Regional Medical Center ("St. Vincent").  St. Vincent only has 180 staffed beds, and does not offer many of the services provided by hospitals such as Presbyterian.

113.    Patients in the Albuquerque Market do not view the few small hospitals in Santa Fe as substitutes for the hospitals located in Albuquerque.

114.    With respect to Hospital Inpatient Services, a distinct geographic market exists that consists of the Albuquerque/Rio Rancho area.

### (ii)    Comprehensive Oncology Services

115.    Cancer is a chronic condition that often requires many appointments with the treating physician.  Cancer patients are typically very sick and cannot physically travel long distances on a routine basis.  Extended travel for certain cancer patients would be harmful to their health.  This discourages or prevents cancer patients from traveling extended distances for Comprehensive Oncology Services.

116.    Patients suffering from cancer will sometimes experience emergencies that will lead to their hospitalization.  Most patients want their physician oncologist (a) close to where they live and (b) to have admitting privileges in the hospital the patient would use in case of an emergency.  None of NMOHC's physicians have admitting privileges at any hospital located in

Santa Fe, or the more distant hospitals located in New Mexico.  On information and belief, none of Presbyterian's medical oncologists who reside in Albuquerque have admitting privileges in any hospital located in Santa Fe, or the more distant hospitals located in New Mexico.

117.    On information and belief, patients located in Albuquerque do not now travel in any meaningful numbers to Santa Fe or more distant cities for Comprehensive Oncology Services.  The hospitals in Santa Fe do not provide the same level of Comprehensive Oncology Services as those provided in the Albuquerque Market.  The other cities in New Mexico that have cancer programs are too far away to attract patients living in Albuquerque who suffer from cancer.

118.    On information and belief, patients living in Santa Fe do not travel to the Albuquerque Market in any meaningful numbers for Comprehensive Oncology Services.

119.    When considering health insurance options, oncology patients will not view health insurance plans offering access to providers in Santa Fe as substitutes for health insurance plans that offer access to providers in Albuquerque.

120.    With respect to Comprehensive Oncology Services, a distinct geographic market exists that consists of the Albuquerque/Rio Rancho area.

### (iii)    Private Health Insurance

121.    A private health insurance company that wants to sell its insurance product to patients in Albuquerque will have to offer Albuquerque residents access to hospitals and physicians located in the Albuquerque Market.

122.    A private health insurer that only offers hospitals and physicians located in distant geographic areas, such as Gallup and Santa Fe, where Albuquerque residents will not travel for

medical care, cannot effectively sell a health insurance product to Albuquerque residents.  A health insurer will have to retain the services of at least one or more of the hospitals in Albuquerque in order to market its health insurance product to consumers.

123.     Such a health plan will also need to have provider contracts with, for example, physicians, cancer programs, and radiologists located in the Albuquerque Market.  Given that the relevant geographic market for Comprehensive Oncology Services is the Albuquerque Market, any private health insurance company seeking to sell private health insurance to residents of the Albuquerque Market will have to include at least one cancer program in its provider network.

124.     With respect to Private Health Insurance, a distinct geographic market exists that consists of the Albuquerque/Rio Rancho area.

**III.     Presbyterian Has Monopoly Power**

      **A.     Presbyterian Dominates All Three Levels
          of the Market For Health Care Services In Albuquerque**

125.     The health care market in Albuquerque consists of facilities (i.e., hospitals and free standing medical centers such as NMOHC's Cancer Center), physicians, and health insurers.

126.     The market for Hospital Inpatient Services has historically involved limited delivery selection in Albuquerque.

127.     Presbyterian controls at least half of the market for Hospital Inpatient Services. The balance of the market is divided by UNM Hospital and Lovelace.  Given UNM Hospital's unique role and position in the market, its market share overstates its competitive significance.

128.     Lovelace's approximately 25% share of the market for Hospital Inpatient Services does not give it the power to restrain Presbyterian's anticompetitive behavior.  On information

and belief, Lovelace has been unable to grow its market share at Presbyterian's expense to any significant degree in the last two decades.

129.     Presbyterian also controls more than 50% of the market for private health insurance through PHP and its contracts with United Healthcare and Cigna.

130.     Presbyterian also directly employs most of the primary care physicians in Albuquerque and hundreds of specialists.

**B.     Entry That Could Limit Presbyterian's
        Market Power Is Difficult and Unlikely**

131.     No new independent full service hospital has opened in Albuquerque in at least the last 30 years.  Building a new hospital takes years of effort and tens of millions of dollars for the land, buildings, equipment, and supplies.

132.     Building a new hospital in Albuquerque would, however, be pointless without also establishing a fully functioning health insurance company that could act as an alternative to PHP and bringing hundreds of new physicians into Albuquerque.  Without a large enough pool of independent physicians, a new health insurer would face severe challenges building a competitive provider network.

133.     It took Presbyterian almost a decade to build PHP's current market position.  Moreover, a significant portion of that growth was created by Presbyterian's acquisition of a rival health insurance plan – FHP.

134.     It also took Presbyterian at least 10 years to build PMG into a physician group with approximately 700 employed physicians.

135.     Breaking any of Presbyterian's locks on these three markets would require entry by a health care organization into all three markets simultaneously.  The costs associated with

such entry are prohibitively high.  Such entry would also entail such a substantial risk of failure as to make any significant entry unprofitable from an ex-ante perspective.

136.    Other than the temporary entry of the Heart Hospital, no meaningful entry has taken place in the Albuquerque Market during the last 30 years.  Freestanding surgery centers have not entered the market due to the need for a PHP contract and the lack of independent surgeons.  While the Heart Hospital was able to enter, it was unable to survive as an independent entity.

### C.    Neither Lovelace Nor UNM Hospital Can Effectively Restrain Presbyterian

137.    If Presbyterian faced competitive pressures in the hospital market, then any effort on its part to charge higher prices would be rebuffed by private insurers, who would turn to other hospitals.  Presbyterian does not face theses pressures.  Health insurers need access to Presbyterian in order to market a competitive health insurance product.

138.    Insurers do not find UNM Hospital to be a viable alternative to Presbyterian. UNM Hospital is state-owned and has a closed staff.  Only physicians on UNM Hospital's medical staff can admit patients to UNM Hospital.  Patients considering treatment at UNM Hospital would have to develop a relationship with a physician who has staff privileges at UNM Hospital.  This deters patients who have preexisting relationships with Presbyterian physicians.

139.    UNM Hospital is also the only trauma center in New Mexico and must reserve a significant portion of its beds for trauma patients.

140.    As a teaching hospital, UNM Hospital must admit patients with a wide range of clinical problems.  Thus, UNM Hospital admits a disproportionately large percentage of Medicaid patients.

141.    UNM Hospital's unique role in the market makes it difficult to get private pay patients admitted to UNM Hospital.

142.    UNM Hospital does not have the ability to prevent Presbyterian's exercise of market power.

143.    Lovelace's size prevents it from providing a significant competitive check on Presbyterian's anticompetitive actions.  Further, Lovelace does not have the same comprehensive treatment coverage that Presbyterian provides.  Nor does Lovelace have a reputation that it can provide the same level of care as Presbyterian.

## IV.    Presbyterian's Acquisition of Monopoly Power

144.    Presbyterian is viewed by a large segment of the population in Albuquerque as a must-have hospital in any health insurance product.  Most persons who acquire private health insurance in Albuquerque view access to Presbyterian's services as being essential given the scope of the services it provides and its perceived quality.

145.    Presbyterian has been able to solidify, entrench, and expand its market position by misusing its market power over Hospital Inpatient Services and Private Health Insurance services, and by employing approximately 700 physicians.  Presbyterian has been able to exclude rivals from the Albuquerque Market, deter entry into Albuquerque by medical providers and health insurance companies, injure its existing competitors and limit their growth, raise its rivals' costs of operation, and force physicians into employment arrangements with Presbyterian.

**A.     Presbyterian Becomes the Dominant**
**Hospital and Health Insurer in Albuquerque**

146.     Since the late 1970s Presbyterian has been the largest hospital in New Mexico. By the 1990s important trends were developing that threatened Presbyterian's dominant and secure market position.

147.     First, technological changes occurred that increased the number of medical procedures that physicians could perform on an outpatient basis.  Outpatient centers require less capital to build, and, therefore, created the possibility that many new participants would enter the market and start competing against established hospitals.   This development threatened hospital admission rates, and created a new way for competitors to enter the market.

148.     Second, the entry of health maintenance organizations ("HMO") into Albuquerque posed a direct threat to Presbyterian's ability to control the health care market in Albuquerque and Presbyterian's ability to control the prices for Hospital Inpatient Services.

**(i)     Technological and Treatment Changes in the 1980s**
**and 1990s Threatened Presbyterian's Admission Rates**

149.     Significant advances in medical technology in the 1990s made it less and less necessary to admit patients to hospitals on an inpatient basis.  Along with these changes came the significant growth of outpatient care facilities and outpatient surgery centers.

150.     Hospitals realized that they could lose patients to more than just other hospitals. Physicians and other health care organizations were building outpatient treatment centers that were providing a wide range of treatment options to patients.  These centers included radiology centers, surgery centers, and cancer centers.

151.     Outpatient centers cannot replace hospitals.  Outpatient centers, however, can create entry points for rival health insurers and/or new hospitals.  New outpatient centers can also take away business from hospitals by offering patients high quality care at lower cost than the same services provided by a hospital.

(ii)     <strong><u>The Role Of Health Insurance and Managed Care</u></strong>

152.     A modern health insurance company purchases and re-sells medical services.  The health insurer purchases medical services from providers such as hospitals and physicians on behalf of its enrollees.  Medical providers will enter into a provider agreement with a health insurer which obligates the provider to offer medical services to the health insurer's enrollees.  These medical providers are reimbursed for the services they provide under various types of pricing and payment arrangements.

153.     Patients pay premiums to the health insurance company for the right to receive health care services when needed from medical providers.  The health insurance company must price its premiums so that the revenues it receives from the enrollees who do not need health care services are sufficient to cover the costs of the medical services consumed by the enrollees who need medical care.

154.     Initially, health insurers paid physicians and hospitals on a fee-for-service basis under what is now called traditional indemnity health insurance.  This generally meant that a hospital was paid for each service it provided.  Under a traditional indemnity policy, patients could choose any hospital or physician they wanted.  Further, health insurers had practically no say as to the types of services a hospital or physician provided.

27

155.    Under a traditional indemnity arrangement, the health insurer does not interpose itself between the medical provider (including a hospital) and its patients.

156.    Traditional indemnity insurance was largely incapable of controlling medical costs.  Health care costs exploded, and, with these increased costs, premiums grew at an unsustainable pace.  These developments have all but eliminated traditional indemnity insurance from the health care market.

157.    Independent health insurers (e.g. Blue Cross) have an incentive to keep the costs of the medical services they purchase as low as possible.  Health insurers tried to address the problem of rising health care costs by creating incentive structures that deter the overuse of medical care by patients and the over-provision of medical care by providers.

158.    HMOs are designed to lower medical costs, in part, by refusing to reimburse patients who go to a hospital or see any physician who has not signed a formal provider contract with the HMO.  Hospitals, for example, are offered the exclusive right to sell their services to the HMO's enrollees, on the condition that they accept fixed payments (also called capitated payments) for each patient.  HMOs also required hospitals and physicians to follow various policies that interfered with the hospital's treatment decisions.

