UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| NEW MEXICO ONCOLOGY AND HEMATOLOGY CONSULTANTS, LTD., | : | CASE NO. 1:12-CV-00526-MV-GBW |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| PRESBYTERIAN HEALTHCARE SERVICES, et al., | : | |
| | : | |
| Defendants. | : | |

---

## MOTION OF DEFENDANTS PRESBYTERIAN HEALTHCARE SERVICES AND PRESBYTERIAN NETWORK, INC. TO DISMISS THE SECOND AMENDED COMPLAINT WITH PREJUDICE AND MEMORANDUM IN SUPPORT

---

Pursuant to Fed. R. Civ. P. 12(b)(6), Defendants Presbyterian Healthcare Services ("PHS") and Presbyterian Network, Inc. move for an order dismissing, with prejudice, the Second Amended Complaint (ECF No. 24) ("SAC") filed by Plaintiff New Mexico Oncology and Hematology Consultants, Ltd. ("NMOHC"). Defendants conferred in good faith with NMOHC in an effort to seek concurrence pursuant to D.N.M.LR-Civ. 7.1(a), but Plaintiff opposes the motion.

## PRELIMINARY STATEMENT

NMOHC alleges it is the largest provider of medical oncology and radiation oncology services in the Albuquerque area. It has sued PHS and Presbyterian Network, Inc., the parent of Presbyterian Health Plan, Inc. ("PHP")[1], alleging antitrust violations, as well as tortious

---

[1] In its SAC, NMOHC defines "PHP" to include defendant Presbyterian Network, Inc. together with its subsidiaries Presbyterian Health Plan, Inc. and Presbyterian Insurance Company, Inc. (SAC ¶ 39.) For ease of reference, Defendants will do the same, but note that the health insurance products at issue in NMOHC's SAC are

interference, unfair competition, injurious falsehood, and a violation of RICO.  NMOHC's

claims can be grouped as follows:

- Counts I and III:  monopolization of an alleged private health insurance market;

- Counts II and IV:  attempted monopolization of an alleged comprehensive oncology services market;

- Counts V and VIII:  tortious interference with existing and prospective economic advantage;

- Count VI:  common law unfair competition and injurious falsehood;

- Count VII:  the operation of an unlawful RICO enterprise.

The vast majority of the lengthy SAC has nothing to do with NMOHC or oncology.

Much of it instead describes irrelevancies in other claimed markets and attempts to portray as

sinister the way in which PHS conducts its business as an integrated healthcare delivery system.

In particular, based on alleged conduct that happened as long ago as the early 1970s, NMOHC

alleges in Counts I and III that PHS is monopolizing a market for private health insurance in

violation of federal and New Mexico antitrust law.  NMOHC has no standing to challenge

conduct in any health insurance market, however, because it is not an insurer or seeking to

become one, nor can it allege any injury as a consumer in such a market.  In any event,

NMOHC's claim about ancient conduct in an irrelevant market is barred by the four-year statute

of limitations.  (Argument Section A, *infra*.)  Counts I and III should be dismissed.

NMOHC also alleges that PHS took steps directed at "put[ting] NMOHC out of

business."  (SAC ¶ 236.)  It focuses on conduct that allegedly occurred after NMOHC ended a

"partner[ ]" relationship with PHS (*id*. ¶ 221) and built an outpatient facility in competition with

PHS, which permitted NMOHC to divert patients from PHS to NMOHC.  PHS responded by

---

offered by Presbyterian Health Plan, Inc., and not by defendant Presbyterian Network, Inc., as that parent company does not offer insurance.

hiring additional oncologists, and NMOHC now complains that PHS, which is an integrated healthcare delivery system, asks PHS-employed physicians to refer patients to other PHS-employed physicians rather than to NMOHC physicians (*id*. ¶¶ 253-266).  NMOHC further complains that the rates at which PHP (a health care insurer) reimburses NMOHC for physician and laboratory services are too low, and NMOHC does not like the process by which PHP makes chemotherapy drugs available to PHP's Medicare Advantage members.  NMOHC also worries that PHP might in the future choose not to contract with NMOHC.  Finally, NMOHC alleges that PHS entered into an exclusive contract with United Healthcare, an insurance company with a small presence in the Albuquerque area.

NMOHC describes this alleged conduct as exclusionary and says that, by engaging in it, PHS has a dangerous probability of monopolizing a market for comprehensive oncology services in violation of federal and state antitrust laws.  (Counts II and IV.)  Yet these perceived acts of mistreatment, taken individually or together, do not rise to the level of exclusionary conduct. (Argument Section B.1, *infra*.)  The antitrust laws do not require PHS to prefer NMOHC's physicians over PHS's physicians or otherwise to conduct its business in ways demanded by NMOHC.  Beyond these failures, NMOHC does not plead any factual support for the assertion that the alleged conduct is likely to lead to PHS monopolizing any market for comprehensive oncology services.  (Argument Section B.2, *infra*.)  To the contrary, NMOHC alleges that *it*, not PHS, is the largest provider of oncology services, and that there are at least two other competing providers of oncology services.  For all these reasons, Counts II and IV should be dismissed.

Next, NMOHC fails to state a claim for tortious interference with existing and prospective economic advantage.  (Counts V and VIII.)  Specifically, NMOHC has failed to allege anything "improper," but only the preference by PHS for PHS-employed physicians over

NMOHC physicians and the preference by PHP that its insured patients purchase chemotherapy and support drugs from PHS's specialty pharmacy.  New Mexico tort law does not require PHS to do business on terms demanded by NMOHC.  (Argument Section C, *infra*.)

NMOHC also fails to state claims for injurious falsehood and unfair competition. (Count VI).  The claim for injurious falsehood rests on a single claimed false statement, but NMOHC fails to allege any malice or any harm flowing from it, let alone the required special damages.  Furthermore, no New Mexico court has ever extended the tort of unfair competition to a theory – as urged by NMOHC here – that a defendant should provide assistance to its competitor.  (Argument Section D.1-2, *infra*.)

Finally, NMOHC's civil RICO claim fails.  A RICO claim based on mail or wire fraud requires, among other elements, that the defendant make a material false misrepresentation and that the speaker know of its falsity or be indifferent to its truth.  A RICO plaintiff must also establish that the fraud was the proximate cause of the plaintiff's injury.  The SAC fails to satisfy either of these critical elements, and therefore must be dismissed.  (Argument Section E.1-2, *infra*.)

