## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW MEXICO

NEW MEXICO ONCOLOGY AND
HEMATOLOGY CONSULTANTS, Ltd.,

        Plaintiff,                        No. 1:12-cv-00526 MV/GBW

v.

PRESBYTERIAN HEALTHCARE SERVICES,
and PRESBYTERIAN NETWORK, INC.

        Defendants.

### PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION TO DISMISS

The Defendants have moved to dismiss (doc. 33) Plaintiff's Second Amended Complaint ("the Complaint" – doc. 24) pursuant to Fed. R. Civ. P. 12(b)(6).  This Court should deny the Motion because each count of the Complaint adequately states a claim against the Defendants.

### LEGAL STANDARD

Fed. R. Civ. P. 8(a)(2) requires a "short and plain statement of the claim showing the pleader is entitled to relief."  The U.S. Supreme Court decisions in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937 (2009), have not created any special pleading rules for antitrust or RICO litigation.  *In Re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*, 562 F. Supp. 2d 392, 398 (E.D.NY 2008) (this 'flexible plausibility standard' is emphatically not a heightened pleading standard).  When deciding a Rule 12(b)(6) motion, this Court must still accept as true all factual statements alleged in the Complaint, viewing those facts in the light most favorable to the non-moving party. *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008).

Under Rule 12(b)(6), the court must determine if the factual allegations, taken as a whole, create a "plausible" claim. *West Penn Allegheny Health System, Inc. v. UPMC*, 627 F.3d 85, 98 (3rd Cir. 2010). Plausible, however, does not mean probable. "[T]he question is not whether the claimant will ultimately prevail but whether the complaint 'is sufficient to cross the federal court's threshold.'" *In re Processed Egg Products Antitrust Litigation*, 821 F. Supp. 2d 709, 716 (E.D. Pa. 2011) (quoting *Skinner v. Switzer*, 131 S. Ct. 1289, 1296 (2011)).

Legal conclusions are not prohibited and do, in fact, still play a role. Legal conclusions supported by factual allegations can provide a framework for the complaint. *Id.* at 679. The court needs to read the complaint as a whole, and determine if the legal conclusions are in some manner supported by factual allegations. *In re Polyurethane Foam Antitrust Litigation*, 799 F. Supp. 2d 777, 793 (N.D. Ohio 2011). In the antitrust context, alleging "monopoly power" or "anticompetitive actions" is essential, and the presence of those terms in the complaint does not weaken the complaint or imply that the complaint lacks factual detail. *Id.*

Finally, "on a Rule 12(b)(6) motion it is not the province of the court to dismiss the complaint on the basis of the court's choice among plausible alternatives." *Anderson News, LLC v. American Media, Inc.*, 680 F.3d 162, 190 (2d Cir. 2012). The choice between or among plausible inferences or scenarios is one for the fact finder. *Id.* at 184, citing *Anderson v. Bessemer City*, 470 U.S. 564, 575, 105 S. Ct. 1504, 1512 (1985). Fact-specific questions cannot be resolved on the pleadings. *Id.* at 185, (citing *Todd v. Exxon Corp.*, 275 F.3d 191, 203 (2d Cir. 2001)).

**ARGUMENT**

I.      **Plaintiff Has Alleged Plausible Antitrust Claims**

      A.      **Summary of Defendants' Motion to Dismiss**

Plaintiff NMOHC asserts that Defendants are (a) engaging in a course of conduct designed to willfully maintain their monopoly position over the market for Private Health Insurance (Counts I and III) through a series of anticompetitive practices and actions,[1] and (b) attempting to monopolize the market for Comprehensive Oncology Services (Counts II and IV). Defendants do not dispute that NMOHC has properly alleged markets for Hospital Inpatient Services and Private Health Insurance.  Defendants also "assume the existence" of the market for Comprehensive Oncology Services for "purposes of this motion to dismiss."  (Motion, p. 12 n. 6.)  Further, Defendants do not dispute the relevant geographic markets identified by NMOHC. Finally, Defendants do not even dispute NMOHC's allegations that they have monopoly power over the market for Hospital Inpatient Services.

Defendants incorrectly contend that NMOHC has failed to identify any anticompetitive practices committed by the Defendants.  NMOHC has alleged facts showing that Defendants have used their monopoly power to raise prices, exclude rivals, and prevent entry.  Defendants have also, among other things, coerced physicians and consumers away from NMOHC, have interfered, illegally, with NMOHC's relationships with physicians and patients, and have attempted to leverage the monopoly power they already possess into monopoly power over the market for Comprehensive Oncology Services.

---

[1]  While Defendants correctly point out that Counts I and III only allege monopolization of the market for Private Health Insurance, the omission of Inpatient Hospital Services was an error that Plaintiff intends to correct. Throughout the Complaint, Plaintiff alleges that Defendants have willfully maintained monopoly power over both Inpatient Hospital Services and Private Health Insurance.  (Complaint, ¶¶ 1, 2, 56-59, 83, 127-9, 145, 165-173, 188, 278.)

Defendants' claim that NMOHC failed to alleged properly their possessing monopoly power over the market for Private Health Insurance is meritless. Defendants control the dominant health insurer in Albuquerque, and the remaining health insurers having significantly smaller market shares. Entry barriers are high and no new health insurers have entered the market for many years. Health insurers in the market cannot seriously challenge Defendants' market position, particularly in light of Defendants' monopoly power over Hospital Inpatient Services. While Defendants may have a market share of approximately 46%, based on the limited information available to NMOHC at this time, NMOHC has alleged facts showing why this market share understates Defendants' ability to control the market for Private Health Insurance.

Finally, Defendants' claim that NMOHC lacks standing to challenge Defendants' monopolizing the market for Private Health Insurance is also meritless. NMOHC tried to develop a physician network and a new community hospital in order to facilitate entry into the market for Private Health Insurance. Defendants retaliated against NMOHC for having done this and have pursued a strategy to make it impossible for NMOHC to facilitate such entry in the future. Defendants' targeting of NMOHC in order to maintain their monopoly power over the market for Private Health Insurance gives NMOHC standing to pursue a monopolization claim against Defendants.

**B. Overview of Plaintiff's Antitrust Allegations**

**i. NMOHC and the Market for Comprehensive Oncology Services**

NMOHC operates a cancer center in which it offers patients "a full range of oncology related services in a coordinated, well supervised, innovative and efficient manner." (Complaint,

4

¶32.)   NMOHC has eight medical oncologists on its staff and has two radiation oncologists. (¶¶70 and 79.)   Only four entities provide medical oncology services in Albuquerque: (a) NMOHC (eight medical oncologists); (b) Hematology Oncology Associates (three full time medical oncologists and one half-time medical oncologist); (c) Presbyterian Healthcare Services (six medical oncologists); and (d) University of New Mexico Hospital (seven medical oncologists).   The University of New Mexico Hospital ("UNM Hospital"), however, does not have a "significant competitive presence in the Albuquerque area with respect to patients who have private health insurance."   (¶76.)   UNM Hospital has a closed staff model which "deters referrals from independent physicians" (¶74) and is "heavily skewed towards treating patients who receive health care financing from state and federal sources, such as Medicare and Medicaid" (¶75).

If Defendants drive NMOHC from the market, it will leave Hematology Oncology Associates ("HOA") as Defendants' principle competitor with respect to medical oncology and hematology services.   With entry into the market by new independent medical oncologists highly unlikely, NMOHC's removal from the market would give Defendants monopoly power over Comprehensive Oncology Services.[2]

### ii.   Defendants' Dominant Position Over Various Healthcare Markets

Healthcare markets have three primary participants: (a) facilities, such as hospitals; (b) health insurers; and (c) physicians.   These participants each play interrelated roles in the provision of healthcare services to patients.   Health insurers need access to hospitals and

---

[2] HOA does not provide Radiation Oncology Services.  A firm called Radiation Oncology Associates does provide Radiation Oncology services as does UNM Hospital.  Radiation Oncology Associates does not provide medical oncology services and could not prevent Defendants' exercising monopoly power over Comprehensive Oncology Services, if NMOHC were forced from the market.

physicians in order to build provider panels that they can market to consumers.  (¶¶137, 162-173.)  In markets where a hospital has monopoly power, health insurers need the hospital on their provider panel, if they want to have meaningful access to the market.  (*Id*.)  A hospital with monopoly power can, therefore, control entry into the market for Private Health Insurance, and can limit the ability of existing health insurers to effectively compete.  (*Id*.)

Hospitals and physicians need access to the provider panels established by health insurers.  (¶158.)  Exclusion from a health insurer's provider panel can make it impossible for health care providers to compete for patients insured by the health insurer.  (¶158, 170.)  *See also*, *West Penn Allegheny v UPMC*, 627 F.3d 85 (3rd Cir. 2010); *Reazin v. Blue Cross and Blue Shield of Kansas, Inc.*, 899 F.2d 951 (10th Cir. 1990).  A health insurer with monopoly power can, therefore, cripple hospitals and physicians that are excluded from its provider panel.  (¶¶162-173.)

Presbyterian has dominated the market for Hospital Inpatient Services in Albuquerque for decades.  (¶¶1, 146.)  Presbyterian is the largest hospital in New Mexico and treats more than 50% of the patients needing Hospital Inpatient Services in Albuquerque.  (¶¶1, 59.)  Its two remaining rivals split the remaining patients.  (¶¶60, 127.)  UNM Hospital, however, is not an effective rival and cannot competitively discipline Defendants.  UNM Hospital has a closed staff that limits its ability to compete against Defendants.  (¶¶58, 82, 138.)  Further, UNM Hospital is the only trauma center in Albuquerque and must set aside a number of its beds for trauma cases.  (¶¶58, 139.)  For these and other reasons, UNM Hospital's share of the overall market overstates its market position.   Presbyterian's share of the market for Hospital Inpatient Services significantly understates its true market position.  (¶¶1, 127.)

### iii.    Defendants Use their Monopoly Power to Prevent Entry and Exclude Rivals

New hospitals and health insurers have not entered the market, and Defendants' market dominance has not eroded over time.  (¶¶1, 136.)  Any new entry into Albuquerque would face significant challenges and is highly unlikely to occur.  (¶¶131-32, 135, 174.)  Under the best conditions, opening a new hospital or health insurer costs millions of dollars and takes a significant amount of time.  (¶¶131-35, 173-74.)  Entry into markets dominated by monopolists selling interrelated services is extremely unlikely, if not impossible.  *See*, *e.g.*, *Geneva Pharmaceuticals Technology Corp. v. Barr Laboratories Inc.*, 386 F.3d 485, 507-508 and n. 4 (3rd Cir. 2004).

