UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO

NEW MEXICO ONCOLOGY AND
HEMATOLOGY CONSULTANTS, LTD.,

        Plaintiff,

v.                                      Civ. No. 12-00526 MV/GBW

PRESBYTERIAN HEALTHCARE SERVICES
and PRESBYTERIAN NETWORK, INC.,

        Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Motion of Defendants Presbyterian Healthcare Services and Presbyterian Network, Inc. to Dismiss the Second Amended Complaint with Prejudice and Memorandum in Support, filed April 15, 2013 [Doc. 33].  The Court, having considered the motion, briefs, and relevant law, and being otherwise fully informed, finds that the motion is well taken in part and will be granted in part.

## BACKGROUND

Plaintiff New Mexico Oncology and Hematology Consultants, Ltd. ("NMOHC") is a professional corporation with its principal place of business located in Albuquerque, New Mexico. [Doc. 24 ¶ 23].  NMOHC is an integrated, comprehensive cancer treatment facility that offers patients a full range of medical oncology and hematology, radiation oncology, chemotherapy infusion, and radiology and laboratory services.  [*Id.* ¶¶ 24, 32, 33, 34].  NMOHC offers patients its services at a free standing cancer center owned and operated by NMOHC.  [*Id.* ¶ 31].  While NMOHC is centered in Albuquerque, it has satellite facilities in underserved areas, including Gallup, Silver City, and Ruidoso.  [*Id.* ¶ 35].

1

Defendant Presbyterian Healthcare Services ("Presbyterian Hospital") is a not-for-profit corporation, with its principle place of business in Albuquerque, New Mexico. [*Id.* ¶ 36]. Presbyterian owns, operates, and manages eight acute care hospitals, all of which are located in New Mexico and three of which are located in Albuquerque. [*Id.* ¶ 37]. Presbyterian Hospital is the largest hospital in both Albuquerque and New Mexico and offers a full range of services, including comprehensive oncology services. [*Id.* ¶¶ 35, 45, 69, 77, 84]. Presbyterian Hospital owns, operates, and manages Presbyterian Medical Group, which employs approximately 700 physicians, including primary care physicians, medical oncologists, and a wide range of other specialists. [*Id.* ¶ 45].

Presbyterian Hospital also is the ultimate parent company of co-Defendant Presbyterian Network, Inc. [*Id.* ¶ 39]. Presbyterian Hospital owns and operates Presbyterian Healthcare Services Affiliates, Presbyterian Healthcare Services Affiliates owns Southwest Health Foundation, Southwest Health Foundation owns Defendant Presbyterian Network Inc., and Presbyterian Network Inc. owns and controls Presbyterian Insurance Company, Inc. and Presbyterian Health Plans Inc. [*Id.*]. The Court collectively refers to Presbyterian Network, Inc. and its subsidiaries as "PHP." [*Id.*].

PHP operates, on a for-profit basis, various health maintenance organizations, preferred provider organizations, and other health insurance products. [*Id.*]. PHP is the largest health insurer in Albuquerque. [*Id.* ¶ 42]. Despite the legal separation between Presbyterian Hospital and PHP, Presbyterian Hospital actively controls PHP's actions. [*Id.* ¶ 43].

Plaintiff NMOHC filed its Second Amended Complaint (hereinafter "complaint") [Doc. 24] against Defendants Presbyterian Hospital and PHP, alleging various federal and state antitrust claims, claims under the federal Racketeer Influenced and Corrupt Organizations Act ("RICO"),

and state common law claims.  These claims arise out of Defendants' alleged use of their dominance in the markets for private health insurance and hospital inpatient services to increase their power in, and drive Plaintiff out of, the market for comprehensive oncology services.  To this end, Plaintiff alleges that Defendants engaged in numerous wrongful acts, including but not limited to lowering their rate of reimbursement to Plaintiff in the most recent healthcare provider contract between Plaintiff and PHP, threatening to terminate this provider contract, entering into an exclusive arrangement with the insurance provider United HealthCare pursuant to which United will not take market actions without PHP's approval, limiting and obstructing referrals to Plaintiff's physicians, pressuring Plaintiff's patients to switch to Presbyterian Hospital's physicians, obtaining and selling drugs obtained through the federal 340B program[1] (referred to herein as the "340B drugs" and "340B program") in an unlawful manner, issuing a mandate requiring Plaintiff's patients to purchase chemotherapy and support drugs from Presbyterian Hospital's specialty pharmacy instead of from Plaintiff (the "mandate"), and falsely informing one of Plaintiff's patients that Plaintiff is not an approved provider under PHP's healthcare plan. These wrongful acts form the basis of the claims alleged in the complaint.

Plaintiff alleges eight counts in the complaint.  Plaintiff asserts monopolization and attempted monopolization antitrust claims under Section 2 of the Sherman Act, 15 U.S.C. § 2, and under the New Mexico Antitrust Act ("NMAA"), N.M. Stat. Ann. § 57-1-2.  Plaintiff's monopolization claims (Counts I and III) arise out of Defendants' alleged willful maintenance of a monopoly and/or monopsony in the market for private health insurance services through the alleged anticompetitive acts of lowering Plaintiff's reimbursement rates, threatening to terminate Plaintiff's provider contract, and entering into an exclusive arrangement with United HealthCare.

---

[1]  This program is codified at 42 U.S.C Section 256b.

[*Id.* ¶¶ 471-76, 483-89].   Plaintiff's attempted monopolization claims (Counts II and IV) arise out of Defendants' alleged attempt to monopolize the comprehensive oncology services market by engaging in the same acts that maintained their monopoly in the private health insurance market and by committing the additional acts of limiting referrals to Plaintiff's physicians and requiring Plaintiff's patients to purchase chemotherapy drugs from Presbyterian Hospital's pharmacy.   [*Id.* ¶¶ 477-82, 490-95].

Plaintiff also asserts claims for tortious interference with existing and prospective contractual relationships (Counts V and VIII), which arise out of Defendants' alleged use of improper means to prevent and prohibit referrals to Plaintiff and out of Defendants' alleged use of improper means to prevent Plaintiff's patients from purchasing chemotherapy drugs from Plaintiff and using Plaintiff's chemotherapy infusion center.   [*Id.* ¶¶ 496-503, 517-25].   Plaintiff in addition asserts state law claims for injurious falsehood and unfair competition (Count VI). Plaintiff's injurious falsehood claim arises out of Defendants' alleged misrepresentation of Plaintiff's provider status to patients, and Plaintiff's unfair competition claim arises out of Defendants' coercion of patients to switch to Presbyterian Hospital's physicians, their pressure upon their physicians to refer patients in-house instead of to Plaintiff, their interference with the ability of their physicians to make referrals to Plaintiff, and their alleged illegal receipt and sale of 340B drugs purchased at a discount from pharmaceutical manufacturers under the federal 340B program and sold in violation of program guidelines to reap inflated profits.   [*Id.* ¶¶ 8, 12, 505]. Plaintiff lastly asserts a federal RICO claim (Count VII), which arises out of Defendants' aforementioned alleged illegal receipt and sale of 340B drugs, and Defendants' issuance of the mandate requiring seniors covered by PHP's health insurance to purchase their chemotherapy

drugs (including 340B drugs) from Presbyterian Hospital's pharmacy instead of from Plaintiff.[2] [Doc. 24 ¶¶ 8-12].

## STANDARD

Federal Rule of Civil Procedure 12(b)(6) authorizes a court to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "The nature of a Rule 12(b)(6) motion tests the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true." *Mobley v. McCormick,* 40 F.3d 337, 340 (10th Cir. 1994). The sufficiency of a complaint is a question of law, and when considering a rule 12(b)(6) motion, a court must accept as true all well-pleaded factual allegations in the complaint, view those allegations in the light most favorable to the plaintiff, and draw all reasonable inferences in the plaintiff's favor. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Smith v. U.S.*, 561 F.3d 1090, 1098 (10th Cir. 2009) (citation omitted), *cert. denied*, 558 U.S. 1148 (2010).

A complaint need not set forth detailed factual allegations, yet a "pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action" is insufficient. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

To survive a motion to dismiss pursuant to Rule 12(b)(6), a plaintiff's complaint must contain sufficient facts that, if assumed to be true, state a claim to relief that is plausible on its face. *See Twombly*, 550 U.S. at 570; *Mink v. Knox*, 613 F.3d 995, 1000 (10th Cir. 2010). "A

---

[2] The Court sets forth additional facts alleged in the complaint throughout the opinion. Rather than restate those facts in this background section, the Court raises the facts relevant to each of Plaintiff's claims in the context of deciding whether Plaintiff has stated a claim for relief.

claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). "Thus, the mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complainant must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims." *Ridge at Red Hawk, LLC v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007) (emphasis omitted). The Tenth Circuit has explained,

> "[P]lausibility" in this context must refer to the scope of the allegations in a complaint:  if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs "have not nudged their claims across the line from conceivable to plausible."  The allegations must be enough that, if assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for relief.

*Robbins v. Okla.*, 519 F.3d 1242, 1247 (10th Cir. 2008) (quoting *Twombly*, 550 U.S. at 570) (internal citations omitted).

## DISCUSSION

Defendants ask the Court to dismiss all of Plaintiff's claims with prejudice pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim for relief.  First, Defendants maintain that the Court should dismiss Plaintiff's Sherman Act and NMAA monopolization claims, because Plaintiff lacks standing to bring the claims and Plaintiff has failed to allege that Defendants possessed monopoly power or maintained that monopoly power through exclusionary conduct.  Second, Defendants argue that the Court should dismiss Plaintiff's federal and state attempted monopolization claims, because Plaintiff has failed to allege that Defendants engaged in anticompetitive conduct or had a dangerous probability of achieving monopoly power.  Third, Defendants contend that the Court should dismiss Plaintiff's state claims for tortious interference

with contractual relationships, because Plaintiff failed to allege that Defendants' sole motive was to harm Plaintiff and because Defendants' actions of refusing to deal with Plaintiff cannot form the basis of a tortious interference claim.   Fourth, Defendants ask the Court to dismiss Plaintiff's state claim of injurious falsehood, because Plaintiff failed to plead special damages or to allege that Defendants knew that the alleged injurious statement was false.   Fifth, Defendants ask the Court to dismiss Plaintiff's state claim for unfair competition, because the Unfair Practices Act preempts the claim and because the Court should not expand New Mexico law by adopting the *Restatement (Third) of Unfair Competition's* broad definition of the claim.   Finally, Defendants contend that the Court should dismiss Plaintiff's RICO claims, because Plaintiff does not have standing and Plaintiff failed to allege facts establishing that Defendants engaged in a scheme to defraud.   The Court will address the merits of each of these requests for dismissal in turn.

I.      Monopolization Claims (Counts I and III).

Plaintiff alleges that Defendants are monopolizing a private health insurance market.[3] Defendants ask the Court to dismiss Plaintiff's monopolization claims, advancing three arguments in support of this request.   First, Defendants maintain that Plaintiff fails to state a monopolization claim under Section 2 of the Sherman Act or the New Mexico Antitrust Act because Plaintiff lacks standing to bring a monopolization claim.   Second, Defendants contend that Plaintiff has failed to allege that Defendants possess monopoly power.   Third, Defendants argue that Plaintiff has failed

---

[3]   Defendants contend that the complaint fails to allege that Defendants monopolized the inpatient hospital services market and they therefore do not move for dismissal of any claims premised on this market.   In its opposition to the Motion to Dismiss, Plaintiff does not argue that the complaint contains such allegations but rather maintains that it intended—but did not—include such allegations and that it will correct this error.   [Doc. 40 at 3 n.1].   To date, Plaintiff has taken no steps to add federal or state claims of monopolization of the inpatient hospital services market. Thus, the Court will not consider whether such monopolization claims are subject to dismissal pursuant to Rule 12(b)(6).

to allege that they maintained their monopoly power through exclusionary or predatory conduct.

A.      Plaintiff has Standing to Assert a Monopolization (or Monopsonization) Claim.

Section 4 of the Clayton Act provides that anyone injured "in his business or property by reason of anything forbidden in the antitrust laws" may bring a claim.  *Reazin v. Blue Cross & Blue Shield, Inc.*, 899 F.2d 951, 960 (10th Cir. 1990), *cert. denied*, 497 U.S. 1005 (1990); *see also* 15 U.S.C. § 15.   A private plaintiff seeking damages for a violation of the federal antitrust laws under Section 4 must have both antitrust standing and antitrust injury.   *See id.* at 960 ("[s]tanding and antitrust injury are essential elements in a private antitrust damages action brought under section 4 of the Clayton Act") (citations omitted).   The concepts are related, although they are often treated separately by courts.  *See id.* at 960-61 (citation omitted).   As one court explained, "It has been suggested that although standing is closely related to antitrust injury, the two concepts are distinct.   Once antitrust injury has been demonstrated by a causal relationship between the harm and the challenged aspect of the alleged violation, standing analysis is employed to search for the most effective plaintiff from among those who have suffered loss."  *Alberta Gas Chems., Ltd. v. E.I. Du Pont de Nemours & Co.*, 826 F.2d 1235, 1240 (3d Cir. 1987), *cert. denied,* 486 U.S. 1059 (1988); *accord Reazin*, 899 F.2d at 961 (citing *Alberta Gas*, 826 F.2d at 1240).

The Tenth Circuit has held that

> the following factors [should] be considered in determining antitrust standing:  the causal connection between the antitrust violations and plaintiff's injury; the defendant's intent; the nature of the plaintiff's injury; the directness or indirectness of the connection between the plaintiff's injury and the allegedly unlawful market restraint; the speculativeness of the plaintiff's damages; and the "risk of duplicative recoveries . . . or the danger of complex apportionment of damages."

*Reazin*, 899 F.2d at 962 n.15 (quoting *Associated Gen. Contractors, Inc. v. Carpenters*, 459 U.S. 519, 544 (1983)).   The "nature of the plaintiff's injury factor is designed to implement the requirement that only *antitrust* injuries are redressable under section 4.   An antitrust injury is an 'injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.'"   *Id.* (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat Inc.*, 429 U.S. 477, 489 (1977)); *see also Abraham v. Intermountain Health Care, Inc.*, 461 F.3d 1249, 1267 (10th Cir. 2006).   An injury which is merely causally linked in some way to an alleged antitrust violation is insufficient.   *See id.* (citing *Cargill, Inc. v. Monfort, Inc.*, 479 U.S. 104, 109 (1986); *Brunswick Corp.*, 429 U.S. at 489).

Defendants argue that "[f]or antitrust standing, a plaintiff must compete in, or purchase services or otherwise participate in, the allegedly restrained market."   [Doc. 45 at 2 (citing *Glen Holly Entertainment, Inc. v. Tektronic Inc.*, 352 F.3d 367, 372 (9th Cir. 2003) (plaintiff must "be a participant in the same market as the alleged malefactors"); *SAS v. Puerto RicoTel. Co.*, 48 F.3d 39, 44-45 (1st Cir. 1995) (explaining that the "presumptively proper plaintiff is a customer who obtains services in the threatened market") (internal quotation marks and citation omitted); *Eagle v. Star-Kist Foods, Inc.*, 812 F.2d 538, 540 (9th Cir. 1987) (plaintiff "must be either a consumer of the alleged violator's goods or services or a competitor of the alleged violator in the restrained market")].   Although Defendants cite authority from courts outside of the Tenth Circuit in support of this proposition, the Tenth Circuit does not read Section 4 of the Clayton Act so narrowly as to grant standing only to consumers or competitors.   *See Reazin*, 899 F.2d at 962.   Rather, in *Reazin v. Blue Cross & Blue Shield*, the Tenth Circuit held that a plaintiff—who was not a direct competitor or consumer in the relevant market—had antitrust standing.   *See id.*   The *Reazin* court explained that the Supreme Court in *Blue Shield v. McCready*, 457 U.S. 465 (1982), noted that

"'[Section 4 of the Clayton Act] does not confine its protection to consumers, or to purchasers, or to competitors . . .'"  *Id.* (quoting *McCready*, 457 U.S. at 482-83) (internal quotations omitted). Instead, the proper inquiry is whether "the injury alleged is so integral an aspect of the [anticompetitive conduct] alleged, [that] there can be no question but that the loss was precisely 'the type of loss that the claimed violations . . . would be likely to cause.'"  *Id.* (quoting *McCready*, 457 U.S. at 479).[4]  Thus, based upon the Tenth Circuit's interpretation of Section 4 of the Clayton Act and the Supreme Court's decision in *McCready*, the Court rejects Defendants' argument that Plaintiff's claim is barred solely because Plaintiff is not a customer or consumer in the private health insurance market.

The Court instead holds that, even though Plaintiff is not a competitor or consumer in the market for private health insurance, the injury Plaintiff alleges nonetheless satisfies the Tenth Circuit's standard for antitrust injury.  In *Reazin*, the Tenth Circuit held that a plaintiff-hospital had demonstrated that it had suffered antitrust injury as a result of the defendant-insurer's decision to terminate the hospital's contracting provider agreement with the insurer, because the hospital's loss was so integral an aspect of the anticompetitive conduct alleged that there could be no question that the loss was precisely the type that the anticompetitive conduct would be likely to cause.  *See id.* at 958, 962.  The Tenth Circuit held that, although the hospital was not a direct

---

[4]   Admittedly, the Tenth Circuit's reading of Section 4 of the Clayton Act and the Supreme Court's decision in *McCready* differs from the interpretations of other courts.  *Compare Norris v. Hearst Trust*, 500 F.3d 454, 466-67 (5th Cir. 2007) (declining to read the "inextricably intertwined" language in *McCready* broadly and holding that *McCready* does not alter the limitations on standing that require a plaintiff to be a customer or competitor in the restrained market); *Serpa Corp. v. McWane, Inc.*, 199 F.3d 6, 13 (1st Cir. 1999) (holding that "we decline to interpret *McCready* broadly," and noting that in *McCready* "the plaintiff was a consumer in the market directly affected by the antitrust violation" and that the Supreme Court has applied *McCready*'s "inextricably intertwined" language "as a legal conclusion" applicable "to the consumers and competitors").   In the absence of a Supreme Court opinion on point, however, it is the Tenth Circuit's opinions that govern the analysis of this Court.

competitor or consumer in the health care financing market, the hospital was a perceived competitor of the defendant-insurer, because the hospital's parent company was in the business of providing private health care financing (as well as healthcare and hospital management services), and because the parent owned an HMO, which was a direct competitor of the defendant-insurer in the market of health care financing.   *See id.* at 956-57, 962-63.   The *Reazin* court also noted that the plaintiff-hospital had standing because the hospital was the direct victim of the defendant-insurer and because there was evidence that the insurer specifically intended to harm the hospital.   *See id.* at 963.

Here, Plaintiff alleges that Defendants' actions in the private insurance market had the anticompetitive effect of harming Plaintiff in the comprehensive oncology market and that Defendants undertook these actions to advance their position in the comprehensive oncology market.   Specifically, Plaintiff alleges that PHP's exclusive contract with United HealthCare in the private health insurance market enhances Defendants' ability to monopolize the market for comprehensive oncology services, [Doc. 24, ¶ 282], that Defendants informed Plaintiff that they do not expect Plaintiff to retain its status as a contracting PHP healthcare provider which has caused Plaintiff harm in the comprehensive oncology market, [*id.* ¶ 267], that PHP used its power in the private insurance market to lower its reimbursement rates to Plaintiff under Plaintiff's most recent provider contract with PHP without any business justification and for the purpose of eliminating Plaintiff from the comprehensive oncology market and enabling Defendants to enter that market, [*id.* ¶ 269], and that Presbyterian Hospital used PHP's dominant position in the private insurance market to limit Plaintiff's ability to expand services in the comprehensive oncology market and to prevent Plaintiff from facilitating the entry of an outpatient surgery center (by refusing to enter into a provider contract with the surgery center), [*id.* ¶¶ 271, 274].   Admittedly,

the allegations do not demonstrate that Plaintiff was a direct competitor of PHP, because PHP operates in the private insurance market and Plaintiff operates in the comprehensive oncology market.   The Court, however, nonetheless concludes that, as in *Reazin*, Plaintiff was a perceived competitor of Defendant PHP, because PHP is affiliated with Defendant Presbyterian Hospital, and Presbyterian Hospital is a direct competitor of Plaintiff's in the market for comprehensive oncology services.

