IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO


NEW MEXICO ONCOLOGY AND
HEMATOLOGY CONSULTANTS, LTD.,

      Plaintiff,

v.                                        Civ. No. 12-526 MV/GBW

PRESBYTERIAN HEALTHCARE SERVICES, *et al.*,

      Defendants.


## ORDER

This matter comes before the Court on Defendants' Amended Motion to Compel (*doc. 188*) and UNM's Cross-Motion to Modify Subpoenas and for Protective Order (*doc. 197*). The Court held a hearing on the motions on November 5, 2015. *Doc. 222.* Having considered the briefing (*see docs. 198, 201, 202*, and *209*), the argument presented at the hearing, and the applicable law, the Court will DENY Defendants' motion and GRANT in part UNM's motion.

### I.    BACKGROUND

Plaintiff New Mexico Oncology and Hematology Consultants, Ltd. ("NMOHC") brings claims against Defendants Presbyterian Healthcare Services, Presbyterian Network, Inc., Presbyterian Insurance Company, Inc., and Presbyterian Health Plan, Inc. (collectively "Presbyterian") for alleged monopoly control over (1) private health

insurance, (2) comprehensive oncology services, and (3) inpatient hospital services in the Albuquerque/Rio Rancho area.  *See generally doc. 123*; *see also doc. 129* at 1-2.  Plaintiff alleges that "Defendants control the dominant hospital in Albuquerque" and "more than 50% of the patients receiving inpatient hospital services in Albuquerque."  *Doc. 123* at 1.  Plaintiff claims that Presbyterian engages in anti-competitive conduct in the areas of physician referrals and specialty drug sales and administration.  *See generally doc. 123.* Relevant here are NMOHC's allegations that Presbyterian took steps at "putting NMOHC out of business", and that by engaging in various types of exclusionary conduct, Presbyterian has a dangerous probability of monopolizing a market for comprehensive oncology services in violation of federal and state antitrust laws. Among other things, NMOHC complains that the rates at which PHP (a health care insurer) reimburses NMOHC for physician and laboratory services are too low or "predatory."

Defendants served a third-party subpoena on Movant University of New Mexico Medical Group, Inc. and third party the Regents of the University of New Mexico (collectively, "UNMMG").  *Doc. 188*, Ex. A.  The primary objection was focused on Request 5 which Defendants then limited to "UNMMG's reimbursement fee schedules relating to oncology services and chemotherapy drugs; and [] any contract provisions

relating to the use of specialty pharmacies." *Doc. 201* at 1. [1]   UNMMG objected to this

limited request only to the extent that it would have them disclose the identity of the

payer's associated with the fee schedules and contracts.  Instead, UNMMG asked that it

be permitted to produce the requested information "on a payer de-identified basis (i.e.,

rates attributed to Payer A and Payer B instead of the actual names of the payers).[2]"

*Doc. 198* at 2.  UNMMG argues that otherwise the subpoena will require them to reveal

the "negotiated reimbursement rates with its healthcare payers, the most commercially

sensitive information UNM maintains." *Doc. 209* at 1.

For the same reason, UNMMG objects to, and seeks similar protection from,

subpart (11) of Request 1.  *Doc. 188*, Ex. A; *doc. 222*.  Unfortunately, this particular

objection was not expressly raised to the Court until the hearing.  Apparently, prior to

making its initial objections to Defendants, UNMMG did not notice this portion of

Request 1, which, when added to the subpart requesting amount paid by payer, would

reveal the same commercially sensitive information.  Consequently, UNMMG originally

agreed to produce all information sought in Request 1.  Although UNMMG's counsel

advised Defendants in later emails of their objection to this portion of Request 1, that

particular objection was never raised in UNMMG's briefing.  This omission is

particularly surprising given that Defendants raised this argument in briefing before

---

[1] Request 5 originally sought "All contracts and participation agreements with all healthcare payers, including reimbursement fee schedules."
[2] At the hearing, the Court confirmed that UNMMG's proposal was that each provider would be consistently referred to by a unique and consistent alias.

UNMMG filed its Reply.  *See doc. 201* at 11-12; *see generally doc. 209*.   While Defendants

argued that UNMMG's conduct undermines their argument of commercial sensitivity

and should constitute waiver, they did not object to the Court addressing the objection

without further briefing.

## II.   LEGAL STANDARD

Federal Rule of Civil Procedure 45 governs the procedure for obtaining discovery

from a nonparty.  *See Simon v. Taylor*, No. 12–0096 JB/WPL, 2014 WL 6633917, at *14

(D.N.M. Nov. 18, 2014).  Because a Rule 45 subpoena is a discovery device, it is subject

to a court's scheduling order as well as applicable rules of procedure.  *See Dreyer v.*

*GACS, Inc.*, 204 F.R.D. 120, 122 (N.D. Ind. 2001).  Likewise, "[a] subpoena to a third

party under Rule 45 is subject to the same discovery limitations as those set out in Rule

26." *W. Convenience Stores, Inc. v. Suncor Energy (U.S.A.), Inc.*, No. 11–cv–01611–MSK–

CBS, 2014 WL 1257762, at *21 (D. Colo. Mar. 27, 2014) (internal quotations omitted).