159.    While other health insurance models give patients greater freedom to choose their medical providers, these models nonetheless also limit the treatment decisions hospitals and physicians can make.  Under a preferred provider model ("PPO"), patients can choose a medical provider who has not contracted with the health insurer, but the patient will have to pay out of their own resources more for these services than if they had used a medical provider who was within the health insurer's provider network.  PPOs may also engage in activities such as

utilization review that interfere directly with treatment decisions made by hospitals and physicians.

160.    HMOs and PPOs are commonly referred to as managed care arrangements ("Managed Care").

161.    Traditional indemnity insurance plays no competitive role in the market for health care services at this point.

162.    From a patient's perspective, under either an HMO or PPO model, the health insurer offers access to a bundle of medical providers and health care services for a set price. Health insurance companies therefore compete with respect to the size and scope of their medical provider network, the scope and quality of the health care services offered, the price (premium) charged for access to those services, and the variable costs imposed directly on the patient for each use of a health care service.

163.    From the perspective of a medical provider, under either an HMO or a PPO model, the health insurer controls access to patients and health care dollars.  As they became more dominant, HMOs and PPOs were initially viewed as threats to medical provider autonomy and profits, because these Managed Care entities directly interposed themselves between the patient and the medical provider.

164.    Presbyterian reacted to the emergence of Managed Care by developing its own HMO.  With its own Managed Care product, Presbyterian could act as both the provider and distributor of its medical services.  Ultimately, Presbyterian developed its own Managed Care product, which prevented independent health insurers from interposing themselves between Presbyterian and its patients.

(iii)    **Competition Issues Are Raised When a
Dominant Hospital Operates a Captive Health Insurer**

165.    When the market for Hospital Inpatient Services is competitive, the hospitals in that market will have to compete against one another for patients.  If a hospital in such a market were to open a captive health insurance company, it would also have to operate its captive health insurer in a competitive manner.  Such a hospital could not cripple rival health insurers by refusing to enter into provider contracts with those other health insurers (such as Blue Cross).  Those health insurers would simply sign provider contracts with the other hospitals in the market.

166.    Such a hospital could not pass on to its enrollees increased inpatient hospital costs in the form of higher health insurance premiums.  An attempt to do so would cause the hospital's health insurer to lose enrollees.

167.    Further, such a hospital would almost certainly have to permit its health insurer to sign provider contracts with many different medical providers including some of its competitors.

168.    A hospital operating in a competitive market for Hospital Inpatient Services would have to structure its relationship with its captive health insurer in a manner similar to its relationship with independent health insurers.  The failure to do so would put the hospital's health insurer at a competitive disadvantage compared to other health insurers.

169.    In a market in which a hospital has market power over Hospital Inpatient Services, that hospital's power over Hospital Inpatient Services would carry over into the health insurance market.  Such a hospital would have different incentives operating its captive health insurer from those of an independent health insurer.

170.    First, a hospital with market power over Hospital Inpatient Service can insulate its health insurance plan from competition by refusing to enter into provider agreements with independent health insurance companies.  The independent health insurers would have to either leave the market or rely on a network of providers who cannot compete effectively against the dominant hospital.

171.    Second, the hospital could demand reimbursement levels from the independent health insurers that would force them to raise their premiums to the premium level set by the hospital's captive health insurer.  A hospital with monopoly power could realize its monopoly profits in the form of higher premiums and/or higher reimbursement levels from the captive health insurer.

172.    Hospitals that lack market power over Hospital Inpatient Services have limited incentives to develop a health insurance company.  Building a health insurance company involves a set of skills very different from those needed to run a hospital.  Pricing a Managed Care product requires actuarial and administrative abilities that most hospitals do not possess.

173.    A hospital with market power over Hospital Inpatient Services can obtain significant benefits from extending its market power to the market for private health insurance. The hospital can increase its market power in both markets, and, therefore, force patients to pay higher prices.  New hospital or health insurance rivals would have to enter the hospital and health insurance markets simultaneously in order to challenge the dominant hospital's market position.

174.    Such added burdens and costs make the new entry of both hospitals and private health insurers unlikely.  Even if a new firm could find the necessary financing and expertise,

building a hospital and a health insurer would take significant time.  Thus, even if new entry

were a realistic option, it would take many years to accomplish.

(iv)    **Presbyterian's Development of A Captive Health Insurance Company**

175.    When Presbyterian saw the risk presented by Managed Care, it was already the

dominant hospital in the Albuquerque Market.

176.    The Chairman of Presbyterian's Board, Larry Stroup, recognized that

Presbyterian was able to move into the health insurance market because of the "isolated market"

in which Presbyterian operated.  Mr. Stroup stated that "we didn't have national players.  That

allowed us to succeed.  We probably couldn't replicate the same process in L.A. or another big

market."

177.    Despite its dominant position in the Albuquerque Market, Presbyterian did not

want to shoulder all of the costs and risks associated with the initial creation of a health

insurance company.  Instead, Presbyterian chose to partner with St. Josephs Hospital in the early

1980s in connection with the development of an HMO.

178.    Presbyterian and St. Josephs Hospital formed a joint venture that offered patients

an HMO product called MasterCare.

179.    MasterCare, however, was unsuccessful and was closed in 1984.

180.    Presbyterian, however, did not abandon its efforts to build a health insurance

company.  Presbyterian, St. Josephs Hospital, and Blue Cross discussed partnering together to

form a replacement health insurance product called HealthPlus.  Blue Cross, however, on

information and belief, dropped out of the arrangement because of disagreements concerning the

composition of the HealthPlus board.

181.    Presbyterian and St. Josephs Hospital went forward with HealthPlus, and HealthPlus enrolled its first member in 1986.  By 1995, HealthPlus had approximately 130,000 covered lives.

182.    In 1995, Jim Hinton became Presbyterian's CEO.  Jim Hinton's elevation to CEO led to a significant shift in Presbyterian's overall market strategy.

183.    Around this time, Presbyterian concluded that combining both the provider and payment (health insurance) sides of the health care market was essential to Presbyterian's overall growth.  Presbyterian's CFO, Dale Maxwell, would later concede that the agencies rating Presbyterian's bonds did not view its captive health insurer as a risk, because "being integrated helps us capture market share."

184.    In or around 1995, Presbyterian acquired all of St. Josephs Hospital's interest in HealthPlus.  Presbyterian then changed HealthPlus' name to Presbyterian Health Plans in order to more closely associate the health plan with Presbyterian.

185.    In 1998, Presbyterian acquired FHP, which offered both private health insurance plans and Medicare based plans.  FHP was owned by PacifiCare, and was a rival to Presbyterian's health plan.

186.    As a direct result of the merger, PHP increased its size by approximately 40%, and became the largest health insurer in New Mexico.  On information and belief, Presbyterian's acquisition of FHP added more than 200,000 enrollees to Presbyterian's health insurance plans. By the end of the 1990s, PHP had more than 300,000 enrollees.

187.    On information and belief, in the space of approximately five years (between 1995 and 2000), Presbyterian had more than tripled the size of its health insurance business.  On

information and belief, a substantial portion of this growth was attributable to Presbyterian's

acquiring a competitor instead of growing its insurance plans through competitive means.

188.    Presbyterian's expansion of PHP entrenched Presbyterian's market dominance in

the markets for Hospital Inpatient Services and Private Health Insurance.

**(v)    Presbyterian's Expansion of PHP Gave Presbyterian the Ability
to Force Physicians Into Employment Relationships with PMG**

189.    A hospital controlling both the markets for hospital services and private health

insurance can further solidify its market position by hiring independent physicians that could

form the basis of a provider network for a rival health insurer.  By acquiring independent

physician practices, a dominant hospital can (a) prevent referrals to more efficient and lower cost

rivals, (b) force rivals out of the market, and (c) make new entry impossible.

190.    Along with PHP's rapid growth, Presbyterian also changed its strategy towards

physicians.  Employing physicians was the final step in Presbyterian's consolidation of its

market position.

191.    Presbyterian's CFO, Dale Maxwell, recognized that by employing physicians

Presbyterian was able to push patients into Presbyterian's hospitals.  Specifically, Mr. Maxwell

has stated that "[w]e might be able to purchase cheaper [using third-party medical providers], but

when it is performed in system, it covers fixed costs internally."

192.    The comments made by Presbyterian's CFO demonstrate that Presbyterian's

actions cause higher health care costs for patients and injure rivals in order to increase hospital

admissions.

### a.    Presbyterian Uses Its Market Strength to Consolidate Physicians Within PMG

193.    During the 1990s, many hospitals believed that they could secure a larger market share by acquiring physician practices.  At the same time, many hospitals believed that they could increase profits by operating their own health insurance companies.

194.    Hospitals that pursued these strategies believed they could put pressure on independent primary care physicians who might fear being excluded from health insurance networks if they did not sell their practices to those hospitals.  Specialists would also be pressured into selling their practices to hospitals in order to prevent the loss of referrals from hospital employed primary care physicians.

195.    Presbyterian aggressively pursued this strategy.

196.    Prior to 1995, Presbyterian had very few employed physicians.  On information and belief, Presbyterian only employed 42 physicians in 1995.

197.    After Presbyterian's acquisition of FHP, Presbyterian had both the dominant hospital and dominant health insurer in the Albuquerque Market.

198.    Presbyterian started its program of employing physicians by focusing on primary care physicians.

199.    As part of its push to employ physicians, Presbyterian created the Presbyterian Medical Group.

200.    Many physicians felt they could not survive in the market without becoming Presbyterian employees.  Many independent physicians, for example, needed access to PHP. Reimbursement payments from PHP constituted a major portion of many independent

physicians' revenues in the mid 1990s and into the following decade. Many physicians could not realistically hope to survive without access to PHP.

201. Between 1995 and the present, PMG grew to approximately 700 employed physicians. Between 2000 and 2005, PMG more than doubled in size.

202. By 2005, PMG employed more specialists than primary care physicians.

203. On information and belief, the rate of admissions to Presbyterian's hospitals increased as more and more specialists were employed by PMG.

204. By 2011, very few independent primary care physicians remained in the Albuquerque Market. Independent surgeons have, for the most part, either accepted employment by PMG or have left the Albuquerque Market.

205. One manifestation of Presbyterian's actions with respect to surgeons is the absence of any free-standing physician owned surgery centers in Albuquerque.

206. Presbyterian's control over the health insurance market in Albuquerque and its employment and control over hundreds of physicians has prevented the entry of free standing surgery centers into the market.

**b.     The Heart Wars**

207. Presbyterian's anticompetitive campaign against the entry by a specialty heart hospital ("Heart Hospital") into Albuquerque demonstrates Presbyterian's strategy to prevent entry and the difficulty of entering the Albuquerque Market. While the Heart Hospital was able to enter the market, its entry occurred at a time when Presbyterian's market position was still solidifying.

208.    By the mid 1990s, Presbyterian had the largest cardiac care center in Albuquerque.

209.    During that time, many cardiologists believed that Presbyterian was not properly funding its cardiac program.  Presbyterian was in the process of acquiring many primary care practices, and the cardiologists believed that Presbyterian was diverting funds to its acquisition program at the expense of its cardiac program.

210.    Around this time, MedCath Inc. approached Southwest Cardiology Associates and New Mexico Heart Institute with a proposal to build a heart hospital in Albuquerque.  When the cardiologists agreed to participate in the venture, Presbyterian and St. Josephs were invited to participate.  Presbyterian refused to participate and St. Josephs agreed.