In the end, NMOHC complains about perfectly rational and lawful business conduct by an integrated healthcare system.  (SAC ¶¶ 6, 46.)  None of its claims states a cause of action under the antitrust laws or otherwise.  Through this lawsuit, NMOHC, already the largest provider of oncology services in the area, seeks to change defendants' business and contracting practices as part of a demand for higher reimbursement levels and more referral business.  But NMOHC's efforts to use the Court as a business tool to try to obtain higher prices or more patients should fail.  The SAC should be dismissed with prejudice.

## FACTUAL ALLEGATIONS[2]

NMOHC provides medical oncology and hematology services, as well as radiation oncology services and radiology and laboratory services, in the Albuquerque area.  NMOHC employs physicians and operates a free-standing cancer center.  (SAC ¶¶ 3, 24, 30-32, 241-246.)

PHS operates eight acute care hospitals in New Mexico and is the largest hospital system in both Albuquerque and New Mexico.  (*Id.* ¶¶ 36-37.)  PHS accounts for roughly 42% of the inpatient staffed hospital beds and 50% of inpatient discharges in Albuquerque.  (*Id.* ¶¶ 37, 57, 59, 127.)  Two other hospital systems – Lovelace and UNM Hospital – account for the rest of the staffed hospital beds in the area.  (*Id.* ¶¶ 55, 57, 127.)  PHS owns Presbyterian Medical Group, a physician group that employs about 700 physicians, including medical oncologists.  (*Id.* ¶ 45.)

Presbyterian Network, Inc., the other defendant, is the parent of Presbyterian Health Plan, Inc., which is the largest seller of private health insurance in Albuquerque (*id.* ¶¶ 39, 42), accounting for approximately 46% of the private health insurance in the area (*id.* ¶ 65).

Comprehensive oncology services consist of medical oncology services and radiation oncology services.  (*Id.* ¶ 86.)  Four organizations provide medical oncology services in the Albuquerque area:  NMOHC, UNM Hospital, PHS, and Hematology Oncology Associates.  (*Id.* ¶ 69.)  Three of them (NMOHC, UNM Hospital, and PHS), along with Radiation Oncology Associates, also provide radiation oncology services.  (*Id.* ¶ 77.)  NMOHC has the largest oncology practice in the area; it employs eight medical oncologists and two radiation oncologists.  (*Id.* ¶¶ 27, 29, 70, 79.)  The next largest is UNM Hospital, followed by PHS and then Hematology Oncology Associates.  (*Id.* ¶¶ 71-73, 78-80.)

---

[2] This section is based on NMOHC's SAC, and the complaint's allegations are assumed to be true only for purposes of this motion to dismiss.  This section summarizes the allegations that are arguably relevant to any claims that NMOHC has standing to bring or that are not barred by the statute of limitations.

For years, NMOHC and PHS partnered to provide oncology services.  (*Id.* ¶ 221.)
NMOHC's medical oncology physicians had staff privileges at PHS hospitals (and still do) (*id.* ¶
222); NMOHC does not allege that its physicians have been denied access to PHS's facilities.

By the end of the 1990s, many recognized the benefits of an integrated, multidisciplinary
approach to cancer treatment.  (*Id.* ¶¶ 223-224.)  Unhappy with what it perceived as PHS's old
equipment, NMOHC built its own free-standing cancer center in the early 2000s featuring
modern radiation oncology equipment.  (*Id.* ¶¶ 3, 229, 231-232, 235.)  NMOHC now offers an
efficient system of comprehensive oncology services.  (*Id.* ¶¶ 241-246.)  PHS, by contrast,
supposedly "remains wedded to the more costly unmanaged model of a non-integrated cancer
program."  (*Id.* ¶ 241.)

At some point after 2008, PHS allegedly sought to squeeze NMOHC out of business,
engaging in exclusionary conduct in an effort to eliminate NMOHC as a competitor in an alleged
market for comprehensive oncology services.  (*Id.* ¶¶ 3-4, 253-295.)  NMOHC complains about
four categories of alleged conduct:[3]

Referrals.  PHS has allegedly taken steps to refer patients to PHS-employed physicians
rather than to non-PHS physicians.  PHS supposedly asked its physicians to explain their
referrals of patients to non-PHS physicians.  (*Id.* ¶¶ 253-254.)  PHS also asked its physicians to
give "special consideration to referring to your medical group colleagues," allegedly basing
compensation to PHS-employed physicians in part on their referrals to other PHS-employed
physicians.  (*Id.* ¶¶ 255, 257.)  Further, PHS configured its computer system to prevent its
physicians from inputting referrals to NMOHC physicians.  (*Id.* ¶ 265.)  In addition, even though

---

[3] The legal deficiencies of these four categories of alleged conduct are discussed in Argument Sections
B.1.a-d, *infra*.

NMOHC is in the network of participating providers available to PHP members, PHS has not

listed NMOHC in its "referral book" since 2008.  (*Id.* ¶ 266.)

NMOHC also speculates ("on information and belief") that PHS tried to divert some

patients from NMOHC-employed physicians to PHS-employed physicians in the following

ways:  (a) PHP supposedly told PHS staff the names of some patients who had been receiving

treatment at NMOHC, and PHS staff then asked those patients to start seeing PHS-employed

oncologists (*id.* ¶ 259); (b) PHS staff supposedly referred patients to PHS-employed physicians

or changed referrals from non-PHS physicians to PHS physicians (*id.* ¶ 260); and (c) on two

occasions PHS staff unsuccessfully scheduled patients to see PHS-employed oncologists rather

than NMOHC oncologists (*id.* ¶¶ 261-262).  Finally, PHP recently told one patient that PHP

would not cover services provided by NMOHC even though NMOHC participates in the PHP

network (*id.* ¶ 258) – the single allegedly false statement on which NMOHC bases its injurious

falsehood claim.

Lowering reimbursement levels.  NMOHC alleges that PHP lowered its reimbursement

rates in 2008 (*id.* ¶¶ 269-270) and "warn[ed]" NMOHC that it may not remain in the PHP

network (*id.* ¶ 267), although it still is.  NMOHC also alleges that, more than four years ago,

PHP declined to reimburse NMOHC for cancer rehabilitation services that NMOHC wanted to

offer (*id.* ¶ 273) and also declined to contract with free-standing surgery centers (*id.* ¶ 274), even

though NMOHC does not operate any such center and has not alleged any plans to do so.