Defendants' control over both the Hospital Inpatient Market and market for Private Health Insurance reinforces Defendants' power over each market.   (¶¶145, 169, 173.) Defendants have used this power to eliminate hundreds of independent physician practices in Albuquerque by either purchasing these practices or hiring the physicians as employees.  (¶¶145, 191.)  Presbyterian currently employs over 700 physicians.  (¶¶1, 134, 145.)  Any health insurer trying to grow or enter the Albuquerque area would have to build a new hospital and recruit hundreds of physicians into Albuquerque.  A similar dynamic protects Presbyterian's monopoly power over Hospital Inpatient Services.  (¶¶132, 135.)

NMOHC realized that Defendants' market dominance was a threat to every independent physician and independent health care facility in Albuquerque.  NMOHC worked to develop a network of independent physicians and to convert the Heart Hospital in Albuquerque into a community hospital.  (¶249.)  Creating these new entities might allow the expansion of the existing private health insurers in Albuquerque or facilitate new entry by health insurers into

Albuquerque.  (¶251.)  NMOHC's efforts were unsuccessful, and Defendants retaliated against NMOHC for its attempt to challenge Defendants' monopoly positions.  (¶253.)

Defendants understand that the existence of independent providers like NMOHC creates a possibility, albeit a small one, of new entry.  (¶¶151.)  Defendants have used their multifaceted monopoly power and the employment of hundreds of physicians to injure physicians who compete against Presbyterian.  Presbyterian, for example, has pressured physicians into not referring patients to NMOHC.  (¶¶4, 256.)  Presbyterian has also used its position as a provider of various ancillary medical services to pressure NMOHC patients to go to Presbyterian for those services.  (¶¶259, 261.)  Most recently, Defendants have used their monopoly power to coerce cancer patients into purchasing various chemotherapy drugs and support drugs from Presbyterian.  (¶¶7, 10, 289.)  Defendants have imposed this mandate on patients even though it interferes with the proper treatment of these very ill and vulnerable patients.  (¶¶13, 289.)

### C.   Plaintiff Alleges a Plausible Attempted Monopolization Claim

A claim of attempted monopolization includes the following elements: (a) the defendant's engaging in predatory or anticompetitive conduct; (b) a specific intent to monopolize; and (c) a dangerous probability of acquiring monopoly power.  *West Penn Allegheny v UPMC*, 627 F.3d 85 (3rd Cir. 2010); *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 317 (3rd Cir. 2007).  Defendants argue that NMOHC has not adequately alleged (a) predatory or anticompetitive conduct or (b) a dangerous probability of Defendants' acquiring monopoly power.  Defendants' arguments are meritless.

### i.   NMOHC Has Adequately Alleged Various Predatory and Anticompetitive Acts

Predatory or anticompetitive conduct

> may take a variety of forms, but it is generally defined as conduct to obtain or maintain monopoly power as a result of competition on some basis other than the merits.  Conduct that impairs the opportunities of rivals and either does not further competition on the merits or does so in an unnecessarily restrictive way may be deemed anticompetitive.

*Broadcom Corporation v. Qualcomm Incorporated*, 501 F.3d at 308.  No one rule separates legitimate conduct from anticompetitive conduct.  *West Penn Allegheny v UPMC*, 627 F.3d at 109 ("'anticompetitive conduct' can come in too many different forms, and is too dependent upon context, for any court or commentator ever to have enumerated all the varieties").  A firm engages in anticompetitive conduct when it "attempts 'to exclude rivals on some basis other than efficiency,' . . . competes 'on some basis other than the merits' [or] 'impairs the opportunities of rivals and either does not further competition on the merits or does so in an unnecessarily restrictive way.'"  *West Penn Allegheny v. UPMC*, 627 F.3d at 108.  This definition of anticompetitive conduct is tied to the basic principle that the antitrust laws are designed to protect consumer welfare.  *Reiter v. Sonotone Corporation*, 442 U.S. 330, 60 L.Ed.2d 931 (1979); *Broadcom Corp. v. Qualcomm Inc.,* 501 F.3d 297, 308 (3rd Cir. 2007).

Courts have classified many different types of conduct as anticompetitive.  Courts have recognized for decades that refusals to deal by a monopolist can violate the antitrust laws.  *Aspen Skiing Company v. Aspen Highlands Skiing Corporation,* 472 U.S. 585, 105 S. Ct. 2847 (1985); *Byars v. Bluff City News Company*, 609 F.2d 843 (6th Cir.1979); L&W/Linco Products, Inc. v. Pure Asphalt Co., 979 F. Supp. 632, 638 (N.D. Ill. 1997) ("it is firmly established that section 2 of the Sherman Act 'prohibits an enterprise from refusing to deal with another entity when this

course of action is undertaken in furtherance of monopoly'").  A hospital with monopoly power interfering with referrals to competitor physicians represents anticompetitive conduct.  *Potters Medical Center v. City Hospital Association*, 800 F.2d. 568 (6th Cir. 1986).  A hospital with monopoly power cannot condition physician access to the hospital with a requirement that the physicians not deal with the monopoly hospital's rivals.  *Id*.  *See*, *e.g*., *Reazin v. Blue Cross and Blue Shield of Kansas, Inc*., 899 F.2d 951 (10th Cir. 1990).  Further, a monopoly health insurer's terminating a provider agreement with a hospital, in retaliation for a hospital's relationship with a rival health insurer, can constitute anticompetitive conduct.  *Id*.  Discriminatory pricing arrangements designed to monopolize a market can also constitute anticompetitive conduct, *West Penn Allegheny v UPMC*, 627 F.3d at 103 ("Highmark maintained West Penn's reimbursement rates at artificially depressed levels and repeatedly refused to increase them"), as can a monopolist's imposing burdens on a rival's customers in order to deter them from working with the rival.  *Lorain Journal Co. v. United States*, 342 U.S. 143, 72 S. Ct. 181 (1951).

Whether specific conduct is anticompetitive requires a fact-specific analysis that depends on the defendant's market power, the defendant's overall actions in the market, the reason for the conduct, the effect of the conduct on rivals, and whether the conduct is unreasonably restrictive.  *Aspen Skiing Company v. Aspen Highlands Skiing Corporation,* 472 U.S. 585, 105 S. Ct. 2847 (1985); *United States v. Microsoft Corporation*, 253 F.3d 34, 60 (D.C. Cir. 2001); *Broadcom Corp. v. Qualcomm Inc*., 501 F.3d at 317.  The ability of firms lacking market power to legally use various business practices does not mean that a firm with monopoly power can use the same business practices.  *See*, *Abbott Laboratories v. Teva Pharmaceuticals*, 432 F. Supp.2d 408 (D. Del. 2006) ("a monopolist is not free to take certain actions that a company in a competitive (or

even oligopolistic) market may take, because there is no market constraint on a monopolist's behavior") (quoting *LePage's Inc. v. 3M,* 324 F.3d 141, 151-52 (3rd Cir. 2003)).  Moreover, a court should not evaluate individual types of conduct in isolation from the defendant's overall conduct.  *Id*., at 428 ("[w]hen determining antitrust liability based on a collection of factual allegations, 'the courts must look to the monopolist's conduct taken as a whole rather than considering each aspect in isolation'") (quoting *LePage's,* 324 F.3d 141, 162 (3rd Cir. 2003)(citing *Cont'l Ore Co. v. Union Carbide & Carbon Corp.,* 370 U.S. 690, 699, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962)); *Kobe v. Dempsey Pump Co*., 198 F.2d 416, 425 (10th Cir. 1952) ("[Defendant's activities], of course, in themselves were not unlawful, and standing alone would not be sufficient to sustain a claim for damages which they may have caused, but when considered with the entire monopolistic scheme which preceded them we think, as the trial court did, that they may be considered as having been done to give effect to the unlawful scheme"); *LePage's Incorporated v. 3M*, 324 F.3d 141, 162 (3rd Cir. 2003) ("[t]he relevant inquiry is the anticompetitive effect of [Defendant's] exclusionary practices considered together").

It is also well established that a firm with monopoly power in one market may not use that monopoly power to monopolize or attempt to monopolize another market.  *Cost Management Services, Inc. v. Washington Natural Gas Company*, 99 F.3d 937, 951 (9th Cir. 1996) ("[i]t is clear from our analysis, however, that to the extent that 'monopoly leveraging' is defined as an attempt to use monopoly power in one market to monopolize another market, this theory remains a viable theory under Section 2"); *Poster Exchange, Inc. v. National Screen Service Corporation,* 431 F.2d 334, 339 (5th Cir. 1970) ("[m]oreover, the Supreme Court has long ago condemned a vertically integrated manufacturer-retailer from using its power at one

level to drive out competition at another").  Defendants' using their monopoly power over Hospital Inpatient Services and Private Health Insurance to destroy competition in the market for Comprehensive Oncology Services is itself a violation of Section 2 of the Sherman Act.

NMOHC has alleged a wide range of conduct by Defendants that, individually and collectively, constitutes anticompetitive conduct.  The Defendants have used their monopoly power over Hospital Inpatient Services and Private Health Insurance to coerce private physicians into employment relationships with PHS or to leave the market entirely.  (Complaint, ¶¶194-5, 200, 204.)   Along with coercion, Defendants have also induced physicians to enter into employment arrangements by paying them compensation well above the fair market value for their practices.  (¶214.)  Presbyterian acquired these physician practices so it could assert additional control over various markets for physician services, including the market for Comprehensive Oncology Services.  This type of conduct is exclusionary and anticompetitive. *See*, *e.g.*, *United States v. Microsoft Corporation*, 253 F.3d at 60 ("Microsoft's efforts to gain market share in one market (browsers) served to meet the threat to Microsoft's monopoly in another market (operating systems) by keeping rival browsers from gaining the critical mass of users necessary to attract developer attention away from Windows as the platform for software development").

Employing more than 700 physicians and controlling the markets for Hospital Inpatient Services and Private Health Insurance, Defendants are pressuring physicians not to refer cancer patients to NMOHC.  (¶¶254, 256-7, 291.)  This is not competition on the merits or simply efficient conduct by a firm.  It is the use of monopoly power to prevent competition on the merits and to limit consumer choice.  Physicians are not referring patients to Presbyterian's employed

oncologists because they believe patients will receive better or more efficient care.  Presbyterian is coercing physicians and engaging in the other referral practices identified by NMOHC because Presbyterian cannot effectively compete against NMOHC on the merits.

Physicians play a critical role in guiding patients' health care decisions.  *See*, *California Dental Association v. Federal Trade Commission*, 526 U.S. 756, 772, 119 S. Ct. 1604, 1613 (1999).  Many patients cannot properly evaluate the best choice of physician for their specific medical condition, and they rely on the advice they receive from their primary physician. Congress has recognized this reality, as well as the need to ensure that a physician's referrals are based on what is best for the physician's patients.  It is unlawful, for example, to pay physicians for specific referrals, or to compensate physicians based on the referrals they make.