Plaintiff's status as a perceived competitor of Defendant PHP's by virtue of PHP's affiliation with its parent company Presbyterian Hospital, as in *Reazin*, is sufficient to confer antitrust standing on Plaintiff.   Moreover, the allegations in the complaint indicate that Plaintiff, like the *Reazin* plaintiff, was the direct victim of Defendant PHP's actions of decreasing reimbursements to Plaintiff and entering into an exclusive arrangement with United HealthCare. *See id.* at 963.   Thus, Plaintiff's injuries were "inextricably intertwined" with the anticompetitive conduct alleged.   In addition, the complaint alleges that Defendants specifically intended to harm Plaintiff's interests in the comprehensive oncology market and anticompetitive intent is indicative of the presence of antitrust injury.   *See id.*

The Court is not persuaded to hold otherwise by Defendants' citation to *Abraham v. Intermountain Health Care, Inc.*, 461 F.3d 1249 (10th Cir. 2006).   To the contrary, the Court concludes that *Abraham* is distinguishable and that dicta in *Abraham* supports a finding of antitrust injury here.   In *Abraham*, the plaintiffs, a group of optometrists, claimed that the defendant, a vertically-integrated company providing hospital, managed health care insurance, and physician services, *see id.* at 1253-54, attempted to monopolize the market for surgical facilities, *see id.* at 1266-67.   The plaintiff-optometrists, however, were not competitors or customers in the surgical facilities market and were only licensed to provide non-surgical eye care services.   *See id.* at

12

1253. The defendant argued that the plaintiffs lacked standing to assert their attempted monopolization claim because there was no connection between the defendant's dominance in the surgical facilities market and the plaintiffs' alleged injury in the non-surgical eye care market. *See id.* at 1267. The plaintiff-optometrists, however, alleged (1) that the defendant leveraged its greater power in the managed care market to increase its power in the surgical facilities market, (2) that because health care providers, including ophthalmologists (who did compete against plaintiffs in the market for non-surgical eye care), wanted to be included on the defendant's provider panels, those providers were willing to agree to send as many patients as possible to the defendant's surgical facilities in exchange for provider paneling, and (3) that this, in turn, had the effect of increasing the defendant's presence in the surgical facilities market. *See id*.

The Tenth Circuit held that the plaintiff-optometrists lacked standing because they made "no attempt to delineate *any* injury they ha[d] suffered or w[ould] suffer that [wa]s associated with [the defendant's] dominance in the surgical facilities market, let alone explain how that injury is 'of the type the antitrust laws were designed to prevent and that flows from that which makes defendants' acts unlawful.'" *Id.* (quoting *Associated Gen. Contractors, Inc. v. Carpenters*, 459 U.S. 519, 535 n.31 (1983)). The Tenth Circuit emphasized that "the Plaintiffs completely fail[ed] to discuss how [the defendant's] purported plan to monopolize the surgical facilities market b[ore] any relation to the practice of optometry or any other interest the Plaintiffs could possibly allege was invaded as a result of that plan. Rather, the Plaintiffs' argument on this point simply assume[d] the existence of standing, [which wa]s insufficient to meet the Plaintiffs' burden." *Id.* at 1267-68.

Defendants contend that *Abraham* compels a finding here that Plaintiffs do not have standing to maintain their Section 2 claims. *Abraham*, however, is distinguishable, because in

13

*Abraham* the plaintiffs did not provide any connection between the defendant's dominance in the surgical facilities market and the plaintiffs' injury in the non-surgical eye care market.   Plaintiff here has alleged facts sufficient to establish such a connection.   *See supra* at 11-12.   Thus, the Court rejects Defendants' argument that *Abraham* supports their claim that Plaintiff lacks standing to maintain its monopolization claim.

Instead, the Court concludes that *Abraham* supports—and does not negate—the Court's conclusion that Plaintiff has standing to assert a Section 2 monopolization claim.   In *Abraham*, Tenth Circuit noted that "*[s]ignificantly*, the Plaintiffs do not allege that part of the monopolization attempt involved the *quid pro quo* discussed in [relation to the Plaintiffs' Sherman Act Section 1 claim]."   *Abraham*, 461 F.3d at 1267 n.12 (first emphasis added).   It is this dicta which suggests that had the plaintiffs in *Abraham* alleged a *quid pro quo* agreement between the defendant and the ophthalmologists (pursuant to which the defendant used its dominance in the surgical facilities market to conspire with ophthalmologists to harm the plaintiffs in a separate market for non-surgical eye care) the plaintiffs would have had standing and which supports the Court's finding of antitrust injury here.

In support of their Section 1 claim, the *Abraham* "plaintiffs alleged that [the defendant] at the behest of several of its panel ophthalmologists . . . unlawfully excluded optometrists from its provider panels" in exchange for the ophthalmologists agreeing to refer patients to the defendant's hospital and surgical facilities, "and that this exclusion injured both competition, generally, and the Plaintiffs, specifically."   *Id.* at 1256.   The plaintiffs maintained that "both [the defendant] and the panel ophthalmologists would benefit [from this agreement]:   [the defendant] would profit by increasing the utilization of (and, accordingly, payment for) its [hospital and surgical] facilities,

and the ophthalmologists would profit by preventing lower-cost optometrists from competing with them for [non-surgical eye care]."   *Id.* at 1260.

The *Abraham* court held that the plaintiffs presented insufficient evidence of an agreement between the defendant and the ophthalmologists and that they therefore could not survive summary judgment.   *See id.* at 1259.   The court explained:

> At first blush, it might appear as though [the defendant] and its panel ophthalmologists acted in concert to exclude optometrists from [the defendant's] provider panels—thereby establishing that element of a § 1 claim.   Indeed, it is clear that [the defendant] excluded optometrists because of the actions of its panel ophthalmologists. But simply because [the defendant] acted in response to ophthalmologists' complaints is not enough to establish the concerted action requirement.   To the contrary, it is well-established in antitrust cases that a manufacturer's exclusion of a buyer-distributor in response to another buyer-distributor's complaints is insufficient as a matter of law to establish conspiracy, *see Monsanto*, 465 U.S. at 763 . . . ; accordingly, that [the defendant] chose not to panel optometrists because its ophthalmologists lobbied [the defendant] for that decision does not indicate that [the defendant] and the ophthalmologists acted in concert within the meaning of § 1.

*Id*.   The Tenth Circuit explained that the plaintiffs were required to "present evidence that tends to exclude the possibility that [the defendant] was acting independently and not pursuant to an agreement with the ophthalmologists" and held that the plaintiffs had failed to satisfy this summary judgment burden.   *Id.*

The Tenth Circuit's acknowledgement that it was "[s]ignificant[]" that the plaintiffs did "not allege that part of the monopolization attempt involved the *quid pro quo* discussed in [relation to the Plaintiffs' Sherman Act Section 1 claim]," *id.* at 1267 n.12, suggests that an allegation that the plaintiffs sustained their injuries in the non-surgical eye care market as a result of the *quid pro quo* conspiracy between the defendant and the ophthalmologists would have been sufficient to

15

confer antitrust standing upon the plaintiffs.   This is because a *quid pro quo* agreement would have provided the missing connection between the plaintiffs' injuries in the non-surgical eye care market and the defendant's dominance in the surgical facilities market.   The Court construes the Tenth Circuit's dicta in *Abraham* as providing a basis for a plaintiff who is not a competitor or customer in the market dominated by the defendant to sustain a Section 2 claim against a defendant for injuries sustained in the plaintiff's market.

Defendants here are, like the defendant in *Abraham*, a vertically integrated company. Likewise, Plaintiff here has sustained injuries, like the plaintiffs in *Abraham*, in a market different from the market dominated by Defendants.   Plaintiff here, however, unlike the plaintiffs in *Abraham*, has alleged facts sufficient to provide a connection between Defendants' dominance in the private health insurance market and Plaintiff's injury in the market for comprehensive oncology services.   *See supra* at 11-12.   The Court therefore concludes that Plaintiff has alleged facts that are sufficient to state a Section 2 claim for injuries in a market different from the distorted market and that Plaintiff has standing to maintain this claim even though it is not a competitor or a customer in the private health insurance market.

The Court also concludes that the complaint contains allegations—which if construed in Plaintiff's favor—are sufficient to confer antitrust standing on a different ground—namely, by virtue of Plaintiff's status as a seller of services to Defendant PHP.   The complaint contends that Defendant PHP lowered reimbursement rates to Plaintiff.   Defendants properly characterize this as a monopsony claim.   [Doc. 33 at 11 (explaining that "monopsonization . . . is the relevant term here because [PHP] is purchasing services from, and not selling services to, [Plaintiff]")].   Allegations that PHP used its market power in the private health insurance market to lower the price it was willing to pay to buy services from Plaintiff is sufficient to confer antitrust injury.

16

Just as consumers can be injured by a monopolist-seller's practices, so too can a seller suffer antitrust injury by a monopsonist-buyer's power in a particular market.[5]   *See Telecor Comm., Inc. v. S.W. Bell Tel. Co.*, 305 F.3d 1124, 1134 (10th Cir. 2002) (acknowledging that antitrust injury in a monopsony claim can be based upon injury to a seller), *cert. denied*, 538 U.S. 1031 (2003); *Dyer v. Conoco, Inc.*, No. 93-2801, 1995 WL 103233 (5th Cir. Feb. 21, 1995) (explaining that Fifth Circuit "cases have recognized that sellers to a monopsony or oligopsony can establish antitrust injury" because "'the seller faces a Hobson's choice:   he can sell into the rigged market and take the depressed price, or he can refuse to sell at all'") (citing and quoting *In re Beef Indus. Antitrust Litig.*, 600 F.2d 1148 (5th Cir. 1979)); Phillip E. Areeda & Herbert Hovenkamp, et. al., Antitrust Law ¶ 350b (2007) ("Notwithstanding numerous statements to the effect that the primary or even exclusive concern of antitrust is 'consumer' welfare, upstream, or monopsony, injury to suppliers is treated in largely the same way as injury to consumers.").

B.   Plaintiff has Stated a Claim for Monopolization (or Monopsonization) (Counts I and III).

Plaintiff alleges that Defendants have willfully maintained a monopoly and/or monopsony in the market for private health insurance services in violation of Section 2 of the Sherman Act and the New Mexico Antitrust Act.   [Doc. 24, ¶¶ 471-76].   To bring a monopolization or monopsonization claim, Plaintiff must allege both (1) the possession of monopoly or monopsony power and (2) the maintenance of that power through exclusionary conduct.   *See Eastman Kodak*

---

[5]   Defendants also argue that Plaintiff cannot obtain standing by virtue of allegations it "tried to bring new entries into both the markets for Private Health Insurance and Hospital Inpatient Services."   [Doc. 40 at 23; Doc. 24 ¶¶ 247-52].   To the extent that Plaintiff claims that it has standing to bring its monopolization claim by virtue of its attempt to enter these markets, [Doc. 40 at 23], the Court declines to consider this basis for standing.   The Court already has held that Plaintiff had standing because of its status as a perceived competitor and its status as a seller of services.   The Court therefore need not decide whether the complaint contains allegations sufficient to confer standing on any other ground.

*Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 481 (1992); *U.S. v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966); *SolidFX, LLC v. Jeppesen Sanderson, Inc.*, 935 F. Supp. 2d 1069 (D. Colo. 2013).[6] Defendants ask the Court to dismiss Plaintiff's monopolization claims on the ground that Plaintiff has not stated a plausible federal or state law monopoly claim with respect to either of these elements.

            1.     Plaintiff has Alleged Facts that Establish Possession of Monopoly Power.

      Defendants argue that Plaintiff has failed to allege facts indicating that Defendant PHP has monopoly power in the private health insurance market, because Plaintiff alleges that PHP has a 46% share of the market and anything less than "'[f]ifty percent is below any accepted benchmark for inferring monopoly power from market share.'" [Doc. 33 at 10 (citations omitted)]. Defendants also reject Plaintiff's argument that Defendants have leveraged their alleged monopoly power in the hospital inpatient services market to monopolize the private health insurance market, because Defendants contend that Plaintiff has alleged only that Presbyterian Hospital has a market

---

     [6] In evaluating Plaintiff's New Mexico Antitrust Act claims, the Court generally follows authority interpreting claims under Section 2 of the Sherman Act. The New Mexico Antitrust Act specifically directs courts to construe the state act "in harmony with judicial interpretations of the federal antitrust laws." N.M. Stat. Ann. § 57-1-15; *accord Smith Machinery Corp. v. Hesston, Inc.*, 694 P.2d 501, 505 (N.M. 1985) (recognizing that the NMAA specifically provides that it is to be construed "in harmony with judicial interpretations of the federal antitrust laws") (citing N.M. Stat. Ann. § 57-1-15); *Romero v. Philip Morris, Inc.*, 242 P.3d 280, 291 (N.M. 2010) (explaining that "[t]o prove a cause of action under the Antitrust Act the Legislature requires that 'the Antitrust Act *shall* be construed in harmony with judicial interpretations of the federal antitrust laws'" and that "'[t]his construction shall be made to achieve uniform application of the state and federal laws prohibiting restraints of trade and monopolistic practices'") (quoting N.M. Stat. Ann. § 57-1-15) (additional citation omitted). Moreover, New Mexico courts have specifically held that they draw upon federal interpretations of the Sherman Act to define the scope of liability under the NMAA, *see Smith Machinery Corp.*, 694 P.2d at 505 ("In the absence of New Mexico decisions directly on point, we look to federal cases involving allegations of antitrust arrangements under Section 1 of the Sherman Act."), and that "[i]t is the duty of the courts to ensure that New Mexico antitrust law does not deviate substantially from federal interpretations of antitrust law," *Romero*, 242 P.3d at 291. Thus, throughout this opinion, the Court relies upon federal authority interpreting the Sherman Act in deciding the NMAA claims.

share of "42% of the total staff[ed] hospital beds in Albuquerque," [Doc. 24, ¶ 57], and that this market share precludes a claim of monopoly power, [Doc. 45 at 3-4]. In support of these contentions, Defendants cite the Tenth Circuit case *Colorado Interstate Gas Co. v. Natural Gas Pipeline Co. of America*, 885 F.2d 683 (10th Cir. 1989), *cert. denied*, 498 U.S. 972 (1990), in which the Tenth Circuit stated that "courts generally require a minimum share of between 70% and 80%" to plead a claim of monopoly power. *Id.* at 694 n.18, *cited in* Doc. 45 at 4.

Defendants further reject Plaintiff's attempt to "cobble together a market share [in the private health insurance market] . . . in excess of 50% by adding the market shares of two unrelated entities"—namely, Cigna and United HealthCare insurance companies—to PHP's share. [Doc. 33 at 10-11 (citing *City of Moundridge v. Exxon Mobil Corp.*, 471 F. Supp. 2d 20, 42 (D.D.C. 2007) (affirming dismissal of monopolization claim and noting that "to sustain a charge of monopolization . . . a plaintiff must allege the necessary market domination of a *particular* defendant")]. Similarly, Defendants contend that Plaintiff cannot raise Presbyterian Hospital's alleged 42% market share in the hospital inpatient services market by alleging "on information and belief" that Presbyterian Hospital was responsible for or controlled "approximately 50%" of patients with private health insurance and something "more than 50%" of patients with Medicare. [Doc. 24 ¶ 59]. Even if Plaintiff could raise the market shares in these alleged markets to 50%, however, Defendants cite case law from the Eleventh Circuit explaining that the court "h[as] discovered no cases in which a court found the existence of actual monopoly established by a bare majority share of the market." *U.S. Anchor Mfg. Co. v. Rule Indus., Inc.*, 7 F.3d 986, 1000 (11th Cir. 1993), *cert. denied*, 512 U.S. 1221 (1994), cited in Doc. 45 at 4; *see also Nobody in Particular Presents, Inc. v. Clear Channel Communications, Inc.*, 311 F. Supp. 2d 1048, 1098 (D. Colo.

19

2004) (rejecting monopolization claim where defendant was alleged to have a 50.48% share of the relevant market), *cited in* Doc. 33 at 10.

Plaintiff rejects Defendants' arguments and instead contends that a firm's market share is only one factor relevant to determining whether a firm has monopoly power, [Doc. 40 at 19 (citing *Reazin v. Blue Cross & Blue Shield, Inc.*, 899 F.2d 951, 963 (10th Cir. 1990) (additional citations omitted)], and that a moderate market share does not preclude the presence of monopoly power, [*id.* at 20 (citing *Cost Mgmt. Servs., Inc. v. Washington Natural Gas Co.*, 99 F.3d 937, 951 (9th Cir. 1996))]. The Court agrees. The Tenth Circuit specifically addressed the question of the relevance of market share to determining monopoly power in *Reazin v. Blue Cross & Blue Shield, Inc.*, 899 F.2d at 963. In *Reazin*, the jury found that the defendant insurance company possessed both market power and monopoly power in the relevant market, and the district court refused to disturb those findings because it concluded that the plaintiffs had presented sufficient evidence that the insurance company had both power over competition and power over price, the two factors relevant to determining monopoly or market power. *See id.* at 968. The evidence before the jury indicated that the estimates of the insurance company's market share varied, that one internal memorandum prepared by an insurance company employee estimated that "'60% of all medically insured Kansans are insured with [the defendant insurer],'" *id.* at 969 (citing memorandum), that one of the plaintiffs' experts testified that, based on his own calculations, the insurance company's percentage of all medically insured Kansans, including self-insureds, was, "'conservative[ly]," forty-seven percent,'" *id.* (citing record), and that another of plaintiffs' experts testified that the insurance company received sixty-two percent of the insurance premiums in its service area compared to less than five percent for its next largest rival, *id.* On appeal, the insurance company

20

argued, among other things, that this market share was insufficient as a matter of law to permit the inference of market power.  *See id.*

The Tenth Circuit rejected the insurance company's argument that a market share of 45 or 47 percent "prohibits, as a matter of law, a conclusion of market or monopoly power."  *Id.* at 970. The Tenth Circuit held that, while relevant, "'market share alone is insufficient to establish market power.'"  *Id.* at 967 (quoting *Bright v. Moss Ambulance Servs., Inc.*, 824 F.2d 819, 824) (10th Cir. 1987) (citing *Colo. Interstate Gas Co. v. Natural Gas Pipeline Co.*, 885 F.2d 683, 695 (10th Cir. 1989); *Shoppin' Bag of Pueblo, Inc. v. Dillon Cos.*, 783 F.2d 159, 162 (10th Cir. 1986)) (additional citation omitted).  The Tenth Circuit noted that market share "may or may not reflect *actual* power to control price or exclude competition," *id.* (citing *Ball Mem. Hosp., Inc. v. Mutual Hosp. Ins., Inc.*, 784 F.2d 1325, 1335 (7th Cir. 1986)), and explained that "[c]ourts have not completely agreed on whether a particular market share should be given conclusive or merely presumptive effect in determining market or monopoly power, or whether market share is only a starting point in the inquiry into market or monopoly power," *id.*[7]  The Tenth Circuit then acknowledged that it opined in "dicta" in *Colorado Interstate Gas Co. v. Natural Gas Pipeline of*

---

[7]  *See also Reazin*, 899 F.2d at 967 (comparing *Valley Liquors, Inc. v. Renfield Importers, Ltd.*, 822 F.2d 656, 667 (7th Cir.) ("Without a showing of special market conditions or other compelling evidence of market power, the lowest possible market share legally sufficient to sustain a finding of monopolization is between 17% and 25%."), *cert. denied*, 484 U.S. 977 (1987), *and Dimmitt Agri Indus., Inc. v. CPC Int'l, Inc.*, 679 F.2d 516, 529 (5th Cir. 1982) ("market shares in the range of 16 to 25 percent, such as those held by [defendant] are insufficient—at least absent other compelling structural evidence—as a matter of law to support monopolization"), *cert. denied*, 460 U.S. 1082 (1983), *with Hayden Publishing Co. v. Cox Broadcasting Corp.*, 730 F.2d 64, 69 n. 7 (2d Cir.1984) ("a party may have monopoly power in a particular market, even though its market share is less than 50%") *and Broadway Delivery Corp. v. United Parcel Serv. of Am.*, 651 F.2d 122, 128 (2d Cir.) ("The trend of guidance from the Supreme Court and the practice of most courts endeavoring to follow that guidance has been to give only weight and not conclusiveness to market share evidence."), *cert. denied*, 454 U.S. 968 (1981)) (citing Areeda & Turner, *Antitrust Law*, ¶ 518.3c ("there is a substantial merit in a *presumption* that market shares below 50 or 60 percent do not constitute monopoly power.")).