"While the court has considerable discretion with regard to regulating discovery

which is exchanged in a lawsuit, discovery from third-parties in particular must, under

most circumstances, be closely regulated." *Premier Election Sol., Inc. v. Systest Labs, Inc.*,

No. 09–cv–01822–WDM–KMT, 2009 WL 3075597, at *3 (D. Colo. Sept. 22, 2009). "It is

generally recognized that a non-party involuntarily embroiled in civil litigation should

not be subjected to undue burden or significant expense merely by virtue of having

received a subpoena." *W. Convenience Stores*, 2014 WL 1257762, at *21 (internal

quotations omitted).  The Rules expressly provide that a court may quash or modify a

subpoena "if it requires … disclosing a trade secret or other confidential research,

development, or commercial information."  Fed. R. Civ. P. 45(d)(3)(B).

## III.   ANALYSIS

### A. What UNMMG seeks to protect is Confidential Commercial Information the Disclosure of which Might Be Harmful

To seek protection under Rule 45(d)(3)(B), UNMMG has the burden of showing

that the information sought qualifies as "trade secret" or "confidential research,

development or commercial information…."  *See In re Cooper Tire & Rubber Co.*, 568 F.3d

1180, 1190 (10th Cir. 2009) (establishing the burden for trade secret protection under

Rule 26(c)).  To meet the first element of this burden, UNMMG argues and provides

support for the following:

> UNM's payer contracts include all components of the UNM Health
> System under a single signature model and include reimbursement rates
> applicable to the procedures and services that UNM's practitioners
> provide. (Masciotra Decl., ¶ 3.)  The information at issue is tightly
> protected, even within UNM itself. UNM's payer contracts and fee
> schedules reflect the result of months of negotiation and data exchanges
> between UNM's managed care contracting team and healthcare payers.
> (Id.) A limited number of legal counsel, senior physicians, and senior
> management officials review and approve the managed care contracts.
> (Id.)
> Payer contracts and fee schedules are maintained in their own
> database separate from other UNM Health System documents. (Id. at ¶ 4.)
> Access to the database that houses payer contracts and fee schedules is
> limited by password to senior-level management and a small number of
> need-to-know business and legal employees. (Id.) About 50 of the
> approximately 7,500 employees of the UNM Health System have access to
> the database. (Id.) In addition, UNM and their partner healthcare payers

are bound by confidentiality provisions in the contracts that generally
prohibit the parties from sharing contract terms and negotiated rates with
third parties. (Id).

*Doc. 198* at 6-7.

For their part, Defendants do not seriously contest the fact that payer contracts

and fee schedules are confidential commercial information. *See generally docs. 188, 201,*

*202.* They do point out that UNMMG initially agreed to produce the information

sought in Request 1 which would have "identif[ied] its reimbursement rates on a payer-

identified basis with respect to specific oncology services rendered to specific patients."

*Doc. 201* at 11-12. Consequently, they claim, UNMMG's sweeping assertions of

confidentiality … ring hollow …." *Id.* at 11. The Court finds that UNMMG's initial

agreement to produce the information sought in Request 1, which would have included

reimbursement amounts on a payer-identified basis, was inadvertent. In

contemporaneously responding to another portion of the same subpoena, UNMMG

made clear its objection to revealing its reimbursement rates on a payer-identified basis.

The fact that they failed to notice that subpart (11) of Request 1 would also reveal the

same information does not fatally undermine UNMMG's arguments or affidavits that

such data is "confidential commercial information." The Court finds UNMMG's

evidence on the matter credible and finds that the payer-identified payer contracts and

fee schedules are "confidential commercial information."

To obtain a protective order, the party seeking it must also "demonstrate that its disclosure might be harmful." *Cooper Tire*, 568 F.3d at 1190.  Regarding harm, UNMMG argues and provides support for the following:

> Were UNM's payer contracts or fee schedules (or parts thereof) to be disclosed, even inadvertently, to Presbyterian or Plaintiff, UNM could suffer serious commercial and competitive harm. Presbyterian and NMOHC are UNM's largest competitors for comprehensive oncology services. (Masciotra Decl., ¶ 7.) In addition, Presbyterian Health Plan ("PHP") is one of the healthcare payers with whom UNM contracts. (Id. at ¶ 5.) Thus, the risk of harm from disclosure is particularly acute because of the parties' competitive relationship (and, in the case of Presbyterian, customer relationship) with UNM.
> …
> For example, if Presbyterian Health Plan knew UNM's reimbursement rates with other healthcare payers, it could use that knowledge unfairly to skew future contract and rate negotiations with UNM in PHP's favor. (Masciotra Decl., ¶ 5.) It could also use knowledge of UNM's rates to win employer accounts from other UNM payer partners. (Id.) As a result, UNM's payer partners could lose membership or not grow as fast as they otherwise could have, thereby reducing UNM's patient volumes. (Id.) Moreover, Presbyterian or NMOHC could use knowledge of UNM's contracts and rates to offer contracts to other payers, such as United, that move patient volume from UNM providers to Presbyterian or NMOHC providers in exchange for a more favorable rate. (Id. at ¶ 6.) And disclosure of contract terms could cause serious harm to UNM, as some contracts contain information that may reveal UNM strategy. Were Presbyterian or NMOHC to see UNM's contracts, direct competitors would obtain insight into UNM's business strategy and plans. (Id. at ¶ 7.)