211.    Presbyterian and its CEO, Jim Hinton, viewed the development of the Heart Hospital as a significant threat to Presbyterian's market position and took steps to prevent this new entry.  Presbyterian started an intimidation campaign against the cardiologists who had agreed to participate in the new Heart Hospital.  One cardiologist was told that things were going to get "ugly" for them if the cardiologists moved forward with the Heart Hospital.  Two cardiac surgeons were threatened with the loss of all of their referrals if they worked at the Heart Hospital.  One of the cardiac surgeons left New Mexico and the other chose to work with Presbyterian.

212.    The Heart Hospital needed a loan from a bank in order to buy land and build its facility.  Jim Hinton, Presbyterian's CEO, sat on the board that advised the bank from whom the Heart Hospital was trying to get the loan it needed.  Hinton warned the board that the bank

should not loan any money to the Heart Hospital because Presbyterian would put the Heart Hospital out of business if it opened.

213.     In an effort to resolve Presbyterian's concerns, some of the physician investors met with Hinton.  At the meeting, Hinton told the investors that Presbyterian would only back off of its opposition if the physician investors agreed to ensure that any patients coming from a satellite office would be referred to Presbyterian instead of the Heart Hospital.  The investors would not agree to this proposal, in part because it was probably unlawful.  Indeed, Hinton's proposal may have constituted a *per se* unlawful market allocation agreement under Section 1 of the Sherman Act.

214.     Presbyterian also hired a large number of cardiologists and cardiac surgeons from Southwest Cardiology Associates and the New Mexico Heart Institute.  Presbyterian paid many of these physicians significantly more than the fair market value of their medical practices. Presbyterian's actions in this regard were probably unlawful under the Medicare anti-kickback laws.

215.     Finally, PHP announced that it wanted all of its enrollees needing cardiac services to be treated by physicians employed by the Presbyterian Heart Group Physicians.

216.     In response to these efforts to prevent the Heart Hospital from opening, the investors complained to the Antitrust Division of the United States Department of Justice. Hinton apparently learned about the complaint, and, shortly thereafter, Presbyterian stopped its efforts to block the loan needed to purchase the land the Heart Hospital needed.

217.     PHP, however, refused to pay the facility charges for any of its enrollees who were treated at the Heart Hospital.  PHP's decision made it impossible for physicians to treat PHP enrollees at the Heart Hospital.

218.     As a result of PHP's decision, the Heart Hospital's revenues were largely limited to Medicare payments and reimbursement payments from Blue Cross.

219.     Presbyterian's actions effectively excluded the Heart Hospital from a majority of the market for cardiac services.

220.     In 2011 the Heart Hospital was sold to Lovelace.

**V.      Presbyterian's Anticompetitive Actions Against NMOHC**

221.     For many years, NMOHC and Presbyterian partnered together with respect to the provision of Comprehensive Oncology Services.

222.     Throughout the 1980s and 1990s, Presbyterian did not employ any medical oncologists.  Instead, NMOHC's physicians all had staff privileges at Presbyterian and provided Comprehensive Oncology Services to PHP enrollees, excluding Radiation Oncology Services that were provided by Radiation Oncology Associates ("ROA").

**A.      NMOHC's Decision to Build the Cancer Center**

223.     By the end of the 1990s, developments in treatment strategies and technology showed the significant quality improvements physicians could achieve with a multidisciplinary approach to the provision of Comprehensive Oncology Services.

224.     Creating a multidisciplinary approach to the treatment of cancer required the development of a cancer program that would bring together the various physicians, nurses,

technicians, and other support staff needed to provide high quality Comprehensive Oncology Services.

225.    In the late 1990s, however, Presbyterian was experiencing significant financial stress given its rapid growth.  During 1998 and 1999, PHP lost tens of millions of dollars.

226.    Presbyterian's refusal to develop a modern cancer program was most starkly evident in the area of Radiation Oncology.

227.    Radiation Oncology requires the use of expensive equipment ("Radiation Oncology Equipment").

228.    In the 1990s, Presbyterian's Radiation Oncology services were provided by ROA. ROA did not own the Radiation Oncology Equipment it used to treat patients.  The Radiation Oncology Equipment was owned by Presbyterian, and was located at Presbyterian's Kaseman Hospital.

229.    By the late 1990s, the equipment at Presbyterian's Kaseman Hospital become antiquated and did not function properly.  NMOHC's physicians were concerned about the level of care ROA was providing with this antiquated equipment.

230.    NMOHC's medical oncologists complained about the problems with Presbyterian's Radiation Oncology Equipment and asked Presbyterian to modernize this equipment.  Presbyterian, however, refused to update its Radiation Oncology Equipment.

231.    NMOHC's physicians decided that the market needed a proper cancer center that would (a) allow NMOHC's physicians and ancillary service providers to work together as a comprehensive team, and (b) have modern Radiation Oncology Equipment.  NMOHC's

physicians believed that a cancer center would create many efficiencies that would lead to a higher level of care at reduced cost.

232.   In 1999, NMOHC's physicians told Presbyterian's management that they wanted to build a cancer center.  NMOHC suggested to Presbyterian that they develop the cancer center as a joint venture.

233.   Presbyterian rejected NMOHC's overtures and indicated that it only wanted NMOHC to rent space from Presbyterian.  On information and belief, Presbyterian's long term goal was to push NMOHC's physicians into employment relationships with PMG.

234.   Presbyterian's rental suggestion would not have allowed NMOHC to update the antiquated radiation oncology equipment or create the efficiencies a cancer center would create.

235.   NMOHC chose to build the Cancer Center without Presbyterian's involvement.

236.   A critical step towards building the Cancer Center was purchasing the land for the project.  When NMOHC told Presbyterian's CEO, Jim Hinton, that NMOHC had purchased land for the Cancer Center and was moving ahead with the project, Mr. Hinton stated that Presbyterian would put NMOHC out of business.

237.   In 1999, however, Presbyterian relied on NMOHC for Comprehensive Oncology Services and, on information and belief, did not have the financial ability to build its own cancer program.  As a result, in the late 1990s and the beginning of the following decade, Presbyterian did not have a viable medical oncology program that it could offer patients as a substitute for NMOHC.

238.   Presbyterian could not exclude NMOHC from PHP, nor could Presbyterian prohibit referrals from its employed physicians to NMOHC.

239.    By 2003, Presbyterian had largely solved its financial problems.  In 2003

Presbyterian also started a $55 million expansion of its flagship hospital in downtown

Albuquerque.

240.    In 2005 Presbyterian offered to employ NMOHC's physicians and take over the

Cancer Center.  NMOHC rejected Presbyterian's offer.

**B.    NMOHC Integration Efforts Reduce Health Care Costs
By, In Part, Reducing Unnecessary In-Patient Admissions**

241.    NMOHC has been moving forward with disease management programs in order

to move patients, when appropriate, to the most effective care settings on the basis of cost and

quality.  In contrast, Presbyterian remains wedded to the more costly unmanaged model of a non-

integrated cancer program that results, for example, in the unnecessary inpatient treatment of

cancer patients.

242.    NMOHC's successful efforts in disease management include its early adoption of

electronic health records and its telephone triage system, which is an innovative effort to prevent

unnecessary inpatient hospital admissions.

243.    Cancer patients have chronic health problems and will go to the emergency room

for a multitude of reasons, and, in the overwhelming number of cases, will be admitted to the

hospital.  A large majority of these patients, however, do not need to go to the emergency room

and could instead receive treatment on an outpatient basis.

244.    Under NMOHC's telephone triage system, NMOHC patients are instructed to call

an NMOHC oncology nurse before going to the emergency room.  Following criteria developed

by NMOHC's physicians, oncology nurses instruct patients whether they need to immediately go

to the hospital or if they can obtain the necessary care at NMOHC on an outpatient basis.

245.     NMOHC believes that its telephone triage system saves, on an annual basis, anywhere between $8 million and $31 million in avoidable hospitalization costs.

246.     The elimination of unnecessary hospitalizations is also safer for patients and increases the overall quality of care they receive.

C.     **NMOHC's Efforts to Facilitate Entry Into Albuquerque**

247.     Given Hinton's prior threat, NMOHC concluded that it needed to reduce its reliance on Presbyterian's hospitals and PHP.  NMOHC understood that it could not survive if PHP refused to enter into a provider contract given the market's structure.

248.     NMOHC tried to address this threat to its continued viability by working in 2005 to facilitate the entry into Albuquerque of both a community hospital and private health insurance companies.

249.     NMOHC's plan was to form a clinical integration program called Independent Doctors of New Mexico ("IDNM") that would include many of the remaining independent physicians in Albuquerque.  IDNM would then convert the Heart Hospital into a new community hospital.

250.     The final step in NMOHC's plan was to use IDNM and the new community hospital to enter into a contract with Blue Cross.  The contract with Blue Cross would provide IDNM and the new hospital with sufficient revenue to keep the clinical integration program viable, at least until IDNM was able to grow its business and develop the community hospital.

251.     NMOHC's hope was that the new arrangement would allow Blue Cross to expand its operations in Albuquerque, while also making it more likely that other health insurers would enter the market.

252.     In 2008 Blue Cross refused to sign a contact with IDNM, and the entire arrangement collapsed for lack of funding.  On information and belief, Blue Cross did not believe that IDNM could financially succeed given Presbyterian's market dominance.  The lack of an alternative to Blue Cross made entry by IDNM and the new community hospital impossible.  On information and belief, Blue Cross is planning to exit the private health insurance market in Albuquerque.

### D.     Presbyterian's Anticompetitive Efforts to Squeeze NMOHC Out of Business

### (i)     Prohibiting Referrals to NMOHC from PMG Physicians

253.     After NMOHC's efforts to create IDNM failed, referrals from Presbyterian employed physicians to NMOHC physicians have declined substantially.  This reduction in referrals has not resulted from head-to-head competition between NMOHC's physicians and Presbyterian's internal cancer program.

254.     Presbyterian physicians that make referrals to NMOHC are approached by hospital administrators and asked to explain their referrals to NMOHC.  It is well understood by Presbyterian employed physicians that Presbyterian does not want physicians referring cancer patients to NMOHC.

255.     In a bullet point contained in an e-mail circulated to Presbyterian's employed physicians, Presbyterian instructed its physicians to "review your referral patterns and give special consideration to referring to your medical group colleagues when services are available within" Presbyterian.  The e-mail then directed each physician to tell Presbyterian whether they would give "full support," "partial support," or "no support" to the bullet points.  If a physician

44

chose "partial support" or "no support," the physician would have to "[p]rovide a comment as to which requests you do not support and why."

256.    The e-mail's instruction sent a message to Presbyterian's employed physicians indicates that they would face repercussions if they referred patients to NMOHC.

257.    On information and belief, the Presbyterian employed physicians receive compensation that is in part based on the number of referrals they make to other Presbyterian employed physicians.

258.    On information and belief, PHP has also misrepresented to patients NMOHC's status as an approved provider on PHP's provider panel.  In 2012, a patient ("Patient A") seeking a referral to NMOHC was told by a PHP representative that PHP would not cover services provided by NMOHC.  Patient A told the PHP representative that he had a friend who was an NMOHC patient, and that PHP was covering his friend's expenses at NMOHC.  Patient A was told that PHP would pay for preexisting NMOHC patients, but would not cover new NMOHC patients such as Patient A.  Any such statement was false.