Exclusive contract with United.  PHS has contracted with United on an allegedly

exclusive basis.  (*Id*. ¶ 276.)  As a result, United allegedly will not take any action without PHS's

approval.  (*Id.*)

Furnishing drugs to Medicare Advantage patients.  PHP offers a Medicare Advantage program to seniors, which provides benefits not available through traditional Medicare and which is funded by the federal Medicare program.  (*Id.* ¶ 283.)  PHP will cover a senior citizen enrolled in the Medicare Advantage program for certain chemotherapy drugs only when those drugs are purchased from PHS's pharmacy.  (*Id.* ¶ 289.)  As a result, patients allegedly have been inconvenienced and their treatment has suffered (*id.*), and NMOHC has incurred increased administrative and storage costs (*id.* ¶ 290).  PHP allegedly plans to expand this policy to all chemotherapy drugs and to patients covered by PHP's private insurance.  (*Id.* ¶¶ 292, 294.)

## **LEGAL STANDARD**

To survive a motion to dismiss, a plaintiff must allege facts sufficient "to raise a right to relief above the speculative level."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Christy Sports, LLC v. Deer Valley Resort Co.*, 555 F.3d 1188, 1191 (10th Cir. 2009).  A complaint cannot rely on mere "labels and conclusions," and "a formulaic recitation of the elements of a cause of action will not do."  *Twombly*, 550 U.S. at 555.  A plaintiff's claim "must not just be possible under some set of facts, but rather [a] plaintiff must provide enough facts, taken as true, to establish that [its] claim is plausible."  *Singh v. Mem'l Med. Ctr., Inc.*, 536 F. Supp. 2d 1244, 1249 (D.N.M. 2008).  Put another way, a plaintiff must plead facts sufficient to "nudge" its allegations across the "line between possibility and plausibility."  *Twombly*, 550 U.S. at 557.

In determining whether a plaintiff has alleged "enough facts to state a claim to relief that is plausible on its face," *Twombly*, 550 U.S. at 570, a court is "not bound by conclusory allegations, unwarranted inferences, or legal conclusions."  *Hackford v. Babbitt*, 14 F.3d 1457, 1465 (10th Cir. 1994); *accord Christy Sports*, 555 F.3d at 1191 (emphasizing "the need for plausibility in the complaint rather than 'wholly conclusory statement[s]'" (quoting *Twombly*,

550 U.S. at 561)); *see also Winters v. Jordan*, No. 2:09-cv-00522 JAM KJN PS, 2012 WL

360194, at *13 (E.D. Cal. Nov. 10, 2011) (dismissing RICO claim because "vague and

conclusory" allegations "do not state a plausible claim for relief under the RICO statute").  "The

use of antitrust 'buzz words' does not supply the factual circumstances necessary to support [a

plaintiff's] conclusory allegations."  *TV Commc'ns Network v. Turner Network*, 964 F.2d 1022,

1026 (10th Cir. 1992).

The Supreme Court has "counsel[ed]" lower courts "against sending the parties into

discovery when there is no reasonable likelihood that the plaintiff[] can construct a claim from

the events related in the complaint."  *Twombly*, 550 U.S. at 558 (internal quotation omitted);

*accord Christy Sports*, 555 F.3d at 1191 ("It is one thing to be cautious before dismissing an

antitrust complaint in advance of discovery, but quite another to forget that proceeding to

antitrust discovery can be expensive." (quoting *Twombly*, 550 U.S. at 558)).

## ARGUMENT[4]

A.   **NMOHC Does Not Have Standing To Challenge Conduct In The Alleged Private Health Insurance Services Market And In Any Event Has Failed To Allege A Monopolization Claim (Counts I and III).**

NMOHC alleges in Counts I and III that "Presbyterian" (defendants presume that

NMOHC means PHP, and not PHS, since PHS is not alleged to be in the insurance business) has

monopolized a vaguely defined "insurance" market.  (*See* SAC ¶ 471 ("Presbyterian … has

willfully maintained a monopoly in the market for Private Health Insurance Services ….").)

NMOHC, however, does not compete or purchase services in a private health insurance market,

and therefore lacks antitrust standing to bring a claim for monopolization of such a market.

---

[4] Because New Mexico antitrust law follows federal antitrust law, Sections A-B simultaneously address the deficiencies in both NMOHC's federal and state antitrust claims.  *Leyba v. Renger*, 874 F. Supp. 1229, 1231 n.1 (D.N.M. 1994); *see also* NMSA 1978, § 51-1-15 (1979) (noting that New Mexico Antitrust Act is to be "construed in harmony with judicial interpretations of the federal antitrust laws … to achieve uniform application of the state and federal laws prohibiting restraints of trade and monopolistic practices").

*Abraham v. Intermountain Health Care, Inc.*, 461 F.3d 1249, 1267-68 (10th Cir. 2006); *accord SigmaPharm, Inc. v. Mut. Pharm. Co.*, 772 F. Supp. 2d 660, 673 (E.D. Pa. 2011).[5]

Even if NMOHC had standing to challenge conduct in an alleged private health insurance market, its monopolization claims would fail as a matter of law.  To bring a monopolization claim, NMOHC must allege both the possession of monopoly power and the maintenance of that power through exclusionary conduct.  *Verizon Commc'ns, Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004).  NMOHC's allegations fall well short.

First, NMOHC has failed to allege that PHP possesses monopoly power in a private health insurance market.  NMOHC alleges that PHP has a 46% share of the claimed market (SAC ¶ 65), but anything less than "[f]ifty percent is below any accepted benchmark for inferring monopoly power from market share."  *Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*, 65 F.3d 1406, 1411 (7th Cir. 1995); *accord Colo. Interstate Gas Co. v. Natural Gas Pipeline Co. of Am.*, 885 F.2d 683, 694 n.18 (10th Cir. 1989) ("[C]ourts generally require a minimum share of between 70% and 80%."); *Nobody in Particular Presents, Inc. v. Clear Channel Commc'ns, Inc.*, 311 F. Supp. 2d 1048, 1098 (D. Colo. 2004) (rejecting monopolization claim where defendant was alleged to have a 50.48% share of the relevant market).

In an effort to avoid this black-letter law, NMOHC describes Cigna and United as "adjuncts" (a term NMOHC does not define or explain) and combines the market shares of PHP, Cigna, and United to reach a hypothetical share for PHP that is allegedly "well over 50%".  (SAC ¶¶ 64, 66.)  NMOHC does not allege that PHP, Cigna, and United share common ownership, and NMOHC cannot cobble together a market share for PHP in excess of 50% by

---

[5] NMOHC also asserts that PHS possesses monopoly power in a claimed market for hospital inpatient services (SAC ¶ 472), but the SAC contains no allegations of a violation of the antitrust laws in any such market. Even if NMOHC had alleged a claim for monopolization of a market for hospital inpatient services, any such claim would be deficient for the same reasons set forth in this Section A.

adding the market shares of two unrelated entities to PHP's alleged share. *City of Moundridge v. Exxon Mobil Corp.*, 471 F. Supp. 2d 20, 42 (D.D.C. 2007) (affirming dismissal of monopolization claim, noting that "to sustain a charge of monopolization … a plaintiff must allege the necessary market domination of a *particular* defendant").