Defendants have engaged in other anticompetitive conduct against NMOHC in order to eliminate NMOHC as a competitor.  Defendants have established, for example, discriminatory reimbursement rates that are designed to cripple NMOHC.  (Complaint, ¶¶257, 269-70.) Defendants have also recently imposed an exclusive dealing arrangement on many of NMOHC's patients that coerces these patients into purchasing chemotherapy drugs and support drugs from PHS' specialty pharmacy.  Not only does this mandate strip NMOHC of significant revenues, it also interferes with NMOHC's ability to properly care for its patients and imposes extra burdens on very sick and elderly cancer patients.  (¶¶289, 291, 293.)   Exclusive dealing arrangements represent a classic form of anticompetitive conduct.  *Standard Oil Co. of California v. United States*, 337 U.S. 293, 69 S. Ct. 1051 (1949); *United States v. Dentsply International, Inc.*, 399 F.3d 181 (3rd Cir. 2005).

### ii.      Defendants' Excuses for their Conduct are Meritless

The Defendants sweepingly argue that as long as they are trying to "make more money" their conduct is not anticompetitive as a matter of law.  (Motion, 12.)  Defendants' argument is absurd.  First, it ignores decades of established law.  *See*, *Aspen Skiing Company v. Aspen Highlands Skiing Corporation,* 472 U.S. 585, 105 S. Ct. 2847 (1985); *Lorain Journal Co. v. United States*, 342 U.S. 143, 72 S. Ct. 181 (1951).  Second, if Defendants' argument were correct, and it is not correct, nothing a monopolist did could ever constitute anticompetitive conduct.  Whenever a monopolist commits anticompetitive actions to monopolize a market or maintain monopoly power, it believes it will "make more money" by acquiring or maintaining monopoly power.

Finally, *Christy Sports v. Deer Valley Resort*, 555 F.3d 1188 (10th Cir. 2009), on which Defendants rely, does not support their position.  In *Christy Sports*, the defendant had created a ski resort that competed against many other ski resorts.  The defendant had initially allowed the plaintiff to operate a ski rental shop on the defendant's property.  The plaintiff alleged the defendant was monopolizing the market for ski rentals on its own resort when the defendant refused to let the plaintiff continue renting skis on its property.  *Id*., at 1192.  The appropriate market, however, was ski resort services, not ski rentals within the defendant's own resort.  *Id.* The defendant did not have any market power in the broader market, and consumers could choose if they wanted to go to a ski resort with only a captive ski rental agency.  *Id*., at 1191. Other than the implausible suggestion that a single ski resort can constitute a relevant market, the plaintiff failed to allege any type of improper conduct.  The Tenth Circuit did not announce a

new antitrust rule that a monopolist is immune from antitrust scrutiny whenever it tries to "make more money."

Defendants' suggestion that referring "business within an integrated healthcare entity is ordinary and understandable behavior that allows a firm to achieve efficiencies" and is *per se* lawful, even if a firm has monopoly power (Motion, p.14), is meritless for a number of reasons. Whether Defendants' conduct is efficient or even ordinary is a fact question with which NMOHC vehemently disagrees.  Defendants are attempting to argue a factual defense that is inappropriate on a motion to dismiss.[3]  Second, even if such practices are lawful and ordinary when practiced by firms lacking monopoly power, that does not mean that the same practices committed by a monopolist trying to eliminate a rival and maintain its monopoly are also lawful. *Berkey Photo v. Eastman Kodak Co.*, 603 F.2d 263, 275 (2d Cir. 1979); *Abbott Laboratories v. Teva Pharmaceuticals*, 432 F. Supp.2d 408, 424 (D. Del. 2006) ("a monopolist is not free to take certain actions that a company in a competitive (or even oligopolistic) market may take, because there is no market constraint on a monopolist's behavior").

With respect to Defendants imposing an exclusivity requirement on NMOHC's patients concerning the purchase of chemotherapy drugs and support drugs, Defendants baselessly argue that their conduct is lawful as a matter of law because it is "no different than if PHP instead lowered the rate of reimbursement for Medicare Advantage drugs purchased at other pharmacies to the rate charted by the PHS specialty pharmacy."  (Motion, p. 15.)  First, Defendants are denying very ill elderly cancer patients any reimbursement if they choose to purchase their

---

[3]  Defendants claim that NMOHC "concedes" that they are an integrated healthcare firm.  Nowhere in the Complaint does NMOHC make such a statement, nor do the Defendants cite to any paragraph in the Complaint to support their claim.

chemotherapy and support drugs from NMOHC.  Defendants' suggestion that forcing cancer patients to use Presbyterian's specialty pharmacy is equivalent to giving patients a choice is absurd.  Second, an exclusive arrangement does not become a pricing issue simply because the arrangement can be theoretically analogized to a pricing issue.  *United States v. Dentsply International, Inc.*, 399 F.3d 181 (3rd Cir. 2005).  Finally, a monopolist that leverages its monopoly power to punish a rival's customers in order to destroy its rival and monopolize a different market is engaging in anticompetitive conduct.  *Aspen Skiing Company v. Aspen Highlands Skiing Corporation*, 472 U.S. 585, 610, 105 S. Ct. 2847, 2861 (1985) ("the record in this case comfortably supports an inference that the monopolist made a deliberate effort to discourage its customers from doing business with its smaller rival … [and this] supports an inference that Ski Co. was not motivated by efficiency concerns and that it was willing to sacrifice short-run benefits and consumer goodwill in exchange for a perceived long-run impact on its smaller rival"); *Lorain Journal Co. v. United States*, 342 U.S. 143, 72 S. Ct. 181 (1951).

### iii.  NMOHC Has Adequately Alleged a Dangerous Probability of Defendants' Monopolizing the Market for Comprehensive Oncology Services

NMOHC has alleged facts showing that Defendants have a dangerous probability of monopolizing the market for Comprehensive Oncology Services in Albuquerque.  There are only three firms in Albuquerque that provide the full range of Comprehensive Oncology Services: Presbyterian, NMOHC, and UNM Hospital.  While HOA is a small provider of medical oncology services, it does not offer patients radiation oncology services.  Further, Radiation Oncology Associates does not provide any medical oncology services.  Defendants' elimination of NMOHC from the market would leave only UNM Hospital as a provider of the full range of

services falling within the market for Comprehensive Oncology Services.  UNM Hospital does not have a significant competitive presence that could prevent the exercise of monopoly power by Defendants if NMOHC was removed from the market.  (Complaint, ¶¶76, 81, 138-42.)

HOA and Radiation Oncology Associates, standing alone, could not prevent Defendants from exercising monopoly power over the market for Comprehensive Oncology Services.  HOA and Radiation Oncology Associates are too small to impose any competitive check on Defendants.  Defendants' destruction of NMOHC through a pattern of anticompetitive actions would almost certainly deter HOA and Radiation Oncology Associates from taking any actions contrary to Defendants' wishes.

Defendants' argument that NMOHC has not identified any market shares for the participants in the market for Comprehensive Oncology Services is both misleading and meritless.  First, NMOHC has identified the participants in the market for Comprehensive Oncology Services and has identified their relative positions and size.  NMOHC's identifying each participant and the number of physicians working for each is a market share calculation.  Second, NMOHC is not required, at the pleading stage, to identify precise market share calculations to support a "dangerous probability of success" allegation.  Whether a firm has a dangerous probability of success is not dependant on the defendant's market share.  *E.I. du Pont De Nemours & Company v. Kolon Industries, Inc.,* 637 F.3d 435 (2011) ("a monopolist's use of exclusive contracts, in certain circumstances, may give rise to a [Sherman Act] Section 2 violation even though the contracts foreclose less than [a] roughly 40% or 50% share . . .") (citing *United States v. Microsoft*, 253 F.3d 34 (2001)).  Whether a defendant has a dangerous probability of success turns on many factors, including, but not limited to, market structure,

number of competing firms and their relative strength, ease of entry, and the defendants overall market power and conduct.  *Broadcom Corp. v. Qualcomm Inc.,* 501 F.3d 297 (3rd Cir. 2007); *L&W/Lindco Products, Inc. v. Pure Asphalt Company*, 979 F.Supp. 632 (N.D.Ill. 1997).  This is a complex factual analysis that is typically not appropriately addressed on a motion to dismiss. *Id*.

Defendants' argument that NMOHC needed to allege that its exit from the market was "imminent" is also meritless.  This is not an element of a claim for attempted monopolization, and Defendants do not cite to any case to support their assertion.  Further, NMOHC has alleged that Defendants' anticompetitive practices may force it out of the market.  (Complaint, ¶¶247, 267, 299.)  Defendants are raising a factual issue that is not amenable to resolution on a motion to dismiss.

Finally, while Defendants claim they assume the market for Comprehensive Oncology Services is a valid market, they nonetheless incorrectly claim that NMOHC has not identified the substance of this market.  (Motion, p.12 n. 6.)  NMOHC alleges that Comprehensive Oncology Services include "medical oncology services and radiation oncology services [and that] [p]atients needing these types of services cannot substitute these medical services for other types of services."  (Complaint, ¶86.)  These services include the "diagnosis, management and treatment of cancer," hematology services that include the "diagnosis, management and treatment of benign and malignant diseases of the blood and blood forming tissues," and radiation oncology that includes "a number of different treatment methods that use high-energy rays to kill cancer cells."  (¶¶25-28.)  NMOHC further alleges that patients cannot substitute other types of medical

treatment for the types of cancer treatment services falling within Comprehensive Oncology Services.  (¶¶86-89.)

Defendants' argument that they cannot tell if Comprehensive Oncology Services includes "physician services, facility services and administration of medication . . ." is baseless.  (Motion, p.12 n. 6.)  The Complaint details the physicians that provide Comprehensive Oncology Services and the facilities in which those services are provided.  (Complaint, ¶¶24-34, 69-82, 85-89, 115-120.)  The management and treatment of cancer includes the administration of Chemotherapy drugs and support drugs, which is also detailed in the Complaint.

This Court should deny Defendants' Motion with respect to Plaintiff's attempted monopolization claims.