*America*, 885 F.2d at 694 n.18—a case Defendants cite in support of their contention that a minimum market share of between 70 to 80 percent is required to establish monopoly power—that "[w]hile the Supreme Court has refused to specify a minimum market share necessary to indicate a defendant has monopoly power, lower courts generally require a minimum market share of between 70% and 80%." *Id.* (quoting *Colo. Interstate Gas Co.*, 885 F.2d at 694 n. 18).  The Tenth Circuit in *Reazin* ultimately held, however, that "[the Circuit does] not view *Colorado Interstate Gas* as establishing a firm market share percentage required before a finding of monopoly power can ever be sustained" and that "[it] prefer[s] the view that market share percentages may give rise to presumptions, but will rarely conclusively establish or eliminate market or monopoly power." *Id.* at 967-68.  The Tenth Circuit therefore held that "[the insurance company's] market share [was] such that there could be at most a presumption of a lack of monopoly or market power." *Id.* at 969-70.

In so holding, the Tenth Circuit reasoned that, regardless of whether the defendant's market share was 62 percent or 47 percent, the insurance company was "by far the largest private source of health care financing in its service area." *Id.* at 969.  The Tenth Circuit explained, "By virtue of its size, [the insurance company] has economic leverage over hospitals.  As [the insurance company's] president . . . conceded, [the company's] membership base gives [it] 'clout' over hospitals." *Id.* (citing record).  Thus, the Tenth Circuit concluded that even if the insurance company had only a market share of 45 percent, this lower percentage alone would not alter the insurance company's relative dominance in the market.  *See id.* at 949 & n.27.

Having rejected the insurance company's contention that a market share of 45 or 47 percent precluded a finding of monopoly power as a matter of law, the Tenth Circuit in *Reazin* next turned to other characteristics of the private health care financing market at issue and to more

22

specific evidence of the insurance company's power over price and competition to determine whether sufficient evidence supported the jury's finding of monopoly and market power.   *See id.* at 968.   The *Reazin* court held that other factors relevant to this inquiry "include the number and strength of the defendant's competitors, the difficulty or ease of entry into the market by new competitors, consumer sensitivity to change in prices, innovations or developments in the market, whether the defendant is a multimarket firm, as well as other evidence presented . . . that [a court] may deem persuasive regarding [a] defendant's market strength."   *Id*.

The Tenth Circuit's holding in *Reazin* is directly applicable here.   Although Defendants urge the Court to dismiss Plaintiff's monopolization claim solely on the ground that Plaintiff's allegations of market share are insufficient to state a claim, the *Reazin* court specifically rejected the application of a minimum threshold market share to sustain a Section 2 claim and instead held that market share percentages may give rise to presumptions, but that they will rarely conclusively establish or eliminate market or monopoly power.   *See id.* at 967-68.   Thus, the Court declines to dismiss Plaintiff's monopolization claims solely on the ground that Plaintiff has alleged an insufficient market share.   At best, allegations of a 42 percent, 46 percent, or in excess of 50 percent market share, [Doc. 33 at 10; Doc 24, ¶ 57; Doc. 45 at 10-11; Doc. 24 ¶ 59], give rise to a presumption that Defendants lack monopoly power.   *Cf. Reazin*, 899 F.2d at 967-68.

Consistent with the Tenth Circuit's analysis in *Reazin*, the Court next must determine whether other characteristics of the private health insurance market are sufficient to state a plausible claim that Defendants had monopoly power.   *See id.* at 968.   With respect to the first factor identified by the *Reazin* court, the number and strength of competitors, Plaintiff has alleged that the private insurance market is concentrated and includes only PHP, Lovelace, Blue Cross, United HealthCare, and Cigna.   Plaintiff further has alleged that PHP has a 46 percent market

23

share, that Lovelace—PHP's most significant competitor—has a 27 percent market share, and that United HealthCare and Cigna each have less than a ten percent market share.   Plaintiff also has alleged that Defendants have tied up additional health insurers—*i.e.*, United HealthCare and Cigna—with exclusive dealing arrangements in order to prevent their working with rivals and potential entrants, thus causing further concentration of the private health insurance market. [Doc. 40 at 21].   In addition, Plaintiff has alleged that Blue Cross is planning to exit the market for private health insurance.   These allegations demonstrate that Defendant PHP effectively has only one competitor, Lovelace, whose market share is, construing the allegations in the complaint in Plaintiff's favor, significantly less than PHP's (or PHP/United's) market share.   This factor, therefore, weighs in favor of finding possession of monopoly power.

With respect to the second factor, the difficulty or ease of entry into the market by new competitors, the Tenth Circuit has explained that "[e]ntry barriers are particular characteristics of a market which impede entry by new firms into that market.   Entry barriers may include high capital costs or regulatory or legal requirements such as patents or licenses."   *Reazin*, 899 F.2d at 968 (citations omitted).   Also relevant could be entrenched buyers' preferences.   *See* Areeda & Turner, *Antitrust Law,* ¶ 409 (1978), *cited in Reazin*, 899 F.2d at 968.   "Substantial market power can persist only if there are significant and continuing barriers to entry."   *Id.*, ¶ 505, *cited in Reazin*, 899 F.2d at 968; *accord Cargill, Inc. v. Monfort, Inc.*, 479 U.S. 104, 119-20 n.15 (1986).

Plaintiff has alleged that significant barriers to entry exist in the private health insurance market and that entering this market even under normal conditions requires significant capital, expertise, and time.   [Doc. 24, ¶ 473].   Plaintiff also has alleged that Blue Cross does not have enough enrollees to independently facilitate entry, that firms that currently exist have not been able to challenge Defendants' market position for many years (particularly given Defendants' alleged

24

monopoly power of hospital inpatient services), that no meaningful entry has occurred in decades, [*id.* ¶¶ 128, 131, 137-43], that entry by new firms has failed because Defendants have closed significant market segments to these entrants, [*id.*¶¶ 131-36], and that Defendants have maintained their dominant position over many years and have expanded their market position with the acquisition of hundreds of physician practices, [*id.* ¶¶ 193-206].  Because Plaintiff has alleged that significant barriers to entry exist, this factor weighs in favor of a finding of monopoly power.

With respect to the fourth factor,[8] whether the defendant is a multimarket firm, the complaint alleges that Defendants are part of a multimarket enterprise that competes in, at a minimum, the hospital inpatient services market, the private health insurance market, and the comprehensive oncology market.  Moreover, Plaintiff has alleged that because Defendants are part of a multimarket firm, they can use their power in one market to impede entry in another market.   Plaintiff alleges, for example, that Blue Cross cannot act as a substitute for, or challenge the market position of, Defendant PHP because Blue Cross enrollees cannot receive covered treatment at Presbyterian Hospital and because Presbyterian's monopoly power over hospital inpatient services ensures that patients seeking treatment at Presbyterian will not purchase Blue Cross's products.  Because Defendants are part of a multimarket firm and Plaintiff has alleged that they have used their dominance in one market to impede entry in another, this factor weighs in favor of a finding of monopoly power.

Plaintiff has alleged facts from which the Court has concluded that three of the four factors identified in *Reazin* weigh in favor of a finding that Defendants possessed monopoly power over the market for private health insurance.   From these allegations, as well as Plaintiff's allegations

---

[8]   Plaintiff identifies no allegations in the complaint relevant to the third factor, so the Court declines to address it.

that Defendant possessed a market share of up to in excess of 50 percent, the Court concludes that Plaintiff has satisfied its burden of alleging facts that, if true, could establish the possession of monopoly power.   The Court therefore denies the Motion to Dismiss to the extent Defendants seek dismissal on the ground that Plaintiff has failed to allege facts sufficient to establish that Defendants possessed monopoly power in the relevant market.

2.   Plaintiff has Alleged Facts that Establish Maintenance of Monopoly Power.

Defendants also argue that Plaintiff has failed to allege that Defendants engaged in the illegal maintenance of PHP's claimed monopoly power in the private health insurance market. The second element of the offense of monopolization is the "willful acquisition or maintenance of [monopoly] power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident."   *U.S. v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966).   Stated differently, it "is the use of monopoly power 'to foreclose competition, to gain a competitive advantage, or to destroy a competitor.'"   *Eastman Kodak*, 504 U.S. at 482-83; *accord SolidFX, LLC v. Jeppesen Sanderson, Inc*., 935 F. Supp. 2d 1069 (D. Colo. 2013).   This is generally referred to as anti-competitive or predatory behavior.

"'Anticompetitive conduct' can come in too many different forms, and is too dependent upon context, for any court or commentator ever to have enumerated all the varieties."   *Id.* (citing *Caribbean Broad. Sys., Ltd. v. Cable & Wireless PLC*, 148 F.3d 1080, 1087 (D.C. Cir. 1998)). Monopolistic acts include exclusionary practices like refusals to deal and predatory pricing.   *See Flying J Inc. v. TA Operating Corp.*, No. 1:06-CV-30-TC, 2008 WL 4923041, at *9 (D. Utah Nov. 14, 2008).

Plaintiff does not identify any specific allegations of conduct that Defendants engaged in to maintain a monopoly in the private health insurance market.   Rather, Plaintiff generally argues

26

that the anticompetitive actions Plaintiff alleges that Presbyterian Hospital committed are attributable to PHP because Presbyterian Hospital is the ultimate parent of PHP.  [Doc. 40 at 21-22 (citing *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752 (1984) (a parent and subsidiary are treated as a single entity under the antitrust laws)].  Because Plaintiff does not specifically identify Defendants' alleged anticompetitive conduct, it has left to Defendants—and the Court—the task of discerning the alleged anticompetitive conduct that forms the basis of Plaintiff's federal and state monopoly claims.

On a motion to dismiss, a court must accept as true all well-pleaded factual allegations in the complaint, view those allegations in the light most favorable to the plaintiff, and draw all reasonable inferences in the plaintiff's favor.  *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Smith v. U.S.*, 561 F.3d 1090, 1098 (10th Cir. 2009) (citation omitted). The 86-page complaint contains 525 numbered paragraphs setting forth the basis of Plaintiff's claims and does not specifically identify which factual allegations constitute predatory conduct to maintain a monopoly in the private health insurance market.  While the Court is obligated to construe the allegations in the complaint and draw all reasonable inferences from those allegations in the light most favorable to Plaintiff, Plaintiff also is required to support its legal positions with authority.  *See* D.N.M.LR-Civ. 7.3(a).  This duty requires Plaintiff to identify its opposing arguments with sufficient specificity to determine the applicable supporting authority.  Plaintiff has not fulfilled this duty.

Defendants construe the complaint as alleging only one act of anticompetitive conduct in the private health insurance market:  that Defendants lowered reimbursement rates in the most recent provider contract.  [Doc. 33 at 11].  The Court, however, consistent with its obligation to construe the complaint in the light most favorable to Plaintiff, reads the complaint as alleging a

27

second set of acts of anticompetitive conduct:  that Defendant PHP entered into an exclusive arrangement with United HealthCare, that United will not take market actions without PHP's approval, and that this arrangement has caused significant concentration of the market for private health insurance.  [Doc. 24 ¶¶276, 277].  Because Plaintiff presents no argument or cites no authority in support of any other specific alleged action constituting anticompetitive conduct in the private health insurance market, *see* D.N.M.LR-Civ. 7.3(a) & 7.1(b), the Court considers whether only the aforementioned sets of acts constitute predatory conduct sufficient to withstand the Motion to Dismiss Plaintiff's monopoly claims.

a.   <u>Lower Reimbursement Rates</u>.

Defendants contend that PHP's offer to pay less for services is not an act of monopolization, or, more accurately, its inverse, monopsonization (because PHP is purchasing services from, and not selling services to, Plaintiff).  [Doc. 33 at 11].  "Monopsony, also known as a buyer's monopoly, is a form of monopoly power in which the monopolist is a buyer who controls the price, volume, and/or can make other anticompetitive demands on a seller."  *White Mule Co. v. ATC Leasing Co.*, 540 F. Supp. 2d 869 (N.D. Ohio 2008).  "Monopsony power involves the ability of buyers to lower input prices below competitive levels, which requires the ability to restrict the quantity demanded of the input."  Roger D. Blair & Jeffrey L. Harrison, *Antitrust Policy & Monopsony*, 76 Cornell L. Rev. 297 (1991).  With either a monopolist or monopsonist, "the quantity that would be exchanged is less than the quantity exchanged under competitive conditions, and the result is allocatively inefficient."  *Id.* "Ironically, the reduced input prices the monopsonist enjoys do not lead to reduced output prices. In fact, when the monopsonist [in the input market] also has market power in its output market, the reduced input prices cause higher output prices."  *Id.*; *see also Telecor Communications, Inc. v.*

28

*S.W. Bell Tel. Co.*, 305 F.3d 1124, 1136 (10th Cir. 2002) (explaining that monopsony still affects consumers because "there is a dead-weight loss associated with imposition of monopsony pricing restraints," and "[s]ome producers will either produce less or cease production altogether, resulting in less-than-optimal output of the product or service, and over the long run higher consumer prices, reduced product quality, or substitution of less efficient alternative products"), *cert. denied*, 538 U.S. 1031 (2003); *accord White Mule Co.*, 540 F. Supp. 2d at 888 n.11. "[M]onopsony power [therefore] leads a profit-maximizing firm to restrict the quantity employed of an input, thereby reducing social welfare."   *Id.* at 306-07.

Defendants argue that "'[a] firm that has substantial power on the buy side of the market . . . is generally free to bargain aggressively when negotiating the prices it will pay for goods and services.'"   [Doc. 33 at 11 (citing *W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 103 (3d Cir. 2010) (noting plaintiff "would have little basis for challenging the reimbursement rates" of defendant private insurer) (additional citations omitted))].   Courts are in agreement that simply possessing monopoly or monopsony power and charging or bidding at monopoly or monopsony prices does not violate Section 2 of the Sherman Act.   *See Pac. Bell Tel. Co. v. Linkline Communications, Inc.*, 555 U.S. 438, 447-48 (2009); *see Verizon Communications, Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004); *White Mule Co.*, 540 F. Supp. 2d at 888.   "As a general rule, businesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing."   *U.S. v. Colgate & Co.*, 250 U.S. 300, 307 (1919); *accord Linkline Communications*, 555 U.S. at 448 (citing *Colgate & Co.*, 250 U.S. at 307).   Likewise, in general, a purchaser or seller may unilaterally refuse to deal with another. *See* Susan Foster, *Monopsony and Backward Integration:  Section 2 Violations in the Buyer's Market*, 11 U. Puget Sound L. Rev. 687, 715 (1988) (hereinafter "Foster").   Thus, based upon this

principle, "courts will not interfere with a buyer's price decisions absent anticompetitive conduct even if the monopsonist in the input market (the buy side of the market) has monopoly power in the output market (the sell side of the market). *See Kartell v. Blue Shield, Inc.*, 749 F.2d 922, 929 (1st Cir. 1983) (explaining that "even if the buyer has monopoly power, an antitrust court (which might, in appropriate circumstances, restructure the market) will not interfere with a buyer's (*nonpredatory*) determination of price") (emphasis added), *cert. denied*, 471 U.S. 1029 (1985). Indeed, "A legitimate buyer is entitled to use its market power to keep prices down." *Id.*; *see Royal Drug Co., Inc. v. Group Life & Health Ins. Co.*, 737 F.2d 1433, 1438 (5th Cir. 1984) (explaining that where an insurer and a pharmacy provider "sit on opposite sides of the bargaining table," "[a]bsent any evidence of the presence and abuse of monopoly power, [the insurer] has the clear right to bargain for the lowest price and best deal for itself and its customers/insureds."), *cert. denied*, 469 U.S. 1160 (1985).

In the event, however, that the monposonist maintains its market power on the buy side of the market through anticompetitive or predatory conduct, the monopsonist is equally as culpable as the monopolist in violating Section 2. *See Campfield v. State Farm Mut. Auto. Ins. Co.*, 532 F.3d 1111, 1118 (10th Cir. 2008) ("Monopsonistic practices by buyers are included within the practices prohibited by the Sherman Act.") (citing *Telecor Communications, Inc.*, 305 F.3d at 1134). "The ultimate question in such a claim is whether the monopolist's (or monopsonist's) activity has an anticompetitive effect. Claims involving abuse of existing monopsony power may be based on a variety of activities including price fixing, refusals to deal[] and vertical integration." Foster, *supra*, at 700.

Plaintiff has alleged that Defendants have a monopoly in the private health insurance market and that they have vertically integrated backwards[9] into the comprehensive oncology services market, which is the market in which Plaintiff sells its services and in which Defendant Presbyterian Hospital is Plaintiff's competitor.   The complaint, construed in the light most favorable to Plaintiff, also alleges that Defendants have set a predatory price, that Defendants explicitly and implicitly refused to deal with Plaintiff, that Defendants engaged in these acts for the anticompetitive purpose of harming Plaintiff and advancing themselves in the secondary comprehensive oncology market, and that the Defendants' conduct has anticompetitive effects. The Court considers whether these allegations are sufficient to satisfy the second element of a monopolization claim.

i.        Refusal to Deal.

"[I]f a monopsonist or a monopolist acts with the purpose of excluding competitors," its express or implied "refusal to deal may result in a violation of Section 2."   Foster, *supra* at 716; *see also Aspen Skiing Co. v. Aspen Highland Skiing Co*., 472 U.S. 585, 602 (1985) (holding that there is no general duty to cooperate with competitors unless the monopolist's refusal was unreasonably "exclusionary" or predatory and explaining that "if a firm has been 'attempting to exclude rivals on some basis other than efficiency,' it is fair to characterize its behavior as predatory").   A court may find that a buyer implicitly refused to deal with a supplier if, for

---

[9]   A business vertically integrates when it obtains a certain amount of control over the distribution or sale of its products at another level of the production-distribution chain.   *See* Foster, *supra* at 716.   Integration may be forward (involving the purchase or control of distributors) or backward (involving the purchase or control of suppliers).   *See id.* at 720.

example, the buyer refuses to purchase except at an unreasonable price.   *See* Foster, *supra* at 715
& n.131.[10]

A refusal to deal may cross the line from permissible to predatory, and therefore satisfy the
second element of a monopsonization/monopolization claim, if its purpose is vertically to integrate
into the supplier's market.   *See id.* at 716-17 (explaining that "in some cases liability may be
imposed if these activities are a means of accomplishing vertical integration" and that "[a
company's] refusal to deal to attain vertical integration may satisfy the second element of
monopsonization (monopolization).").   "Clearly, [however,] vertical integration is not prohibited
per se . . . and even an alleged monopolist has the right to compete vigorously."   *U.S. v. Am. Tel.
& Tel. Co.*, 524 F. Supp. 1336, 1373 (D.D.C. 1981).   Indeed, vertical integration often may have
pro-competitive effects.   *See* Foster, *supra* at 716.   On the other hand, however, vertical
integration "may have anticompetitive effects . . . , such as foreclosing competition or increasing
barriers to entry."   *Id.*   When vertical integration creates monopoly power and is accompanied by
anticompetitive effects, it may be unlawful under the Sherman Act.   *See Am. Tel. & Tel. Co.*, 524
F. Supp. at 1373 (explaining that "vertical integration may be unlawful under the Sherman Act if it
creates monopoly power and is accompanied by an intent to exclude competition" and that "when
activity among vertically-related affiliates restrains trade it violates the antitrust laws") (citations
omitted).

---

[10]   Thus, in *Eastman Kodak Co. v. Southern Photo Materials Co*., 273 U.S. 359, 375
(1927), the Court found that the defendant's refusal to sell to the plaintiff except at
over-the-counter prices was unreasonable and was effectively a refusal to deal.   Similarly, in *Six
Twenty-Nine Productions Inc. v. Rollins Telecasting, Inc.*, 365 F.2d 478 (5th Cir. 1966), a radio
station's refusal to pay normal commission rates for material prepared by an advertising agency
was found to be a refusal to deal.