*Doc. 198* at 7-9.  The Court finds UNMMG has easily established that disclosure of payer-identified payer contracts and fee schedules "might be harmful."

### B. Balancing Favors Protective Order

Having made the required showing, the burden shifts to Defendants "to establish that the disclosure … is relevant and necessary to the action.  The need … should be balanced against the claim of harm resulting from disclosure.  It is within the sound discretion of the trial court to decide whether the [information is] relevant and whether the need outweighs the harm of disclosure."  *Cooper Tire*, 568 F.3d at 1190 (quotations and citations omitted).

The Court has no trouble determining that the payer-identified payer contracts and fee schedules are relevant.  Defendants have established that comparing reimbursements rates among different payers would assist in rebutting claims that Defendants' reimbursement rates to Plaintiffs are predatory.  Moreover, Defendants have established that knowing the identities of the comparison payers would assist in understanding which of the comparison payers provide more accurate or relevant benchmarks.

Defendants do not contest that unprotected disclosure of payer-identified payer contracts and fee schedules would be harmful.  Instead, they argue that the disclosure would be under the protection of the existing Protective Order (*doc. 93*).  The Court agrees that the "strong language of the Protective Order provides significant protections to all discovery in the litigation, including discovery obtained from non-parties."  *Doc. 201* at 7.  Of course, such a protective order is neither a cure-all nor irrelevant.  Courts

generally recognize that "disclosure to a competitor is more harmful than disclosure to

a noncompetitor," *R & D Bus. Sys. v. Xerox Corp.*, 152 F.R.D. 195, 197 (D. Colo. 1993)),

and that even the entry of "a protective order may not sufficiently eliminate the risk of

real harm," *Cont'l Auto. Sys., U.S., Inc. v. Omron Auto. Elec., Inc.*, 2014 WL 2808984, at *5

(N.D. Ill. June 20, 2014); *see e.g., Apple, Inc. v. Samsung Electronics Co., Ltd.*, 2013 WL

5693759 (N.D. Cal. Oct. 15, 2013).  Courts are particularly concerned about this risk

where, as here, the discovery request is directed at a nonparty.  *Id.* at *4 ("Th[e] risk

[that there could be a violation of a protective order] is one that a *party* must, of

necessity, endure.  But it is not one that a nonparty ought to be forced to take where the

party seeking the information is its foremost competitor and there appear to be

alternative sources of information.") (emphasis in original).

While the Protective Order reduces the risk of an unprotected disclosure, it

certainly does not eliminate it.  Given the severe and irreversible economic damages

which would occur if improper disclosure occurred, the Court considers the harm of

disclosure relatively high.  As explained above, this harm must be balanced against the

need Defendants have for the payer-identified payer contracts and fee schedules.  The

Court finds the need relatively low.

The relevant dispute is whether Defendants' reimbursement rates to Plaintiff are

predatory.  Therefore, the key question is Defendants' intent in setting those

reimbursement rates.  Obtaining the payer contracts and fee schedules without payer

identification (but instead with aliases) will permit Defendants to compare their

reimbursement rates to numerous other payers.  If they are broadly in line with other

payers, such would be powerful evidence that Defendants' rates are not predatory.  In

any event, Defendants argue that they need the identification of those payers to permit

their expert to explain the economic and contractual forces which may explain why the

other payers set their rates where they did.  But the motivations of the other payers are

not particularly relevant.  Having heard from Defendants and their expert, the Court

recognizes that a more perfect econometric analysis can be performed on the relevant

market if all the payers are identified.  Not being able to create the perfect econometric

model will not meaningfully interfere with Defendants' ability to argue that economic

realities (e.g. bargaining power, patient volume, contractual relationships), and not

predatory intent, explain their reimbursement rates to Plaintiffs.  This conclusion

establishes that the identities are "relevant," but not that they are "necessary to the

action."  To the extent that Defendants "need" the identities, the harm significantly

outweighs requiring disclosure of them.

### C.  UNMMG's Request for Additional Protections

UNMMG requested an order instituting additional safeguards over any highly

confidential information UNM produces under the subpoenas—1) limiting distribution

to non-New Mexico based outside counsel and experts, and 2) providing notice to UNM

upon disclosure of its documents to any expert or consultant.  UNMMG asserts that it

has shown "good cause" for these restrictions to be added to the protections contained

in the existing Protective Order.  However, UNMMG's filings manifestly fail to

establish that these additional restrictions are necessary.  Therefore, this request will be

denied.

## IV.  CONCLUSION

For the foregoing reasons, Defendants' Amended Motion to Compel (*doc. 188*) is

DENIED and UNM's Cross-Motion to Modify Subpoenas and for Protective Order (*doc.*

*197*) is GRANTED in part and DENIED in part.

IT IS SO ORDERED.

_____
GREGORY B. WORMUTH
United States Magistrate Judge