259.    Presbyterian also has its non-physician staff call patients who receive treatment at NMOHC and ask them to drop NMOHC and start seeing Presbyterian employed medical oncologists.  NMOHC does not share the names of its current patients with Presbyterian Hospital.  On information and belief, PHP improperly provides this information to Presbyterian Hospital.

260.    On information and belief, Presbyterian has recently started a program pursuant to which non-physician hospital employees intervene and prevent referrals made to non-Presbyterian employed physicians, even if a Presbyterian employed physician had referred the

patient to a non-Presbyterian physician.  On information and belief, individuals who are not physicians will unilaterally make or change referrals.  On information and belief, this change is done without the treating physician's approval or the patient's approval.

261.    Presbyterian non-physician employees also pressure patients to see Presbyterian employed oncologists, even though those patients are currently seeing an NMOHC oncologist. In one instance, an NMOHC physician referred a patient to Presbyterian for a mammogram. After the mammogram was taken, a Presbyterian Nurse Navigator insisted that the patient start seeing a Presbyterian employed oncologist.  The Nurse Navigator's actions upset the patient who felt pressured into ending her relationship with her NMOHC oncologist.

262.    In another case, an NMOHC patient was referred to Presbyterian for a mammogram.  After the mammogram, the Nurse Navigator scheduled an appointment between the patient and a Presbyterian employed oncologist.  The patient had not asked to see the Presbyterian employed oncologist, and the Nurse Navigator had not discussed the referral or the appointment with the patient prior to making the appointment.  The patient refused to see the Presbyterian employed oncologist and demanded that the Nurse Navigator cancel the appointment.

263.    On information and belief, the Nurse Navigator was following a Presbyterian policy to divert NMOHC patients to Presbyterian employed oncologists.

264.    On information and belief, Presbyterian's policy and the actions of the Nurse Navigator have prevented patients from seeking NMOHC physicians.

265.    Presbyterian has also reconfigured its computer system so that its physicians cannot even input a referral to NMOHC.

46

266.     For years, NMOHC appeared in a referral book that was circulated to Presbyterian physicians.  The referral book identified all of the PHP approved providers and was used by Presbyterian physicians and their staffs to make referrals.  While NMOHC has remained a PHP provider, Presbyterian had NMOHC's name removed from the referral book in 2008.

> **(ii)     Presbyterian Is Using PHP to Threaten NMOHC's
> Continued Existence and To Limit NMOHC's Business**

267.     Presbyterian has warned NMOHC that it does not foresee NMOHC retaining its status as a PHP provider.  While Presbyterian has not yet refused to contract with NMOHC, its threat to terminate NMOHC's contract is putting significant stress on NMOHC and is threatening its cohesiveness as a firm.

268.     In 2003, PHP and NMOHC entered into a five year provider contract.  At this time, Presbyterian was rebuilding its main hospital in Albuquerque and had not made any advances on developing its own cancer program.

269.     As this five-year contract approached its termination date, PHP demanded that NMOHC accept a provider contract with reimbursement rates that would financially strangle NMOHC.  No legitimate business justification existed for the substantial change in Presbyterian's business relationship with NMOHC and the reimbursement rates it was demanding.  The only difference was that Presbyterian was in the process of building its own cancer program and was closer to being able to eliminate NMOHC from the market.

270.     On information and belief, the reimbursement rates PHP offered to NMOHC are significantly lower than the reimbursement rates it pays to Presbyterian.  The reimbursement rates are also significantly lower than the reimbursement rates NMOHC would receive in a competitive health insurance market.

271.    Presbyterian has also used PHP to limit NMOHC's ability to expand the services it offers to patients.

272.    On numerous occasions, NMOHC has tried to offer new ancillary services to its patients.  PHP, however, has routinely refused to cover these new services.

273.    In 2007, NMOHC wanted to offer cancer rehabilitation services to its patients through a company called Navitas.  Cancer patients often need rehabilitation services, and these rehabilitation services are sometimes different from those offered to patients who have suffered injuries or who suffer from different medical conditions.  PHP, however, refused to cover these services.  Without coverage from PHP, NMOHC could not offer these specially tailored services to its patients.

274.    On two separate occasions (in 2007 and 2008), NMOHC tried to facilitate the entry of an outpatient surgery center so it could offer cancer related outpatient surgery services to its patients.  No outpatient surgery center will enter the market without having a contract with PHP, and PHP will not enter into contracts with a free standing surgery center.

### (iii)    Presbyterian's Exclusive Contract with United

275.    Excluding PHP and the Lovelace health insurer, only Blue Cross, United Healthcare and Cigna have a meaningful market presence.

276.    United Healthcare and Presbyterian have had an exclusive dealing arrangement for years.  United Healthcare will not take market actions without Presbyterian's approval.

277.    Presbyterian's exclusive contract with United Healthcare has caused further and significant concentration of the market for Private Health Insurance.

278.     Blue Cross cannot act as a substitute for PHP, United Healthcare, and Cigna. Blue Cross' growth is limited because, as a practical matter, its enrollees cannot receive care at Presbyterian's hospitals.  Patients who want or need access to Presbyterian's hospitals cannot purchase Blue Cross' health insurance products.  Presbyterian's monopoly power over Hospital Inpatient Services, therefore, prevents Blue Cross from challenging PHP's market position.

279.     Patients who have selected Blue Cross are limited to using Lovelace and UNM Hospital.  Patients and employers (acting on behalf of their employees) who want access to Presbyterian must contract with either PHP, United Healthcare, or Cigna.

280.     Blue Cross does not have enough enrollees to independently facilitate entry. Further, on information and belief, Blue Cross is planning to exit the market for Private Health Insurance in Albuquerque.

281.     Blue Cross, therefore, cannot prevent anticompetitive actions by Presbyterian.

282.     Presbyterian's exclusive contract with United Healthcare also enhances Presbyterian's ability to monopolize the market for Comprehensive Oncology Services in the Albuquerque Market.

**(iv)     Presbyterian's Tying Arrangement**

283.     In addition to the Private Health Insurance that Presbyterian offers through PHP, PHP also offers Medicare HMO and PPO plans to seniors.  Traditional Medicare pays a set price for medical services (hospital charges and physician charges) on a fee for service basis and pays for drugs purchased by seniors.  A large percentage of patients who are entitled to Medicare benefits choose to enroll in a type of managed care plan (commonly referred to as "Medicare Advantage") that is largely funded by payments from Medicare.  These Medicare Advantage

programs offer patients various benefits that they cannot receive under traditional Medicare. These benefits include, but are not limited to, expanded access to medical providers through reduced cost sharing.

284.    Through PHP, Presbyterian controls the dominant Medicare Advantage program in New Mexico, which is referred to below as PHP's Medicare HMO and PPO plans.  On information and belief, PHP's Medicare HMO and PPO plans cover over 50% of the seniors living in Albuquerque who have purchased some type of Medicare Advantage.

285.    NMOHC provides chemotherapy services to its patients at the Cancer Center. Chemotherapy is an umbrella term that includes many different drugs that are administered (a) orally, (b) non-intravenously, and (c) intravenously.  These drugs include both the actual chemotherapy drugs and various other support drugs.

286.    Chemotherapy drugs and support drugs are sensitive and must be handled properly in order to prevent contamination and degradation.

287.    NMOHC must have a stable supply of chemotherapy drugs and support drugs. Supply disruptions would threaten NMOHC's ability to treat its patients, as well as threaten the health of its patients.  Further, if these drugs are not properly handled they can lose their efficacy and can become more toxic for the patient.

288.    NMOHC has always purchased its own supplies of chemotherapy drugs and support drugs.  By purchasing these drugs, NMOHC can ensure a stable supply of chemotherapy drugs and support drugs for its patients.  NMOHC can also ensure that it stocks genuine chemotherapy drugs and support drugs, and that these drugs are properly handled.

289.    Presbyterian announced in 2012 a new policy that listed a number of oral chemotherapy drugs, non-intravenous chemotherapy drugs, and support drugs that NMOHC's patients will have to purchase from Presbyterian's specialty pharmacy, if these patients are enrolled in PHP's HMO and PPO plans.  Under this new policy, Presbyterian offered to ship the drugs to NMOHC, on an as needed basis, for each NMOHC patient who purchases chemotherapy drugs and support drugs from Presbyterian's specialty pharmacy.  For patient safety reasons, NMOHC has refused to administer medications with uncertain provenence into its patients, and patients have been greatly inconvenienced and their treatment has suffered because of this action by Presbyterian.

290.    Presbyterian's actions are part of its ongoing strategy to raise NMOHC's costs and make NMOHC even more dependent on Presbyterian.  If NMOHC accepted chemotherapy drugs and support drugs from Presbyterian's specialty pharmacy, NMOHC would incur increased administrative and storage costs that would impair its ability to compete against Presbyterian.

291.    Presbyterian's policy also makes NMOHC entirely dependent on Presbyterian's ability and willingness to provide the necessary chemotherapy drugs and support drugs to NMOHC.  Even a short disruption in NMOHC's ability to obtain chemotherapy drugs and support drugs would endanger its patients' health and treatment.  By controlling and limiting access to chemotherapy drugs and support drugs by NMOHC's patients, Presbyterian sends a strong signal to referring physicians that it could put NMOHC out of business.  Such a message would deter physicians from referring patients to NMOHC.

292.     Presbyterian has informed NMOHC that Presbyterian intends to expand this policy to all chemotherapy drugs and support drugs and to patients covered by PHP's Private Health Insurance plans.

293.     Presbyterian's current policy with respect to PHP's HMO and PPO plans will make it difficult, if not impossible, for NMOHC to continue to provide chemotherapy services to these enrollees.

294.     Presbyterian's expanding its policy to patients enrolled in PHP's private insurance plans would cripple NMOHC's ability to provide chemotherapy services to its patients.  Such a move by Presbyterian would threaten NMOHC's continued viability as a firm.

295.     Presbyterian's new policy is part of its effort to monopolize the market for Comprehensive Oncology Services and to prevent the entry of any possible competition into the market.

## VI.   NMOHC's Destruction Would Have Significant Anticompetitive Effects

296.     NMOHC's elimination from the market would significantly increase the costs for obtaining Comprehensive Oncology Services.  NMOHC has been at the forefront of nationwide efforts in disease management in order to move patients to the most effective care settings when appropriate on the basis of cost and quality.

297.     NMOHC's elimination would also force cancer patients to receive inpatient services that they don't need and don't want.

298.     NMOHC's elimination would also deprive the large majority of cancer patients of any choice of medical provider.  PHP's enrollees would have no other option but to use Presbyterian's cancer program.

299.    Presbyterian's eliminating NMOHC from the market would solidify Presbyterian's overall market position by making any new entry into the market by outpatient facilities and medical specialists highly doubtful.  NMOHC is one of only a few remaining independent medical practices in Albuquerque that could credibly serve as a platform for such new entry.

300.    NMOHC's elimination from the market would also cause the closure of its clinics throughout the state of New Mexico.  NMOHC has opened clinics in areas where patients do not have any meaningful access to the Comprehensive Oncology Services provided in Albuquerque. If Presbyterian were to drive NMOHC from the market, it would have significant anticompetitive consequences throughout the state.

## RICO CLAIMS

301.    NMOHC repeats and realleges the allegations contained in Paragraph 1 through Paragraph 300, above.

**I.    Overview**

302.    Pursuant to a federal drug discount program called the 340B Program, Presbyterian is able to purchase outpatient pharmaceuticals at a significant discount.  The actual drugs Presbyterian purchases through the 340B Program are referred to below as 340B Drugs.