Second, NMOHC does not allege any illegal maintenance of PHP's claimed monopoly power in the alleged private health insurance market within the four-year limitations period. 15 U.S.C. § 15b; NMSA 1978, § 57-1-12 (1979). NMOHC complains about only one act in the last four years, *i.e.*, the decision to offer allegedly lower reimbursement rates in the most recent PHP provider contract. (SAC ¶¶ 269-270.) As a matter of law, PHP's offer to pay less for services is not an act of monopolization (or its inverse, monopsonization, which is the relevant term here because PHP is purchasing services from, and not selling services to, NMOHC). "A firm that has substantial power on the buy side of the market … is generally free to bargain aggressively when negotiating the prices it will pay for goods and services." *W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 103 (3d Cir. 2010) (noting plaintiff "would have little basis for challenging the reimbursement rates" of defendant private insurer); *accord Pac. Bell Tel. Co. v. Linkline Commc'ns, Inc.*, 555 U.S. 438, 447-48 (2009) ("Simply possessing monopoly power and charging monopoly prices does not violate § 2 …."); *Trinko*, 540 U.S. at 407 ("The mere possession of monopoly power, and the concomitant charging of monopoly prices, is not only not unlawful; it is an important element of the free-market system."); *Kartell v. Blue Shield of Mass., Inc.*, 749 F.2d 922, 929 (1st Cir. 1984) ("A legitimate buyer is entitled to use its market power to keep prices down.").

**B.     NMOHC's Claims Of Attempted Monopolization Of A Comprehensive Oncology Services Market Fail (Counts II and IV).**

To state an attempt to monopolize claim, NMOHC must allege that PHS:  (1) "'engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power.'"  *Christy Sports*, 555 F.3d at 1192 (quoting *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993)).  NMOHC fails as a matter of law to plead the necessary elements of a claim that PHS has attempted to monopolize any comprehensive oncology services market in Albuquerque.[6]

**1.     The Various Perceived Acts Of Mistreatment Do Not Rise To The Level Of Predatory Or Exclusionary Conduct.**

Predatory or exclusionary conduct under Section 2 of the Sherman Act is "conduct constituting an abnormal response to market opportunities.  Predatory practices are illegal if they impair opportunities of rivals and are not competition on the merits or are more restrictive than reasonably necessary for such competition, if the conduct appears reasonably capable of contributing significantly to creating or maintaining monopoly power."  *Multistate Legal Studies, Inc. v. Harcourt Brace Jovanovich Legal & Prof'l Publ'ns, Inc.*, 63 F.3d 1540, 1550 (10th Cir. 1995) (internal quotation omitted).  As the Tenth Circuit has made clear, conduct is not exclusionary as long as it is motivated by nothing "other than a desire to make more money."  *Christy Sports*, 555 F.3d at 1197.

---

[6] Defendants assume the existence of this claimed market only for purposes of this motion to dismiss.  It should be noted, however, that NMOHC has not clearly defined what constitutes the "comprehensive oncology services market" other than to say that it includes "medical oncology services and radiation oncology services." (SAC ¶ 86.)  The complaint says nothing about whether the claimed market includes physician services, facility services, provision and administration of medication, or something else, or some combination of one or more of these and/or still other services.  NMOHC's failure to allege what products are in the relevant market or whether such products enjoy reasonable interchangeability of use or cross-elasticity of demand is another basis on which to dismiss the SAC.  *Telecor Commc'ns, Inc. v. Sw. Bell Tel. Co.*, 305 F.3d 1124, 1130 (10th Cir. 2002).

NMOHC identifies four perceived acts of mistreatment as the basis for its claim of exclusionary conduct.  Viewed separately or together, these acts do not constitute exclusionary conduct.  Indeed, the challenged conduct is perfectly understandable and entirely lawful.

### (a) Limiting Referrals To NMOHC Physicians

NMOHC alleges that PHS has taken steps to refer patients to PHS-employed physicians rather than to non-PHS physicians.  According to NMOHC, PHS asked its physicians to give "special consideration" to referring patients to other PHS-employed physicians, and allegedly based compensation to PHS-employed physicians in part on their referrals to other PHS-employed physicians.  (SAC ¶¶ 255, 257.)  PHS also allegedly tried to divert patients from NMOHC-employed physicians to PHS-employed physicians.  (*Id.* ¶¶ 259-262.)[7]

Far from alleging exclusionary conduct, NMOHC has pled nothing more than PHS's legitimate response to NMOHC's decision to build its own cancer center and attempt to divert outpatient business from PHS to NMOHC.  Antitrust law is clear:  PHS has no obligation to cooperate with NMOHC by referring patients to NMOHC physicians or outpatient facilities. *Christy Sports*, 555 F.3d at 1194 (acknowledging that "[t]he Supreme Court has recognized the economic value of allowing businesses to decide with whom they will deal"); *accord Trinko*, 540 U.S. at 410 (noting that "insufficient assistance in the provision of service to rivals is not a recognized antitrust claim"); *Four Corners Nephrology Assocs., P.C. v. Mercy Med. Ctr.*, 582 F.3d 1216, 1223 (10th Cir. 2009) ("Having made a substantial investment in developing its own nephrology practice – indeed, having even tried to secure [the plaintiff's] services for that practice – [the hospital] is entitled to recoup its investment without sharing its facilities with a

---

[7] Notably, NMOHC does not allege a refusal to cooperate at all, but only a decision by PHS to refer patients to other PHS-employed physicians.  Nor does NMOHC allege that PHS's claimed policy specifically targets oncology services or even NMOHC.

competitor."); *Olympia Equip. Leasing Co. v. W. Union Tel. Co.*, 797 F.2d 370, 375 (7th Cir. 1986) ("Today it is clear that a firm with lawful monopoly power has no general duty to help its competitors ....").