### D.     Plaintiff Alleges a Plausible Monopolization Claim

Defendants' argument that NMOHC has not, as a matter of law, alleged facts showing Defendants' possession of monopoly power over the market for Private Health Insurance is meritless.  Monopoly power is the ability to control the price of the monopolized product or service and to exclude rivals.  *Reazin v. Blue Cross and Blue Shield of Kansas, Inc*., 899 F. 2d 951, 963 (10th Cir. 1990).  A firm can have monopoly power even if it faces competitors in the monopolized market.  *Id.; Abbott Laboratories v Teva Pharmaceuticals*, 432 F. Supp. 2d 408, 424 (D. Del. 2006).  A firm's market share is only one factor courts look at when determining whether a firm has monopoly power.  *Reazin v. Blue Cross and Blue Shield of Kansas, Inc*., 899 F. 2d 951, 963 (10th Cir. 1990); *Geneva Pharmaceuticals Technology Corp. v. Barr Laboratories Inc.,* 386 F.3d 485 (2d Cir. 2004); *Allen v. Dairy Farmers of America, Inc.,* 748 F. Supp.2d 323 (D.Vt. 2010).  A high market share, for example, does not conclusively prove that a

firm has monopoly power, nor does a moderate market share preclude the presence of monopoly power. *Cost Management Services, Inc. v. Washington Natural Gas Company*, 99 F. 3d 937, 951 (9th Cir. 1996).

Determining whether a firm has monopoly power involves a fact specific analysis that looks into a number of different factors. *Id.* These factors include, for example, the number and strength of competitors in the market, the ability of new firms to enter the market, the presence or absence of entry in the past, the stability of the relevant market positions, and whether the defendant has monopoly power in other markets and the elasticity of demand. This type of analysis is not typically amenable to resolution on a motion to dismiss. *Id.*; *Allen v. Dairy Farmers of America, Inc.,* 748 F. Supp. 2d 323 (D. Vt. 2010).

Defendants' exclusive focus on Plaintiff's having alleged that Defendants have a 46% market share over Private Health Insurance is legally baseless. NMOHC has alleged that the markets for Hospital Inpatient Services and Private Health Insurance are interrelated and that Defendants' monopoly power over Hospital Inpatient Services has given Defendants the ability to monopolize the market for Private Health Insurance. In *Geneva Pharmaceuticals Technology Corp. v. Barr Laboratories Inc.*, the court recognized the synergy created by using a monopoly in one market to monopolize a related market. 386 F.3d 485, 507-508 and n. 4 (3rd Cir. 2004) (pharmaceutical companies' conspiracy with supplier of drug needed to produce warfarin sodium was designed to prevent entry by monopolizing both the manufacturing and supply side of the market). *See also*, *United States v. Microsoft Corporation*, 253 F.3d at 60. In *West Penn Allegheny Health System, Inc. v. UPMC*, 627 F. 3d 85 (3rd Cir. 2010) the court recognized the bilateral monopoly phenomenon in the context of a conspiracy between a dominant hospital in

the area and a dominant health insurer to prevent entry into both of their markets.  Indeed, the Tenth Circuit's finding unlawful monopolization in *Reazin* was based on Blue Cross' efforts to prevent entry into the health insurance market by punishing a hospital that tried to bring a new health insurer into the market.  *Reazin v. Blue Cross and Blue Shield of Kansas, Inc*., 899 F. 2d 951 (10th Cir. 1990).

NMOHC has also alleged that Defendants do not face any major competitors in either the markets for Hospital Inpatient Services or Private Health Insurance.  (Complaint, ¶¶56, 58, 63-68, 127-30, 142-43, 275-82.)   The Defendants have maintained their dominant position over many years and have expanded their market position with the acquisition of hundreds of physician practices.  (¶¶193-206.)  The firms that currently exist have not been able to challenge Defendants' market position for many years, and no meaningful entry has occurred in decades.  (¶¶128, 131, 137-143.)   Entry by new firms has failed because Defendants have closed significant market segments to such entrants.  (¶¶131-36.)  Further, Defendants have tied up additional health insures with exclusive dealing arrangements in order to prevent their working with rivals and potential entrants.  Defendants' additional anticompetitive practices are detailed above and in the Complaint and will not be repeated in greater detail here.  Plaintiffs have plausibly alleged that Defendants possess monopoly power over the market for Private Health Insurance.

Finally, Defendants' argument that NMOHC did not allege the maintenance of Defendants' monopoly power over Private Health Insurance though anticompetitive actions is meritless.  Defendants are essentially arguing that none of the anticompetitive actions committed by Presbyterian (the defendant hospital) are attributable to PHP (the defendant health insurer).

Presbyterian and PHP are part of the same corporate entity.  (Complaint, ¶¶39-43.)  Indeed, Presbyterian is PHP's ultimate parent corporation.  It is frivolous to suggest that Presbyterian and PHP are not the same entity with respect to a claim under Section 2 of the Sherman Act. *Copperweld Corporation v. Independence Tube Corporation*, 467 U.S. 752, 104 S. Ct. 2731 (1984) (a parent and subsidiary are treated as a single entity under the antitrust laws).

NMOHC has plausibly alleged that Defendants possess monopoly power over the market for Private Health Insurance and that they have maintained that power though the commission of various anticompetitive actions.

### E.     Plaintiff Has Standing To Assert Its Monopolization Claim

Defendants' argument that NMOHC does not have standing to challenge Defendants' monopolization of the Private Health Insurance market is baseless.  While it is true that NMOHC does not sell health insurance and is not suing in its capacity as a purchaser of Defendants' health insurance products, those are not the only ways a firm can have standing to assert a monopolization claim.  *Geneva Pharmaceuticals Technology Corp. v. Barr Laboratories Inc.*, 386 F.3d at 512-514.  A firm has standing to bring a monopolization claim if it was targeted by a monopolist as part of the monopolist's efforts to maintain its monopoly in a different market. *See*, *id.*; *Reazin v. Blue Cross and Blue Shield of Kansas, Inc*., 899 F.2d 951, 963 (10th Cir. 1990) (plaintiff possessed antitrust standing because "Plaintiff's claimed injuries were an 'integral aspect' of the conspiracy to restrain trade in the health care financing market"); *Blue Shield of Virginia v. McCready*, 457 U.S. 465, 479, 102 S. Ct. 2540, 2548 (1982) (health plan subscriber had standing to challenge defendant insurer's exclusion of psychologists because "[t]he harm to McCready and her class was clearly foreseeable; indeed, it was a necessary step in

22

effecting the ends of the alleged illegal conspiracy"); *Crimpers Promotions Inc. v. Home Box Office, Inc*. 724 F.2d 290, 294 (2d Cir. 1983) (plaintiff hosting a trade show for cable programming providers had standing to challenge the anticompetitive conduct of large cable programming providers despite being neither a consumer nor a competitor in the market of cable programming because plaintiff "got in the way" of the defendants' anticompetitive scheme); *Donahue v. Pendleton Woolen Mills, Inc*. 633 F. Supp. 1423, 1435 (S.D. N.Y. 1986) (salesmen had standing to bring antitrust action against former employer that terminated their employment after they failed to go along with defendant's illegal resale price maintenance agreement, because "of the central role of Pendleton's sales force in imposing the averred resale price maintenance agreement on Pendleton retailers . . . [and because] [c]oercing these plaintiffs and the rest of the sales force into implementing the scheme 'was the very means by which it is alleged that [Pendleton] sought to achieve its illegal ends'").

Here, Defendants have targeted NMOHC because NMOHC tried to bring new entries into both the markets for Private Health Insurance and Hospital Inpatient Services.  (Complaint, ¶253.)  Further, Defendants have pursued a strategy of destroying or crippling any independent health care provider that could act as a new source of entry.   Under these circumstances, NMOHC has standing to challenge Defendants monopolization efforts.

Defendants' reliance on *Abraham v. Intermountain Health Care, Inc*., 461 F. 3d 1249 (10th Cir. 2006) is misplaced.  In *Abraham*, the plaintiffs were optometrists who alleged that Intermountain Health Care ("IHC") conspired with ophthalmologists to exclude optometrists from IHC's managed care plans.  Optometrists did not provide surgical eye care services but did compete against ophthalmologists with respect to non-surgical eye care.  *Id*., 461 F. 3d at 1258.

The optometrists alleged that the ophthalmologists agreed to help IHC monopolize the market for surgical eye care, in which IHC participated, in exchange for IHC preventing competition by optometrists.  *Id*.  On summary judgment the court dismissed the plaintiffs' conspiracy claims. Without the conspiracy claim, however, the plaintiffs could not show that their exclusion from IHC's provider panels had any connection whatsoever with a scheme to monopolize the market for surgical eye care services.  *Id*., 461 F. 3d at 1259.  The plaintiffs in *Abraham* could not show that they were targeted to facilitate the monopolization of the market for surgical eye care services, and the court properly held that they did not have standing to pursue a monopolization claim concerning the market for surgical eye care services.  The court's decision in *Abraham* has no relevance here.

For the reasons stated above, this Court should reject Defendants' standing argument.

**F.      Defendants' Suggestion that Plaintiff's Claims are Barred by the Statute of Limitations is Meritless**

Defendants make a statement in the introduction to their Motion that "ancient conduct in an irrelevant market is barred by the four-year statute of limitation."  (Motion, p. 2.)  Defendants do not develop this point in any manner and do not even apparently ask this Court to dismiss any of Plaintiff's claims on statute of limitation grounds.  If they had, however, such an argument is meritless.  Plaintiff is permitted to introduce evidence in an antitrust case concerning events that occurred outside the statute of limitations period in order to show violations of the antitrust laws within the statute of limitations period.  *United States v. Suntar Roofing, Inc.*, 897 F. 2d 469, 479-80 (10th Cir. 1990) (district court properly admitted evidence of similar customer allocation agreements before period charged in indictment; jury instructed that evidence admissible only for limited purpose of proving knowledge, intent, or lack of mistake); *In Re Coordinated Pretrial*

*Proceeding in Petroleum Prods. Antitrust Litig.,* 906 F.2d 432, 451 (9th Cir. 1991) (dated conduct, even if outside scope of statute of limitations, relevant to establish intent and motive); *Panotex Pipe Line Co. v. Phillips Petroleum Co.,* 457 F.2d 1279, 1285 (5th Cir. 1972) (evidence of events prior to and after limitations period may be admissible to show the purpose and character of transactions at issue).

## II.   PLAINTIFF HAS ADEQUATELY ALLEGED RICO VIOLATIONS BY PHS

### A.  Plaintiff has Adequately Alleged a Fraudulent Scheme and Fraudulent Statements in Support of its Mail and Wire Fraud Claims

Plaintiff's RICO claim is based on a fraudulent scheme developed by Defendants to obtain chemotherapy and support drugs unlawfully through a federal drug discount program called the 340B Program and then force NMOHC's patients to purchase those drugs. (Complaint, ¶¶369, 378, 381-82, 386-88.)  Presbyterian makes significant profits on these sales, because it can purchase the drugs at a deeply discounted price.  (¶¶383, 406.)