One way of demonstrating that a refusal to deal exceeds vigorous competition and instead has anticompetitive effects is to show that the promotion of vertical integration increases entry barriers. *See* Foster, *supra* at 720-21. Entry barriers are increased in the context of a monopsonization claim to achieve backward vertical integration if other firms would be forced to operate at two levels simultaneously.[11] *See id.* at 721. Theoretically, firms would be required to do so only if "(1) operation at the second level alone required doing business with the monopsonist; (2) the monopolist/monopsonist ceased dealing with outsiders; and (3) dual entry would be more difficult than entry at a single level. These conditions would be met if the monopsonist covered virtually all of the market." *Id.* at 721 & n.168.

Plaintiff has alleged that Defendant PHP has both implicitly and explicitly refused to deal with it. The complaint alleges that when Presbyterian Hospital began to compete in the comprehensive oncology market, PHP significantly lowered its reimbursement rates to Plaintiff below competitive levels to "financially strangle" and eliminate Plaintiff from the comprehensive oncology market. [Doc. 24 ¶ 276 (PHP has warned Plaintiff that it does not foresee Plaintiff retaining its status as a PHP provider); *id.* ¶ 270 ("the reimbursement rates PHP offered to NMOHC are significantly lower than the reimbursement rates it pays to Presbyterian [physicians]" and are "significantly lower than the reimbursement rates [Plaintiff] would receive in a competitive health insurance market"); *id.* ¶ 269 ("PHP demanded that NMOHC accept a provider contract with reimbursement rates that would financially strangle NMOHC" and "[n]o legitimate business justification existed for the substantial change in Presbyterian's business relationship

---

[11] "If a monopolist or monopsonist has the power to force simultaneous entry at both levels, potential competition may be reduced in a variety of ways. First, the amount of capital and the level of technological skill necessary for entry would increase. Second, integration may increase the minimum level of efficient operation in the industry thereby limiting entry only to larger firms." Foster, *supra* at 722 & n.170.

with NMOHC and the reimbursement rates it was demanding"); *id.* (suggesting that PHP lowered reimbursement rates only after Presbyterian Hospital entered the comprehensive oncology market because Presbyterian Hospital was "in the process of building its own cancer program and was closer to being able to eliminate NMOHC from the market" for comprehensive oncology services)]. The complaint also alleges that Defendant PHP expressly refused to deal with Plaintiff when it declined to cover services offered by Plaintiff. [*Id.* ¶¶ 271-72 ("Presbyterian has also used PHP to limit NMOHC's ability to expand the services it offers to patients" by "routinely refus[ing] to cover these new services"); *id.* ¶ 273 (Plaintiff wanted to offer cancer rehabilitation services to its patients, but PHP refused to cover these services and "[w]ithout coverage from PHP, NMOHC could not offer these specially tailored services to its patients"); *id.* ¶ 274 (PHP tried to facilitate the "entry of an outpatient surgery center so it could offer cancer related outpatient surgery services to its patients," but "[n]o outpatient surgery center will enter the market without having a contract with PHP, and PHP will not enter into contracts with a free standing surgery center")].

The complaint further alleges that PHP's refusals to deal had the anticompetitive effect of increasing barriers to entry. [*Id.* ¶ 136 (hospitals, surgery centers, and other facilities and providers have not entered the market "because they needed contracts with PHP"); *id.* ¶ 273 ("[w]ithout coverage from PHP, NMOHC could not offer [cancer rehabilitation] services to its patients"); *id.* ¶ 274 ("[n]o outpatient surgery center will enter the market without having a contract with PHP, and PHP will not enter into contracts with a free standing surgery center")]. In addition, the complaint alleges that competitors in the private health insurance, comprehensive oncology, and inpatient hospital services markets will have to enter the market on all three levels simultaneously, that "the costs associated with such entry are prohibitively high," and that "[s]uch

entry would also entail such a substantial risk of failure as to make any significant entry unprofitable from an ex-ante perspective."  [*Id.* ¶ 135].  The complaint also alleges that even without simultaneous entry, significant barriers to entry exist in the private health insurance market and that entering this market even under normal conditions requires significant capital, expertise, and time.  [*Id.* ¶ 473].

The Court concludes that the foregoing allegations are sufficient to satisfy the second element of a monopsonization claim.  Plaintiff has not simply alleged that Defendant PHP has vigorously competed with Plaintiff by exercising its monopsonization power with the goal of promoting its own vertical integration into the comprehensive oncology market.  Rather, Plaintiff has alleged that PHP's actions towards vertical integration had the anticompetitive effect of increasing barriers to entry.  *Cf. Am. Tel. & Tel. Co.*, 524 F. Supp. at 1373, 1374 (rejecting the defendants' argument that the "evidence shows nothing more than that [defendants] took advantage of the efficiencies of their vertically integrated structure," and instead holding that the evidence "demonstrates that incentives other than those arising from vertical integration per se have underlain the [defendant's] procurement decisions," and that these incentives were sufficient to establish the anticompetitive conduct necessary to support a monopolization claim).  The Court therefore denies Defendants' Motion to Dismiss Plaintiff's federal and state claims for monopsonization of the market for private health insurance.

ii.    Predatory Bidding.

Plaintiff also has alleged facts sufficient to withstand Defendants' Motion to Dismiss the Section 2 and NMAA monoposonization claims by alleging that Defendant PHP's bidding prices are predatory and intended to produce anticompetitive effects in the comprehensive oncology market.  Allegations of predatory pricing (or, more accurately, in the context of a monopsony

35

claim, predatory bidding)[12] to promote backward vertical integration may violate the antitrust laws to the extent the price (or bid) is designed to harm competition in the secondary market.   As one commentator explained, a buyer may be liable for predatory pricing if, for example, its pricing increases "the supplier's costs [and if] the purchaser 'is vertically integrated into the production of some fraction of its input needs.'"   Foster, *supra* at 720 ("Action designed to increase a supplier's cost for the purpose of excluding the supplier and vertically integrating into the input market should thus be considered predatory and a violation of the antitrust laws."); *see also* Krattenmaker & Salop, *Anticompetitive Exclusion:   Raising Rivals Costs to Achieve Power Over Price*, 96 Yale L.J. 208, 218, 238 (1986).   "By integrating into its source of supply, the backward integrationist is assured that it will be able to take all monopoly/monopsony profits in that chain.   Thus, the monopsonist that attains backward integration is able to profit from its position in two successive levels."   Foster, *supra* at 720 & n. 164.   When the backward integrationist's action also causes anticompetitive effects, such as increased barriers to entry, this price bidding with a goal of vertical integration becomes predatory and anticompetitive and therefore may form the basis of an antitrust violation.   *See id.*

The Court concludes that, just as Plaintiff's allegation that PHP refused to deal was sufficient to constitute anticompetitive conduct, so too is Plaintiff's allegation that PHP engaged in predatory bidding.   Plaintiff alleges that Defendant "PHP demanded that NMOHC accept a provider contract with reimbursement rates that would financially strangle NMOHC," [Doc. 24 ¶ 269], that these reimbursement rates were "significantly lower than the reimbursement rates it pays to Presbyterian [physicians]" and "significantly lower than the reimbursement rates

---

[12]   Predatory bidding can also be characterized as an implied refusal to deal, if the price bid is unreasonable.   *See* Foster, *supra* at 715 & n.131; *see supra* note 9.

[Plaintiff] would receive in a competitive health insurance market," [*id.* ¶ 270], that "[n]o legitimate business justification existed for the substantial change in Presbyterian's business relationship with NMOHC and the reimbursement rates it was demanding," [*id.* ¶ 269], and that PHP lowered reimbursement rates only after Presbyterian Hospital entered the comprehensive oncology market because Presbyterian Hospital was "in the process of building its own cancer program and was closer to being able to eliminate NMOHC from the market" for comprehensive oncology services, [*id.* ¶ 270].   These allegations are sufficient to establish that Defendant PHP offered a predatory bid for the purpose of promoting its backward integration into the comprehensive oncology market.   Moreover, the same allegations in the complaint that established that PHP's refusals to deal had anticompetitive effects also indicate that PHP's alleged predatory bidding had anticompetitive effects.   *See supra* at 33-35.   The Court concludes that these allegations are sufficient to satisfy the second element of a Section 2 or NMAA monopsonization claim.   Having concluded that Plaintiff has alleged facts sufficient to satisfy both elements of a federal and state monopsonization claim, the Court denies Defendants' Motion to Dismiss these claims.

The Court is not persuaded to hold otherwise by Defendants' argument that its bid for lowered reimbursement rates establishes only that Defendants engaged in rational business conduct with no anticompetitive component.   Admittedly, courts have recognized that a buyer—even one with monopoly power on the buy side (*i.e.*, monopsony power)—is entitled to use its market power to keep prices down.   *See, e.g.*, *Kartell v. Blue Shield, Inc.*, 749 F.2d 922, 929 (1st Cir. 1984).   In *Kartell v. Blue Shield, Inc.*, for example, the plaintiff alleged that the defendant-insurer's payments for physician services were "too low" and that the insurer's price scheme was "too rigid."   *Id.*   The First Circuit rejected the argument that low reimbursement

rates gave rise to antitrust liability because there was no evidence of any anticompetitive effect. *See id.* (explaining that "[t]here is no suggestion that Blue Shield's fee schedule reflects, for example, an effort by, say, one group of doctors to stop other doctors from competing with them") (citation omitted).   Rather, the court reasoned that the "[insurer] Blue Shield and the doctors 'sit on opposite sides of the bargaining table,'" *id.* (quoting *Royal Drug Co. v. Group Life & Health Ins. Co.*, 737 F.2d 1433, 1438 (5th Cir. 1984)), and that the insurer seems simply to be acting "'as every rational enterprise does, *i.e.,* [to] get the best deal possible,'" *id.* at 929-30 (quoting *Travelers Ins. Co. v. Blue Cross of W. Pa.*, 481 F.2d 80, 84 (3d Cir. 1983)).   Thus, the court held that the conduct complained of simply constituted purely unilateral conduct for which the defendant-insurer could not incur antitrust liability.   *See id.* at 930.

While Plaintiff and Defendant PHP seem to—like the parties in *Kartell*—sit on opposite sides of the bargaining table with respect to their interests in the private health insurance market (*i.e.*, Plaintiff is the seller of physician and medical services whereas Defendant PHP is the buyer of those services), Defendant PHP, by virtue of its association with Presbyterian Hospital, is a perceived competitor of Plaintiff's.   *See supra* at 11-12.   Thus, Plaintiff and PHP do not, as a practical matter, sit on opposite sides of the bargaining table.

Plaintiff has alleged that Defendant PHP undertook its actions of engaging in predatory bidding to accomplish vertical integration and other anticompetitive effects in the comprehensive oncology market.   These allegations are sufficient to state a Section 2 and NMAA monoposonization claim.

### b.   Exclusive Contract with United HealthCare.

The Court also denies Defendants' Motion to Dismiss the Section 2 and NMAA claims because Plaintiff has alleged a second set of acts that constitute anticompetitive conduct.

Specifically, the Court concludes that Plaintiff's allegations that Defendant PHP and United HealthCare entered into an exclusive arrangement are sufficient to establish the anticompetitive conduct necessary to satisfy the second element of a monopolization claim.

In its complaint, Plaintiff alleges that (1) the market for private healthcare insurance is concentrated and includes only PHP, Lovelace, Blue Cross, United HealthCare, and Cigna; (2) that PHP has a 46 percent market share, that PHP's most significant competitor Lovelace has a 27 percent market share, and that United HealthCare and Cigna each have less than a ten percent market share; (3) that United HealthCare and Presbyterian have had an exclusive dealing arrangement for years, that United HealthCare will not take market actions without Presbyterian's approval, and that the exclusive contract with United HealthCare has caused significant concentration of the market for private health insurance; and (4) that Blue Cross cannot act as a substitute for, or challenge the market position of, PHP because Blue Cross enrollees cannot receive covered treatment at Presbyterian and because Presbyterian's monopoly power over hospital inpatient services ensures that patients seeking treatment at Presbyterian will not purchase Blue Cross's products, that Blue Cross does not have enough enrollees to independently facilitate entry, and that Blue Cross is planning to exit the market for private health insurance.   [Doc. 24 ¶¶ 61-68, 275-81].   The Court must determine whether these allegations, if true, establish that Defendants attempted to maintain their market power through exclusionary or anticompetitive conduct.   *Cf. Verizon Communications, Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004).

Exclusive arrangements can constitute maintenance of monopoly power through exclusionary conduct.   *See U.S. Healthcare, Inc. v. Healthsource, Inc.*, 986 F.2d 596, 597 (1st Cir. 1993) ("Exclusive contracts might in some situations constitute the wrongful act that is an

ingredient in monopolization claims under section 2").   Conduct is unlawful, however, only where it has or threatens to have a significant exclusionary impact in the market allegedly monopolized.   *See id.* at 597-98.   The question, therefore, is whether the alleged exclusive arrangement between Defendant PHP and United HealthCare, under which United will not take market actions without PHP's approval, has or threatens to have a significant exclusionary impact on the private health insurance market.

The allegations in the complaint establish that Defendant PHP entered into a horizontal agreement with United HealthCare, which is another competitor in the private health insurance market.   The Tenth Circuit has explained that horizontal arrangements pose a significant threat to competition:   "[W]hen actual competitors enter agreements" competition is restricted "because cooperation among would-be competitors will 'deprive[ ] the marketplace of the independent centers of decisionmaking that competition assumes and demands,' and risk anti-competitive effects."   *Campfield v. State Farm Mut. Auto. Ins. Co.*, 532 F.3d 1111, 1119 (10th Cir. 2008) (quoting *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 768-69 (1984)). "'Vertical arrangements, on the other hand, do not generally give rise to the same concerns and often have pro-competitive effects.'"   *Id.* (quoting *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877 (2007)) (additional citations omitted).

Defendants contend that PHP's alleged exclusive relationship with United HealthCare does not foreclose a significant part of the private health insurance market because Plaintiff alleges only that United HealthCare has less than a ten percent share of the market.   [Doc. 33 at 14-15]. The Court, however, must assume that the allegations in the complaint are true and construe those allegations in the light most favorable to Plaintiff.   *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Smith v. U.S.*, 561 F.3d 1090, 1098 (10th Cir. 2009) (citation

40

omitted).   The allegations do not establish that the exclusionary effect is insignificant.   PHP has

an alleged market share of 46 percent and United HealthCare has a market share of approximately

ten percent.[13]   The combined market share of both entities, therefore, totals more than 50 percent

and is not insignificant.   Moreover, the Tenth Circuit has held that cooperation between two

would-be competitors, such as PHP and United HealthCare, deprives the marketplace of the

independent centers of decisionmaking that are essential to a competitive system.   *See Campfield*,

532 F.3d at 1119.   Thus, the Court concludes that, by having alleged that PHP and United entered

into this exclusive arrangement, Plaintiff has given the Court "reason to believe that [it] has a

reasonable likelihood of mustering factual support for [its] claims."   *Ridge at Red Hawk, LLC v.*

*Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007) (emphasis omitted).

Plaintiff also has alleged other facts that bolster Plaintiff's Section 2 and NMAA claims.

Plaintiff has alleged, for example, that the market for private healthcare insurance is concentrated

and includes—besides PHP and United HealthCare—only Lovelace, Blue Cross, and Cigna, that

Lovelace's market share is 27 percent and that United, Cigna, and Blue Cross play only a

peripheral role in the market, and that Blue Cross is planning to exit the market for private health

insurance.   [Doc. 24 ¶¶ 61-68, 275-81].   If Blue Cross exits the market, only Lovelace and Cigna

remain as would-be competitors to PHP/United.   Even if Blue Cross does not exit the market,

Plaintiff has alleged that Blue Cross cannot challenge the market position of PHP because Blue

Cross enrollees are not authorized to receive covered treatment at Presbyterian Hospital.   [*Id.* ¶¶

275-81].   This is because Presbyterian Hospital's monopoly power over hospital inpatient

services ensures that patients seeking treatment at Presbyterian Hospital will not purchase Blue

---

[13]   Although the complaint alleges that United HealthCare has a market share of less than
ten percent, the Court, construing the complaint in the light most favorable to Plaintiff, *see Tellabs*,
551 U.S. at 322, assumes that share is ten percent.

41

Cross's products, and because Blue Cross does not have enough enrollees to independently facilitate entry.   [*Id.*].   In addition, Plaintiff has alleged that significant barriers to entry exist in the private health insurance market and that entering this market even under normal conditions requires significant capital, expertise, and time.   [*Id.* ¶ 473].   These allegations further suggest that the exclusive arrangement between PHP and United HealthCare has a significant anticompetitive impact on the private health insurance market.   For these reasons, the Court concludes that Plaintiff's allegations of an exclusive arrangement with United HealthCare are sufficient to satisfy the second element of a federal and state monopolization claim.

The Court is not persuaded to hold otherwise by Defendants' citation to *U.S. Healthcare, Inc. v. Healthsource, Inc.*, 986 F.2d at 597.   Defendants argue that for the same reasons the *U.S. Healthcare* court held that an exclusive dealing agreement did not foreclose a significant part of the private health insurance market, this Court should also conclude that the alleged PHP and United arrangement does not foreclose a significant part of the market.   [Doc. 33 at 14-15].   In *U.S. Healthcare*, the defendant HMO entered into exclusive arrangements with many of the HMO's independent physicians, pursuant to which the physicians agreed not to provide their services to competing HMOs in exchange for extra compensation.   *See* 986 F.2d at 592.   The *U.S. Healthcare* court held that the plaintiff's Sherman Act Section 1 and 2 claims challenging this exclusivity agreement failed because the plaintiff had not demonstrated that the arrangement foreclosed a substantial part of the relevant market.   *See id.* at 596-98.

The facts of *U.S. Healthcare* are distinguishable, however, and therefore the reasoning supporting that decision is not applicable here.   First, the exclusive arrangement in *U.S. Healthcare* was vertical, not horizontal.   The *U.S. Healthcare* court specifically indicated that "[t]here are multiple reasons why the law permits (or, more accurately, does not condemn per se)

42

vertical exclusivity," and explained that "the incentives for and effects of [vertical] arrangements are usually more benign than a horizontal arrangement among competitors" to act jointly.  *Id.* at 594.   In contrast, however, the arrangement before this Court is not vertical, but rather horizontal, and the Tenth Circuit has specifically held that horizontal cooperation between would-be competitors poses a significant threat to competition because it deprives the marketplace of an essential ingredient of a competitive system.  *See Campfield*, 532 F.3d at 1119.

Second, the facts in *U.S. Healthcare* are distinguishable because the percent of the market foreclosed there was 25 percent, whereas here Plaintiff has alleged that over 50 percent of the market was foreclosed.   Moreover, here, the alleged 50 percent share of the market is particularly significant because Plaintiff has alleged that the marketplace is concentrated and that, if Blue Cross exits the market, only two competitors remain.

Third, *U.S. Healthcare* is distinguishable because there new physicians were "constantly entering the market with an immediate need for patients" and the 25 percent foreclosure of the physician market consequently was not significant.  *Id.* at 596.   Here, in contrast, Plaintiff has alleged that the private health insurance market is concentrated, with only four companies competing with PHP, that one of the competitors will be exiting the market, that significant barriers to entry exist, and that entering the private health insurance market even under normal conditions requires substantial capital, expertise, and time.  *See supra* at 39-40.   Here, there is not a constant flow of private health insurers entering the market and therefore, construing the complaint in the light most favorable to Plaintiff, the foreclosure of the market is significant.

The Court also is not persuaded to hold otherwise by Defendants' contention that its alleged agreement with United HealthCare is not sufficient to establish maintenance of monopoly power through exclusionary conduct because Defendants were motivated by nothing more than a

lawful desire to make more money.   [Doc. 45 at 4 n.2].   Admittedly, the Tenth Circuit in *Christy Sports LLC v. Deer Valley Resort Co.*, 555 F.3d 1188, 1197 (10th Cir. 2009), held that the defendant's action of revoking consent to operate a ski rental facility was not anticompetitive and reasoned that the complaint contained "no allegation that [the defendant] was motivated by anything other than a desire to make more money for itself."   *Id.*   The *Christy* court, however, did not hold that a company has a free pass to engage in anticompetitive conduct so long as the company is motivated by a desire to make money.   Rather, the court held that the complaint before it did not contain any allegations establishing that the defendant engaged in any anticompetitive conduct, but instead contained only allegations showing that the defendant was motivated by an ordinary—and not anticompetitive—desire to turn a profit.   *See id.*   Because the complaint did not contain any allegations of anticompetitive conduct, the *Christy* court affirmed the district court's dismissal of the complaint for failure to state a claim.   In contrast, Plaintiff alleges facts that, if true, could demonstrate that Defendants' conduct was anticompetitive and not motivated by a simple (and lawful) desire to make money.