303.    The 340B Program limits the individuals to whom Presbyterian can sell 340B Drugs.

304.    First, Presbyterian can only sell 340B Drugs on an outpatient basis.  Second, Presbyterian can only sell 340B Drugs to its own patients.

305.     Presbyterian cannot lawfully sell 340B Drugs to patients whose care is managed by independent physicians, such as the physicians at NMOHC.  Nor can Presbyterian order 340B Drugs from pharmaceutical manufacturers in order to sells those drugs to individuals who are not Presbyterian patients.

306.     In 2012, Presbyterian directed PHP to force thousands of elderly patients in PHP's Medicare HMO and PPO plans to purchase the chemotherapy drugs and support drugs they need from Presbyterian's specialty pharmacy.  Presbyterian's goal was, and is, to increase the sales made by its specialty pharmacy.

307.     PHP and Presbyterian's exclusive agreement concerning Presbyterian's specialty pharmacy is referred to below as the "Mandate."

308.     Many patients covered by the Mandate are patients of NMOHC's physicians.

309.     Presbyterian is able to earn increased profits by illegally selling 340B Drugs to NMOHC's patients.

310.     Presbyterian fraudulently obtains these 340B Drugs from pharmaceutical manufacturers.

311.     Through PHP, Presbyterian has made misleading statements to seniors, other patients and health care providers concerning Presbyterian's compliance with the 340B Program.

312.     Presbyterian's scheme has interfered with NMOHC's ability to care for its elderly cancer patients, and has caused NMOHC to lose revenues by reducing NMOHC's sale of chemotherapy drugs and support drugs.

A.     **Chemotherapy And The Treatment of Cancer**

313.    Prescribing, dispensing, and administering chemotherapy drugs are critical components of the Oncology Services provided by NMOHC.

314.    Chemotherapy drugs are either taken orally by a patient or administered by an injection.  Chemotherapy drugs consist of a broad range of drugs that are used to treat a patient's cancer or to control the growth or further spread of the cancer.

315.    Patients taking chemotherapy drugs will frequently need one or more support drugs to help treat the cancer or to prevent the negative side-effects caused by the chemotherapy drugs.  Support drugs are administered by injection or infusion.  Infusion involves using an intravenous line to administer the support drug directly into the patient's bloodstream.

316.    Support drugs and chemotherapy drugs are complex drugs that require special handling to ensure that they retain their potency and efficacy.  In certain cases, the pharmacy dispensing chemotherapy drugs and support drugs will have to mix the drugs to achieve the dosage prescribed by the patient's physician.

317.    Under a chemotherapy program, patients need to receive the proper dosage of the chemotherapy drug and support drugs they are prescribed.

318.    Carefully timing when a patient takes chemotherapy drugs and support drugs are also of critical importance in many instances.  Patients undergoing chemotherapy must take their chemotherapy drugs and support drugs according to a specific treatment cycle.  This cycle is part of a complex treatment plan that requires the use of many different drugs.  During the treatment cycle, the patient's physician must monitor how the patient reacts to the prescribed medication.

319.    Proper patient care requires that patients rigorously follow the treatment schedule established by their physician.

320.    NMOHC physicians schedule when their patients take chemotherapy drugs and when they take support drugs.  This schedule is monitored and modified when necessary.

321.    A patient's failing to receive a support drug at the proper time, for example, can lead to serious infections and to death.  A patient's failing to take a chemotherapy drug on time can reduce the overall effectiveness of the patient's chemotherapy treatment program.

322.    The proper administration of chemotherapy drugs and support drugs is part of NMOHC's integrated approach to the treatment of cancer.  An NMOHC physician will prescribe the appropriate medications, schedule when the patient will take the prescribed chemotherapy drugs and support drugs, arrange the infusion of the prescribed support drugs when necessary, and performs the necessary follow-up concerning the patient's progress.

323.    To accomplish these goals, NMOHC (a) operates a pharmacy that stocks the chemotherapy drugs and support drugs NMOHC's patients will need, and (b) maintains an infusion center.

324.    By having its own pharmacy, NMOHC can ensure that (a) it has adequate supplies of chemotherapy drugs and support drugs, (b) the chemotherapy drugs and support drugs are genuine and have come from a reliable source, (c) the chemotherapy drugs and support drugs are properly stored and maintained, and (d) the chemotherapy drugs and support drugs are properly dispensed.

325.    NMOHC physicians can also ensure that patients are receiving their chemotherapy drugs and support drugs at the correct time.  An NMOHC physician can schedule

when the chemotherapy drugs and support drugs are dispensed, schedule an injection or the oral administration of these drugs, and schedule the infusion of a support drug.

326.    When NMOHC patients have to purchase chemotherapy drugs and support drugs from Presbyterian's specialty pharmacy, NMOHC cannot confirm that the patient actually took the prescribed medication.  Nor can NMOHC ensure that the patient is taking the chemotherapy drugs and support drugs at the right times.

327.    Elderly cancer patients are not always capable of rigorously following the prescribed treatment plan on their own.

328.    NMOHC does not mandate that its patients use its pharmacy or that they use its infusion center.  Prior to the Mandate, NMOHC patients had the option to purchase chemotherapy drugs and support drugs from Presbyterian's pharmacy and to use Presbyterian's infusion center.

329.    NMOHC's patients, however, overwhelmingly chose to purchase their chemotherapy drugs and support drugs from NMOHC's pharmacy, and chose to have support drugs administered at NMOHC's infusion center.

**B.**    **Presbyterian and PHP's Scheme To**
    **Fraudulently Purchase And Sell 340B Drugs**

330.    Presbyterian operates a specialty pharmacy.

331.    Presbyterian's specialty pharmacy sells chemotherapy drugs and support drugs.

**(i)**    **The 340B Program**

332.    The 340B Program is codified at 42 U.S.C. Section 256b.

### a.   Entities That Participate In The 340B Program

333.    Under the 340B Program, pharmaceutical manufacturers that participate in the program must provide various price discounts to qualified health care entities.  Health care providers allowed to participate in the 340B Program are referred to as "Covered Entities."

334.    Some health care providers qualify for the 340B Program because they receive one of ten specific federal grants.

335.    Several health care entities affiliated with Presbyterian are Covered Entities because they receive one of these grants.

336.    Not-for-profit hospitals that treat a certain percentage of indigent patients can also qualify as Covered Entities.  These hospitals are called disproportionate share hospitals under the 340B Program.

337.    Presbyterian is a Covered Entity as a result of its status as a disproportionate share hospital.

338.    By 2011, there were over 16,000 Covered Entities in the United States.

339.    Manufacturers of pharmaceutical products are not legally compelled to participate in the 340B Program.

340.    A manufacturer of pharmaceutical products, however, must participate in the 340B Program, if the manufacturer wants to sell its drugs through the Medicaid and Medicare programs.

341.    Given the size of the Medicare and Medicaid programs, an overwhelming number of pharmaceutical manufacturers participate in the 340B Program.

342.     A pharmaceutical manufacturer must sell 340B Drugs that are ordered by a Covered Entity.  The Covered Entity only has to notify the pharmaceutical manufacturer that it is placing an order for 340B Drugs to get the drugs at the discounted rate.  The pharmaceutical manufacturer must rely on, and accept, the Covered Entity's representation that the 340B Drugs it is ordering are for sale through the 340B Program.

343.     NMOHC cannot qualify as a Covered Entity.  It does not receive and cannot receive any of the federal grants that trigger 340B participation, nor is it a hospital.

344.     As for-profit health insurers, the entities that constitute PHP cannot become Covered Entities.

> **b.     Covered Entities Can Earn Substantial
>             Profits Under the 340B Program**

345.     Manufacturers of pharmaceutical products that participate in the 340B Program must sell their drugs to Covered Entities at a discount.

346.     The minimum price discounts pharmaceutical manufacturers must provide to Covered Entities are set by regulation.  These discounts are estimated to range between 20% and 50%.

347.     Covered Entities are not obligated to pass on these savings to the individuals who purchase the 340B Drugs from the Covered Entity.  In some cases, Covered Entities cannot legally pass on to its patients the price discounts the Covered Entity receives under the 340B Program.

348.     Covered Entities can sell the drugs they obtain through the 340B Program at prices higher than the Covered Entities' cost for those 340B Drugs.  This result was intended by Congress.

349.    According a report prepared by the Government Accountability Office in 2011 ("GAO Report"), the 340B Program was designed to "enable covered entities to stretch scarce federal resources to reach more eligible patients, and provide more comprehensive services."

350.    The 340B Program was not designed to lower the drug costs of patients who receive 340B Drugs from a Covered Entity.

351.    The 340B Program allows Covered Entities to make additional profits from the sale of 340B Drugs.  Covered Entities were supposed to use these increased profits to offset the losses they incur when treating certain types of patients.  These profits could thereby help Covered Entities increase the services they provide.

### c.    Covered Entities Can Only Sell 340B Drugs to Their "Patients"

352.    Covered Entities can only sell drugs they obtain through the 340B Program to their "patients" in an outpatient setting.

353.    The Health Resources and Services Administration ("HRSA") is the federal agency that supervises the 340B Program.  In 1996, HRSA issued a "Final Notice" in the Federal Register informing "interested parties of final guidelines regarding a definition of covered entity 'patient.'"

354.    Under the Final Notice, a person is a Covered Entity's "patient" under the 340B Program if (a) "the covered entity has established a relationship with the individual, such that the covered entity maintains records of the individual's health care;" (b) "the individual receives health care services from a health care professional who is either employed by the covered entity or provides health care under contractual or other arrangements . . . such that responsibility for the care provided remains with the covered entity," and (c) the " individual receives a health care

service or range of services from the covered entity which is consistent with the service or range of services for which grant funding . . ."

355.    In 2001, HRSA clarified the definition of a "patient" by stating that the "primacy of the patient's medical relationship is apparent in the Federal Register definition [of a patient], which focuses on the affiliation of the provider with the [Covered Entity] and the maintenance of records by the [Covered Entity]."

356.    Covered Entities cannot sell their 340B Drugs to an individual when the Covered Entity's physicians are not responsible for managing the individual's care.

357.    Sales of 340B Drugs by a Covered Entity to individuals who are not its patients is called diversion.  Diversion is unlawful under the 340B Program.

358.    The rule against diversion is critical to the proper functioning of the 340B Program.

359.    Diversion has many adverse consequences.  For example, it can force pharmaceutical manufacturers to increase the prices they charge to entities not covered by the 340B Program.  These price increases occur as the pharmaceutical manufacturers attempt to cover losses they incur from the sales they make through the 340B Program.

360.    Price increases by pharmaceutical manufacturers will ultimately increase the price of 340B Drugs given the formula used to calculate 340B discounts.

361.    Over the long term, diversion could increase drug prices throughout the health care system.

362.    Increasing drug prices hurts patients, particularly elderly patients, and restricts access to care.

363.    Diversion can also result in excessive purchases of drugs through the 340B Program that can cause drug shortages for entities not entitled to participate in the 340B Program.

364.    Diversion can also give Covered Entities, such as hospitals, an unfair competitive advantage.

365.    The GAO Report highlighted various deficiencies in HRSA's oversight of the 340B Program.

366.    The GAO concluded in its report that "HRSA's oversight of the 340B program is inadequate because it primarily relies on participants' self-policing to ensure compliance. Changes in the settings where the program is used may heighten concerns about the inadequacy of HRSA's oversight, and HRSA's plans for improving oversight are uncertain."