Not only that, but PHS is (as NMOHC concedes) an integrated healthcare provider.  It offers hospital services through PHS, physician services through Presbyterian Medical Group, and health insurance products through PHP.  Referral of business within an integrated healthcare entity is ordinary and understandable behavior that allows a firm to achieve efficiencies.  *Christy Sports*, 555 F.3d at 1197.  Such a routine effort to keep work within a single entity is hardly "conduct … that has no legitimate business justification other than to destroy or damage competition."  *Mozart Co. v. Mercedes-Benz of N. Am., Inc.*, 833 F.2d 1342, 1352 (9th Cir. 1987) (quotation omitted); *accord Marshfield Clinic*, 65 F.3d at 1413 ("Physicians employed by the Clinic, which has its own HMO, are hardly to be expected to steer their patients to another HMO ….").

### (b)   Lower Reimbursement Rates In Current PHP Provider Contract

NMOHC complains that PHP lowered the rates at which it will reimburse NMOHC for services provided to patients insured by a PHP plan.  As explained in Section A, *supra*, the law is clear:  a customer's decision to pay less for a product or service is not an exclusionary act, even assuming the customer has market or even monopoly power.  *Linkline Commc'ns*, 555 U.S. at 447-48; *Trinko*, 540 U.S. at 407; *W. Penn*, 627 F.3d at 103; *Kartell*, 749 F.2d at 929.

### (c)   "Exclusive" Contract With United

NMOHC alleges that PHS and United, an insurer, have an exclusive arrangement and that United will not take any steps without PHS's approval.  (SAC ¶ 276.)  NMOHC, however, does not allege that United has any meaningful presence in Albuquerque; indeed, NMOHC asserts that United's market share does not exceed 10%.  (*Id*. ¶ 66.)  NMOHC has not alleged

(nor could it) that it has been foreclosed from access to any significant part of the patient base as a result of the alleged PHS-United relationship. *B & H Med., L.L.C. v. ABP Admin., Inc.*, 526 F.3d 257, 266 (6th Cir. 2008) (observing that foreclosure levels less than 30 or 40% are not a concern); *U.S. Healthcare, Inc. v. Healthsource, Inc.*, 986 F.2d 589, 596 (1st Cir. 1993) (Sherman Act Section 1 claim based on exclusive dealing requires "a compelling showing of foreclosure of substantial dimensions").

(d)   <b>Furnishing Drugs For Medicare Advantage Program</b>

NMOHC protests the manner in which PHS requires certain chemotherapy drugs to be purchased under the PHP Medicare Advantage program. NMOHC claims that the purchase of these drugs through PHS's specialty pharmacy inconveniences patients (SAC ¶ 289) and has resulted in increased administrative and storage costs for NMOHC (*id.* ¶ 290). NMOHC also worries that PHS will expand the policy to all chemotherapy drugs and to patients covered by PHP's private insurance. (*Id.* ¶¶ 292, 294.)

The challenged conduct is not exclusionary conduct as a matter of law. In fact, it is no different than if PHP instead lowered the rate of reimbursement for Medicare Advantage drugs purchased at other pharmacies to the rate charged by the PHS specialty pharmacy. As explained above, setting the levels at which a customer (even assuming it has monopoly power) will pay for services is not exclusionary conduct. Sections A & B.1.b, *supra*. "Part of competing like everyone else is the ability to make decisions about with whom and on what terms one will deal." *Goldwasser v. Ameritech Corp.*, 222 F.3d 390, 397 (7th Cir. 2000). PHS is entitled to choose for itself efficient methods for doing business, including the price it is willing to pay for services; it is not obligated to choose a method that benefits NMOHC. *Id.* at 398; *accord Christy Sports*, 555 F.3d at 1198 (affirming dismissal of plaintiff's complaint, concluding that "antitrust laws should not be allowed to stifle a business's ability to experiment in how it operates").

15

**(e)     The Alleged Desire To Drive NMOHC Out Of Business Does Not Satisfy The Requirement Of Exclusionary Conduct**

NMOHC seeks to infer exclusionary conduct from PHS's alleged threat to "put NMOHC out of business." (SAC ¶ 236.)  Such statements of allegedly bad intent do not transform otherwise lawful conduct into exclusionary conduct.  "[I]f conduct is not objectively anticompetitive the fact that it was motivated by hostility to competitors … is irrelevant." *Olympia Equip. Leasing*, 797 F.2d at 379 (noting that such comments "tell[] us nothing about the lawfulness of [the] conduct"); *accord Int'l Travel Arrangers v. NWA, Inc.*, 991 F.2d 1389, 1396 (8th Cir. 1993) (recognizing the weakness of such statements because "[t]hey provide no help in deciding whether a defendant has crossed the elusive line separating aggressive competition from unfair competition" (internal quotation omitted)).  The alleged statements, even if true, demonstrate only that PHS intended to compete vigorously once NMOHC opened its own free-standing cancer center.

In sum, NMOHC has not pled anything other than typical, expected, and legally benign conduct in the face of competition between NMOHC and PHS.  As a matter of law, its allegations are insufficient to plead a claim for attempted monopolization.  *Christy Sports*, 555 F.3d at 1196 (dismissing complaint for failure to allege exclusionary conduct).

**2.     NMOHC Does Not Allege A Dangerous Probability Of PHS Achieving Monopoly Power.**

To satisfy the "dangerous probability of success" element of an attempt to monopolize claim, NMOHC "must show that there was a dangerous probability [PHS] would achieve monopoly status as the result of the [alleged] predatory conduct." *Tarabishi v. McAlester Reg'l Hosp.*, 951 F.2d 1558, 1569 (10th Cir. 1991) (internal quotation omitted).  "This is typically done by examining the defendant's market share in the relevant market." *Id.*; *accord Bacchus*

*Indus. v. Arvin Indus.*, 939 F.2d 887, 894 (10th Cir. 1991) ("[I]t must be shown how much of the relevant market a defendant controls if market power is to be evaluated.").

The SAC is silent regarding the respective market shares of the various participants in the alleged comprehensive oncology services market except that NMOHC concedes that it, not PHS, is the largest provider of comprehensive oncology services in Albuquerque today.  (SAC ¶¶ 27, 29, 70, 79.)  NMOHC also concedes the existence of other competitors in the claimed market that are unaffected by PHS's allegedly wrongful conduct.  (*Id.* ¶¶ 69, 77.)  And NMOHC has not alleged its imminent exit from any comprehensive oncology services market.  Lacking such allegations, NMOHC has not adequately pled a dangerous probability that PHS will acquire monopoly power.  Simply using "antitrust buzz words" and pleading the legal conclusion that "[a] dangerous probability exists that [PHS] will acquire monopoly power" (*id.* ¶ 481) is not enough to support an attempt to monopolize claim as a matter of law.  *Twombly*, 550 U.S. at 555; *Singh*, 536 F. Supp. 2d at 1253 (dismissing antitrust claim where, although "couched in antitrust buzz words," plaintiff's conclusory allegations did not amount to an antitrust violation).