The 340B Program was designed by Congress to help certain health care providers offset losses from treating indigent patients by allowing these entities (called "Covered Entities") to purchase drugs at deeply discounted prices.  (¶¶333-42, 345-51.)  Covered Entities, however, can only sell these drugs to their own patients.  (¶¶352-56.)  A Covered Entity cannot purchase drugs through the 340B Program and sell them to other physicians' patients.

Defendants' scheme involves Presbyterian's ordering and purchasing drugs through the 340B Program, knowing that it is going to sell those drugs to persons who are not its patients.  A critical component of the scheme is Presbyterian's directing its health insurer to coerce NMOHC's patients to purchase chemotherapy drugs and support drugs from Presbyterian's specialty pharmacy.  This Mandate violates the 340B Program.  First, Presbyterian cannot

compel individuals to purchase 340B drugs through its pharmacy.  *See*, Notice Regarding 340B Drug Pricing Program—Contract Pharmacy Services, 75 Fed. Reg. No. 43, pp.10272-10279, 10278 (March 5, 2010) ("the covered entity will inform the patient of his or her freedom to choose a pharmacy provider . . . [i]f the patient does not elect to use the contracted service, the patient may obtain the prescription from the covered entity and then obtain the drug(s) from the pharmacy provider of his or her choice).  Second, the Mandate ensures that Presbyterian will sell 340B drugs to persons who are not its patients.  Presbyterian misleads pharmaceutical companies when it purchases drugs through the 340B Program that it intends to direct to patients of other physicians.  (¶¶342, 387.)  Defendants then made misleading statements to providers and patients that Presbyterian can lawfully sell 340B drugs to NMOHC's patients.  (¶¶391-96, 412, 414-21.) Defendants have used the U.S. Mail to further their scheme as well as making false statements on the Internet concerning the 340B Program (the basis for NMOHC's wire fraud allegations). (¶¶449-67.)

> **i.**   **Affirmative Misrepresentations are not an Essential Element in every Mail Fraud Claim**

The predicate acts on which NMOHC relies are mail fraud (18 U.S.C. §1341) and wire fraud (18 U.S.C. §1343).  A mail fraud claim has the following elements:

> (1) the devising of a scheme or artifice either (a) to defraud or (b) for obtaining money by means of false or fraudulent pretenses, representations, or promises, (2) the specific intent to defraud, and (3) the use of the United States mails to execute the scheme.[4]

*U.S. v. Kennedy*, 64 F.3d 1465, 1475 (10th Cir. 1995).  The "first element is the existence of a scheme." *Id*.  The scheme does not have to include any fraudulent statements. *Id*. *See*, *Bridge v.*

---

[4] Wire fraud is identical to mail fraud, except that the third element requires the use of the wires to transmit a message across state lines.  Because of the overlap, we will not separately address wire fraud.

*Phoenix Bond & Indemnity Co.*, 553 U.S. 639, 652, 128 S. Ct. 2131, 2140 (2008) (mail fraud is not a codification of common law fraud nor does it criminalize the making of false misrepresentations; instead it makes unlawful "the use of the mails with the purpose of executing or attempting to execute a scheme to defraud").   Specifically, two types of schemes can violate the mail fraud statute: (a) schemes to defraud, or (b) schemes to obtain "money by means of false or fraudulent pretenses, representations, or promises."   *U.S. v. Kennedy*, 64 F.3d at 1476 ("[s]ince the decision in Graham, this court has taken an additional step in interpreting the language of the mail fraud statute by making explicit the distinction between mail fraud violations based on schemes 'to defraud' and those based on schemes 'for obtaining money or property by means of false or fraudulent pretenses, representations, or promises'").

Defendants premise their challenge to NMOHC's RICO claim, however, on the legally erroneous assertion that a "scheme to defraud requires, among other elements, that the defendant made a material false misrepresentation . . ."   (Motion, p. 22.)   This Court should reject Defendant's argument.

A defendant perpetrates a scheme to defraud when it takes advantage of implicit understandings and assumptions made during the course of routine transactions.   For example, when a person deposits checks with a bank, an implicit assumption exists that the check is supported by sufficient funds.   A person who deposits a series of bad checks with a bank in order to create a false appearance of solvency has created a scheme to defraud.   While the checks themselves do not contain any express misrepresentations, they falsely portray the actual availability of supporting funds.   *See*, *U.S. v. Bonnett*, 877 F.2d 1450, 1454-55 (10th Cir. 1989) (borrowing the relevant standards from the mail and wire fraud statutes in a bank fraud case).

Here, when Defendants order drugs through the 340B Program, they are also making an implicit statement that they are only going to sell the drugs to their own patients consistent with the 340B Program. By repeatedly ordering drugs through the 340B Program that the Defendants intend to sell to NMOHC's patients the Defendants are falsely portraying to pharmaceutical manufacturers that they are going to sell the drugs consistent with the 340B Program.

Plaintiff has alleged a scheme to defraud that violates the mail and wire fraud statutes, even without defendants having made any affirmative misrepresentations. Plaintiff has also alleged that the Defendants used the U.S. Mail to further this scheme.

### ii. Plaintiff has Alleged Facts Showing that Defendants Made Many Misrepresentations to Providers and Patients Concerning the 340B Program

Defendants' coercing various NMOHC and HOA cancer patients to purchase their chemotherapy drugs and support drugs from Presbyterian's specialty pharmacy was opposed by NMOHC, HOA, and many of their patients. (Complaint, ¶399.) The Mandate (¶¶306-7) imposes significant burdens on very ill elderly patients, many of whom are dying of cancer. (¶¶312, 380, 384-5.) Defendants cavalierly refer to this as "patients have been inconvenienced." (Motion, p.8.) NMOHC's patients did not want to have their treatment at NMOHC disrupted or be forced to go physically to Presbyterian to fill a prescription and have these drugs infused at Presbyterian's infusion center. This is significantly more than being "inconvenienced."

In order to lull patients and providers into believing Defendants' actions were lawful, Presbyterian had its health insurer send a series of letters to patients and providers that contained numerous misrepresentations concerning the 340B Program. First, Presbyterian Health Plans circulated a letter to providers misrepresenting that Presbyterian could use the Mandate and the

340B Program to lawfully lower health care costs.    (Complaint, ¶¶391-396.)    Second, Presbyterian Health Plans circulated a series of letters to HOA containing misleading statements that were designed to make HOA believe the Mandate was not going to violate the 340B Program. (¶¶400-412.)  Finally, the President of Presbyterian Health Plan Inc. made a series of statements for publication on the Internet that falsely portrayed the 340B Program to consumers. (¶¶413-421.)

Making statements to lull targets and victims violates the mail fraud and wire fraud statutes.  *U.S. v. Massey*, 48 F.3d 1560 (10th Cir. 1995).  Defendants' communications were transmitted by U.S. Mail and the wires and constitute mail fraud and wire fraud.

Finally, Plaintiff has alleged facts showing that Defendants knowingly made the previously described statements to consumers and providers.  Plaintiff alleges that Presbyterian employees knew Presbyterian was violating the 340B Program and when they tried to stop these violations were "told to mind their own business." (Complaint, ¶¶370-372.)  Further, Defendants cannot plausibly state that every NMOHC patient covered by the Mandate would necessarily also be a Presbyterian patient.  Presbyterian cannot create a scheme that will violate the 340B Program as a matter of course, and then deny knowing about these violations.  Plaintiff has alleged facts showing that Defendants made various misleading statements knowingly, deliberately, and maliciously.

Plaintiff has properly alleged that Defendants committed mail fraud and wire fraud.

### B.    Plaintiff Has Standing to Assert Its RICO Claim

Defendants' scheme directly targets NMOHC's sales of chemotherapy and support drugs to NMOHC's patients.   Defendants did not structure their scheme so they could obtain

discounted drugs from pharmaceutical manufactures that they would not be able to sell.  Nor was the Defendants' primary goal to injure pharmaceutical manufactures by purchasing discounted drugs through the 340B Program.  The primary target of the scheme was and remains NMOHC. Defendants stripped many of NMOHC's sales of chemotherapy drugs and support drugs so they could earn extra profits at NMOHC's expense.  NMOHC losses are the direct result of Defendants' scheme and are the foreseeable and natural consequence of Defendants' scheme. NMOHC, therefore, has alleged injuries that were proximately caused by Defendants' scheme, and NMOHC has standing under 18 U.S.C. §1964(c).  *Bridge v. Phoenix Bond & Indemnity Co.*, 553 U.S. at 647, 128 S. Ct. at 2138; *In re Neurontin Marketing and Sales Practices Litigation*, 712 F.3d 21, 37 (1st Cir. 2013) (plaintiff's injuries were the foreseeable and natural consequence of defendant's scheme).

### i.      NMOHC has Sufficiently Alleged Proximate-Cause

RICO plaintiffs have standing to sue under 18 U.S.C. Section 1964(c), which broadly provides that "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor . . . and shall recover threefold the damages he sustains and the cost of the suit, including reasonable attorneys fees."  Courts have imposed a proximate-cause limitation on the scope of Section 1964(c).  *Bridge v. Phoenix Bond & Indemnity Co.*, 553 U.S. at 654, 128 S. Ct. at 2142.  Proximate-cause, however, is a "flexible concept that does not lend itself to 'a black-letter rule that will dictate the result in every case."  *Id.*, 553 U.S. at 654, 128 S. Ct. at 2142; *In re Neurontin Marketing and Sales Practices Litigation*, 712 F. 3d at 35 ("[b]ecause of 'the infinite variety of claims that may arise' in which a court must analyze

proximate causation, it is 'virtually impossible to announce a black-letter rule that will dictate the result in every case'").

The proximate-cause requirement does not create artificial cut-offs on who can and cannot bring RICO actions. Proximate cause is designed to "reflect 'ideas of what justice demands, or of what is administratively possible and convenient.'" *In re Neurontin Marketing and Sales Practices Litigation*, 712 F.3d at 35. Accordingly, courts will look at a number of factors, including (a) the directness of the injury and "whether the 'links' in the 'chain of causation' were clear or only 'vaguely defined,'" (b) the identity of immediate victims, and (c) whether independent intervening causes exist. *Id*. Court's will also determine if the plaintiff's RICO claim would raise complex issues of apportioning damages. *Id*.

All of these factors support NMOHC's satisfying the proximate cause requirement. First, NMOHC was and is a direct target of Defendants' scheme. Second, the links connecting NMOHC to the scheme are direct and clear. Defendants have coerced NMOHC's patients into purchasing chemotherapy and support drugs from Presbyterian's specialty pharmacy, so Presbyterian can increase its sale of illegally obtained 340B drugs. NMOHC's patients do not have choice, and NMOHC is not losing drug sales because Presbyterian is enticing them away from NMOHC with better services or prices. Third, NMOHC has not alleged that its patients must now pay more for chemotherapy drugs or support drugs as a result of the Mandate. The injury suffered by NMOHC's patients (the disruption of their care and the additional burdens placed on them) is very different from the harm NMOHC suffers (the loss of drug sales). For this reason, there is no risk of multiple recoveries or the complex apportionment of damages. Finally, NMOHC's damages are not affected by any intervening causes.