II.   <u>Plaintiff has Stated a Claim for Attempted Monopolization (Counts II and IV)</u>.

Defendants maintain that Plaintiff's claims for attempted monopolization of the comprehensive oncology services market in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, and the New Mexico Antitrust Act, N.M. Stat. Ann. §57-1-2, must fail because Plaintiff has not alleged facts that support a plausible claim that Defendants engaged in two of the three elements necessary to state a claim.   [Doc. 45 at 5].   To state a claim for attempted monopolization, a plaintiff must allege that a defendant "(1) engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) [that the defendant had] a dangerous probability of achieving monopoly power."   *Christy Sports*, 555 F.3d at 1192 (internal quotation marks and

citation omitted).   Defendants contend that Plaintiff has failed to allege a factual basis for the first and third elements.

A.   Plaintiff has Alleged Facts that Establish Anticompetitive Conduct.

The first element of an attempted monopolization claim, *i.e.*, engaging in predatory or anticompetitive conduct, also forms the basis of a monopolization claim.   *See Flying J Inc. v. TA Operating Corp.*, No. 1:06-CV-30-TC, 2008 WL 4923041, at *9 (D. Utah Nov. 14, 2008); *see also U.S. v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966); *Multistate Legal Studies, Inc. v. Harcourt Brace Jovanovich Legal & Professional Publications, Inc.*, 63 F.3d 1540, 1550 (10th Cir. 1995). Predatory conduct comes in too many forms to enumerate.   *See SolidFX, LLC v. Jeppesen Sanderson, Inc.*, 935 F. Supp. 2d 1069, 1080 (D. Colo. 2013).   Monopolistic acts include exclusionary practices like refusals to deal and predatory pricing.   *See Flying J*, 2008 WL 4923041, at *9.   Attempted monopolization is the "doing of these kinds of monopolistic acts with the specific intent to monopolize in circumstances in which there is a dangerous probability of success.   Thus, while monopolization and attempted monopolization typically involve similar conduct, the attempt offense requires a showing of somewhat more egregious conduct, and something less than present monopoly power."   *Id.*

Defendants argue that Plaintiff's allegations—specifically, that PHP lowered Plaintiff's reimbursement rates, that PHP entered into an exclusive contract with United HealthCare, that PHP limited referrals to Plaintiff's physicians, and that PHP imposed an exclusivity requirement on Plaintiff's patients by requiring them to purchase chemotherapy and support drugs from Presbyterian Hospital's specialty pharmacy—do not constitute anticompetitive or predatory conduct sufficient to support an attempted monopolization claim.   The Court already has held that the first two acts alleged, if true, are sufficient to state a plausible claim that Defendants engaged in

45

anticompetitive conduct in the private health insurance market. *See supra* at 28-43. For the same reasons the Court held that the conduct was predatory with respect to Plaintiff's monopolization of the private health insurance market claim, the Court likewise holds that it is predatory in the context of Plaintiff's attempted monopolization of the comprehensive oncology services market claim. *See id.* Because these allegations are sufficient to satisfy the first element of an attempted monopolization claim, the Court need not consider whether the remaining conduct alleged constitutes anticompetitive conduct sufficient to support a Section 2 or NMAA claim.

Although the Court declines to decide whether PHP's alleged acts of limiting referrals to Plaintiff or its physicians constitutes anticompetitive conduct, the Court notes that at least one court has held that conduct in the buyer's market akin to limiting referrals to related entities within a vertically integrated company may constitute anticompetitive conduct sufficient to state an antitrust claim. In *United States v. American Telephone & Telegraph Co.*, the government charged the defendant AT&T with exploiting its structural incentives to its purchasing agents, which encouraged AT&T's agents to purchase equipment from suppliers who were related to AT&T, without regard to price, rather than from independent sources. *See* 524 F. Supp. 1336, 1371 (D.D.C. 1981). The evidence "indicated that [AT&T] did not authorize the purchase of the general trade equipment [from independent suppliers] even if no . . . product of equivalent quality, cost, or technical sophistication was available from [an AT&T-related company]," that "[AT&T's agents] were under pressure from AT&T officials to buy from [AT&T-related entities] (even when a general trade product [from an independent supplier] was cheaper or of better quality) or to wait until a product [from an AT&T-related entity] comparable to the desired general trade equipment was available," and that "[AT&T agents] were required to provide detailed justifications for general trade purchases which were not necessary for the purchase of . . . equipment [from related

46

entities]."   *Id.*   The district court rejected the defendants' argument that the purchasing decisions of its agents were made pursuant to "reasonable engineering and sound business judgment which should not be second-guessed by the Court."   *Id.* at 1372.   The court acknowledged that "it may well be that defendants will be able to refute the government's procurement evidence and the inferences which may appropriately be drawn therefrom," but that on the record before it the government had made "a showing . . . which, unless it is rebutted, would support the conclusion that defendants have engaged in anticompetitive conduct in their procurement practices, in violation of the law."   *Id.*

Similarly, Plaintiff here has alleged that Presbyterian Hospital adopted incentives to limit their agents' (*i.e.*, Presbyterian-employed physicians') referrals to non-Presbyterian entities and physicians.   [Doc. 24 ¶¶ 255, 257 (alleging that Presbyterian Hospital asked its physicians to give "special consideration" to referring patients to other Presbyterian-employed physicians and that it compensated Presbyterian physicians for their referrals to other Presbyterian-employed physicians); *id.* ¶¶ 259-62 (alleging that Presbyterian Hospital tried to divert patients from Plaintiff's physicians to Presbyterian's physicians)].   Plaintiff also has alleged that Presbyterian Hospital "reconfigured its computer system so that its physicians cannot even input a referral to NMOHC" and eliminated Plaintiff from its referral book (which not only identified all of the PHP-approved providers, but which also served as a tool for Presbyterian physicians to make referrals), that the hospital required detailed justifications for decisions to refer to non-Presbyterian entities or physicians, and that the hospital had no valid business justification for this conduct.   [*Id.* ¶¶ 255-57, 265-66].   Although the complaint may well state a claim based upon this conduct, just as the procurement limitations in *American Telephone & Telegraph* were

47

sufficient to support a finding of anticompetitive conduct, the Court need not decide this question at this stage of the litigation.

B.   Plaintiff has Alleged Facts that Establish a Dangerous Probability of Presbyterian Hospital Achieving Monopoly Power.

Defendant argues that Plaintiff's attempted monopolization claim also must fail because the complaint does not allege facts sufficient to establish that they had a dangerous probability of achieving monopoly power in the comprehensive oncology services market. Defendants first argue that dismissal is warranted because Plaintiff has failed to identify the precise market share of each of the participants in the comprehensive oncology services market. Plaintiff contends—and the Court agrees—that it has identified the participants in the relevant market as well as their relative positions and size, and that this constitutes a market share calculation.

Plaintiff alleges that the market for comprehensive oncology services includes medical oncology services and radiation oncology services, [*Id.* ¶ 86], and identifies only three participants in this market:  Plaintiff, Presbyterian Hospital, and University of New Mexico Hospital ("UNM Hospital"), [*id.* ¶¶ 69, 77].[14]  Plaintiff further alleges that NMOHC has eight medical oncologists and two radiation oncologists, that Presbyterian Hospital employs approximately six medical oncologists and two radiation oncologists, and that UNM Hospital has seven medical oncologists and four radiation oncologists.  [*Id.* ¶¶ 70-73, 78-80].  Plaintiff further alleges that UNM Hospital does not play a significant role in the comprehensive oncology services market because it uses a closed staff model and because its practice is heavily skewed towards treating patients who

_____

[14]   While Hematology Oncology Associates ("HOA") provides medical oncology services, it does not provide radiation oncology services.  [Doc. 24 ¶¶ 69, 77].  Likewise, while Radiation Oncology Associates provides radiation oncology services, it does not provide medical oncology services.  [*Id.*].  Thus, neither of these firms are participants in the comprehensive oncology services market as defined by Plaintiff.  [*Id.* ¶ 86].

receive health care financing from state and federal sources and not towards treating patients with private health insurance.  [*Id.* ¶¶ 74-76].  The Court, construing these allegations in the light most favorable to Plaintiff, *see Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Smith v. U.S.*, 561 F.3d 1090, 1098 (10th Cir. 2009) (citation omitted), concludes that Plaintiff has sufficiently identified Defendant's relevant market share.  Specifically, from the facts alleged, the Court is able to conclude that Presbyterian Hospital employs 28.5 percent of the medical oncologists and 25 percent of the radiation oncologists in the comprehensive oncology services market, when the calculations are premised upon all three firms participating in the comprehensive oncology services market, and 43 percent of the medical oncologists and 50 percent of the radiation oncologists, when UNM Hospital is excluded from the calculations.  [*Id.* ¶¶ 70-73, 78-80].  Thus, the Court denies Defendants' Motion to Dismiss to the extent it seeks dismissal on the ground that Plaintiff failed to identify a precise market share.

Defendants next argue that Plaintiff has failed to identify a factual basis for its allegations of a dangerous probability of success of achieving monopoly power.  Defendants contend that market share is the most significant factor in proving a dangerous probability of success, and that Plaintiff's facts supporting market share are insufficient to plead a dangerous probability of success.[15]  [Doc. 33 at 17; Doc. 45 at 9].  The Court has concluded that Plaintiff's allegations support a finding that Presbyterian Hospital employs between either 28.5 and 43 percent of the medical oncologists and either 25 and 50 percent of the radiation oncologists in the comprehensive oncology services market, with the variation attributable to the Court's inclusion or exclusion of UNM Hospital in the calculation.  Defendants cite decisions of courts outside of the Tenth Circuit

---

[15]   Defendants also argue that Plaintiff has not alleged its own imminent exit from the market, [Doc. 33 at 17], but produce no authority indicating that such an allegation is an element or otherwise essential to an attempted monopolization claim.   Thus, the Court rejects this argument.

holding that a share of less than 30 or even 50 percent of the market is insufficient to plead a dangerous probability of success.   [Doc. 45 at 9 (citing *U.S. Anchor Mfg. Co. v. Rule Indus., Inc.*, 7 F.3d 986, 1001 (11th Cir. 1993); *Acme Markets, Inc. v. Wharton Hardware & Supply Corp.*, 890 F. Supp. 1230, 1241 (D.N.J. 1995))].   The Court, however, already has held—as articulated by the Tenth Circuit in *Reazin v. Blue Cross & Blue Shield, Inc.*—that market share alone does not conclusively preclude a finding of monopoly power.   *See* 899 F.2d 951, 963 (10th Cir. 1990) (holding that market share "may give rise to presumptions, but will rarely conclusively establish or eliminate market or monopoly power"); *see supra* at 21-22.   Thus, under *Reazin*, just as market share did not conclusively eliminate monopoly power in a monopolization claim, so too can it not eliminate a dangerous probability of achieving monopoly power in an attempted monopolization claim.   *Cf. id.*

Furthermore, Plaintiff argues, and the Court agrees, that whether a defendant has a dangerous probability of success is not dependent on market share alone but rather turns on many factors.   The Tenth Circuit in *Reazin* held that other characteristics of the relevant market and evidence of a defendant's power over price and competition are relevant to the question of monopoly and market power.   *See id.* at 968.   These factors include but are not limited to "the number and strength of the defendant's competitors, the difficulty or ease of entry into the market by new competitors, . . . whether the defendant is a multimarket firm, as well as other evidence presented . . . that [a court] may deem persuasive regarding [a] defendant's market strength."   *Id.*

Weighing these factors, the Court concludes that Plaintiff has alleged facts that state a plausible claim that Defendants had a dangerous probability of achieving monopoly power in the market for comprehensive oncology services.   Specifically, the first, second, and fourth factors identified by the *Reazin* court weigh in favor of a finding in Plaintiff's favor.   In addition, Plaintiff

50

has alleged facts which, if true, indicate that Defendants had power over price and competition. *See id.* at 968.

With respect to the first factor identified by the *Reazin* court, the number and strength of competitors, Plaintiff has alleged that the comprehensive oncology market includes only Plaintiff, Presbyterian Hospital, and UNM Hospital, and that UNM Hospital is not a significant participant in the market because of its closed staff model and its reliance on state and federal healthcare financing instead of private health insurance.  [Doc. 24 ¶¶ 69, 77, 74-76].  Furthermore, Plaintiff has alleged that within this three-firm structure, Presbyterian Hospital has a significant market share—*i.e.*, between 28.5 and 43 percent of the medical oncologists and between 25 and 50 percent of the radiation oncologists in the comprehensive oncology services market, [*id.* ¶¶ 70-73, 78-80]—and that Presbyterian Hospital's anticompetitive actions may force Plaintiff out of the market, [*id.* ¶¶ 247, 267, 299].  These allegations demonstrate that Plaintiff is Presbyterian Hospital's only competitor, and that Presbyterian's actions may be eliminating Plaintiff from the market.  The Court concludes that, based upon these allegations, this factor weighs in favor of finding a dangerous probability of achieving monopoly power.

With respect to the second factor, the difficulty or ease of entry into the market by new competitors, Plaintiff has alleged that it "is one of only a few remaining independent medical practices in Albuquerque that could credibly serve as a platform for such new entry," and that "Presbyterian's eliminating NMOHC from the [comprehensive oncology services] market would solidify Presbyterian's overall market position by making any new entry into the market by outpatient facilities and medical specialists highly doubtful."  [*Id.* ¶ 299].  Because this allegation is sufficient to establish that barriers to entry exist in the comprehensive oncology services market, the Court concludes that the second *Reazin* factor weighs in favor of a finding of

a dangerous probability of achieving monopoly power.

With respect to the fourth factor, whether the defendant is a multimarket firm, this Court already has explained that the complaint clearly alleges that Defendants are part of a multimarket enterprise that competes in, at a minimum, the hospital inpatient services market, the private health insurance market, and the comprehensive oncology market, and that Plaintiff has alleged that because Defendants are part of a multimarket firm, they can use their power in one market to impede entry in another market.   *See supra* at 25-26.   The fourth factor, therefore, also weighs in favor of a finding of a dangerous probability of achieving monopoly power.

In addition, other facts alleged in the complaint demonstrate Presbyterian Hospital's power over price and competition and its market strength more generally.   Plaintiff has alleged that Defendants are engaging in anticompetitive actions that may force Plaintiff to exit the comprehensive oncology services market.   [Doc. 24 ¶¶ 247, 267, 299].   In addition, Plaintiff has alleged that if Defendants are successful in eliminating Plaintiff from the market through their anticompetitive conduct, Defendants would "significantly increase the costs for obtaining Comprehensive Oncology Services," [*id.* ¶ 296], and "force cancer patients to receive inpatient services that they don't need and don't want, [*id.* ¶ 297].   These allegations establish that Presbyterian Hospital exercises power over price and competition.

For the foregoing reasons, the Court concludes that three of the four factors identified in *Reazin* weigh in favor of a finding of a dangerous probability of achieving monopoly power, and that other circumstances demonstrate Presbyterian Hospital's control over price and competition, which also supports a finding in Plaintiff's favor.   Accordingly, the Court holds that Plaintiff has satisfied its burden of alleging facts sufficient to state an attempted monopolization claim under

Section 2 of the Sherman Act and under the NMAA and therefore denies Defendants' Motion to Dismiss these claims.

III.   <u>Tortious Interference with Existing and Prospective Economic Advantage (Counts V and VIII).</u>

Plaintiff asserts two claims of tortious interference with existing and prospective economic advantage.   In support of its first claim, Plaintiff alleges that Defendants used improper means to prevent and prohibit referrals to Plaintiff and its physicians and to prohibit Plaintiff from developing relationships with a substantial number of additional patients.   In support of its second claim, Plaintiff alleges that Defendants used improper means to prevent Plaintiff's patients from purchasing chemotherapy drugs from Plaintiff and using Plaintiff's infusion center.

Defendants argue that both of Plaintiff's claims are deficient as a matter of law because Plaintiff fails to allege that Defendants' sole motive in restricting its referrals and requiring Plaintiff's patients to purchase chemotherapy drugs from Defendants' pharmacy was to harm Plaintiff.   Plaintiff contends that it need not allege a sole motive to harm when it advances an intentional interference with prospective contractual relationship under an improper means theory.

The Supreme Court of New Mexico recognizes the tort of interference with prospective contractual relations and has adopted the definition found in § 766B of the *Restatement (Second) of Torts*.[16]   *See M & M Rental Tools, Inc. v. Milchem, Inc.*, 612 P.2d 241, 244-245 (N.M. Ct. App.

---

[16]   New Mexico courts often look to the law as stated in the *Restatement (Second) of Torts* for guidance when dealing with issues of first impression.   *See Schmitz v. Smentowski*, 785 P.2d 726, 736 (N.M. 1990) ("We have also been very willing to adopt the view of the Restatement of Torts to assist our development of new tort areas."); *Montanez v. Cass*, 546 P.2d 1189, 1195 (N.M. Ct. App. 1975) ("It has long been the policy of our courts to follow in the footsteps of the Restatement of Torts, 2d."), *rev'd in part on other grounds sub nom N.M. Elec. Serv. Co. v. Montanez*, 551 P.2d 634 (N.M. 1976); *see also Coffey v. U.S.*, 906 F. Supp. 2d 1114, 1170 n.31 (D.N.M. 2012).   Although there is a *Restatement (Third) of Torts*, the Supreme Court of New Mexico has relied on it primarily in the contexts of products liability, *see, e.g., Brooks v. Beech*

1980); *Horizon AG-Prods. v. Precision Sys. Eng'g, Inc.*, No. CIV 09-1109 JB/DJS, 2010 WL 4054131, *6 (D.N.M. Sept. 28, 2010).   Section 766B states:

> One who intentionally and improperly interferes with another's prospective contractual relation . . . is subject to liability to the other for the pecuniary harm resulting from loss of the benefits of the relation, whether the interference consists of:
>
> (a)    inducing or otherwise causing a third person not to enter into or continue the prospective relation or
>
> (b)    preventing the other from acquiring or continuing the prospective relation.

*Restatement (Second) of Torts* § 766B (1979); *accord Horizon*, 2010 WL 4054131, *6-7 (citations omitted).

To state a claim for interference with prospective contractual relations, a plaintiff must allege that "there was an actual prospective contractual relation which, but for the [defendant's] interference, would have been consummated."  *Anderson v. Dairyland Ins. Co.*, 637 P.2d 837, 841 (N.M. 1981); *accord Horizon*, 2010 WL 4054131, *7.   A plaintiff must also allege that the defendant committed the tort with either improper motive or through improper means.  *See Zarr v. Washington Tru Solutions, LLC*, 208 P.3d 919, 921 (N.M. Ct. App. 2009); *Fikes v. Furst*, 81 P.3d 545, 552 (N.M. 2003).   In recognition that "'American courts are not as willing to protect interests in prospective contractual relations as they are to protect interests in existing contracts,'" *Fikes*, 81 P.3d at 552 (quoting *Anderson v. Dairyland Ins. Co.*, 637 P.2d 837, 840 (N.M. 1981)); *accord*

---

*Aircraft Corp.*, 902 P.2d 54 (1995), apportionment of liability, *see, e.g.*, *Baker v. Hedstrom*, No. 33,635, 2013 WL 4760950 (N.M. Sept. 5, 2013), and foreseeability with respect to liability for physical and emotional harm, *see, e.g.*, *Rodriguez v. Del Sol Shopping Ctr. Assocs., L.P.*, 326 P.3d 465, 467 (N.M. 2014).  Because New Mexico courts have relied upon the *Restatement (Second) of Torts* in the absence of controlling precedent, this Court likewise relies upon the *Restatement* to predict how the New Mexico Supreme Court would rule.  *Cf. Guidance Endodontics, LLC v. Lentsply Intern., Inc.*, 708 F. Supp. 2d 1209, 1253 (D.N.M. 2010) (citations omitted).