367.    The GAO also found that "[b]eyond relying on participants' self-policing, HRSA engages in few activities to oversee the 340B program and ensure its integrity, which agency officials said was primarily due to funding constraints."  The GAO added that "[b]ecause of HRSA's reliance on self-policing to oversee the 340B program as well as its nonspecific guidance, the agency cannot provide reasonable assurance that covered entities and drug manufacturers are in compliance with program requirements and is not able to adequately assess program risk."

368.    The GAO also found that "[i]ncreased use of the 340B program by . . . hospitals may result in greater risk of drug diversion, further heightening concerns about HRSA's reliance on participants' self-policing to oversee the program."

(ii)      **Presbyterian's Diversion of 340B Drugs**

369.     Presbyterian has for years violated the 340B Program.  Presbyterian has systematically sold 340B Drugs to persons who are not its patients, and has refused to create controls that would prevent such illegal sales.

370.     Employees in Presbyterian's pharmacy knew that Presbyterian was not complying with the 340B Program's limitations.

371.     These concerns were raised by pharmacy employees with their superiors at Presbyterian.

372.     Efforts by pharmacy employees at Presbyterian to ensure compliance with the 340B Program were stopped by Presbyterian leadership, and employees were told to mind their own business.

373.     Prior to PHP's imposing the Mandate, Presbyterian's ability to increase its sales of 340B Drugs was limited.

374.     Cancer patients treated by independent practices, such as NMOHC, could purchase their chemotherapy drugs and support drugs directly from NMOHC and then have the drugs immediately administered at NMOHC.

375.     NMOHC's patients overwhelmingly chose to use NMOHC's pharmacy and infusion center for their chemotherapy treatments.

376.     Presbyterian wanted to change this dynamic when it opened its specialty pharmacy.

377.     Presbyterian wanted its specialty pharmacy to grow significantly.  Presbyterian also wanted to grow its cancer program, which had struggled against firms like NMOHC.

Without a successful cancer program, Presbyterian's specialty pharmacy could not increase its sales of chemotherapy drugs and support drugs.

378.    In early 2012, PHP altered the terms of its Medicare HMO and PPO plans by requiring all of its enrollees to obtain chemotherapy drugs and support drugs from Presbyterian's specialty pharmacy.  Presbyterian has stated it wants to expand the Mandate to all PHP enrollees who need chemotherapy drugs and support drugs.

379.    Presbyterian directed and agreed with PHP to institute the Mandate so Presbyterian could increase its sales of chemotherapy drugs and support drugs.

380.    The program was also part of a larger effort by Presbyterian to make firms like NMOHC less competitive by imposing burdens on their patients.

381.    Presbyterian now dispenses chemotherapy drugs and support drugs to NMOHC's patients pursuant to the Mandate.  The chemotherapy drugs and support drugs Presbyterian sells to NMOHC's patients were acquired by Presbyterian through the 340B Program.

382.    NMOHC patients have to purchase these drugs from Presbyterian's specialty pharmacy even though the drugs were prescribed by an NMOH physician, and an NMOHC physician is responsible for the patient's care.

383.    Presbyterian is able to earn significant profits on these drug sales, because Presbyterian is able to purchase the 340B Drugs at a statutorily mandated discount.

384.    NMOHC's inability to dispense chemotherapy and support drugs to its patients also prevents, as a practical matter, NMOHC's ability to administer these drugs in its infusion center.  NMOHC's patient safety policies prevent it from infusing drugs for which it cannot

verify the pedigree or proper storage.  NMOHC's safety policies are based on safety policies adopted by the American Society of Clinical Oncology.

385.    It is administratively impossible for NMOHC to verify the pedigree or proper storage of chemotherapy drugs and support drugs that Presbyterian's specialty pharmacy dispenses to NMOHC's patients.

386.    Presbyterian's dispensing 340B Drugs to NMOHC's patients is unlawful under the 340B Program.  The NMOHC patients forced to fill their prescriptions at Presbyterian's specialty pharmacy are not Presbyterian patients under the 340B Program.

387.    Presbyterian's scheme is designed to fraudulently obtain and sell chemotherapy drugs and support drugs under the 340B Program.  It is also designed to strip patients away from NMOHC and give Presbyterian an unfair competitive advantage.

388.    Presbyterian has used its control over PHP to force NMOHC's patients to purchase their chemotherapy drugs and support drugs from Presbyterian's specialty pharmacy as part of its fraudulent scheme to violate the 340B Program.

389.    Presbyterian could not have executed its scheme without the assistance and complicity of PHP entities.  While Presbyterian has access to the 340B Program and can sell chemotherapy drugs and support drugs, it cannot unilaterally issue a mandate requiring NMOHC patients to purchase such drugs from Presbyterian's specialty pharmacy.

390.    Presbyterian, through PHP and Presbyterian Health Plans, Inc., has executed this fraudulent scheme through a pattern of racketeering activity.  The pattern of racketeering activity consists of various acts of mail fraud and wire fraud.

391.    On February 29, 2012, Presbyterian Health Plans, Inc. circulated a letter to the healthcare providers on PHP's HMO and PPO provider panels informing them that effective April 1, 2012, "providers are required to obtain [designated specialty medications] through our specialty pharmacy" (the "Mandate").

392.    Presbyterian Health Plans, Inc. misleadingly referred to the "specialty pharmacy" as "our specialty pharmacy."  The specialty pharmacy referred to in the February 29 Letter was, and is, owned and operated by Presbyterian.

393.    In the February 29 Letter, Presbyterian Health Plans, Inc. states that Presbyterian can obtain drugs at a discount pursuant to "drug purchasing programs developed by Congress." On information and belief, Presbyterian Health Plans, Inc. was referring to the 340B Program when it made this statement.

394.    Presbyterian Health Plans, Inc. then stated that the discounts on drug purchases that Presbyterian can obtain "result in reduced out of pocket expense, lower premiums and enhanced benefits for" PHP enrollees.

395.    The February 29 Letter was misleading, because it suggests that Presbyterian could lawfully obtain these discounts to benefit PHP's Medicare HMO and PPO enrollees.

396.    Presbyterian Health Plans, Inc.'s February 29 Letter furthered the execution of Presbyterian's fraudulent scheme to illegally increase its acquisition and sale of 340B Drugs by forcing NMOHC patients to use Presbyterian's specialty pharmacy.  The letter disclosed the Mandate and directed NMOHC and many other physicians to comply with the Mandate.

397. On March 1, 2012, Presbyterian Health Plans, Inc. mailed a letter to the elderly patients enrolled in its Medicare HMO and PPO plans. That letter told these enrollees that they would have to purchase various drugs from Presbyterian's specialty pharmacy.

398. Presbyterian Health Plans, Inc.'s March 1 Letter furthered the execution of Presbyterian's fraudulent scheme to illegally increase its acquisition and sale of 340B Drugs by forcing NMOHC patients to use Presbyterian's specialty pharmacy.

399. NMOHC and HOA both objected to the Mandate.

400. On March 27, 2012, HOA, through its attorneys, sent Presbyterian Senior Care a Notice of Grievance concerning the Mandate. HOA claimed that the Mandate would "work a material adverse effect upon HOA" and would "interfere with HOA's relationships with its members and its ability to provide unfettered medical care to its patients."

401. In a letter dated April 10, 2012, PHP, through Presbyterian Senior Care, responded to the Notice of Grievance. PHP made misleading statements concerning Presbyterian's compliance with the 340B Program in its April 10 Letter.

402. PHP claimed that "[n]ot all drugs obtained through Presbyterian's Specialty Pharmacy Network will be eligible for 340B pricing." PHP's statement implied that Presbyterian would not give every patient purchasing drugs from Presbyterian's specialty pharmacy "340B pricing."

403. PHP's statement was misleading. Presbyterian obtains the 340B pricing when it purchases drugs from pharmaceutical manufacturers through the 340B Program.

404.     PHP's statement was designed to lull HOA into believing Presbyterian was complying with the 340B program by not passing on discounts to all of the patients covered by the Mandate.

405.     PHP's statements misleadingly shifted the focus from whether Presbyterian was illegally diverting 340B Drugs, to whether Presbyterian was passing on to seniors certain price discounts.

406.     It is unlawful for Presbyterian to divert any 340B Drugs to individuals who are not its patients.  Presbyterian's refusing to offer price discounts when it illegally diverts 340B Drugs does not make Presbyterian's conduct lawful.  Presbyterian's refusal to offer price discounts on 340B Drugs increases the illegal profits Presbyterian earns by selling 340B Drugs to individuals who are not its patients.

407.     PHP's statement that "Presbyterian's Specialty Pharmacy Network has implemented a process to verify whether or not each and every prescription qualifies for 340B pricing" was also misleading.  PHP was again was shifting the focus to the resale price of 340B Drugs to individuals, instead of the illegal diversion of 340B Drugs by Presbyterian.

408.     The April 10 Letter was designed to further Presbyterian's fraudulent scheme by attempting to mislead HOA into believing Presbyterian was fully complying with the 340B Program.

409.     On June 25, 2012, Presbyterian Health Plans, Inc. sent another letter to HOA concerning the Mandate.

410.     In the June 25 Letter, Presbyterian Health Plans, Inc. told HOA that it would not discuss the "establishment and operation of the 340B program by the hospital itself . . ."

411.    Presbyterian Health Plans, Inc. stated, however, that it (PHP) was not "eligible for – and do not receive – 340B pricing . . ."  Presbyterian Health Plans, Inc. claimed that any cost savings to which it had previously referred arise because Presbyterian Health Plans, Inc. can "negotiate more favorable drug prices overall in part because the hospital is able to access 340B pricing when it purchases drugs for its patients."

412.    The representations concerning the 340B pricing issue contained in the June 25 Letter were misleading.  As with its April 10 Letter, Presbyterian Health Plans, Inc. implied that Presbyterian was not violating the 340B Program because Presbyterian Health Plans, Inc. was not receiving 340B pricing.  Presbyterian violates the 340B Program when it provides 340B Drugs to HOA and NMOHC patients pursuant to the Mandate PHP implemented.  Presbyterian's selling 340B Drugs to HOA and NMOHC's patients at full price did not, and does not, make such sales lawful under the 340B Program.

413.    In December 2012, Presbyterian Health Plans, Inc.'s President (Dennis Batey) addressed the Mandate and the 340B issue by making statements for an article that was published by the Albuquerque Journal.

414.    The article contains various statements by Dr. Batey concerning the 340B Program and Presbyterian's use of the 340B Program.  The article states that "Presbyterian Medicare Advantage Plan members will be able to get less expensive specialty drugs for treatment of diseases like cancer . . . through the government's 340B program."  On information and belief, this statement was based on representations made by Dr. Batey to the Albuquerque Journal that PHP wanted published.

415.     PHP's Medicare Advantage Plan members are not all entitled to receive 340B
Drugs.  Dr. Batey's representation that all seniors on the Medicare Advantage Plan are entitled to
340B Drugs was false.

416.     The Article also states that "[a]ll Medicare Advantage members will receive the
lower price automatically provided they have seen a physician employed by Presbyterian
Healthcare in the previous 12 months."  On information and belief, this statement was based on
representations made by Dr. Batey that he wanted the Albuquerque Journal to publish.  The
Article then represents that Dr. Batey stated that "contact with a physician employed by
Presbyterian is a federal requirement."