## C.    NMOHC's Claims Of Tortious Interference With Existing And Prospective Economic Advantage Are Groundless (Counts V and VIII).

NMOHC alleges that PHS "has used improper means to prevent and prohibit referrals to NMOHC and its physicians," preventing NMOHC from developing "relationships with a substantial number of additional patients."  (SAC ¶¶ 501, 502.)  NMOHC further alleges that PHS and PHP have used improper means to prohibit NMOHC's patients from purchasing chemotherapy drugs from NMOHC and from using NMOHC's infusion center.  (SAC ¶ 523.)

These allegations are deficient as a matter of law because "[t]he mere refusal to deal with a party cannot support a claim for tortious interference with contractual relations."  *Quintana v. First Interstate Bank*, 105 N.M. 784, 786, 737 P.2d 896, 898 (Ct. App. 1987); *see also*

*Neonatology Assocs., Ltd. v. Phoenix Perinatal Assocs. Inc.*, 164 P.3d 691, 694 (Ariz. Ct. App. 2007) (rejecting plaintiff neonatology group's claim of tortious interference where perinatologists within defendant neonatology and perinatology group previously referred patients to plaintiff but now routinely referred patients to neonatologists within their own practice).  Nor can NMOHC base such claims on a theory that PHP's insurance plan operates in a way that NMOHC does not like.  *Darby Trading Inc. v. Shell Int'l Trading & Shipping Co. Ltd.*, 568 F. Supp. 2d 329, 346-47 (S.D.N.Y. 2008) (dismissing claim of tortious interference with business relations claim where "Plaintiff's Complaint … merely alleges that the various interlocked companies in the Shell family preferred to purchase from each other rather than from outside companies"); *see also Lenscrafters, Inc. v. Kehoe*, 2012-NMSC-020, ¶ 44, 282 P.3d 758 (affirming dismissal of claim of intentional interference with patients where plaintiff optometrist "fail[ed] to point to any evidence in the record that [defendant] was acting beyond a profit motive, for personal vengeance or spite").

In short, under New Mexico tort law, as under the antitrust laws, PHS has no duty to do business in the manner desired by NMOHC.

**D.    NMOHC's Claims Of Injurious Falsehood And Unfair Competition Also Fail (Count VI).**

NMOHC alleges that the conduct of PHS and PHP – "including misrepresenting NMOHC's provider status to patients, pressuring patients to switch to Presbyterian physicians, unilaterally making or changing referrals to Presbyterian physicians, pressuring Presbyterian physicians to avoid referrals to NMOHC, and otherwise interfering with the ability of Presbyterian physicians to make referrals to NMOHC" – amounts to "common law unfair competition under the Restatement (Third) of Unfair Competition and 'injurious falsehood'

under the Restatement (Second) of Torts." (SAC ¶ 505.) NMOHC cannot reformulate its failed antitrust and tortious interference claims in this way.

**1.     NMOHC Has Not Pled Malice Or Special Damages To Support A Claim of Injurious Falsehood.**

The purported "injurious falsehood" claim is premised on a single alleged incident, where "[i]n 2012, a patient … seeking a referral to NMOHC was told by a PHP representative that PHP would not cover services provided by NMOHC [unless he had a preexisting relationship with NMOHC]…. Any such statement was false." (*Id.* ¶ 258.) This allegation falls well short of what is required to plead a claim of injurious falsehood.

First, an injurious falsehood must be "false and malicious." *W. Commerce Bank v. Reliance Ins. Co.*, 105 N.M. 346, 349, 732 P.2d 873, 876 (1987). That is, the speaker must "'know[] that the statement is false or act[] in reckless disregard of its truth or falsity'" and "'intend[] for publication of the statement to result in harm to interests of the other.'" *Bacchus Indus.*, 939 F.2d at 893 (quoting Restatement (Second) of Torts § 623A (1977)). Here, NMOHC summarily concludes that this single statement was false, but does not allege it was knowingly or recklessly false or made with the express intent to harm NMOHC. Its allegation therefore misses a key element of the claim and does not "possess enough heft to show that [NMOHC] is entitled to relief." *Twombly*, 550 U.S. at 557 (internal quotation and brackets omitted).

Second, the falsehood must be "injurious," causing "pecuniary loss," *Bacchus Indus.*, 939 F.2d at 893, "that has been realized or liquidated, as in the case of specific lost sales," *Ruiz v. Varan*, 110 N.M. 478, 481, 797 P.2d 267, 270 (1990) (internal quotation omitted). Such special damages "must be pleaded as well as proved." *Jemez Props., Inc. v. Lucero*, 94 N.M. 181, 186, 608 P.2d 157, 162 (Ct. App. 1979). As a general rule, a plaintiff "must identify the particular purchasers who have refrained from dealing with him, and specify the transactions of which he

claims to have been deprived." *Ruiz*, 110 N.M. at 481, 797 P.2d at 270 (internal quotation

omitted).  Thus, for example, in *General Steel Domestic Sales, LLC v. Chumley*, No. 10-cv-

01398-PAB-KLM, 2011 U.S. Dist. LEXIS 61997 (D. Colo. June 10, 2011), the court dismissed a

claim where the counterclaimant had not "identified customers lost on account of the business

disparagement" or "specifically pled the lost profits it ha[d] suffered" but had "merely allege[d]

in conclusory fashion that it ha[d] suffered that category of damages." *Id.* at *8.

NMOHC has pled even less here, with no allegations of special damages whatsoever, let

alone any lost patients named or lost profits quantified.  NMOHC has failed to plead "enough

facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570.

**2.     New Mexico Law Does Not Support The Unfair Competition Claim.**

As stated above, NMOHC has not pled allegations sufficient to state claims under federal

and state antitrust law or under the tort of tortious interference.  *See* Sections A-C, *supra*;

*Quintana*, 105 N.M. at 786, 737 P.2d at 898.  Repackaging such legally deficient claims under

the common law tort of unfair competition does not save them.  "The common law of unfair

competition does not prohibit one market participant from attempting to divert customers from

his competitors, or even divert customers from one competitor in particular." *Guidance*

*Endodontics, LLC v. Dentsply Int'l, Inc.*, 708 F. Supp. 2d 1209, 1248 (D.N.M. 2010).