The Supreme Court's decision in *Bridge v. Phoenix Bond & Indemnity Co.*, 553 U.S. 639, 128 S. Ct. 2131 (2008) controls here. In *Bridge*, the plaintiff would bid for tax liens placed on real property. The bidding process would essentially allocate liens among the bidders. This process was subject to abuse by firms using multiple agents to place bids. If a single firm had multiple agents, it would necessarily receive an inflated number of tax liens. Because only a limited number of tax liens existed at any given time, extra liens going to one bidder meant other bidders were losing liens. The county conducting the bids addressed this problem by requiring an affidavit certifying that each bidder was not using agents to submit simultaneous bids.

The defendants in *Bridge* submitted false certifications to the county in order to inflate the number of tax liens they would receive under the allocation system. The Court held that the plaintiff had standing even though the plaintiff never received a false certification (they would go to the county). The plaintiff had standing because its losses were a guaranteed consequence of the scheme. Here, NMOHC's losses are also a guaranteed consequence of Defendants' scheme. When the losses are closely linked to the defendant's scheme, proximate-cause exists. *Brown v. Cassens Transport Co.,* 546 F.3d 347 (6th Cir. 2009) (plaintiffs who were denied workers' compensation benefits due to fraudulent medical opinions proximately harmed); *Williams v. Mohawk Industries, Inc.,* 465 F.3d 1277 (11th Cir. 2006) (workers facing depressed wages due to defendants bringing undocumented workers into the area to depress wages had standing to sue); *Johnson v. KB Home,* 720 F.Supp.2d 1109 (D.Az. 2010) (scheme to inflate home values gave purchasers standing).

The facts in *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 126 S. Ct. 1991 (2006), on which Defendants rely, bear no relationship to NMOHC's theory of harm. In *Anza*, the RICO

scheme involved the defendant's refusal to pay sales taxes on the products it sold and its filing fraudulent tax returns to conceal its failure to pay sales taxes. The plaintiffs went on to claim that the defendant's costs were allegedly lower because of its failure to pay sales taxes, and, as a result, the defendant could charge its customers lower prices. The last chain in plaintiff's theory was that customers selected defendant's steel products because of defendant's lower prices.

The plaintiff in *Anza* could not show proximate cause given the multiple links in its alleged chain of causation and the many intervening factors that could have accounted for its lost sales. First, defendant's failure to pay sales taxes did not necessarily mean it would have lower costs than the plaintiff. Second, how much the defendant was able to lower its prices as a result of its failure to pay sales taxes was not direct or clear. Third, as pointed out by the Court, the defendant "could have lowered its prices for any number of reasons unconnected to the asserted pattern of fraud." *Anza v. Ideal Steel Supply Corp.*, 547 U.S. at 458-59, 126 S. Ct. at 1997. Finally, consumers were still free to choose between plaintiff's and defendant's products, and price was only one of many factors. *Id.*, ("[b]usinesses lose and gain customers for many reasons, and it would require a complex assessment to establish what portion of Ideal's lost sales were the product of National's decreased prices").

Here, NMOHC's patients were not enticed away from NMOHC with a promise of lower prices: NMOHC's patients were told they could no longer purchase chemotherapy drugs and support drugs from NMOHC. Further, Defendant's scheme directly related to and targeted NMOHC's sales. Defendant's reliance on *Anza* is misplaced.

### ii.      Defendants' Reliance Argument is Meritless

The Supreme Court explained in *Bridge* that reliance is not required to show mail fraud, and reliance appears nowhere in the statute providing private individuals with standing to sue under RICO.  *Bridge v. Phoenix Bond & Indemnity Co.*, 553 U.S. at 648-49, 128 S. Ct. at 2138-39.  For this reason, the Supreme Court expressly refused to import into RICO the proximate-cause rules for common law fraud claims.  *Id.*, 553 U.S. at 655-56, 128 S. Ct. at 2142-43 ([h]aving rejected petitioners' argument that reliance is an element of a civil RICO claim based on mail fraud, we see no reason to let that argument in through the back door by holding that the proximate-cause analysis under RICO must precisely track the proximate-cause analysis of a common-law fraud claim").  The Court did recognize that reliance by "someone" on a misrepresentation might be necessary to show causation in some cases.  *Id.*, 553 U.S. at 658-59, 128 S. Ct. at 2144.  The Court, however, did not conclude that reliance is always required and was careful to state that it was not making reliance a part of the RICO cause of action:

> it may well be that a RICO plaintiff alleging injury by reason of a pattern of mail fraud must establish at least third-party reliance in order to prove causation . . . '[b]ut the fact that proof of reliance is often used to prove an element of the plaintiff's cause of action, such as the element of causation, does not transform reliance itself into an element of the cause of action.

*Id.*, 553 U.S. at 659, 128 S. Ct. at 2144.  Defendants' claim that reliance is always required is meritless.

Finally, even if some type of reliance is needed, reliance by anyone affected by the scheme is sufficient: first-party reliance is not required.  *Bridge v. Phoenix Bond & Indemnity Co.*, 553 U.S. at 661, 128 S. Ct. at 2145.  Here, NMOHC has identified numerous fraudulent statements by Defendants to providers and to patients.  (Complaint, ¶¶391-423.)  NMOHC has

also alleged Presbyterian misled pharmaceutical manufactures when it ordered drugs through the 340B Program that Defendants intended to and did sell to NMOHC's patients. This is analogous to the fact pattern in *Bridge,* where the defendants falsely certified to a third-party that they were complying with a bidding rule that allowed them to divert valuable property liens away from the plaintiff. *Bridge v. Phoenix Bond & Indemnity Co.*, 553 U.S. at 643, 128 S. Ct. at 2135-36.

For the reasons stated above, Plaintiff has properly alleged proximate-cause and has properly alleged mail fraud.

## III. THE COMPLAINT STATES CLAIMS UNDER NEW MEXICO COMMON LAW

### A. New Mexico generally follows the Restatements

In many instances New Mexico courts have either formally adopted specific Restatement sections as the law of New Mexico or at least discussed and implicitly applied Restatement sections without formally adopting them. *See, e.g., Crespin v. Albuquerque Baseball Club, LLC*, 2010-NMSC-043, ¶ 21, 148 N.M. 646, 651, 241 P.3d 1086, 1091 (*citing* the Restatement (Third) of Torts); *State v. Santiago*, 2009-NMSC-045, ¶ 25, n. 3, 147 N.M. 76, 84, 217 P.3d 89, 97 n. 3 (2009) (*citing* the Restatement (Second) of Torts); *Pincheira v. Allstate Ins. Co.*, 2008-NMSC-049, ¶ 54, 144 N.M. 601, 613, 190 P.3d 322, 344 (*citing* the Restatement (Third) of Unfair Competition); *Chavarria v. Fleetwood Retail Corp*., 2006-NMSC-046, ¶ 30, 140 N.M. 478, 488, 143 P.3d 717, 727 ("we take this opportunity to explicitly adopt Sections 909 of the Restatement (Second) of Torts and 217C of the Restatement (Second) of Agency"); *Schmitz v. Smentowski*, 109 N.M. 386, 396, 785 P. 2d 726, 736 (1990) ("we have recognized that intentional, malicious conduct that injures another, even though it may not have been recognized by the heretofore accepted areas of intentional tort, can serve as a basis for tort liability. We have also been very

willing to adopt the view of the Restatement of Torts to assist our development of new tort areas"); *Watson Truck & Supply Co., Inc.* 111 N.M. 57, 59, 801 P.2d 639, 641 (1990) (discussing types of resulting trusts recognized in Restatement (Second) of Trust); *Eker Bros., Inc. v. Rehders*, 2011-NMCA-092, ¶18, 150 N.M. 542, 546, 263 P.3d 319, 323 ("the Restatement [(Second) of Contracts §374] is consistent with New Mexico law. … Accordingly, we now explicitly adopt the approach set forth in Section 374"); *Randles v. Hanso*n, 2011-NMCA-059, ¶14, 150 N.M. 362, 367258 P.3d 1154, 1159 ("in the absence of any relevant New Mexico authority, we turn to the Restatement (Third) of Suretyship and Guaranty for guidance"); *Sandoval v. Baker Hughes Oilfield Operations, Inc.*, 2009-NMCA-095, 146 N.M. 853, 872, 215 P.3d 791, 810 (Ct. App. 2009) (citing the Restatement (First) of Torts and the Restatement (Second) of Torts); *Martin v. Franklin Capital Corp*., 2008-NMCA-152, ¶ 12, 145 N.M. 179, 183, 195 P.3d 24, 28 ("the Restatement (Second) of Torts supports our view"); *New Mexico ex rel. Hanosh v. N.M. Envtl. Improvement Bd.*, 2008-NMCA-156, ¶ 3, 145 N.M. 269, 271, 196 P.3d 970, 972 (*citing* the Restatement (Second) of Judgments); *Talbott v. Roswell Hospital Corp*., 2008-NMCA-114, ¶¶ 12 & 13; 144 N.M. 753, 757, 192 P.2d 267, 271 (we "take this opportunity to expressly adopt Section 411 [of the Restatement (Second) of Torts] as part of New Mexico's tort law"); *State ex rel. Children, Youth and Families Dept. v. Andree G*., 2007-NMCA-156, ¶21, 143 N.M. 195, 199, 174 P.3d 531, 535 ("the proper test to be applied to a challenge of subject matter jurisdiction in a collateral proceeding is set forth in Restatement (Second) of Judgments §12 (1982)"); *State v. Ashley*, 108 N.M. 343, 346, 772 P. 2d 377, 380 (Ct. App. 1989) (relying on Restatement (Second) of Property to determine that threat to forcibly remove tenant was a tort).

Based on a consistent pattern by New Mexico courts, this Court should look to and apply the Restatements in addressing the plaintiff's common law claims in this case, absent any New Mexico law specifically rejecting the Restatements in those areas.

**B.      Count VI of the Complaint States a Claim Under the Restatement (Third) of Unfair Competition § 1 et seq.**

In addition to the general practice of New Mexico courts to follow the Restatements, the New Mexico Supreme Court did so specifically in *Pincheira v. Allstate*, 144 N.M. 601, 613, 190 P.3d 322, 334 (2008) (citing Restatement (Third) of Unfair Competition § 39 cmt. e in determining whether a trade secret exists).   Judge Browning also specifically applied the Restatement (Third) of Unfair Competition in *Guidance Endodontics, LLC v. Dentsply Int'l, Inc.,* 708 F. Supp. 2d 1209, 1254 (D.N.M. 2010).