*LensCrafters, Inc. v. Kehoe*, 282 P.3d 758, 768 (N.M. 2012), the Supreme Court of New Mexico has held that under an improper motive theory, an improper motive must be the sole motive for interfering with a *prospective* contract, but that it need not be the sole motive for interfering with an *existing* contract.   *See Fikes*, 81 P.3d at 552 (explaining that "[t]his Court . . . has never stated that an improper motive must be the sole motive for interfering with an existing contract," but has "only applied the 'sole motive' test to prospective contracts") (citations omitted).   A sole motive to harm requires "a strong showing . . . that the defendant acted not for legitimate business reasons but from some motive such as personal vengeance or spite. . . .   If the accused can show a legitimate business reason for the action, even if there also may have been a motive to harm the plaintiff," then sole motive has not been shown.   *Id.* (citing *Anderson*, 637 P.2d at 840); *Kelly v. St. Vincent Hosp.*, 692 P.2d 1350, 1356 (N.M. Ct. App. 1984)).

In *Zarr v. Washington Tru Solutions, LLC*, the Court of Appeals of New Mexico held that a plaintiff must allege that the defendant's sole motive was to harm under the improper motive theory, but that such a showing is not necessary under an improper-means theory.   *See* 208 P.3d at 921-22.   Defendants contend, however, that the New Mexico Supreme Court rejected the *Zarr* holding in *LensCrafters, Inc. v. Kehoe*, 282 P.3d 758 (N.M. 2012), and instead applied the sole-motive-to-harm requirement to both the improper motive and improper means theories. [Doc. 45 at 16].   The Court does not find Defendants' reading of *LensCrafters* persuasive for several reasons.

In *LensCrafters*, the plaintiff LensCrafters sued the defendant Kehoe for allegedly violating a non-compete clause in their contract when Kehoe began working with the competing eye care provider Pearle Vision.   *See* 282 P.3d at 761.   Kehoe asserted an intentional interference

55

with prospective business relations counterclaim, advancing three theories in support of his claim. *See id.* at 768.

In support of his first theory, Kehoe maintained that LensCrafters intentionally interfered with his prospective business relations by using its lawsuit to enforce the non-compete clause to harm Kehoe's relationship with Pearle Vision. *See id*. The New Mexico Supreme Court affirmed the dismissal of this litigation-based claim on summary judgment because Kehoe did not "put forth evidence in the record showing that LensCrafters' primary motive for filing its lawsuit was personal vengeance or spite." *Id.*

The Court concludes that this holding is not applicable to the facts alleged in *Zarr* and is likewise inapplicable here because Kehoe's litigation-based intentional interference claim was not premised upon an improper means theory, which is the theory upon which the *Zarr* holding was based and the theory upon which Plaintiff relies here.   Rather, Kehoe argued that LensCrafters' act of bringing its lawsuit constituted the unlawful interference in and of itself, without identifying any improper means that LensCrafters utilized in bringing suit.   *See id.* at 761, 768.   Such a claim necessarily must proceed under an improper motive—and not improper means—theory and the *LensCrafters* court therefore required evidence of a sole motive to harm.   *See id.* at 768.

In support of his second theory, Kehoe argued that "LensCrafters intentionally interfered with his patients at LensCrafters by inappropriately asking him to steer patients to its store and provide his patient lists in violation of standard industry practice."   *Id.* at 768.   The *LensCrafters* court likewise rejected this claim because the court reasoned that "Kehoe fail[ed] to point to any evidence in the record that LensCrafters was acting beyond a profit motive, for personal vengeance or spite."   *Id.*   The *LensCrafters* holding, however, is inapplicable to the facts at issue here, and does not overrule *Zarr*, because the *LensCrafters* plaintiff's theory, once again, was not premised

56

upon an improper means, and thus the *LensCrafters* court applied the sole-motive-to-harm requirement.

The Court so holds because a defendant's *request* for referrals or patient lists is not inherently improper unlike the means alleged by Plaintiff here. *See, e.g.*, Restatement (Second) of Torts § 767 cmt. d (explaining that "[i]f the conduct is independently wrongful—as, for example, if it is illegal because it is in restraint of trade or if it is tortious toward the third person whose conduct is influenced—the desire to interfere with the other's contractual relations may be less essential to a holding that the interference is improper," and that "[o]n the other hand, if the means used by the actor are innocent or less blameworthy, the desire to accomplish the interference may be more essential to a holding that the interference is improper"); *id.* §766(B) cmt. d (explaining that "[i]f the means used is innately wrongful, predatory in character, a purpose to produce the interference may not be necessary," but that "if the sole purpose of the actor is to vent his ill will, the interference may be improper although the means are less blameworthy"). Simply making a request, even if the request is not consistent with an industry practice, does not rise to the level of an actionable improper means. As the New Mexico Court of Appeals has explained, "What may qualify as 'improper means' depends to some degree on context and can include, but is not limited to predatory behavior, violence, threats or intimidation, deceit or misrepresentation, bribery, economic pressure, unfounded litigation, defamation, unlawful conduct, and perhaps violation of business ethics and customs." *M & M Rental Tools*, 612 P.2d at 246; *accord Zarr*, 208 P.3d at 922; *see also Restatement (Second) of Torts* § 767 cmt. c. Because a request for referrals and patient lists does not constitute an improper means, the Court declines to construe the *LensCrafters* holding as grafting the sole-motive-to-harm requirement onto a means-based intentional interference with prospective business advantage claim.

In support of his last theory, Kehoe argued that LensCrafters intentionally interfered with his patients at Pearle Vision by providing false and misleading information to patients who tried to contact him after he left Pearle Vision.  *See id.*  The court explained that "[t]o support this allegation, Kehoe cites the deposition testimony of a patient who stated that she had called Pearle Vision and was not given sufficient information about Kehoe's new practice," but held that "even if [it were to] assume that someone intentionally misled the patient, her testimony alleges improper conduct by Pearle Vision and not LensCrafters," and that therefore "Kehoe's evidence [was] irrelevant to his claim."  *Id.*  Moreover, the court noted that "[w]hen asked by the district court at the hearing on summary judgment whether Kehoe had *any* evidence that LensCrafters had interfered with Kehoe's relationship with his patients, Kehoe claimed he had a sworn statement from another patient who testified that someone at LensCrafters told him that Kehoe had left town."  *Id.*  The court explained, "however, [that] the sworn statement was not in the record, and Kehoe could not produce it for the court."  *Id.*  Thus, the court affirmed the dismissal of Kehoe's claim.

Admittedly, this third theory in support of the *LensCrafters* plaintiff's claim, could be characterized as an improper means—and not motive—claim.  The Court, however, nonetheless does not construe the *LensCrafters* holding with respect to this claim as adopting the sole-motive-to-harm for means-based claims.  Indeed, the *LensCrafters* court did not affirm the dismissal of Kehoe's claim because he failed to present evidence of a sole motive to harm.  Rather, the *LensCrafters* court rejected the claim because Kehoe failed to support his allegation that LensCrafters intentionally misled his patients with any supporting evidence.  *See id*.  This holding, therefore, does not support a different rule from that announced in *Zarr*.

In so holding, the Court concedes that some language in *LensCrafters* could be construed to require a sole motive to harm even under an improper means theory.   *See id.* (explaining that to the extent that the claimant Kehoe argued that LensCrafters interfered by intentionally misleading potential patients, that Kehoe's evidence "was not enough to establish all the required elements of Kehoe's tort claim, including actual interference based on a motivation other than profit").   This language, however, is dicta.[17]   The Tenth Circuit has held that when a "state's highest court has not decided the issue presented, [a federal court] may either certify the question to that court or predict how it would rule."   *Koch v. Koch Indus., Inc.*, 203 F.3d 1202, 1230 (10th Cir. 2000), *cert. denied*, 531 U.S. 926 (2000).   The Tenth Circuit has further explained that a federal court "'must . . . follow any intermediate state court decision unless other authority convinces us that the state supreme court would decide otherwise.'"   *Id.* (quoting *Daitom, Inc. v. Pennwalt Corp.*, 741 F.2d 1569, 1574 (10th Cir. 1984)); *see also West v. Am. Tel. & Tel. Co.*, 311 U.S. 223, 237 (1940) ("Where an intermediate appellate state court rests its considered judgment upon the rule of law which it announces, that [decision] is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise."). The Court concludes that the dicta in *LensCrafters* is not sufficiently compelling to convince the Court that the New Mexico Supreme Court would reject the holding of *Zarr*.

The Court also declines to adopt the dicta in *LensCrafters* as a statement of how the Supreme Court of New Mexico would rule, because that dicta—which grafts the requirement of a

---

[17]   The *LensCrafters* court did not hold that the claimant's argument that LensCrafters interfered with his prospective contracts by the improper means of misleading patients lacked merit because Kehoe failed to present evidence that LensCrafters acted with a sole motive to harm. *See* 282 P.3d at 768.   Rather, the court held that Kehoe could not establish his claim because Kehoe failed to present any evidence in support of his allegation that LensCrafters intentionally misled patients.   *See id.*   Thus, the court's statement that Kehoe's evidence was not enough to "establish . . . actual interference based on a motivation other than profit" is dicta.   *Id.*

sole motive to harm onto an improper means theory—is not consistent with the *Restatement (Second) of Torts*, which New Mexico courts follow.  *See supra* note 15.  If Defendants' interpretation of *LensCrafters* is correct, the *LensCrafters* decision effectively abolishes the improper means theory of supporting an intentional interference claim.  If a sole motive to harm is required under both theories, a plaintiff would have no reason to assert an interference claim under an improper means theory, because a plaintiff asserting an improper means claim would need not only to satisfy the requirements of an improper motive theory, but also would need to satisfy the additional requirements of an improper means theory.  The commentary to Section 766B of the *Restatement (Second) of Torts*, however, recognizes both theories.  More specifically, the *Restatement* contemplates that proof of improper motive may not be necessary when the means used are independently wrongful, illegal, tortious, or predatory.  *See Restatement (Second) of Torts* §§ 766(B) cmt. d, 767 cmt. d.  Because New Mexico courts follow the *Restatement* and the *Restatement* recognizes an improper means theory, the Court declines to construe *LensCrafters* as abolishing all claims based solely upon improper means for this reason as well.

In addition to arguing that the *LensCrafters* decision requires dismissal of Plaintiff's intentional interference claims, Defendants also maintain that the Court should dismiss these claims because in New Mexico, the "'mere refusal to deal with a party cannot support a claim for tortious interference with contractual relations.'"  [Doc. 33 at 17 (citing *Quintana v. First Interstate Bank*, 737 P.2d 896, 898 (N.M. Ct. App. 1987) (additional citation omitted)].  Defendants further contend that the law does not authorize claims for tortious interference when a defendant simply prefers purchases from within its own companies than outside companies or when a defendant simply acts for the purpose of profit without any unlawful motive.  [*Id.* (citing *Darby Trading Inc. v. Shell Int'l Trading & Shipping Co.*, 568 F. Supp. 2d 329, 245-57 (S.D.N.Y.

2008) (dismissing claim of tortious interference with business relationship claim where the plaintiff's complaint "merely alleges that the various interlocked companies in the Shell family preferred to purchase from each other rather from outside companies"); *Lenscrafters*, 282 P.3d 758 (affirming dismissal of claim for intentional interference with patients where the plaintiff optometrist "fail[ed] to point to any evidence in the record that [the defendant] was acting beyond a profit motive, for personal vengeance or spite")].   Plaintiff argues, however, and the Court agrees, that it has not simply alleged that Defendants have refused to deal with Plaintiff, that Defendants have preferred to purchase from within their own related companies, or that Defendants have acted for the purpose of making a profit.   Rather, Plaintiff has alleged that Defendants have engaged in conduct that is anticompetitive and predatory.   *See supra* at 28-43. Thus, the Court does not find Defendants' remaining arguments in favor of dismissal of Plaintiff's intentional interference claims compelling.

IV.   <u>Plaintiff Has Failed to State a Claim for Injurious Falsehood (Count VI).</u>

Plaintiff's injurious falsehood claim arises out of Defendants' alleged misrepresentation of Plaintiff's provider status to patients.   [Doc. 24 ¶ 505].   Defendants move to dismiss this claim on the ground that Plaintiff failed to plead special damages and therefore cannot state a claim for relief.   Defendants also move to dismiss the claim on the ground that Plaintiff failed to allege that Defendants knew the alleged statement was false or that Defendants acted in reckless disregard of its truth or falsity and on the ground that Plaintiff failed to allege that Defendants intended for publication of the statement to result in harm to Plaintiff.   [Doc. 33 at 19].

New Mexico courts have recognized that a group of claims exists which includes what today is called injurious falsehood, but which also includes "[d]isparagement of title, slander of title, defamation of title, or in other contexts, slander of goods, [or] trade libel."   *W. Commerce*

*Bank v. Reliance Ins. Co.*, 732 P.2d 873, 875-76 (N.M. 1987) (citing *Triester v. 191 Tenants Ass'n*, 415 A.2d 698 (Pa. 1979)); *see also Ruiz v. Varan*, 97 P.2d 267, 269-70 (N.M. 1990) (explaining that the tort allegedly committed by the defendant is "akin to slander of title, a form of tort that Professors Prosser and Keeton call by the generalized name, 'injurious falsehood,' and that the "gist of the tort is the interference with the prospect of sale or some other advantageous relation"); *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887 (10th Cir. 1991) (explaining that the plaintiff's claim is "one called by various names such as disparagement of property, slander of goods, commercial disparagement and trade libel," and that these claims are now generally referred to as injurious falsehood). These claims are premised upon the false and malicious representation of the title or quality of another's interest in goods or property. *See W. Commerce Bank*, 732 P.2d at 876.

Plaintiff concedes that "[i]t is true that there is language in the older [New Mexico] cases concerning slander of title and what used to be known as product disparagement stating that plaintiffs must allege and prove their special damages." [Doc. 40 at 43]. The older cases Plaintiff refers to include *Ruiz v. Varan*, 797 P.2d 267 (N.M. 1990), and *Garver v. Public Service Co.*, 421 P.2d 788 (N.M. 1966). In *Ruiz*, the Supreme Court of New Mexico held that, "[t]o establish the existence of the tort of injurious falsehood, among other things, '[t]he plaintiff must prove special damages in the form of pecuniary loss.'" 797 P.2d at 970 (quoting W.P. Keeton, D. Dobbs, R. Keeton, D. Owen, *Prosser and Keeton on the Law of Torts* § 121, at 967 (5th ed. 1984)). Likewise, in *Garver*, the Supreme Court of New Mexico held that to state a slander of title claim, a plaintiff must plead special damages. *See* 421 P.2d at 795. The Supreme Court explained that "[t]he special damage rule requires the plaintiff to establish pecuniary loss that has been realized or liquidated, as in the case of specific lost sales." *Ruiz*, 797 P.2d at 971.

Plaintiff argues that these older cases do not reflect the modern law regarding injurious falsehood.   [Doc. 40 at 43 (arguing that "today the tort of injurious falsehood does not require any 'magic' or conclusory allegations as to suffered damages")].   In support of this contention, Plaintiff cites a case decided by the Eastern District of Illinois, in which the court explained that "[a]lthough the traditional rules [for product disparagement cases] is that special damages must be pleaded in every such case, [the court] located a number of cases calling the traditional rule in question, albeit in dicta."   *Hollymatic Corp. v. Holly Sys., Inc.*, 620 F. Supp. 1366, 1371 (E.D. Ill. 1985).   This Court, however, is bound to follow New Mexico law and not the law of other jurisdictions.   The New Mexico Supreme Court has held that a plaintiff must plead special damages to state an injurious falsehood claim.   Because Plaintiff has failed to plead such damages, the Court dismisses Plaintiff's injurious falsehood claim.[18]

V.      Plaintiff has Stated a Claim for Unfair Competition (Count VI).

Plaintiff's unfair competition claim arises out of Defendant's alleged coercion of patients to switch to Presbyterian Hospital's physicians, their pressure upon their own physicians to refer patients in-house and to eliminate referrals to Plaintiff's physicians, their interference with the ability of their physicians to make referrals to Plaintiff, their illegal receipt and sale of 340B drugs, and their requirement that Plaintiff's patients use Presbyterian Hospital's specialty pharmacy. [*Id.* ¶ 505].   Defendants move to dismiss Plaintiff's common law claim for unfair competition on the ground that the Unfair Practices Act ("UPA") preempts common law claims for unfair competition.   [Doc. 33 at 20-21 & n.8].   Plaintiff argues that claims for common law unfair

---

[18]   The Court does not consider Defendants' additional arguments in favor of dismissal because the Court dismisses Plaintiff's injurious falsehood claim on the ground Plaintiff failed to plead special damages.

competition are viable in New Mexico and that the Court should follow the elements of the claim set forth in the *Restatement (Third) of Unfair Competition*.

Section 1(a) of the *Restatement* bars only particular types of conduct, including (1) deceptive marketing or false advertising, (2) infringement of trademarks, (3) appropriation of intangible trade values including trade secrets, and (4) acts or practices "determined to be actionable as an unfair method of competition, taking into account the nature of the conduct and its likely effect on both the person seeking relief and the public." *Restatement (Third) of Unfair Competition* § 1(a)(i)-(iv). Plaintiff contends that it has stated a claim under the *Restatement's* fourth category of proscribed conduct. Comment g to Section 1(a), which addresses the *Restatement's* fourth category, explains that "[c]ertain recurring patterns of objectionable practices form the basis of the traditional categories of liability specifically enumerated in [categories one through three]." *Id.* cmt. g. The comment further explains that "these specific forms of unfair competition do not fully exhaust the scope of statutory or common law liability for unfair methods of competition, and Subsection (a) therefore includes a residual [fourth] category encompassing other business practices determined to be unfair." *Id.* Thus, "Section 1(a) of the *Restatement*, read together with Comment g, contemplates a fluid, 'residual rule of liability' for unfair practices that defies a definitive test." *Environmental Tectonics Corp. v. Walt Disney World Co.*, No. 05-6412, 2008 WL 821065, *16 (E.D. Pa. Mar. 26, 2008) (citing *Restatement (Third) of Unfair Competition* § 1(a), cmt. g).

Defendants argue that the "Restatement should not define New Mexico law on unfair competition," because "New Mexico courts have already suggested that the Unfair Practices Act preempt[s] the common law of unfair competition . . . and replace[s] it with a defined set of prohibited conduct." [Doc. 45 at 13]. The only case Defendants cite in support of this

proposition is the New Mexico Court of Appeals' decision in *Ernest Thompson Fine Furniture*

*Maker, Inc. v. Youart*, in which the court stated:

> Although the trial court and the parties argue that this is a case
> of common law unfair competition, we are not able to distinguish
> the claim from a claim under the Unfair Practices Act, NMSA 1978,
> §§ 57-12-1 to -22 (Repl. Pamp. 1987 & Cum. Supp. 1989).   The
> New Mexico act is modeled after the Uniform Deceptive Trade
> Practices Act, 7A U.L.A. 265 (1985).   *See* Comment, § 57-12-1.
> The prefatory note to the Uniform Deceptive Trade Practices Act
> observes that unfair trade practices were commonly referred to as
> "unfair competition."   The Uniform Deceptive Trade Practices Act
> was designed to bring uniformity to the law of unfair competition
> and to remove undue restrictions on the common law action for
> deceptive trade practices.   Uniform Deceptive Trade Practices Act,
> Prefatory Note.

787 P.2d 1255, 1258-59 (N.M. Ct. App. 1990).   The *Youart* court held that it could not distinguish

a claim under the common law from a claim under the UPA, and analyzed the plaintiff's claim

under the UPA—and not the common law—because the UPA represented the "statutory

codification" of a common law unfair competition claim.   *Id.*   To the extent the *Youart* court held

that the UPA preempts a common law unfair competition claim, the Court declines to hold that

Plaintiff's common law unfair competition claim is preempted by the UPA.