417.     Based on Dr. Batey's statements, the Article misleads patients into believing that
they can obtain 340B Drugs and discounted drug prices for any drug they purchase from
Presbyterian's specialty pharmacy so long as they see any Presbyterian employed physician for
any purpose.

418.     These statements were false.

419.     Dr. Batey intended the publication of these false statements in order to address the
criticisms concerning the Mandate that patients were receiving.

420.     The statements Dr. Batey wanted published were designed to lull patients into
believing that Presbyterian could lawfully sell them 340B Drugs, even if they were being treated
by independent physicians.

421.     The statements were also meant to convince patients that the added burdens
imposed on them by using Presbyterian's specialty pharmacy would lawfully save them money.

422.     PHP and Presbyterian Health Plans, Inc. knew and understood that the Albuquerque Journal would publish the Article on the Internet.

423.     The statements made by Dr. Batey, on behalf of PHP and Presbyterian Health Plans, Inc., were made to further Presbyterian's fraudulent scheme.  By lulling patients into believing that Presbyterian's actions were lawful, Presbyterian could continue its fraudulent scheme.

424.     PHP's drug purchase Mandate remains in effect.

425.     Presbyterian and PHP have made various statements that they intend to expand the scope of the Mandate to all patients enrolled in a PHP plan.

426.     On information and belief, Presbyterian has illegally purchased and sold millions of dollars worth of chemotherapy drugs and support drugs since the Mandate was put in place.

### (iii)     Impact of Presbyterian's Scheme on NMOHC and Its Patients

427.     The Mandate has negatively impacted NMOHC and its patients.

428.     NMOHC operates its own pharmacy that sells chemotherapy drugs and support drugs to NMOHC's patients.  NMOHC also operates an infusion center.

429.     NMOHC earns revenues from the sale of chemotherapy drugs and support drugs.

430.     As a result of the Mandate and Presbyterian's fraudulent scheme, NMOHC has lost the ability to sell chemotherapy drugs and support drugs to many of its own patients.

431.     Patients covered by the Mandate must also have certain support drugs administered at Presbyterian's infusion center.

432.     NMOHC cannot administer the chemotherapy drugs purchased by its patients from Presbyterian's specialty pharmacy under NMOHC's patient safety guidelines.

433.    Presbyterian's offer to deliver to NMOHC the support drugs purchased by NMOHC patients from Presbyterian's specialty pharmacy is neither a practical nor a viable alternative.

434.    For example, NMOHC would need to acquire the chemotherapy drugs from Presbyterian's specialty pharmacy prior to administering the drugs to its patients.  Storing patient specific chemotherapy drugs would significantly increase NMOHC's costs.  NMOHC would also face significant challenges scheduling the administration of chemotherapy drugs and support drugs.  Finally, NMOHC would become vulnerable to delays and delivery problems by Presbyterian's specialty pharmacy that could negatively impact NMOHC's ability to care for its patients.

435.    The Mandate has also interfered with NMOHC's efforts to provide integrated and timely care to its patients.

436.    After an NMOHC patient has been prescribed a chemotherapy drug and support drug, a patient covered by the Mandate must schedule a trip to Presbyterian to purchase the chemotherapy drug and support drug and have the drugs administered.

437.    NMOHC patients subject to the Mandate have experienced delays using the Presbyterian specialty pharmacy.

438.    NMOHC's patients have experienced quality of care problems when forced to purchase their chemotherapy drugs and support drugs from Presbyterian's specialty pharmacy.

**(iv)    PHP and Presbyterian Health Plans, Inc. are RICO Enterprises**

439.    Presbyterian Health Plans, Inc. is a RICO enterprise.  PHP is an association in fact enterprise.  The PHP entities are related corporate entities that collectively provide health

insurance products.  These entities coordinate their activities and pursue a common purpose of providing health insurance in the markets for private health insurance and Medicare Advantage.

440.    Presbyterian exerts significant influence and control over Presbyterian Health Plans, Inc. and PHP.

441.    Presbyterian's CEO, Jim Hinton, regularly meets or discusses Presbyterian's and PHP's operations with PHP's officers and employees.

442.    Mr. Hinton has historically exercised significant influence and control over PHP's actions.

443.    Mr. Hinton has repeatedly commented on the need to integrate Presbyterian and PHP's operations with PHP employees and officers.

444.    Presbyterian and PHP/Presbyterian Health Plans, Inc. play distinct but critical roles in the fraudulent conspiracy.

445.    The entities that make up PHP cannot participate in the 340B Program.

446.    Presbyterian cannot sell health insurance directly.

447.    Presbyterian has used Presbyterian Health Plans, Inc., and PHP, to control the flow of patients to Presbyterian's specialty pharmacy.

448.    Presbyterian has used PHP and Presbyterian Health Plans, Inc. to notify providers and seniors of the Mandate's existence, enforce compliance with the Mandate, and mislead providers and PHP enrollees as to the existence of Presbyterian's fraudulent scheme.

**(v)**     **Predicate Acts and The Pattern of Racketeering Activity**

449.    Presbyterian has had PHP and Presbyterian Health Plans, Inc. mail, on information and belief, thousands of letters in furtherance of Presbyterian's fraudulent scheme to violate the 340B Program.

450.    PHP and Presbyterian Health Plans, Inc. mailed the February 29, 2012 letter to NMOHC using the United States Postal Service.  On information and belief, PHP and Presbyterian Health Plans, Inc. mailed the February 29 Letter to hundreds of other healthcare providers.

451.    The February 29, 2012 letter was mailed to NMOHC and other healthcare providers to further Presbyterian's fraudulent scheme.  The February 29, 2012 letter notified healthcare providers as to the existence of the Mandate.  The February 29, 2012 letter was also designed to mislead providers as to the existence of Presbyterian's fraudulent scheme.

452.    PHP and Presbyterian Health Plans, Inc.'s mailing the February 29, 2012 letter constituted mail fraud in violation of 18 U.S.C. Section 1341.

453.    On information and belief, PHP and Presbyterian Health Plans, Inc. mailed the March 1, 2012 letter to thousands of elderly individuals using the United States Postal Service.

454.    The March 1, 2012 letter was mailed to elderly patients to further Presbyterian's fraudulent scheme.  The March 1, 2012 letter notified elderly individuals enrolled in the PHP's HMO and PPO plans as to the Mandate's existence.

455.    PHP and Presbyterian Health Plans, Inc.'s mailing the March 1, 2012 letter constituted mail fraud in violation of 18 U.S.C. Section 1341.

456.     PHP mailed the April 10, 2012 letter to HOA using the United States Postal Service.

457.     The April 10, 2012 letter was mailed to HOA to further Presbyterian's fraudulent scheme.

458.     PHP's mailing the April 10, 2012 letter constituted mail fraud in violation of 18 U.S.C. Section 1341.

459.     PHP and Presbyterian Health Plans, Inc. mailed the June 25, 2012 letter to HOA using the United States Postal Service.

460.     The June 25, 2012 letter was mailed to HOA to further Presbyterian's fraudulent scheme.

461.     PHP and Presbyterian Health Plans, Inc. mailing the June 25, 2012 letter constituted mail fraud in violation of 18 U.S.C. Section 1341.

462.     Presbyterian Health Plans, Inc's President, Dr. Batey, made various statements to the Albuquerque Journal for an article that PHP knew the Albuquerque Journal would publish on the Internet.  PHP intended and expected the Albuquerque Journal to publish Dr. Batey's statements on the Internet.

463.     Dr. Batey made the statements to the Albuquerque Journal to further Presbyterian's fraudulent scheme.

464.     On information and belief, many individuals residing in Albuquerque would access the Article using servers that were located in different state.  PHP and Presbyterian Health Plans, Inc. efforts to have the Albuquerque Journal publish the Article on the Internet constitute wire fraud in violation of 18 U.S.C. Section 1343.

465.     On information and belief, PHP routinely sends enrollees in its Medicare HMO and PPO plans documents through the United States Postal Service that further Presbyterian's fraudulent scheme.  These documents include billing statements, benefit statements, coverage statements, and other information concerning the Medicare HMO and PPO.  On information and belief, PHP and Presbyterian Health Plans, Inc. send communications through the United States Postal Service and the wires to regulatory agencies such as HRSA and Centers for Medicare and Medicaid Services ("CMS") concerning the Mandate and the operation of the Medicare HMO and PPO plans.  On information and belief, PHP's communications to HRSA and CMS were designed to further Presbyterian's fraudulent scheme.  HRSA and CMS are located in Washington, D.C., and these communications would have crossed state lines.

466.     PHP and Presbyterian Health Plans, Inc.'s letters and the Article are related to each other in that they effectuate separate but related aspects of Presbyterian's fraudulent scheme.

467.     Presbyterian's fraudulent scheme is ongoing and continuing.

468.     Presbyterian is planning to expand its fraudulent scheme.

469.     NMOHC was injured by Presbyterian's predicate acts of mail fraud and wire fraud.

**COUNT I**
**(Unlawful Maintenance Of Monopoly Power)**
**(Violation of Section 2 of the Sherman Act)**

470.     NMOHC repeats and realleges all prior allegations.

471.     Presbyterian, through the acts and practices alleged above, has willfully maintained a monopoly in the market for Private Health Insurance Services in violation of Section 2 of the Sherman Act, 15 U.S.C. Section 2.

472.     Presbyterian possesses monopoly power over the markets for Hospital Inpatient Services and Private Health Insurance Services.  Presbyterian has the power to control prices in both of those markets, and has the ability to exclude rivals in those markets.

473.     Significant barriers to entry exist in the markets for Hospital Inpatient Services and Private Health Insurance Services.  Entering those markets under normal conditions requires significant capital, expertise, and time.

474.     Presbyterian's anticompetitive actions have significantly increased the barriers to entry in the markets for Hospital Inpatient Services and Private Health Insurance Services.

475.     Presbyterian's anticompetitive practices have injured NMOHC and consumers.

476.     Presbyterian, through the acts and practices complained of herein has committed, and is committing, a violation of Section 2 of the Sherman Act, 15 U.S.C. Section 2.

## COUNT II
### (Attempted Monopolization)
### (Violation of Section 2 of the Sherman Act)

477.     NMOHC repeats and realleges all prior allegations.

478.     Presbyterian, through the acts and practices complained of, is engaged in an attempt to monopolize the market for Comprehensive Oncology Services in the Albuquerque Market in violation of Section 2 of the Sherman Act, 15 U.S.C. Section 2.

479.     Presbyterian has specifically intended to monopolize the market for Comprehensive Oncology Services in the Albuquerque Market.  Presbyterian is engaged in, and

is committed to, a long-term pattern of anticompetitive actions that are designed to put NMOHC out of business.

480.    Presbyterian's actions have injured NMOHC and have created a dangerous probability that Presbyterian will succeed in driving NMOHC out of business.

481.    Presbyterian offers patients Comprehensive Oncology Services in the Albuquerque Market.  A dangerous probability exists that Presbyterian will acquire monopoly power over the market for Comprehensive Oncology Services in the Albuquerque Market.

482.    Presbyterian, through the acts and practices complained of herein, has committed, and is committing, a violation of Section 2 of the Sherman Act, 15 U.S.C. Section 2.