NMOHC cannot expand the common law by citation to the Restatement (Third) of Unfair

Competition.  (*See* SAC ¶ 505.)  This Court in *Guidance Endodontics* correctly noted that

"[t]here is some doubt whether any of the grounds for the … [common law] unfair competition

claim are valid, given the pervasive statutory schemes that the New Mexico Legislature has

established to deal with the same conduct, and the lack of substantial case-law guidance from

New Mexico courts."  708 F. Supp. 2d at 1249.  NMOHC has not alleged a violation of any New

Mexico statute relating to unfair competition and no basis exists to use the Restatement to

expand the common law to create a claim where none exists.[8]  The Tenth Circuit observed in a similar situation that "it is not our place to expand Utah state law beyond the bounds set by the Utah Supreme Court or, in the absence of Utah Supreme Court precedent, by the lower Utah courts."  *Proctor & Gamble Co. v. Haugen*, 222 F.3d 1262, 1279-80 (10th Cir. 2000) (internal quotation omitted).  In short, the Restatement (Third) of Unfair Competition does not save NMOHC's legally deficient claims.

## E.      NMOHC Fails To State A Claim Under RICO.

By its new RICO claim, NMOHC alleges that PHS's use of drugs obtained through the federal 340B Program and dispensed in accordance with PHP's specialty pharmacy network benefit is a fraudulent scheme in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO").  NMOHC's real concern is that PHS no longer purchases drugs from NMOHC (SAC ¶¶ 428-430), but instead purchases them at lower prices through the 340B Program, leading to cost savings that may in turn be passed on to PHS's patients. (*Id*. ¶¶ 333-337, 346-347.)

Were this case to proceed on the merits, PHS would establish its compliance with the 340B Program.  But this case should not proceed, because NMOHC's RICO claim fails on the pleadings for two reasons.  First, NMOHC fails to plead mail and wire fraud because NMOHC does not allege that PHS made any false statement or otherwise knew that any of the challenged statements were false.  Second, NMOHC lacks standing to sue under RICO.  NMOHC did not

---

[8] The major subjects of the Restatement – deceptive marketing, trademark infringement, and "appropriation of intangible trade values," Restatement (Third) of Unfair Competition § 1 (1995) – are addressed extensively by the Trade Practices and Regulations chapter of the New Mexico Statutes Annotated, including and especially the Unfair Practices Act, *id*. §§ 57-12-1 to 12-26 (2009).  The Unfair Practices Act itself is modeled after the Uniform Deceptive Trade Practices Act, which "was designed to bring uniformity to the law of unfair competition."  *Ernest Thompson Fine Furniture Maker, Inc. v. Youart*, 109 N.M. 572, 575-76, 787 P.2d 1255, 1258-59 (Ct. App. 1990).  Thus, the *Youart* court professed itself "[un]able to distinguish [a] claim [for common law unfair competition] from a claim under the Unfair Practices Act," *id*. at 575, 787 P.2d at 1258.  In this case, NMOHC does not bring a claim under the Unfair Practices Act, and none of the challenged conduct contravenes that Act.  *See* NMSA § 57-12-2(D) (2009).

rely on (and in fact fails to identify anyone who relied on) any allegedly fraudulent statement and cannot otherwise show any injury proximately caused by the alleged fraud.

### 1. NMOHC Does Not Allege That Any Statement Made By PHS Was False.

RICO prohibits "(1) … the conduct of (2) an enterprise (3) through a pattern (4) of racketeering activity." *Tal v. Hogan*, 453 F.3d 1244, 1261 (10th Cir. 2006).  NMOHC claims PHS engaged in "racketeering activity" through the predicate acts of mail and wire fraud in violation of 18 U.S.C. § 1341 and § 1343.  (SAC ¶¶ 449-469.)  To state a claim for mail and wire fraud, NMOHC must allege "(1) a scheme or artifice to defraud … [and] (2) an intent to defraud." *Burnett v. Amrein*, 243 Fed. App'x 393, 395 (10th Cir. 2007) (per curiam) (affirming dismissal of RICO claim for failing to adequately plead fraud).  A scheme to defraud requires, among other elements, that the defendant made a material false representation and that the speaker knew of its falsity or was indifferent to its truth. *BancOklahoma Mortg. Corp. v. Capital Title Co.*, 194 F.3d 1089, 1103 (10th Cir. 1999) (affirming summary judgment for defendant). NMOHC does not adequately allege either.

First, while NMOHC points to four letters and a newspaper article, NMOHC does not allege that any statement in those documents is actually false.  Nor could it.  The statements cited by NMOHC constitute nothing more than PHP's description of its own Medicare Advantage Plan, including its policies and procedures, and the benefits available to enrollees.  (*E.g.* SAC ¶¶ 393-394, 402, 407, 411, 416.)  NMOHC does not allege that PHP's description falsely or inaccurately describes PHP's plans and policies, or that PHP did not provide or intend to provide the stated benefits to its enrollees.  As such, NMOHC fails to allege a material false representation. *BancOklahoma Mortg. Corp.*, 194 F.3d at 1103; s*ee also Alpine Bank v.*

*Hubbell*, 555 F.3d 1097, 1107 (10th Cir. 2009) (a promise cannot be a misrepresentation absent an intent not to perform).[9]

Second, even if PHS did not provide or intend to provide the stated benefits, NMOHC does not allege the statements were made with knowledge of or indifference to any claimed falsity of such statements. *See Heinrich v. Waiting Angels Adoption Servs., Inc.*, 668 F.3d 393, 406 (6th Cir. 2012) (affirming dismissal of a RICO claim where plaintiff did not allege defendant's knowledge of or reckless disregard for the falsity of the statement).

### 2. NMOHC Does Not Allege That It, Or Anyone Else, Actually Relied On The Alleged Misstatements.

NMOHC's RICO claim fails on the additional ground that NMOHC does not allege that the purported fraud was the proximate cause of any claimed injury. RICO permits suit by "any person injured in his business or property by reason of a violation of [18 U.S.C. § 1962]." 18 U.S.C. § 1964(c). The "by reason of" language in the statute requires a plaintiff to plead that the alleged RICO violation proximately caused the plaintiff's injury. *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 268 (1992). Because the compensable injury under RICO "necessarily is the harm caused by [the] predicate acts," the issue in the proximate cause analysis is "the directness of the relationship between the conduct and the harm." *Hemi Group, LLC v. City of New York*, 559 U.S. 1, 130 S. Ct. 983, 991-92 (2010) (quotation omitted) (holding

---

[9] Any contention by NMOHC that the statements are misleading because they (in NMOHC's view) "imply" that PHS's actions comply with the 340B program (*e.g.* SAC ¶¶ 395, 412), gets NMOHC nowhere. The RICO claim is not premised on any alleged statement by PHS that it was complying with the 340B program. And, even had PHS made such a statement, PHS's expression of its understanding of the law does not constitute fraud. *Cf. BancOklahoma Mortg*, 194 F.3d at 1103; *Utesch v. Dittmer*, 947 F.2d 321, 329 (8th Cir. 1991) (an expression of opinion may constitute fraud only if the actor knew when stating the opinion that it was false). Furthermore, some of the challenged statements are actually consistent with NMOHC's construction of the 340B program requirements. (*See, e.g.*, SAC ¶ 402 ("'not all drugs … will be eligible for 340B pricing'"); SAC ¶ 406 ("'contact with a physician employed by Presbyterian is a federal requirement.'").)

plaintiff could not show proximate cause where the conduct and harm were based on separate actions by separate parties).