> Because New Mexico courts tend to follow Restatement law when dealing with issues of first impression, and in the absence of any state law on the subject, the Court concludes that the Supreme Court of New Mexico would likely follow the Restatement's view…. See Restatement (Third) of Unfair Competition ….

Section 1(a) of that Restatement imposes liability for three specified types of conduct deemed to be "unfair competition," and also for "other acts or practices of the actor determined to be actionable as an unfair method of competition, taking into account the nature of the conduct and its likely effect on both the person seeking relief and the public."   Comment g discusses this "residual rule" and explains that liability thereunder "is not limited to conduct that is otherwise tortious with respect to the party seeking relief."   As an example, "if the conduct is likely to interfere in a substantial manner with the ability of prospective purchasers to choose on the merits of the competing products, it will ordinarily be considered unfair."

Common law unfair competition "is a broad equitable doctrine that has evolved in response to predatory business practices and is designed to enforce increasingly higher standards of fairness or commercial morality in trade." *Pacamor Bearings v. Minebea Co. Ltd.,* 918 F. Supp. 491, 500 (D.N.H.1996). Furthermore, "unfair competition thus does not describe a single course of conduct or a tort with a specific number of elements.... The category is open-ended, and nameless forms of unfair competition may be recognized at any time for the protection of commercial values." *Id.* Likewise, in *Airport Systems Intern. Inc. v. Airsys ATM, Inc.*, 144 F. Supp. 2d 1268, 1271 (D. Kan. 2001), the court noted the "broad scope of the tort of unfair competition." thereby causes the customer not to enter into a business relationship with the plaintiff.

Other cases, not tied explicitly to the Restatement, demonstrate the breadth of a cause of action for common law unfair competition. In *Third Party Verification, Inc. v. Signaturelink, Inc.*, 492 F. Supp. 2d 1314, 1325 (M.D. Fla. 2007), the court pointed out that the common law of unfair competition is an "umbrella for all statutory and nonstatutory causes of action arising out of business conduct which is contrary to honest practice in industrial or commercial matters." In *Excellus Health Plan, Inc. v. Tran*, 287 F. Supp. 2d 167, 179 (W.D. N.Y. 2003), the court noted that a cause of action for common law unfair competition "encompasses an incalculable variety of illegal practices" that can be broadly described as "any form of commercial immorality."

*Excellus* is of particular interest here, because that case addressed conduct that "resulted in the unilateral reassignment of patients … without patient authorization or approval" and that the counter-defendant had "communicated false information to patients, threatened individual physicians with financial harm, and refused to contact physicians when asked to do so by

patients in emergency situations." *Id.*  Here, Defendants' CEO threatened to put NMOHC out of business (Complaint ¶ 236); Defendants pressured their employed physicians to avoid referrals to NMOHC, when those physicians would otherwise make such referrals in the best interests of their patients (¶¶  254-257); Defendants pressured patients being treated for cancer to change their doctors to those employed by Defendants, including their making misrepresentations as to the insurance coverage available to NMOHC's patients (¶¶ 258-259, 261-262); Defendants "undo" referrals to NMOHC that have already been made by Defendants' employed physicians (¶ 260); Defendants impliedly threatened to terminate NMOHC as a provider in order to extract unreasonable and anticompetitive contract terms from NMOHC (¶¶ 267-274); and Defendants have coerced NMOHC's patients to purchase and use chemotherapy drugs from Presbyterian, thereby increasing the health risks to NMOHC's patients and stripping substantial revenues from NMOHC (¶¶ 283-295).

The above-described allegations reflect acts by Defendants that interfere in a substantial manner with the ability of prospective patients "to choose on the merits of competing products." Restatement (Third) of Unfair Competition, §1(a).  The logical inference is that patients have chosen and/or will choose in the future not to enter into a relationship with NMOHC because of the false information and direct pressure from the Defendants, as well as other conduct (like pressure on its own physicians) that prevents patients from even having a choice at all, let alone making an "informed" choice.  As a result, in addition to the public harm from interference with the patient-doctor relationship, NMOHC has lost and/or will lose in the future the revenue it would have otherwise received from these patients.  It is not necessary to allege or prove that the potential patients were actually misled or relied on the false information.  The cause of action

does not lie with the patients.  The cause of action lies with NMOHC, because it is the entity that was injured by Defendants' unfair competitive behavior.

The Defendants' Motion asserts that their conduct is "just competition" and not actionable under any theory put forth in the Complaint.  It is remarkable indeed that Defendants contend, for example, that intimidating cancer patients into changing their physicians <u>during</u> <u>treatment</u>, or misrepresenting to patients the status of their insurance coverage, is "just competition," let alone "fair" competition.  For the reasons stated above, Defendant's conduct is anticompetitive and predatory.  Given the breadth of the cause of action for common law unfair competition, Plaintiff's allegations state a claim sufficient to avoid dismissal.

### C.    Count VI of the Complaint states a claim under Restatement (Second) of Torts § 623A.

The Restatement (Second) of Torts §623A states:

One who publishes a false statement harmful to the interests of another is subject to liability for pecuniary loss resulting to the other if
>   (a) he intends for publication of the statement to result in harm to interests of the other having a pecuniary value or either recognizes or should recognize that it is likely to do so, and
>   (b) he knows that the statement is false or acts in reckless disregard of its truth or falsity.

New Mexico courts have long recognized the tort of commercial disparagement, which has, over time, acquired the name of injurious falsehood.  "Disparagement of title, slander of title, defamation of title, or in other contexts, slander of goods, trade, libel or injurious falsehood, is the false and malicious representation of the title or quality of another's interest in goods or property." *Western Commerce Bank v. Reliance Ins. Co.*, 105 N.M. 346, 348-49, 732 P.2d 873, 875-76 (1987); *Bacchus Industries, Inc. v. Arvin Industries, Inc.*, 939 F. 2d 887 (10th Cir. 1991) ("the claim that Bacchus appears to state is one called by various names such as disparagement

of property, slander of goods, commercial disparagement and trade libel and is now generally referred to as injurious falsehood") (internal quotations omitted); *Ruiz v. Varan*, 110 N.M. 478, 480-81, 797 P.2d 267, 269-70 (1990) ("the tort committed by Ruiz is also akin to slander of title, a form of tort that Professors Prosser and Keeton call by the generalized name, 'injurious falsehood' …. The gist of the tort is the interference with the prospect of sale or some other advantageous relation"); *see also*, *Priniton, Inc. v. McGraw-Hill, Inc.*, 35 F. Supp. 2d 1325 (D. N.M. 1998)(court implicitly recognized tort of injurious falsehood that was barred by statute of limitations).

The tort of injurious falsehood arises in a variety of commercial settings.  *See*, *Bankwest v. Fidelity & Deposit Co. of Maryland*, 63 F. 3d 974 (10th Cir. 1995) (bank letters containing false statements regarding customers' line of credit supported cause of action for injurious falsehood).  "The tort has been broadly interested to include the publication of 'other falsehoods harmful to any legal interest of another that has pecuniary value.'" *Id.* at 980, *citing* The Restatement (Second) of Torts §623(A); *see also*, *Annbar Associates v. American Exp. Co.*, 565 S.W. 2d 701 (Ct. App. Missouri, 1978) (reservation company telling potential customers who called to make hotel reservations that the hotel was "not available" when the hotel in fact had rooms available stated claim for injurious falsehood under §623(A)); *Pro Golf Mfg., Inc. v. Tribune Newspaper Co.*, 809 A. 2d 243, 244-245 (Pa. 2002) (plaintiff stated cause of action for injurious falsehood because newspaper's false statement that plaintiff's manufacturing plant had been destroyed "caused a pecuniary loss and loss of customers").

The commonalties among these cases are that 1) a false statement concerning the business of another 2) is published by one who intends the publication to cause pecuniary loss or

reasonably should recognize that publication will result in pecuniary loss, and 3) pecuniary loss

does in fact result, and 4) the publisher either knows the statement is false or acts in reckless

disregard of the truth.   *Pro Golf Mfg.*, *supra*, at 246.  The Complaint alleges that defendants told

Patient A in 2012 that plaintiff was not an approved provider under his defendant-provided

insurance (¶ 258).   PHP knew this statement was false.   PHP and its employees know that

NMOHC is an approved provider for cancer services for patients with insurance provided by

PHP (¶ 258).  PHP intended or reasonably recognized that when it told Patient A that PHP would

not pay for services provided by NMOHC at the approved rate that Patient A would not enter

into a patient relationship with NMOHC because otherwise he would be forced to pay out of his

own resources more for his comprehensive oncology services (¶¶ 152 and 159).  PHP knew that

by giving false information to Patient A that it would effectively control access by Patient A, and

others similarly situated, to NMOHC (¶163 "health insurer controls access to patients and health

care dollars" and ¶159).   Patient A, upon information and belief, could not, as with the

overwhelming majority of patients without health insurance, obtain needed comprehensive

oncology services without accessing and receiving the services provided by his PHP-provided

health insurance (¶¶ 91-92, 258).   PHP knew that, by limiting or preventing patients from

entering into patient relationships with NMOHC, NMOHC would suffer pecuniary losses (¶¶ 84

"ongoing attempts to monopolize the separate marker for Comprehensive Oncology Service by

putting NMOHC out of business," and ¶ 259-266 "the Nurse Navigator was following a

Presbyterian policy to divert NMOHC patients to Presbyterian employed oncologists").   PHP

knows that NMOHC relies on the reimbursement rates paid to it by PHP for comprehensive

oncology services provided to patients insured by PHP provided policies (¶¶ 267-270 "PHP

demanded that NMOHC accept a provider contract with reimbursement rates that would financially strangle NMOHC").   The inference is obvious that NMOHC suffers pecuniary damages every time PHP intentionally and falsely tells a potential cancer patient that he or she will not be able to become a patient at NMOHC if he wants his insurance policy to pay for his comprehensive oncology services under the approved provider rates.

Defendants argue that NMOHC should have alleged that it suffered special damages if it is going to rely on the tort of injurious falsehood.   It is true that there is language in the older cases concerning slander of title and what used to be known as product disparagement stating that plaintiffs must allege and prove their special damages.   *See*, *Garver v. Public Serv. Co.*, 77 N.M. 262, 272 (1966); *Ruiz v. Varan*, 110 N.M. 478, 480-81, 797 P.2d 267, 269-70 (1990) ("the special damage rule requires the plaintiff to establish pecuniary loss that has been realized or liquidated, as in the case of specific lost sales").   However, today the tort of injurious falsehood does not require any "magic" or conclusory allegations as to suffered damages.   "Although the traditional rules [for product disparagement cases] is that special damages must be pleaded in every such case, we have located a number of cases calling the traditional rule in question, albeit in dicta." *Hollymatic Corp. v. Holly Systems, Inc.*, 620 F. sup. 1366, 1371 (E.D. Ill. 1985).