A federal court applying state law may either certify the question to the state's highest

court or predict how that court would rule.   *See Koch v. Koch Indus., Inc.*, 203 F.3d 1202, 1230

(10th Cir. 2000).   In making a prediction, a federal court "'must . . . follow any intermediate state

court decision unless other authority convinces [it] that the state supreme court would decide

otherwise.'"   *Id.* (quoting *Daitom, Inc. v. Pennwalt Corp.*, 741 F.2d 1569, 1574 (10th Cir.1984));

*see also West v. Am. Tel. & Tel. Co.*, 311 U.S. 223, 237 (1940) (court should not disregard the

decision of an intermediate appellate state court unless it is "convinced by other persuasive data

that the highest court of the state would decide otherwise").   Consistent with the Tenth Circuit's

instruction, the Court declines to follow *Youart* because it is convinced that the Supreme Court of New Mexico would not hold that the UPA preempts common law claims arising out of the same conduct as a statutory claim.   Indeed, the UPA itself indicates that "[t]he relief provided in this section is in addition to remedies otherwise available against the same conduct under the common law or other statutes of this state."   N. M. S. A. 1978, § 57-12-10(D).   Thus, the Court denies Defendants' Motion to Dismiss the unfair competition claim to the extent that Defendants seek dismissal of the claim on the ground that it is preempted by the UPA.

Defendants next argue that the Court should reject the *Restatement's* "sweeping[]" residual rule, as New Mexico law, because the UPA itself does not provide for such relief.   [Doc. 45 at 14]. As discussed, however, the UPA expressly indicates that its relief is in addition to common law and other remedies.   The Court, therefore, is not persuaded by Defendants' argument that it should reject the *Restatement's* residual rule because the UPA does not provide for comparable relief.

Defendants also contend that adopting the *Restatement's* residual rule is particularly inappropriate because Plaintiff has not stated viable claims under federal antitrust or RICO theories.   The Court, however, already has held that Plaintiff has stated a claim under the federal antitrust laws.   Defendants' third argument, therefore, is not persuasive.

Finally, Defendants maintain that a federal court should not expand New Mexico law, by adopting the *Restatement's* residual rule, citing the Tenth Circuit's decision in *Proctor & Gamble Co. v. Haugen*, 222 F.3d 1262, 1280 (10th Cir. 2000), in support of this contention.   In *Proctor & Gamble*, the plaintiff appealed from the district court's dismissal of its state law unfair competition claim against parties "who disseminated the rumor that P & G [Proctor & Gamble] is a corporate agent of Satan."   *Id.* at 1267.   In affirming the dismissal, the Tenth Circuit indicated that "the

66

Utah Supreme Court had considered the tort of unfair competition primarily in the context of palming off and misappropriation of goodwill," which involve "situations in which a company attempts to profit from the reputation of its competitor by selling one of its own products as that of its competitor or misappropriating a trademark belonging to its competitor." *Id.* at 1279-80 (citing *Allen's Prods. v. Glover*, 414 P.2d 93, 95 (Utah 1966)) (internal quotations and additional citation omitted).   The Tenth Circuit held that dismissal was appropriate because "that is not what occurred in the instant case," and reasoned that "it is not our place to expand Utah state law beyond the bounds set by the Utah Supreme Court or, in the absence of Utah Supreme Court precedent, by the lower Utah courts." *Id.* at 1280 (citing *Sellers v. Allstate Ins. Co.*, 82 F.3d 350, 352 (10th Cir. 1996)).   In support of this decision, the Tenth Circuit cited its decision in *Sellers v. Allstate Insurance Co.*, in which it explained that "[its] duty [as a federal court sitting in diversity jurisdiction] is . . . to ascertain and 'apply the most recent statement of state law by the state's highest court.'" *Id.* (citing *Sellers*, 82 F.3d at 352 (quoting *Wood v. Eli Lilly & Co.*, 38 F.3d 510, 513 (10th Cir. 1994)).   The Tenth Circuit also cited its decision in *Taylor v. Phelan*, explaining that "[a]s a federal court, we are generally reticent to expand state law without clear guidance from [the state's] highest court." *Id.* (citing *Taylor v. Phelan*, 9 F.3d 882, 887 (10th Cir. 1993)).

*Proctor & Gamble* is distinguishable because in that case the Utah Supreme Court had defined the tort of unfair competition and the Tenth Circuit concluded that the Utah Supreme Court had limited the tort to claims of palming off and misappropriation of goodwill. *Id.* at 1279-80. The Tenth Circuit held that, because the state court had defined the tort, it was not proper for it to expand the tort "beyond the bounds set by the Utah Supreme Court." *Id.* at 1280; *see also Sellers*, 82 F.3d at 352 (a federal court should apply a state supreme court's most recent statement of state law). Here, in contrast, the parties have not identified any decisions of the New Mexico Supreme

Court setting the "bounds" of the common law tort of unfair competition or otherwise excluding the *Restatement's* residual category of proscribed conduct from its reach.   Thus, by adopting the *Restatement's* statement of the tort, the Court would not be "expanding" common law unfair competition beyond the New Mexico Supreme Court's articulation of its scope, which was the Tenth Circuit's concern in *Proctor & Gamble* and *Taylor*.   Rather, because the New Mexico Supreme Court has not stated the limits of a common law unfair competition claim, the Court must predict how the Supreme Court would define such a claim.

New Mexico courts have, in the absence of controlling authority, relied upon the *Restatement's* articulation of state law.   For example, in *Guidance Endodontics, LLC v. Dentsply Intern., Inc.*, the court accepted the defendants' argument that, in the absence of New Mexico law on point, the *Restatement* is the law that the Court should apply.   *See* 708 F. Supp. 2d 1209, 1249 (D.N.M. 2010).   Because no New Mexico court had set forth the parameters of an unfair competition claim premised on either false advertising or trademark dilution, the court relied upon Section 1(a) of the *Restatement (Third) of Unfair Competition*.   *See id.* at 1249, 1251, 1253.   The *Guidance Endodontics* court reasoned that "in the absence of any state law on the subject, . . . the Supreme Court of New Mexico would likely follow the *Restatement's* view on common-law claims of [unfair competition]."   *Id.* at 1251, 1253 (citing cases).   The court then cited several New Mexico cases relying upon the Restatement.   *See id.* at 1253 (citing *State v. Santiago*, 217 P.3d 89, 97 n.3 (N.M. 2009) (citing the *Restatement (Second) of Torts* ); *Pincheira v. Allstate Ins. Co.*, 190 P.3d at 334 (citing the *Restatement (Third) of Unfair Competition*); *Crespin v. Albuquerque Baseball Club, LLC*, 216 P.3d 827, 834 (N.M. Ct. App. 2009) (citing the *Restatement (Third) of Torts* and the *Restatement (Second) of Torts*); *Sandoval v. Baker Hughes Oilfield Operations, Inc.*, 215 P.3d 791, 810 (N.M. Ct. App. 2009) (citing the *Restatement (First) of*

68

*Torts* ); *Martin v. Franklin Capital Corp.*, 195 P.3d 24, 28 (N.M. Ct. App. 2008) ("The *Restatement (Second) of Torts* supports our view."); *New Mexico ex rel. Hanosh v. N.M. Envtl. Improvement Bd.*, 196 P.3d 970, 972 (N.M. Ct. App. 2008) (citing the *Restatement (Second) of Judgments*)); *see also Pincheira v. Allstate*, 190 P.3d 322, 334 (2008) (citing and adopting portions of the *Restatement (Third) of Unfair Competition* defining what value is necessary to establish a trade secret).   This Court agrees with the *Guidance Endodontics* court, and holds that, in the absence of controlling law by the New Mexico Supreme Court, it is appropriate for the Court to assume that the Supreme Court would adopt the elements of an unfair competition claim set forth in the *Restatement (Third) of Unfair Competition*.

Plaintiff argues that it states a claim under the fourth residual category of conduct proscribed by Section 1(a) of the *Restatement*.   Comment g to Section 1(a) discusses the conduct that falls within the residual category.   The comment explains that "[i]t is impossible to state a definitive test for determining which methods of competition will be deemed unfair in addition to those included in the categories of conduct described in the preceding Comments," and indicates that "[c]ourts continue to evaluate competitive practices against generalized standards of fairness and social utility."   *Restatement (Third) of Unfair Competition* § 1(a) cmt. g.   The comment notes, however, that "[a]s a general matter, if the means of competition are otherwise tortious with respect to the injured party, they will also ordinarily constitute an unfair method of competition." *Id.*; *accord Building Materials Corp. of Am. v. Rotter*, 535 F. Supp. 2d 518, 526 n.4 (E.D. Pa. 2008).   "Hence, tortious interference may form the basis of a claim for unfair competition," as well as establishing or maintaining an unlawful restraint of trade.   *Id.*

The Court has held that the complaint states a claim for both a violation of Section 2 of the Sherman Antitrust Act and the NMAA as well as for tortious interference with prospective

business relations.   This conduct may form the basis of a claim for unfair competition under the

*Restatement's* residual rule.   *See Restatement (Third) of Unfair Competition* § 1(a) cmt. g.

Because Plaintiff has alleged facts sufficient to state an unfair competition claim, the Court denies

Defendants' Motion to Dismiss this claim.

VI.      Plaintiff has Failed to State a Claim Under RICO (Count VII).

To establish a civil RICO claim under 18 U.S.C. § 1962(c), Plaintiff must show that

Defendants "'(1) participated in the conduct (2) of an enterprise (3) through a pattern (4) of

racketeering activity.'"   *BancOklahoma Mortgage Corp. v. Cap. Title Co.*, 194 F.3d 1089, 1103

(10th Cir. 1999) (quoting *Resolution Trust Corp. v. Stone*, 998 F.2d 1534, 1541 (10th Cir. 1993)).

Plaintiff contends that Defendants engaged in the fourth element of "racketeering activity" by

engaging in the predicate acts of mail and wire fraud in violation of Sections 1341 and 1343.

[Doc. 24 ¶¶ 449-69].   To state a claim for mail fraud, as defined in 18 U.S.C. § 1341, Plaintiff

must allege "(1) a scheme or artifice to defraud or obtain property by means of false or fraudulent

pretenses, representations, or promises, (2) an intent to defraud, and (3) use of the mails to execute

the scheme."   *U.S. v. Welch*, 327 F.3d 1081, 1104 (10th Cir. 2003) (citing *U.S. v. Haber*, 251 F.3d

881, 887 (10th Cir. 2001)).   "The first and second elements of federal mail and wire fraud are

identical.   The third element of wire fraud as defined in 18 U.S.C. § 1343 is the use of interstate

wire or radio communications to execute the scheme."   *Id.* (citing *U.S. v. Smith*, 133 F.3d 737,

742 (10th Cir. 1997)).

Plaintiff alleges that Defendants' use and dispensation of drugs obtained through the

federal 340B program in accordance with PHP's specialty pharmacy network benefit is a

fraudulent scheme that violates RICO, because Defendants falsely represent to pharmaceutical

companies, consumers, and providers that their purchase and sale of the 340B drugs is in

70

compliance with the law when Defendants in fact are selling the drugs unlawfully.   As factual support for this claim, Plaintiff alleges that Defendants are able to purchase discounted drugs from pharmaceutical manufacturers under the federal 340B program, that 340B program guidelines limit Defendants' sale of covered drugs to Presbyterian Hospital's patients, that in 2012 Defendants issued the mandate pursuant to which Defendants began requiring every senior enrolled in PHP's HMO or PPO to purchase a wide range of drugs from Presbyterian Hospital's specialty pharmacy, that Defendants sells drugs they obtain through the 340B program to these seniors and that this sale violates 340B program guidelines limiting sales to a covered entity's patients, and that this illegal sale of 340B drugs allows Defendants to reap inflated profits and gain a competitive advantage over Plaintiff.   [Doc. 24 ¶¶ 8-12].

Defendants argue that these allegations are insufficient to state a RICO claim because Plaintiff has failed to allege the first element of mail or wire fraud, which is "a scheme or artifice to defraud." *Welch*, 327 F.3d at 1104.   Defendants also contend that dismissal of Plaintiff's RICO claim is proper because Plaintiff does not have standing to bring a claim under RICO.

The Court first addresses the threshold question of standing.   Defendants maintain that Plaintiff does not have standing to assert a RICO claim, because standing requires a showing of proximate cause and Plaintiff has not alleged facts that establish proximate cause.   RICO's private right of action is contained in 18 U.S.C. Section 1964(c) and provides that "any person injured in his business or property by reason of a violation of [Section 1962]" may bring suit.   18 U.S.C. § 1964(c).   The Supreme Court has interpreted the language "by reason of" to require a plaintiff to plead that the alleged RICO violation proximately caused the plaintiff's injury.   *See Holmes v. Secs. Investor Protection Corp.*, 503 U.S. 258 (1992).

Proximate cause is a "flexible concept" that does not lend itself to "a black-letter rule that will dictate the result in every case." *Bridge v. Phoenix Bond & Indemnity Co.*, 553 U.S. 639, 655 (2008) (internal quotation marks and citations omitted). Instead, proximate cause is a "'judicial tool[] used to limit a person's responsibility for the consequences of that person's own acts,' . . . with a particular emphasis on the 'demand for some direct relation between the injury asserted and the injurious conduct alleged.'" *Id.* (quoting *Holmes*, 503 U.S. at 268).

> The direct-relation requirement avoids the difficulties associated with attempting "to ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent, factors," . . . ; prevents courts from having "to adopt complicated rules apportioning damages among plaintiffs removed at different levels of injury from the violative acts, to obviate the risk of multiple recoveries[;]" and recognizes the fact that "directly injured victims can generally be counted on to vindicate the law as private attorneys general, without any of the problems attendant upon suits by plaintiffs injured more remotely."

*Id.* at 654-55 (quoting *Holmes*, 503 U.S. at 269-70).

Defendants contend that Plaintiff has failed to allege facts that establish proximate cause because (1) Plaintiff has not alleged reliance by the pharmaceutical companies, consumers, or providers upon the fraudulent misrepresentations (express or implied[19]) alleged in the complaint; and (2) Plaintiff is not a sufficiently direct victim of the alleged misrepresentations. [Doc. 45 at 11-12]. In support of their first argument, Defendants cite the Supreme Court's decision in

---

[19] The Tenth Circuit has distinguished between two types of mail fraud violations: "violations based on schemes 'to defraud' and those based on schemes 'for obtaining money or property by means of false or fraudulent pretenses, representations, or promises.'" *U.S. v. Kennedy*, 64 F.3d 1465, 1476 (10th Cir. 1995) (internal quotations omitted). The Circuit has held "that schemes to defraud need not . . . contemplate the use of affirmative misrepresentations." *Id.* (citing *U.S. v. Cronic*, 900 F.2d 1511, 1513-14 (10th Cir. 1990)). Rather, it is only when "alleg[ations of] mail fraud [are] based on the statute's second type of scheme" that "[f]alse or fraudulent pretenses, representations or promises" are required. *Id.* (citing *Chronic*, 900 F.2d at 1413-14). Plaintiff argues that because its RICO claim is premised on a scheme to defraud, it may state a claim through allegations of implicit—rather than explicit—misrepresentations.

*Bridge v. Phoenix Bond & Indemnity Co.*, 553 U.S. at 658, and argue that in *Bridge* the Supreme Court held that reliance on an alleged misrepresentation by someone—whether the plaintiff or a third party—is necessary to establish proximate cause.  [Doc. 33 at 24].  In support of their second argument, Defendants maintain that Plaintiff was not the direct victim of the alleged scheme to defraud and that any injury to Plaintiff was incidental and cannot support a finding of proximate cause.  [Doc 33 at 25].

Plaintiff counters that the *Bridge* Court stated only that reliance by someone "may" be necessary to establish proximate cause and argues that, on the facts alleged here, reliance is not a necessary component of proximate cause.  Plaintiff also contends that Defendants' scheme directly related to and targeted Plaintiff's sales and that Plaintiff therefore has standing to assert a RICO claim.  [Doc. 40 at 31-33].

The Court first addresses the question of reliance and decides whether at least third-party reliance is essential to a finding of proximate cause.  In *Bridge*, the Supreme Court held that a RICO plaintiff need not establish first-party reliance—*i.e.*, reliance by the plaintiff on the alleged misrepresentation—to establish proximate cause.  *See id.* at 656-57.  The Supreme Court opined, however, that to hold that first-party reliance is not necessary does not mean "that a RICO plaintiff who alleges injury 'by reason of' a pattern of mail fraud can prevail without showing that *someone* relied on the defendant's misrepresentations."  *Id.* at 658 (citation omitted).  The Court explained, "In *most* cases, the plaintiff will not be able to establish even but-for causation if no one relied on the misrepresentation."  *Id.* (emphasis added).  Likewise, the Court noted that "the complete absence of reliance *may* prevent the plaintiff from establishing proximate cause." *Id.* at 658-59 (emphasis added).

Although the Supreme Court's selection of the words "most" and "may" left the door open for the argument that the absence of reliance may *not* prevent the plaintiff from establishing but-for or proximate causation, the Court elsewhere seemingly foreclosed this possibility by stating that, "[o]f course, a misrepresentation can cause harm only if a recipient of the misrepresentation relies on it."  *Id.* at 657 n.6.  Admittedly, the *Bridge* Court did not expressly hold that at least third-party reliance is necessary to establish proximate cause.  *See id.* at 658-59.  This Court nonetheless concludes, however, that, both as a matter of law and on the facts as alleged here, either first- or third-party reliance is necessary to establish proximate cause.

Absent a contrary holding by the Supreme Court that reliance is not necessary to establish proximate cause, this Court is bound by the Tenth Circuit's holding that reliance is a necessary requirement of a RICO mail or wire fraud claim.   In *BancOklahoma Mortgage Corporation v. Capitol Title Inc.*, the Tenth Circuit explained that "the common thread among . . . the[] crimes [of mail and wire fraud] is the concept of fraud."   194 F.3d 1089, 1103 (10th Cir. 1999).   The court held that "actionable fraud consists of (1) a representation; (2) that is false; (3) that is material; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) the speaker's intent it be acted on; (6) the hearer's ignorance of the falsity of the representation; (7) the hearer's reliance; (8) the hearer's right to rely on it; and (9) injury."   *Id.*   Because the Tenth Circuit held that the seventh and eighth requirements of an actionable RICO mail or wire fraud claim include the hearer's reliance and right to rely on the fraudulent representations, and because the Supreme Court has not held to the contrary, the Court concludes that as a matter of law either first- or third-party reliance is necessary to establish proximate cause.

The Court also holds that, even if at least-third party reliance is not always an indispensable requisite of proximate cause, on the facts alleged here, at least third-party reliance is necessary to

establish proximate cause.   Plaintiff presents no argument, and this Court perceives none, explaining how the alleged misrepresentations could have proximately caused Plaintiff's alleged injury absent reliance by at least the third-party hearers.   Thus, the Court concludes that even if reliance (by a first- or third-party) is not an essential requisite of proximate cause, reliance by someone is—on the facts alleged by Plaintiff—necessary to establish that alleged RICO violations were the proximate cause of Plaintiff's injury.

The Court next determines whether Plaintiff alleges at least third-party reliance, and, if so, whether Plaintiff has alleged a sufficiently direct relationship between the harm and the RICO violation.   Here, Plaintiff alleges that the hearers of Defendants' misrepresentations were pharmaceutical companies, consumers, and providers.   Specifically, Plaintiff argues that Defendants made an implicit statement to pharmaceutical companies "that they [we]re only going to sell the drugs to their own patients consistent with the 340B Program."   [Doc. 40 at 28]. Plaintiff also asserts that Defendants made explicit false statements to providers and to patients on multiple occasions:   (1) PHP "circulated a letter to providers misrepresenting that Presbyterian could use the Mandate and the 340B Program to lawfully lower health care costs"; (2) PHP "circulated a series of letters to [Hematology Oncology Associates ("HOA")] containing misleading statements that were designed to make HOA believe the Mandate was not going to violate the 340B Program"; and (3) the "President of Presbyterian Health Plan Inc. made a series of statements for publication on the Internet that falsely portrayed the 340B Program to consumers."   [Doc. 40 at 29].   The Court first determines whether the alleged representations to pharmaceutical companies satisfy both the reliance and directness components of proximate cause and thereafter evaluates whether the alleged representations to consumers and providers satisfy the requirements of proximate cause.