**COUNT III**
**(New Mexico Antitrust Act – Monopolization)**
**(New Mexico State Law)**

483.    NMOHC repeats and realleges all prior allegations.

484.    Presbyterian, through the acts and practices alleged above, has willfully maintained a monopoly in the market for Private Health Insurance Services in violation of Section 2 of the Sherman Act, 15 U.S.C. Section 2.

485.    Presbyterian possesses monopoly power over the markets for Hospital Inpatient Services and Private Health Insurance Services.  Presbyterian has the power to control prices in both of those markets and has the ability to exclude rivals in those markets.

486.    Significant barriers to entry exist in the markets for Hospital Inpatient Services and Private Health Insurance Services.  Entering those markets under normal conditions requires significant capital, expertise, and time.

487.     Presbyterian's anticompetitive actions have significantly increased the barriers to entry in the markets for Hospital Inpatient Services and Private Health Insurance Services.

488.     Presbyterian's anticompetitive practices have injured NMOHC and consumers.

489.     Presbyterian, through the acts and practices complained of herein, has committed, and is committing, a violation of Section 57-1-2 of the New Mexico Antitrust Act.

**COUNT IV**
**(New Mexico Antitrust Act – Attempted Monopolization)**
**(New Mexico State Law)**

490.     NMOHC repeats and realleges all prior allegations.

491.     Presbyterian, through the acts and practices complained of, is engaged in an attempt to monopolize the market for Comprehensive Oncology Services in the Albuquerque Market.

492.     Presbyterian has specifically intended to monopolize the market for Comprehensive Oncology Services in the Albuquerque Market.  Presbyterian is engaged in, and is committed to, a long term pattern of anticompetitive actions that are designed to put NMOHC out of business.

493.     Presbyterian's actions have injured NMOHC and have created a dangerous probability that Presbyterian will succeed in driving NMOHC out of business.

494.     Presbyterian offers patients Comprehensive Oncology Services in the Albuquerque Market.  A dangerous probability exists that Presbyterian will acquire monopoly power over the market for Comprehensive Oncology Services in the Albuquerque Market.

495.     Presbyterian, through the acts and practices complained of herein, has committed, and is committing, a violation of Section 57-1-2 of the New Mexico Antitrust Act**.**

**COUNT V**
**(Tortious Interference with Existing and Prospective Economic Advantage)**
**(Referral Practices)**
**(New Mexico State Law)**

496.    NMOHC repeats and realleges all prior allegations.

497.    NMOHC has had long-term referral relationships with many physicians who are now employed by Presbyterian and resulting physician-patient relationships with many patients referred to NMOHC by those physicians.

498.    Many physicians who are now employed by Presbyterian have referred patients to NMOHC physicians for many years.  These physicians would continue making referrals to NMOHC, and NMHOC would enter into physician-patient relationships with those patients, but for Presbyterian's efforts to prevent such referrals.

499.    Many physicians employed by Presbyterian who do not have long-standing relationships with NMOHC physicians, have referred patients to NMOHC physicians in the past.  These physicians would continue making referrals to NMOHC physicians, and NMHOC would enter into physician-patient relationships with those patients, but for Presbyterian's efforts to prevent such referrals.

500.    Presbyterian had knowledge about referrals by its employed physicians to NMOHC and its physicians.  Presbyterian also has knowledge that many of its employed physicians had referred patients to NMOHC and its physicians for many years.  Presbyterian knew that many of its physicians wanted to refer patients to NMOHC and its physicians.

501.    Presbyterian has taken actions to prevent referrals from its employed physicians to NMOHC and its physicians, and thereby prevents NMOHC from developing physician-patient

relationships with those patients.  Presbyterian has used improper means to prevent and prohibit referrals to NMOHC and its physicians.

502.     Presbyterian's actions have caused NMOHC and its physicians to lose a substantial number of referrals and thereby prevented NMOHC from developing physician-patient relationships with a substantial number of additional patients.

503.     NMOHC has lost revenues and profits, and will continue to lose revenues and profits, as a result of Presbyterian's actions.  NMOHC has been harmed and will continue to be harmed as a result of Presbyterian's actions.

**COUNT VI**
**(Common Law Unfair Competition and Injurious Falsehood)**
**(New Mexico State Law)**

504.     NMOHC repeats and realleges all prior allegations.

505.     The conduct by Presbyterian described above, including misrepresenting NMOHC's provider status to patients, illegally obtaining and diverting 340B Drugs to NMOHC's patients, forcing some of NMOHC's patients to use Presbyterian's specialty pharmacy, pressuring patients to switch to Presbyterian physicians, unilaterally making or changing referrals to Presbyterian physicians, pressuring Presbyterian physicians to avoid referrals to NMOHC, and otherwise interfering with the ability of Presbyterian physicians to make referrals to NMOHC, constitutes common law unfair competition under the Restatement (Third) of Unfair Competition and "injurious falsehood" under the Restatement (Second) of Torts.

506.     NMOHC and consumers have been damaged by the conduct described above.

**COUNT VII**
**(RICO Claim Against Presbyterian Healthcare Services)**
**(18 U.S.C. 1962(c))**

507.     NMOHC repeats and realleges all prior allegations.

508.     Presbyterian has participated in the creation and operation of the Mandate instituted by PHP.

509.     Presbyterian had PHP and Presbyterian Health Plans, Inc. implement the Mandate so Presbyterian can increase its sale of 340B Drugs.  Presbyterian has, and is, illegally selling 340B Drugs to NMOHC's patients pursuant to the Mandate.  Presbyterian intends to continue illegally selling 340B Drugs to NMOHC's patients.

510.     Presbyterian could not have effectuated its scheme without PHP and Presbyterian Health Plans, Inc.'s participation.

511.     The PHP entities could not operate for-profit health insurance plans without Presbyterian having created some level of separation between Presbyterian and the PHP entities. Without a health insurer that controls the benefits to which seniors are entitled, Presbyterian could not have forced NMOHC's patients to use Presbyterian's specialty pharmacy.

512.     Presbyterian and PHP/Presbyterian Health Plans, Inc. play separate and distinct roles in the fraudulent scheme created by Presbyterian.

513.     PHP is an association in fact enterprise for purposes of 18 U.S.C. Section 1962(c). Presbyterian Health Plans, Inc. is an enterprise for purposes of 18 U.S.C. Section 1962(c).

514.     Presbyterian has conducted Presbyterian Health Plans, Inc.'s affairs through a pattern of racketeering activity.  Presbyterian has conducted PHP's affairs through a pattern of racketeering activity.

515.   NMOHC has been injured in its business and property as a result of the predicate acts committed by PHP and Presbyterian Health Plans, Inc.   NMOHC has been injured in its business and property as a result of the pattern of racketeering activity committed by PHP and Presbyterian Health Plans, Inc.

516.   NMOHC and its patients have been damaged by the conduct described above.

**COUNT VIII**
**(Tortious Interference with Existing and Prospective Economic Advantage)**
**(The Sale of Chemotherapy Drugs and Support Drugs)**
**(New Mexico State Law)**

517.   NMOHC repeats and realleges all prior allegations.

518.   NMOHC has had long-term relationships with many of its patients.

519.   Cancer is a chronic condition that requires an extended course of treatment.

520.   NMOHC's patients overwhelmingly purchase their chemotherapy drugs and support drugs from NMOHC's pharmacy.  NMOHC's patients also overwhelmingly use NMOHC's infusion center.

521.   Presbyterian knew, and knows, that the overwhelming number of NMOHC's patients purchase their chemotherapy drugs and support drugs from NMOHC's pharmac, and use NMOHC's infusion center.

522.   Pursuant to the Mandate, Presbyterian through PHP is prohibiting NMOHC patients enrolled in PHP's Medicare HMO and PPO plans from purchasing chemotherapy drugs and support drugs from NMOHC's pharmacy.  The Mandate has the practical effect of preventing NMOHC's patients from using NMOHC's infusion center.

523.    Presbyterian and Presbyterian Network Inc. have used improper means to prohibit NMOHC's patients from purchasing chemotherapy drugs and support drugs from NMOHC's pharmacy, and in preventing NMOHC's patients from using NMOHC's infusion center.

524.    Presbyterian's actions have caused NMOHC to suffer damages from the lost sale of chemotherapy drugs and support drugs from NMOHC's pharmacy.  NMOHC has also suffered damages from the decline in patient use of NMOHC's infusion center.

525.    NMOHC has lost revenues and profits, and will continue to lose revenues and profits, as a result of Presbyterian's actions.  NMOHC has been harmed and will continue to be harmed as a result of Presbyterian's actions.

WHEREFORE, the Plaintiff, New Mexico Oncology and Hematology Consultants, pray that this Honorable Court grant it the following relief:

A.    Adjudge and decree that Presbyterian has violated Sections 1 and 2 of the Sherman Act, violated 18 U.S.C. Section 1962(c), violated the New Mexico antitrust act, tortiously interfered with NMOHC's prospective economic advantage, and committed common law unfair competition and injurious falsehood;

B.    Permanently enjoin Presbyterian from (a) prohibiting referrals to NMOHC, (b) interfering with or diverting referrals made to NMOHC, (c) providing its employed physicians with financial incentives that are tied to those physicians steering referrals away from NMOHC;

C.    Permanently enjoin Presbyterian and Presbyterian Network Inc., their subsidiaries and affiliated entities, from refusing to contract with NMOHC on non-discriminatory terms;

D.      Permanently enjoin Presbyterian and Presbyterian Network Inc., their subsidiaries and affiliated entities, from tying access to their health insurance plans with the purchase of any chemotherapy drugs and support drugs from Presbyterian;

E.      Permanently enjoin Presbyterian and Presbyterian Network Inc., their subsidiaries and affiliated entities, from (a) directing NMOHC's patients to Presbyterian's specialty pharmacy, so long as Presbyterian is a Covered Entity under the 340B Program, and (b) selling 340B Drugs to NMOHC's patients when those patients are not Presbyterian patients;

F.      Award NMOHC damages in the form of three times the amount of lost profits NMOHC suffered, or will continue to suffer, as a result of Presbyterian's anticompetitive actions and its violations of 18 U.S.C. 1962(c);

G.      Award NMOHC the amount of lost profits NMOHC suffered, or will continue to suffer, as a result of Presbyterian's unfair competition and tortious interference with NMOHC's prospective advantage;

H.      Award NMOHC exemplary or punitive damages;

I.      Award NMOHC costs and attorneys' fees;

J.      A trial by jury; and

K.      Such other and further relief as the Court deems appropriate and equitable.


**LAW OFFICES OF GEORGE M. SANDERS, P.C.**

By:  /s/ George M. Sanders
George M. Sanders
150 N. Michigan Ave.
Suite 2800
Chicago, IL  60601
Telephone:  (312) 624-7645
Facsimile:  (312) 624-7701

**FOSTER, RIEDER & JACKSON, P.C.**

By:  /s/ J. Douglas Foster
J. Douglas Foster
Geoffrey D. Rieder
P.O. Box 1607
Albuquerque, NM  87103-1607
Telephone:  (505) 767-0577
Facsimile:   (505) 242-9944

I HEREBY CERTIFY that on the 13th day of  February, 2013, I filed the foregoing electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

Bruce D. Hall
Rodey, Dickason, Sloan, Akin & Robb, PA
PO Box 1888
Albuquerque, NM 87103

FOSTER, RIEDER & JACKSON, P.C.

/S/J. Douglas Foster
J. Douglas Foster