NMOHC does not satisfy the proximate cause requirement because the SAC fails to identify anyone (NMOHC or otherwise) who relied on any alleged misstatement.  "[A] RICO plaintiff who alleges injury 'by reason of' a pattern of mail fraud" must plead "that *someone* relied on the defendant's misrepresentations."  *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 658 (2008) (emphasis in original).  Following *Bridge*, courts routinely dismiss fraud-based RICO claims where a plaintiff fails to identify anyone who relied on the alleged misstatements. *See In re Actimmmune Mktg. Litig.*, 614 F. Supp. 2d 1037, 1052 (N.D. Cal. 2009) (dismissing RICO action based on deceptive drug marketing, holding plaintiffs could not show proximate cause where they did not allege anyone relied on the misrepresentations).[10]

NMOHC does not allege any reliance on its part.  It received only the February 29, 2012 letter, and NMOHC does not allege it took any action in reliance on any statement in that letter. Nor does NMOHC allege that any PHP enrollee relied on the alleged fraud.  Three of the allegedly misleading documents were not even sent to enrollees, but only to health care providers.  (SAC ¶¶ 391, 401, 410.)  As for the remaining two, NMOHC does not claim that any PHP enrollee read the December 2012 article (let alone relied on it) or that the March 1, 2012 letter to enrollees contained a misleading statement.  (SAC ¶¶ 397-398, 464.)  NMOHC also does not claim that any enrollee took any action as a result of the alleged misstatements, as opposed to the plan policy and other benefits offered by PHP.

---

[10] *See also In re Bextra & Celebrex Mktg. Sales Practices & Prod. Liab. Litig.*, No. 05-CV-01699, 2012 WL 3154957, at *5 (N.D. Cal. Aug. 2, 2012) (dismissing RICO claim based on fraud against third party for failure to plead reliance); *In re WellPoint, Inc. Out-of-Network UCR Rates Litig.*, 865 F. Supp. 2d 1002, 1038 (C.D. Cal. 2011) (same).

The Supreme Court has rejected NMOHC's theory of liability because it fails to satisfy RICO's proximate cause requirement.  *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 460 (2006).  In *Anza*, the Court held that a plaintiff could not show proximate cause because the alleged harm (sales lost to defendant that offered lower prices by refusing to charge sales tax) was distinct from the alleged RICO violation (defendant's fraud on the state by filing false tax returns).  *Id.* at 458.  Important in the Court's analysis was the presence of a more direct victim (the state) that had incentive to sue.  *Id.*[11]

Here, NMOHC frames PHS's conduct as a scheme "designed to fraudulently obtain and sell chemotherapy drugs."  (SAC ¶¶ 387, 509.)  Accepting the truth of NMOHC's allegations, the primary victim(s) of the predicate acts are the drug manufacturers that purportedly sold their product to PHS at a discount.  As in *Anza*, any injury to NMOHC is incidental.  That NMOHC's injury may have been a foreseeable or even intended consequence is irrelevant.  *See Hemi*, 130 S. Ct. at 991; *Anza*, 547 U.S. at 460 ("A RICO plaintiff cannot circumvent the proximate-cause requirement simply by claiming that the defendant's aim was to increase market share at a competitor's expense.").

NMOHC lacks RICO standing for failure to plead that anyone relied on any allegedly fraudulent statement.

## CONCLUSION

NMOHC's effort to challenge as exclusionary and monopolistic PHS's and PHP's legitimate business practices fails for all of the reasons above.  The SAC should be dismissed with prejudice.

---

[11] *See also Rezner v. Bayerische Hypo-Und Vereinsbank AG*, 630 F.3d 866, 873 (9th Cir. 2010) (affirming dismissal of private RICO action based on illegal tax shelter because the United States was the primary victim); *Mayfield SWD, L.L.C. v. Blevins*, No. CIV-10-0467-HE, 2011 WL 195656, at *2-4 (W.D. Okla. Jan 19, 2011) (dismissing RICO claims for failure to plead proximate cause).

RODEY, DICKASON, SLOAN, AKIN & ROBB, P.A.

/s/  Charles K. Purcell
Bruce Hall
Charles K. Purcell
Post Office Box 1888
Albuquerque, NM 87103
Telephone:  (505) 765-5900
Fax:  (505) 768-7395

JONES DAY
Jeffrey A. LeVee
Kate Wallace
555 South Flower Street, Fiftieth Floor
Los Angeles, CA 90071
Telephone:  (213) 489-3939
Fax:  (213) 243-2539

JONES DAY
Thomas Demitrack
North Point
901 Lakeside Avenue
Cleveland, OH 44114
Telephone:  (216) 586-3939
Fax:  (216) 579-0212

JONES DAY
Toby G. Singer
51 Louisiana Ave., N.W.
Washington, D.C. 20001-2113
Telephone:  (202) 879-3939
Fax:  (202) 626-1700

**Counsel for Defendants Presbyterian Healthcare Services and Presbyterian Network, Inc.**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 15, 2013, I electronically filed the foregoing using the

CM/ECF system, which will send notification of such filing to the following:

        J. Douglas Foster
        Geoffrey D. Rieder
        FOSTER, RIEDER & JACKSON, P.C.
        201 Third Street, NW, Suite 1300
        P.O. Box 1607
        Albuquerque, NM 87102
        jdfoster@swcp.com
        geoff@frjlaw.com

        George M. Sanders
        150 N. Michigan Ave., Suite 2800
        Chicago, IL 60601
        george.sandersfl@earthlink.net

                       /s/  Charles K. Purcell
                       An attorney for Defendants
                       Presbyterian Healthcare Services and
                       Presbyterian Network, Inc.

LAI-3188130v2