The Restatement (Second) of Torts §633, Pecuniary Loss, has adopted this approach.   It states,

> (1)   The pecuniary loss for which a publisher of injurious falsehood is subject to liability is restricted to
> (a) The pecuniary loss that results directly and immediately from the effect of the conduct of third persons, including the impairment of vendibility or value caused by disparagement.
> …
> (2)   This pecuniary loss may be established by
> (a) proof of the conduct of specific person, or

> (b) proof that the loss has resulted from the conduct of a number of
> persons whom it is impossible to identify.

The identification of particular potential patients whose relationships with NMOHC were lost or disrupted, thereby causing pecuniary loss to NMOHC, will ultimately depend on the discovery conducted in this case.  In light of HIPAA rules and regulations, as well as the confidentiality of a patient-physician relationship, the identification of specific instances of loss will be a future issue to be explored.  "If it is not a practical possibility to show specific losses, damages may then be proved by evidence similar to that used to prove lost profits resulting from a breach of contract." *Teilhaber Mfg. Co. v Unarco Material Storage*, 791 P. 2d 1164, 1168 (Ct. App. Colo. 1989) (court adopted Restatement (Second) of Torts §623A and affirmed verdict for plaintiff; loss of general business was adequate measure of damages because impossible to identify specific lost sales).

For purposes of a motion to dismiss, the Complaint adequately alleges the fact that plaintiff suffered pecuniary losses because of the injurious falsehoods published by Defendants.

**D.    The Complaint States a Claim for Intentional Interference with
Business Relations Under Restatement (Second) of Torts §§ 766B and 767**

New Mexico courts have recognized the tort of interference with <u>existing</u> contractual relations "for at least fifty years," and the tort of interference with <u>prospective</u> contractual relations based on the *Restatement (Second) of Torts* § 766B since 1984.  *Zarr v. Wash. Tru Solutions*, LLC, 208 P.3d 919, 921 (N.M. Ct. App. 2009) (citing *Wolf v. Perry*, 339 P.2d 679, 681 (1959) and *M & M Rental Tools, Inc. v. Milchem*, 612 P.2d 241, 276 (N.M. Ct. App. 1984) ("[w]hether the tort is described as improper interference or without privilege, <u>either</u> an improper motive (solely to harm plaintiff), <u>or</u> an improper means is required for liability") (emphasis

added).   Intentional interference with <u>prospective</u> relations "can be accomplished by either of two methods: improper motive solely to harm the plaintiff or improper means.  If proven, either basis standing alone will support liability."  *Id*.   The "sole motive" test is only applied with respect to prospective contracts.  *Id*. (citing *Fikes v. Furst*, 81 P.2d 545 (2003)

Furthermore, sole-motive-to-harm is an issue only in "improper motive" cases and not when "improper means" has been alleged.  *Zarr*, 208 P.3d 919 at 922 (rejecting argument that plaintiff must establish that defendant used improper means solely to harm it).  Stating that prior cases clearly limited the sole-motive-to-harm factor to the improper-motive cases, the court in *Zarr* found no reason to "further reduce the reach of the tort because the improper means ground for liability is sufficiently governed by the nature of the conduct required to be shown."  *Id*. "What may qualify as 'improper means' depends to some degree on context and can include, but is not limited to, predatory behavior, violence, threats or intimidation, deceit or misrepresentation, bribery, economic pressure, unfounded litigation, defamation, unlawful conduct, and perhaps violation of business ethics and customs."  *Id*. (citing the *Restatement (Second) of Torts* § 767 cmt c); *see also Bogle v. Summit Investment Co*., LLC, 107 P.3d 520, 528 ("[i]mproper means" can be tortious behavior or any "predatory" behavior based on standards in a trade or profession).

Plaintiff has alleged that the Defendants intentionally interfered with its existing and prospective contractual relations by using improper means to prevent and prohibit referrals to it and its physicians, and by using improper means to prohibit NMOHC's patients from purchasing chemotherapy drugs from NMOHC and from using its infusion center.  (Complaint ¶¶ 501-502, 523.)  The defendants assert that "[t]hese allegations are deficient as a matter of law because

'[t]he mere refusal to deal with a party cannot support a claim for tortious interference with contractual relations.'" (Motion ¶17 (citing *Quintana v. First Interstate Bank*, 737 P.2d 896, 898 (Ct. App. 1987).) However, plaintiff is not simply alleging that the Defendants refused to deal with it. Plaintiff is alleging that the Defendants used improper means to interfere with its existing and prospective contractual relations with patients.

Plaintiff specifically alleges that Defendants: (a) issued an email to its physicians indicating that they would face negative repercussions if they referred patients to NMOHC; (b) instructed their non-physician staff to call patients receiving treatment at NMOHC and ask them to drop NMOHC and start seeing Presbyterian-employed oncologists; (c) reconfigured their computer system so their physicians cannot even input a referral to NMOHC; and (d) removed NMOHC's name from their referral book that had previously identified all of the PHP providers, including NMOHC (¶¶ 256, 259, 265-266). Plaintiff also alleges that defendants misrepresented to patients NMOHC's status as an approved provider on defendants' provider panel and falsely informed a patient that PHP would not be covering new NMOCH patients (¶ 258). Plaintiff further alleges that in addition to threatening not to retain NMOHC as a PHP provider, Defendants are requiring NMOHC's patients to purchase chemotherapy drugs from Presbyterian's specialty pharmacy, interfering with and jeopardizing NMOHC's treatment of its patients (¶¶ 267, 270, 285-292).

These allegations constitute much more than a mere "refusal to deal." Rather, these allegations identify intimidation, deceit, misrepresentation, and violations of business ethics and customs --- the very conduct identified by the New Mexico courts and the Restatements as

sufficient to state an improper-means ground for the tort of intentional interference with existing and prospective contractual relations.

The defendant's reliance on the New Mexico Court of Appeals' decision in *Quintana* is misplaced.  The court in *Quintana* upheld the trial court's dismissal of the tortious interference claim because the complaint only alleged that the defendant refused to enter into business relation with plaintiffs.  737 P.2d at 898.  "There is no allegation that the Bank did more.  It did not advise Guardian not to do business with plaintiffs; there is no indication that it disparaged plaintiffs in any manner."  *Id*.  Accordingly, the decision in *Quintana* is inapposite and dismissal of Plaintiff's intentional interference claims is not warranted.

The Defendants' reliance on *Neonatology Assoc., Ltd. v. Phoenix Perinatal Assoc., Inc*., is also unavailing.  164 P.3d 691, 694 (Ariz. Ct. App. 2007).  In *Neonatology* the court granted summary judgment on the improper interference claims because in Arizona the courts "have held that a business competitor does not act improperly if its purpose at least in part is to advance its own economic interests."  *Id*. at 695.  However, NMOHC has alleged intentional interference with existing and prospective contractual relations predicated on <u>improper means</u>.  As stated *supra*, in New Mexico a plaintiff need not establish that the defendant used improper means with an intention solely to harm it.  *See Zarr*, 208 P.3d 919 at 922.  A defendant's trying to advance its economic interests is not an absolute defense to the tort of intentional interference with prospective business relations.

Further, the Tenth Circuit and New Mexico courts have permitted intentional interference claims to be heard by a jury when they were predicated on similar conduct.  In *Reazin v. Blue Cross and Blue Shield of Kansas*, the Tenth Circuit upheld damages for tortious interference by

47

Blue Cross for its "deliberate use of media and other efforts to discourage its subscribers from using Wesley Medical Center" where Wesley was reasonably certain to have continued in the existing and future business relationships with the subscribers.  899 F.2d 951, 976-977 (10th Cir. 1990); *see also, Murrays v. Burt, et al*, 9-cv-1150, * 4 (D.N.M. 2010) (summary judgment was denied on intentional interference claims based on alleged termination of agreement to "stand" *Dash Ta Fame* (horse) with plaintiff during breeding season; plaintiffs stated actionable claims of intentional interference with existing and prospective contracts between them and mare owners interested in breeding their mares with *Dash Ta Fame*).

As with Plaintiff's unfair competition claims, it is simply remarkable that Defendants would contend that intimidating cancer patients into changing their physicians during treatment, or misrepresenting to patients the status of their insurance coverage, constitutes a legal, "mere refusal to deal" with NMOHC.  Because these allegations of intimidation and misrepresentation, among other factual assertions, sufficiently support a finding of improper conduct with respect to plaintiff's intentional interference claims, dismissal is not warranted.

## CONCLUSION

For the reasons stated above, this Court should deny Defendants' Motion to Dismiss.[5]

---

[5] If this Court were to find any technically deficient allegations, Plaintiff believes it can easily correct any such deficiencies, and Plaintiff should be allowed to amend.  *Foman v. Davis*, 371 U.S. 178, 182, 83 S. Ct. 227, 230, 9 L.Ed.2d. 222 (1962) ("rule 15(a) declares that leave to amend 'shall be freely given when justice so requires'; this mandate is to be heeded"); *Minter v. Prime Equip. Co.*, 451 F. 3d 1196, 1204 (10th Cir. 2006) ("the purpose of the Rule is to provide litigant the maximum opportunity for each claim to be decided on its merits rather than on procedural niceties").

**LAW OFFICES OF GEORGE M. SANDERS, P.C.**

George M. Sanders
150 N. Michigan Ave.
Suite 2800
Chicago, IL  60601
Telephone:  (312) 624-7645
Facsimile:  (312) 624-7701

**FOSTER, RIEDER & JACKSON, P.C.**

By:  /s/ J. Douglas Foster
J. Douglas Foster
Geoffrey D. Rieder
P.O. Box 1607
Albuquerque, NM  87103-1607
Telephone:  (505) 767-0577
Facsimile:  (505) 242-9944

Attorneys for Plaintiff

I HEREBY CERTIFY that on the 14th day of June, 2013, I
filed the foregoing electronically through the CM/ECF
system, which caused the following parties or counsel to be
served by electronic means, as more fully reflected on the
Notice of Electronic Filing:

Bruce D. Hall/Charles K. Purcell
Rodey, Dickason, Sloan, Akin & Robb, PA
PO Box 1888
Albuquerque, NM 87103

Jeffrey A. LeVee
555 South Flower Street, Fiftieth Floor
Los Angeles, CA 90071

FOSTER, RIEDER & JACKSON, P.C.

By: /s/J. Douglas Foster
        J. Douglas Foster

49