A.     Plaintiff Fails to State a RICO Claim Premised On Misrepresentations to Pharmaceutical Companies.

Plaintiff alleges that under the 340B program, participating pharmaceutical manufacturers must provide various price discounts to qualified health care entities such as Presbyterian Hospital. [Doc. 24 ¶ 333].   Plaintiff alleges that Presbyterian Hospital "only has to notify the pharmaceutical manufacturer that it is placing an order for 340B Drugs to get the drugs at the discounted rate," that "[t]he pharmaceutical manufacturer must rely on, and accept, [Presbyterian's] representation that the 340B Drugs it is ordering are for sale through the 340B Program," and that the "pharmaceutical manufacturer must sell 340B Drugs that are ordered by [Presbyterian]" at a price discounted between twenty to fifty percent.   [*Id.* ¶¶ 342, 345, 346]. Presbyterian Hospital need not pass on this savings to consumers; to the contrary, a qualified entity such as Presbyterian Hospital lawfully is entitled, and sometimes is required, to reap additional profits as a result of the discounts.   [*Id.* ¶¶ 347, 351].   Presbyterian Hospital, however, may only lawfully sell drugs obtained through the 340B program to individuals who are its own patients. [*Id.* ¶¶ 357, 358].   Plaintiff alleges that Defendants have violated the 340B program guidelines because they are selling 340B drugs to non-patients.   [*Id.* ¶¶ 357, 369].   Plaintiff further alleges that Defendants have engaged in mail and wire fraud in violation of RICO because they falsely have represented to pharmaceutical companies that they are selling 340B drugs in a manner that complies with the 340B program requirements.   [*Id.* ¶ 390].

Although Plaintiff does not argue that it has alleged third-party reliance by pharmaceutical companies, the Court concludes, construing the complaint in the light most favorable to Plaintiff, that Plaintiff has alleged facts that establish reliance.   The complaint alleges that Presbyterian Hospital "only has to notify the pharmaceutical manufacturer that it is placing an order for 340B

76

Drugs to get the drugs at the discounted rate," and that "[t]he pharmaceutical manufacturer must rely on, and accept, [this] representation that the 340B Drugs [are] for sale through the 340B Program." [*Id.* ¶¶ 342, 345, 346]. The Court concludes that this allegation is sufficient to establish that pharmaceutical companies relied upon Presbyterian Hospital's representation that it was ordering drugs for sale to its own patients consistent with the requirements of the 340B program.

The Court next addresses Defendants' second argument, namely, that the injury alleged—*i.e.*, loss of Plaintiff's sales—is not directly related to the RICO violation—*i.e.*, Presbyterian Hospital's implicit false representation to pharmaceutical companies that it is requesting 340B drugs for sale to its own patients—and therefore cannot support a finding of proximate cause. As discussed, the proximate cause inquiry requires a "particular emphasis on the 'demand for some direct relation between the injury asserted and the injurious conduct alleged.'" *Bridge*, 553 U.S. at 655 (quoting *Holmes*, 503 U.S. at 268). "When a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries." *Anza*, 547 U.S. at 461.

The Court concludes that Plaintiff does not have standing to bring its RICO claim premised on misrepresentations to pharmaceutical companies, because the alleged violation did not lead directly to Plaintiff's injuries. The natural and foreseeable consequence of Defendants' alleged misrepresentation is that pharmaceutical companies sell drugs to Defendants at a discounted price, which, in turn, allows Presbyterian Hospital to sell drugs to patients (its own or others) at full price thereby increasing its profit margin. While admittedly, Presbyterian Hospital's scheme to increase its profit presumably hurt Presbyterian's competitors, because competitors such as Plaintiff did not have the same opportunity to increase their profit margin, the Supreme Court has

held that this type of indirect injury to a competitor is not sufficient to establish proximate cause or to confer standing.

Specifically, in *Anza v. Ideal Steel Supply Corporation*, 547 U.S. 451 (2006), the Supreme Court held that the plaintiff could not establish proximate cause on a mail and wire fraud RICO claim because the alleged harm was distinct from the purported RICO violation.  *See id.* at 461. The *Anza* plaintiff alleged that the defendant filed fraudulent tax returns to conceal its failure to pay sales taxes on the products it sold, that the defendant's costs were lower because of its failure to pay taxes, that its lower costs allowed it to charge customers less, that customers selected the defendant's products because of these lower prices, and that the defendant's aim was to increase its market share at the plaintiff's expense.  *See id.* at 457-58.  The Supreme Court held that the alleged harm to the plaintiff—*i.e.*, lost sales—was distinct from the alleged RICO violation—*i.e.*, the defendant's fraud on the state by filing false tax returns—and that the plaintiff therefore could not establish proximate cause.  *See id.* at 460.  The Supreme Court held that "[t]he direct victim of [the defendant's] conduct was the State of New York, not [the plaintiff]," because it was the State that lost tax revenue.  *Id.* at 457-58.

In so holding, the *Anza* Court reasoned that "[t]he proper referent of the proximate-cause analysis [wa]s [the] alleged practice of conducting [the defendant's] business through a pattern of defrauding the State."  *Id.* at 458.  The Supreme Court recognized that "[the plaintiff] assert[ed] it suffered its own harms when the [defendant] failed to charge customers for the applicable sales tax," but reasoned that the "cause of [the plaintiff's] asserted harms . . . [wa]s a set of actions (offering lower prices) entirely distinct from the alleged RICO violation (defrauding the State)." *Id.*  The *Anza* court thus rejected the plaintiff's argument that a causal link existed between the defendant's fraudulent tax scheme and the harm that resulted to the plaintiff because the tax

78

scheme allegedly enabled the defendant to offer lower prices and attract more customers (including customers of the plaintiff). *See id.* at 457-58. The *Anza* Court also found it of no import that the plaintiff alleged that the defendant's purpose of entering into the scheme to defraud the State of New York was to gain a competitive advantage over the plaintiff. *See id.* at 460 ("A RICO plaintiff cannot circumvent the proximate-cause requirement simply by claiming that the defendant's aim was to increase market share at a competitor's expense.") (citation omitted). Instead, the Court confirmed that the central inquiry is limited to whether the alleged violation led directly to the plaintiff's injuries. *See id.* at 461.

In enforcing the requirement of a direct causal connection, the *Anza* Court noted that the requirement "is especially warranted where the immediate victims of an alleged RICO violation can be expected to vindicate the laws by pursuing their own claims." *Id.* at 460. The Court held that the State of New York could be "expected to pursue appropriate remedies" and that the State's claims "would be relatively straightforward." *Id.* The Court therefore concluded that "[t]here [wa]s no need to broaden the universe of actionable harms to permit RICO suits by parties who have been injured only indirectly." *Id.*

In addition to holding that the injury was not directly caused by the RICO violation, the *Anza* Court also concluded that there were multiple links in the chain of causation and intervening factors that could have accounted for the plaintiff's lost sales and that these factors precluded a finding of proximate cause. *See id.* at 459-60. The Court also indicated that the defendant "could have lowered its prices for any number of reasons unconnected to the asserted pattern of fraud." *Id.* at 458-59 (reasoning "that the defendant's "lowering of prices in no sense required it to defraud the state tax authority" and "the fact that a company commits tax fraud does not mean the company will lower its prices"). The Court further noted another "discontinuity between the

79

RICO violation and the asserted injury":  namely, that the plaintiff's "lost sales could have resulted from factors other than [the defendant's] alleged acts of fraud."  *Id.* at 459 (noting that "[b]usinesses lose and gain customers for many reasons, and it would require a complex assessment to establish what portion of [the plaintiff's] lost sales were the product of [the defendant's] decreased prices").

 *Anza* is directly on point and governs the result here.  As in *Anza*, the direct victim is not the Plaintiff, but rather the third-party pharmaceutical companies to whom Defendants made the misrepresentations.  Plaintiff, however, has shifted the focus from the proper referent of the proximate cause analysis—*i.e.*, the fraud on the pharmaceutical companies and the fraud's direct impact on those companies—to the indirect harm that the alleged fraudulent practice had on Plaintiff.  This shift is in contravention of the Supreme Court's holding in *Anza*, which dictates that the focus of the proximate cause inquiry be on the RICO violation and the direct harm of that action.  *See Anza*, 547 U.S. at 461 ("When a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries.").  Plaintiff cannot comply with *Anza's* directness requirement, however, because the complaint alleges that Defendants' fraud on the pharmaceutical companies resulted in no injury to Plaintiff.  Indeed, Plaintiff alleges that for years Presbyterian Hospital violated the 340B program by selling drugs to persons who are not its patients [Doc. 24 ¶ 369], and that despite this violation of program rules Plaintiff's patients "overwhelmingly chose to use [Plaintiff's] pharmacy and infusion center for their chemotherapy treatments," [*id.* ¶¶ 373, 375].  Rather, Plaintiff alleges that it was PHP's action of issuing the mandate requiring Plaintiff's patients to purchase their chemotherapy drugs from Presbyterian Hospital instead of from Plaintiff that caused Plaintiff's harm.  [*Id.* ¶¶ 376-80, 387, 388 (alleging that it was only after Defendants

issued the mandate that Presbyterian Hospital obtained an unfair competitive advantage over Plaintiff and began to "strip" patients away from Plaintiff)].   Defendants' action of issuing the mandate to PHP's *health insurance consumers*, however, is completely distinct and separate from Defendants' alleged RICO scheme of defrauding the *pharmaceutical companies*, and therefore the alleged harm to Plaintiff is not the direct result of the RICO violation.[20]   Thus, consistent with *Anza*, the Court concludes that Plaintiff cannot establish proximate cause based upon its indirect injury and therefore holds that Plaintiff does not have standing to assert a RICO claim premised on the alleged misrepresentations to pharmaceutical companies.

The Court also holds that the RICO violation did not proximately cause the alleged harm to Plaintiff because the Defendants' issuance of the mandate is an intervening cause that breaks the chain of causation.   Thus, here, the causal link between the harm alleged (loss of Plaintiff's sales) and the RICO violation (the fraud on pharmaceutical companies) is directly alleged and therefore is even more attenuated than in *Anza*.

Plaintiff concedes in its complaint that the fraud on the pharmaceutical companies resulted in no harm to Plaintiff.   [Doc. 24 ¶¶ 369, 373, 375].   Instead, Plaintiff alleges that it was the intervening cause of the mandate—not the actions constituting the alleged RICO fraud—that

---

[20]   That the alleged harm to Plaintiff and the RICO violation are unrelated to one another, and therefore distinct, is further illustrated by the fact that Defendants could have issued the mandate for any number of reasons unconnected to the asserted fraudulent scheme involving the pharmaceutical companies.   *Cf. Anza*, 547 U.S. at 458-59 (holding that proximate cause did not exist because the harm and violation were not sufficiently related and explaining that the defendant "could have lowered its prices for any number of reasons unconnected to the asserted pattern of fraud," "that the defendant's "lowering of prices in no sense required it to defraud the state tax authority" and "that a company commits tax fraud does not mean the company will lower its prices").   Issuing the mandate did not necessarily require Presbyterian Hospital to defraud the pharmaceutical companies.   To the contrary, Presbyterian had an incentive to issue the mandate even if it did not purchase any 340B drugs, because Presbyterian would profit—albeit less—on the sale of non-340B drugs.   Likewise, that Defendants allegedly defrauded the pharmaceutical companies did not necessarily mean that Defendants would issue the mandate.

resulted in harm to Plaintiff.   [*Id.* ¶¶ 376-80, 387, 388].   This alleged intervening cause of Plaintiff's injury breaks the chain of causation and precludes a finding of proximate cause.[21]

Dismissal for lack of standing is particularly appropriate here because the pharmaceutical companies are better suited to sue than Plaintiff.   In *Anza*, the Supreme Court explained that the State of New York was the direct victim of the alleged RICO scheme and could be expected to pursue appropriate remedies.   The Court therefore held that there was "no need to broaden the universe of actionable harms to permit RICO suits by parties who have been injured only indirectly."   *Id.* at 460.   Likewise, here, the pharmaceutical companies are the direct victims of the RICO scheme and they are better suited to sue.   For this and the foregoing reasons, the Court concludes that Plaintiff has failed to allege facts that support a finding of proximate cause. Furthermore, because proximate cause is necessary to confer standing, and proximate cause is absent here, the Court grants Defendants' Motion to Dismiss the RICO claim.

The Court is not persuaded to hold otherwise by Plaintiff's contention that *Bridge v. Phoenix Bond & Indemnity Co.*, 553 U.S. 639 (2008), in which the Supreme Court held that the harm to the plaintiffs was direct and supported a finding of proximate cause, governs the result here.   In *Bridge*, the plaintiffs brought suit challenging the defendants' submission of false certifications to the county, which allowed the defendants to acquire an increased number of tax liens in the county's public auction.   *See id.* at 641.   The county would hold this annual auction at

---

[21]   Even if Plaintiff had alleged that Defendants harmed it by increasing their profit margin by buying 340B drugs at a discount and selling them to persons not covered by the 340B program, when Plaintiff did not have the same opportunity to inflate its profit margin (because Plaintiff is not eligible to purchase 340B drugs), this allegation could not confer standing.   The *Anza* Court specifically rejected the argument that a defendant-competitor's scheme to lower prices by fraudulently omitting a charge for sales tax was sufficiently related to the harm of lost sales incurred by the plaintiff-competitor because the defendant was able to attract more customers. *See* 547 U.S. at 459-61.

which it would sell tax liens it had acquired on the property of delinquent taxpayers.  *See id.*  The

tax liens were valuable because if the property owner did not pay to the lienholder during the

statutory redemption period, the delinquent taxes plus the penalty established at the auction and an

additional twelve percent penalty on any taxes subsequently paid by the lienholder, the lienholder

would obtain a tax deed for the property, thereby in effect purchasing the property for the value of

the delinquent taxes.  *See id.*  Because of the county's method of allocating the liens amongst

bidders in a tie, the bidding process was subject to abuse.  *See id.* at 643.  Specifically, bidders

who used multiple agents to place bids necessarily would obtain an inflated number of tax liens at

the expense of bidders who did not use agents.  *See id.*  Because only a limited number of tax

liens existed at any given time, extra liens going to one bidder meant that other bidders necessarily

lost liens.  *See id.*  To prevent abuse, the county implemented a "Single, Simultaneous Bidder

Rule," under which bidders were required to submit an affidavit to the county certifying that each

bidder was not using any additional agents to submit simultaneous bids.  *See id.*  The plaintiffs

alleged that the defendants committed a RICO violation by submitting false certifications and

violating the single bidder rule, which resulted in injury to the plaintiffs.  *See id.* at 643-44.

 The Supreme Court held that the plaintiff-bidders' alleged injury—*i.e.*, the loss of valuable

liens—was the direct result of defendant-bidders' alleged RICO violation—*i.e.*, the submission of

a fraudulent certification to the count.  *See id.* at 658.  The Court explained, "It was a foreseeable

and natural consequence of [defendant's] scheme to obtain more liens for themselves that other

bidders would obtain fewer liens."  *Id.*  The *Bridge* Court distinguished its decision in *Anza*, on

the ground that in *Bridge*, there were "no independent factors that account[ed] for [the plaintiff's]

injury . . . and no more immediate victim [wa]s better situated to sue."  *Id.* (explaining that both

the District Court and the Court of Appeals concluded that respondents and other losing bidders were the *only* parties injured by petitioners' misrepresentations").

The Court rejects Plaintiff's argument that *Bridge* is controlling.   In *Bridge*, the natural and foreseeable consequence of the defendant's scheme was necessarily the loss of the bids that the defendants wrongfully obtained; this is because there was a fixed supply of tax liens and the bids that the defendant obtained because of its false certification and use of additional agents in contravention of that false certification necessarily depleted the number of liens available and curtailed the plaintiffs' opportunity to obtain those liens.   Here, in contrast, the natural and foreseeable consequence of the RICO scheme to defraud the pharmaceutical companies was only the increase in Defendants' profit margin for the sale of 340B drugs.   The Plaintiff's lost sales of chemotherapy drugs did not necessarily arise as a result of this fraud.   Indeed, Plaintiff does not even allege that its lost sales arose from Defendants' alleged unlawful purchase of the 340B drugs. [Doc. 24 ¶¶369, 373, 375].   Rather, Plaintiff alleges that the harm occurred because Defendants issued the mandate, which in turn caused Plaintiff's patients to purchase their chemotherapy drugs from Presbyterian Hospital's specialty pharmacy instead of from Plaintiff.   [*Id.* ¶¶ 376-80, 387, 388].   Moreover, unlike *Bridge*, here there are more direct victims of the alleged RICO scheme—namely the pharmaceutical companies—who are better suited to sue than Plaintiff. Thus, the Court concludes that, because the alleged harm was not necessarily caused by the alleged fraud, and because there are other directly injured parties who can be counted on to challenge the alleged RICO scheme, *Bridge* is distinguishable and does not compel the result advocated by Plaintiff.

B.   <u>Plaintiff Fails to State RICO Claims Premised On Misrepresentations to Consumers and Providers</u>.

Plaintiff also alleges that Defendants committed a RICO violation by falsely representing to consumers and providers on multiple occasions that their purchase and sale of 340B drugs was lawful.  The complaint further alleges that Plaintiff was injured when Defendants subsequently issued the mandate to consumers and providers requiring consumers (including Plaintiff's patients) and providers to purchase their chemotherapy drugs from Presbyterian Hospital.  [Doc. 24 ¶¶ 396, 397].  To have standing to pursue these claims, Plaintiff must allege facts that support a finding of proximate cause:  Plaintiff must first allege that consumers and providers relied upon the alleged misrepresentations, and must second allege that the misrepresentations directly caused Plaintiff's injury of lost sales.  *See supra* at 74, 77-78.  Plaintiff has not alleged facts that support either of these showings.

The complaint does not allege that the consumers or providers to whom Defendants made the alleged misrepresentations relied upon the representations or that Plaintiff's patients decided to purchase their chemotherapy drugs from Presbyterian Hospital instead of from Plaintiff because of their reliance.  Rather, Plaintiff alleges that it was the Defendants' issuance of the mandate that caused Plaintiff's patients to purchase their chemotherapy drugs from Presbyterian Hospital instead of from Plaintiff.  [Doc. 24 ¶¶ 381, 382].  Thus, the Court concludes that Plaintiff does not have standing to pursue its RICO claims premised on misrepresentations to consumers and providers and grants the Motion to Dismiss these claims on this ground.

The Court also concludes that Plaintiff lacks standing because the RICO violations—*i.e.*, misrepresentations to consumers and providers regarding compliance with 340B program requirements—did not directly cause the injury alleged—*i.e.*, Plaintiff's loss of drug sales to its

patients.   The complaint alleges that it was the mandate that caused Plaintiff's patients to purchase their chemotherapy drugs from Presbyterian Hospital instead of from Plaintiff.   [Doc. 24 ¶¶ 381, 382].   The mandate, therefore, constitutes an intervening cause that breaks the chain of causation and precludes a finding of proximate cause.   Accordingly, the Court concludes that Plaintiff lacks standing to pursue its RICO claims premised upon Defendants' alleged misrepresentations to consumers and providers and dismisses the claims pursuant to Federal Rule of Civil Procedure 12(b)(6) for this reason as well.[22]

### CONCLUSION

For the foregoing reasons, IT THEREFORE IS ORDERED that the Motion of Defendants Presbyterian Healthcare Services and Presbyterian Network, Inc. to Dismiss the Second Amended Complaint with Prejudice and Memorandum in Support, filed April 15, 2013 [Doc. 33], is granted in part and denied in part as follows:

(1)      The Court denies the Motion to Dismiss Plaintiff's Sherman Act Section 2 and New Mexico Antitrust Act monopolization claims (Counts I and III);

(2)      The Court denies the Motion to Dismiss Plaintiff's Sherman Act Section 2 and New Mexico Antitrust Act attempted monopolization claims (Counts II and IV);

(3)      The Court denies the Motion to Dismiss Plaintiff's New Mexico state law claims for tortious interference with existing and prospective contractual relationships (Counts V and VIII);

---

[22]   Defendants also argue that the Court should dismiss Plaintiff's RICO claims because Plaintiff failed to allege that Defendants made a false statement and failed to allege that Defendant knew of this falsity or was indifferent to its truth.   The Court declines to address this argument. The Court already has granted the Motion to Dismiss the RICO claims on the ground that Plaintiff does not have standing to assert the claims, and this holding is dispositive.

(4)     The Court grants the Motion to Dismiss the New Mexico state law claim for injurious falsehood (Count VI);

(5)     The Court denies the Motion to Dismiss the New Mexico state law claim for unfair competition (Count VI); and

(6)     The Court grants the Motion to Dismiss the RICO claim (Count VII).


Dated this 22nd day of August, 2014.

_____
MARTHA VÁZQUEZ
UNITED STATES DISTRICT JUDGE