UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO

NEW MEXICO ONCOLOGY AND
HEMATOLOGY CONSULTANTS, LTD.,

    Plaintiff,

v.                                                                           Civ. No. 12-00526 MV/GBW

PRESBYTERIAN HEALTHCARE SERVICES
and PRESBYTERIAN NETWORK, INC.,

    Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Partial Motion of Defendants Presbyterian Healthcare Services and Presbyterian Network, Inc. to Dismiss the Third Amended Complaint with Prejudice and Memorandum in Support, filed April 20, 2015 [Doc. 141]. Defendants seek to dismiss Plaintiff's new claims for monopolization of an alleged "Inpatient Hospital Services" market. The Court, having considered the motion, briefs, relevant law, and being otherwise fully informed, finds that the motion is well taken and will be granted.[1]

## BACKGROUND

Plaintiff New Mexico Oncology and Hematology Consultants, Ltd. ("NMOHC") is a professional corporation with its principal place of business located in Albuquerque, New Mexico. [Doc. 123 at 23]. NMOHC is an integrated, comprehensive cancer treatment facility that offers patients a full range of medical oncology and hematology, radiation oncology, chemotherapy infusion, and radiology and laboratory services. [*Id.* at 24, 32, 33, 34].

---

[1] The present ruling dismissing Plaintiff's claims for monopolization of an alleged market for inpatient hospital services does not disrupt this Court's prior ruling denying dismissal of Plaintiff's claims for monopolization of the alleged market for private health insurance. [Doc. 79 at 17–53].

NMOHC offers patients its services at a freestanding cancer center owned and operated by NMOHC. [*Id.* at 31]. While NMOHC is based in Albuquerque, it has satellite facilities in underserved areas, including Gallup, Silver City, and Ruidoso. [*Id.* at 35].

Defendant Presbyterian Healthcare Services ("Presbyterian Hospital") is a not-for-profit corporation, with its principle place of business in Albuquerque, New Mexico. [*Id.* at 36]. Presbyterian Hospital owns, operates, and manages eight acute care hospitals, all of which are located in New Mexico and three of which are located in Albuquerque. [*Id.* at 37]. Presbyterian Hospital is the largest hospital in New Mexico and offers a full range of services, including comprehensive oncology services. [*Id.* at 35, 45, 69, 77, 84]. Presbyterian Hospital owns, operates, and manages Presbyterian Medical Group, which employs approximately 700 physicians, including primary care physicians, medical oncologists, and a wide range of other specialists. [*Id.* at 45].

Presbyterian Hospital also is the ultimate parent company of co-Defendant Presbyterian Network, Inc. [*Id.* at 39]. Presbyterian Hospital owns and operates Presbyterian Healthcare Services Affiliates, Presbyterian Healthcare Services Affiliates owns Southwest Health Foundation, Southwest Health Foundation owns Defendant Presbyterian Network Inc., and Presbyterian Network Inc. owns and controls Presbyterian Insurance Company, Inc. and Presbyterian Health Plans Inc. [*Id.*]. In the interest of brevity, the Court will refer collectively to Presbyterian Network, Inc. and its subsidiaries as "PHP." [*Id.*].

PHP operates, on a for-profit basis, various health maintenance organizations, preferred provider organizations, and other health insurance products. [*Id.*]. PHP is the largest health insurer in Albuquerque. [*Id.* at 43]. Despite the legal separation between Presbyterian Hospital and PHP, Presbyterian Hospital actively controls PHP's actions. [*Id.* at 44].

Plaintiff filed its Second Amended Complaint (hereinafter "SAC") [Doc. 24] against Defendants Presbyterian Hospital and PHP, alleging various federal and state antitrust claims, claims under the federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), and state common law claims. On August 22, 2014, this Court granted in part and denied in part Defendants' Motion to Dismiss the Second Amended Complaint, dismissing Plaintiff's state law claim for injurious falsehood (Count VI) and Plaintiff's claims under RICO (Count VII). Plaintiff filed a Third Amended Complaint (hereinafter "TAC") on March 19, 2015, [Doc. 123], in which Plaintiff amended its antitrust claims under Counts I, II, IV, and V. Defendants filed the present Partial Motion to Dismiss the Third Amended Complaint on April 20, 2015, asking the Court to dismiss Plaintiff's new antitrust claims. [Doc. 141].

Plaintiff asserts monopolization and attempted monopolization antitrust claims under Section 2 of the Sherman Act, 15 U.S.C. § 2, and under the New Mexico Antitrust Act ("NMAA"), N.M. Stat. Ann. § 57-1-2. In its SAC, Plaintiff's antitrust claims are premised upon the theory that Defendants used their monopoly in the private health insurance market to employ anticompetitive tactics that harm Plaintiff in the comprehensive oncology market. Plaintiff's monopolization claims under this theory (Counts I, IV) arise out of Defendants' alleged willful maintenance of a monopoly and/or monopsony in the market for private health insurance services through the alleged anticompetitive acts of lowering Plaintiff's reimbursement rates, threatening to terminate Plaintiff's provider contract, and entering into an exclusive arrangement with United HealthCare. [Doc. 24 at 471–76, 483–89]. The Court upheld Plaintiff's antitrust claims related to Defendants' monopoly in the private insurance market. [Doc. 79 at 52–53].

However, Plaintiff's TAC alleges an additional theory for its antitrust claims, which is the subject of the present Partial Motion to Dismiss. Plaintiff now alleges that Defendants used

3

their monopoly in the inpatient hospital services market to harm Plaintiff in the comprehensive oncology market. Plaintiff's monopolization claims under this theory (Counts II, V) arise out of Defendants' alleged willful maintenance of a monopoly in the market for inpatient hospital services through the alleged anticompetitive acts of intimidating physicians who referred patients to NMOCH, actively discouraging and interfering with physician referrals to NMOCH, offering financial benefits for physicians who refused to refer patients to NMOCH, and alterations to Defendants' internal computer system that made it difficult for Defendants to process referrals to NMOCH. [Doc. 123 at 255–63, 267].

Plaintiff also claims attempted monopolization in violation of Section 2 (Count III). In its SAC, Plaintiff's attempted monopolization claim appeared to be based solely on Defendants' alleged attempt to monopolize the comprehensive oncology services market by engaging in the same acts that maintained their monopoly in the private health insurance market. In the TAC, however, Plaintiff's attempted monopolization claim arises out of Defendants' alleged attempt to monopolize the comprehensive oncology services market by engaging in the same acts that maintained both alleged monopolies in the private health insurance market and the inpatient hospital services market.

The Court did not consider claims based on the inpatient hospital services market in Defendants' first Motion to Dismiss because the parties agreed that Plaintiff would amend claims pertaining to Defendants' alleged monopoly of the market for inpatient hospital services. [Doc. 79 at 7, n.3].

## **STANDARD**

Federal Rule of Civil Procedure 12(b)(6) authorizes a court to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "The nature

of a Rule 12(b)(6) motion tests the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true." *Mobley v. McCormick,* 40 F.3d 337, 340 (10th Cir. 1994). The sufficiency of a complaint is a question of law, and when considering a rule 12(b)(6) motion, a court must accept as true all well-pleaded factual allegations in the complaint, view those allegations in the light most favorable to the plaintiff, and draw all reasonable inferences in the plaintiff's favor. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Smith v. U.S.*, 561 F.3d 1090, 1098 (10th Cir. 2009) (citation omitted), *cert. denied*, 558 U.S. 1148 (2010).

A complaint need not set forth detailed factual allegations, yet a "pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action" is insufficient. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

To survive a motion to dismiss pursuant to Rule 12(b)(6), a plaintiff's complaint must contain sufficient facts that, if assumed to be true, state a claim to relief that is plausible on its face. *See Twombly*, 550 U.S. at 570; *Mink v. Knox*, 613 F.3d 995, 1000 (10th Cir. 2010). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). "Thus, the mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complainant must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims." *Ridge at Red Hawk, LLC v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007) (emphasis omitted). The Tenth Circuit has explained,

> "[p]lausibility" in this context must refer to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs "have not nudged their claims across the line from conceivable to plausible." The allegations must be enough that, if assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for relief.

*Robbins v. Okla.*, 519 F.3d 1242, 1247 (10th Cir. 2008) (quoting *Twombly*, 550 U.S. at 570) (internal citations omitted).

## DISCUSSION

Plaintiff alleges that Defendants are using their monopoly of the inpatient hospital services market, in conjunction with their monopoly of the private health insurance market, to drive Plaintiff out of the market for comprehensive oncology services. [Doc. 156 at 22]. Defendants ask the Court to dismiss Plaintiff's monopolization claims related to the market for inpatient hospital services, advancing two arguments in support of this request. First, Defendants maintain that Plaintiff fails to state a monopolization claim under Section 2 of the Sherman Act or the New Mexico Antitrust Act because Plaintiff fails to allege that Defendants possess monopoly power or that they maintained their monopoly power through exclusionary or predatory conduct. Second, Defendants contend that Plaintiff lacks standing to bring a monopolization claim because Plaintiff does not participate in the market for inpatient hospital services and has not suffered an antitrust injury.

The Court considers the issue of standing first and finds that although Plaintiff is a perceived competitor in the market for inpatient hospital services, Plaintiff fails to allege an antitrust injury with respect to this market. Accordingly, Plaintiff lacks standing to bring the monopolization claims pertaining to the inpatient hospital services market. Having found that Plaintiff lacks standing, the Court does not consider whether Plaintiff's monopolization theory

related to the market for inpatient hospital services sufficiently states federal and state antitrust claims under Rule 12(b)(6).

I. **Plaintiff Lacks Standing to Bring Monopolization Claims Pertaining to the Market for Inpatient Hospital Services**

The Court's Memorandum Opinion and Order deciding Defendants' Motion to Dismiss the Second Amended Complaint outlines the controlling Tenth Circuit law for establishing standing to pursue an antitrust claim. [Doc. 79 at 8–17]. By way of review, a private plaintiff seeking damages for a violation of the federal antitrust laws under Section 4 must have both antitrust standing and antitrust injury. *Reazin v. Blue Cross & Blue Shield, Inc.*, 899 F.2d 951, 960 (10th Cir. 1990), *cert. denied*, 497 U.S. 1005 (1990). The concepts of antitrust standing and antitrust injury are related, although courts often treat them separately. *See id.* at 960–61 (citation omitted). As one court explained, "[o]nce antitrust injury has been demonstrated by a causal relationship between the harm and the challenged aspect of the alleged violation, standing analysis is employed to search for the most effective plaintiff from among those who have suffered loss." *Alberta Gas Chems., Ltd. v. E.I. Du Pont de Nemours & Co.*, 826 F.2d 1235, 1240 (3d Cir. 1987), *cert. denied,* 486 U.S. 1059 (1988); *accord Reazin*, 899 F.2d at 961 (citing *Alberta Gas*, 826 F.2d at 1240). The Tenth Circuit has identified "the following factors [for consideration] in determining antitrust standing and antitrust injury:

> the causal connection between the antitrust violations and plaintiff's injury; the defendant's intent; the nature of the plaintiff's injury; the directness or indirectness of the connection between the plaintiff's injury and the allegedly unlawful market restraint; the speculativeness of the plaintiff's damages; and the "risk of duplicative recoveries . . . or the danger of complex apportionment of damages."

*Reazin*, 899 F.2d at 962 n.15 (quoting *Associated Gen. Contractors, Inc. v. Carpenters*, 459 U.S. 519, 544 (1983)). The "nature of the plaintiff's injury factor is designed to implement the requirement that only *antitrust* injuries are redressable under [S]ection 4. An antitrust injury is an 'injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.'" *Id.* (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat Inc.*, 429 U.S. 477, 489 (1977)); *see also Abraham v. Intermountain Health Care, Inc.*, 461 F.3d 1249, 1267 (10th Cir. 2006). An injury that is merely causally linked to an alleged antitrust violation is insufficient. *See id.* (citing *Cargill, Inc. v. Monfort, Inc.*, 479 U.S. 104, 109 (1986); *Brunswick Corp.*, 429 U.S. at 489). In sum, a causal relationship between the alleged antitrust violation and Plaintiff's injury is necessary but not sufficient to guarantee antitrust standing.

A. <u>Plaintiff is a Perceived Competitor in the Market for Inpatient Hospital Services</u>

This Court previously held that under *Reazin*, Plaintiff need not be a competitor or consumer in the market in which Defendants allegedly have a monopoly in order to satisfy the Tenth Circuit's standard for antitrust injury. [Doc. 79 at 10–11]. For example, in *Reazin*, the Tenth Circuit found that the plaintiff hospital was a perceived competitor of the defendant insurer because the hospital's parent company was in the business of providing private health care financing, and because the parent owned an HMO that was a direct competitor of the defendant insurer in the market for health care financing. *Reazin*, 899 F.2d at 956–58, 962–63. In holding that Plaintiff had standing to pursue its monopolization claims pertaining to Defendants' alleged monopoly of the private health insurance market, this Court found that Plaintiff is a perceived competitor of Defendant PHP, because PHP is affiliated with Defendant

Presbyterian Hospital, which is a direct competitor of Plaintiff's in the market for comprehensive oncology services. [Doc. 79 at 12].

Here, Plaintiff similarly alleges that it is a perceived competitor of Defendant Presbyterian Hospital because, although Plaintiff does not participate in the market for inpatient hospital services, Presbyterian Hospital and Plaintiff are direct competitors in the market for comprehensive oncology services.[2] Plaintiff alleges that Defendants' actions in the inpatient hospital services market had the anticompetitive effect of harming Plaintiff in the comprehensive oncology market and that Defendants undertook these actions to advance their position in the comprehensive oncology market. [Doc. 123 at 486–89]. Defendants argue that "[i]n contrast to *Reazin*, NMOCH does not allege that it is affiliated with any entities operating in the inpatient hospital market. Nor is there an allegation that Presbyterian perceived NMOCH's actions to be a threat to Presbyterian's position in that market." [Doc. 141 at 13]. Defendants ignore the Court's prior ruling, which finds that Plaintiff need not be a perceived competitor in the *same* market in which Plaintiff alleges Defendants' have a monopoly. [Doc. 79 at 12]. Like *Reazin*, the Court finds that because Plaintiff and Defendants are direct competitors in the comprehensive oncology services market, Plaintiff's allegations concerning Defendants' use of their monopoly power in one market to exclude Plaintiff from another market renders Plaintiff a perceived

---

2 Plaintiff also notes that it competes directly with Defendant Presbyterian Hospital through its "nurse triage program," which "is designed to and in fact limits the number of inpatient admissions." [Doc. 156 at 24 (citing Doc. 123 at 243–48)]. While Plaintiff's triage program may impact the number of inpatient admissions at Defendants' hospitals, the Court does not find that this program makes Plaintiff a direct competitor in the market for inpatient hospital services. Nevertheless, Plaintiff's triage program, which Plaintiff operates as a provider of comprehensive oncology services, supports the Court's conclusion that Plaintiff is a perceived competitor in the market for inpatient hospital services, as Plaintiff offers patients a possible alternative to those services.

competitor. Accordingly, Defendants cannot defeat Plaintiff's standing by arguing that Plaintiff does not participate in the market for inpatient hospital services.[3]

### B. Plaintiff Fails to Establish an Antitrust Injury

Although a perceived competitor, Plaintiff fails to establish an antitrust injury because the allegations supporting its theory, even accepted as true, were not necessarily caused by Defendants' alleged monopoly. Defendants point out that "[n]one of this alleged conduct relates in any way to the 'Inpatient Hospital Services' market or includes allegations that Presbyterian is somehow monopolizing that market or taking steps to preserve a monopoly in that market." [Doc. 141 at 4]. Although Plaintiff bases its monopolization claim on Defendants' alleged monopoly of the inpatient hospital services market, the allegations of exclusionary conduct supporting Plaintiff's theory pertain to both inpatient and outpatient services provided by Defendants. Because Plaintiff fails to state sufficiently a causal connection between Defendant's monopolization of the inpatient hospital services market and Plaintiff's injury, Plaintiff does not have standing to pursue its monopolization claims pertaining to Defendants' alleged monopoly of inpatient hospital services.

Plaintiff's TAC defines the market for inpatient hospital services broadly but specifies Defendants' market share using more narrow parameters. The TAC defines the inpatient hospital services market as "a cluster of services that are essential for the treatment of a wide variety of illnesses and medical conditions," explaining that "certain medical conditions require

---

3 Defendants argue that Plaintiff cannot be a perceived competitor in the market for inpatient hospital services unless Plaintiff was a direct victim of Defendants' actions in this market and Defendants actually intended to harm Plaintiff through their conduct in the market for inpatient hospital services. The Court rejects this argument and notes that these findings were not necessary to the Court's prior ruling. [Doc. 79 at 12 ("Plaintiff's status as a perceived competitor of Defendant PHP's by virtue of PHP's affiliation with its parent company Presbyterian Hospital, as in *Reazin*, is sufficient to confer antitrust standing on Plaintiff.")]. These additional factors, whether Plaintiff was a direct victim and whether Defendants actually intended to harm Plaintiff, pertain to the related concept of antitrust injury, which, discussed *infra*, Plaintiff fails to establish.

specialized equipment and immediate access to a wide range of medical services that only a hospital can provide. For example, open heart surgery requires specialized operating rooms, highly trained support teams, and access to a wide range of other medical services in case of complications." [Doc. 123 at 101–02]. As to where the line is drawn between inpatient and outpatient services, the TAC only states that "[p]atients needing Hospital Inpatient Services cannot substitute these services with outpatient services or physician services." [*Id*. at 103]. Contrary to this broad definition of the inpatient services market, the TAC defines Defendants' market share of hospital inpatient services by focusing not on circumstances that require "specialized equipment" or "immediate access," but rather on the percentage of staffed beds and the percentage of inpatient discharges, alleging that Presbyterian Hospital controls at least 42% of the total staffed hospital beds in Albuquerque and was responsible for approximately 50% of the actual in-patient discharges in Albuquerque. [*Id*. at 58–59]. Even if the Court accepts all of Plaintiff's allegations as true, the Court must limit its understanding of Defendants' alleged monopoly to services for patients admitted to hospitals, as Plaintiff alleged Defendants' market share according to the number of staffed hospital beds. Although Plaintiff may have sought to define the market for inpatient hospital services more broadly, without well-pleaded allegations defining Defendants' market share beyond the number of patients admitted to Defendants' hospitals, the Court must confine its understanding of the market for inpatient hospital services to services for patients admitted to hospitals.

Plaintiff alleges four categories of actions that Defendant Presbyterian Hospital took to exploit its monopoly of the inpatient hospital services market in an attempt to eliminate Plaintiff as a competitor in the market for comprehensive oncology services. Each category of conduct

could pertain to inpatient or outpatient hospital services, and Plaintiff fails to allege that Defendants committed these actions in the inpatient hospital market.

First, Defendants allegedly intimidated Presbyterian-employed physicians who referred patients to NMOCH, but Plaintiff does not specify whether these physicians were making referrals through the hospital's inpatient or outpatient services. These physicians were merely "approached by hospital administrators and asked to explain their referrals to NMOHC." [*Id*. at 255]. Furthermore, a survey was emailed to Presbyterian's physicians asking them to "review your referral patterns and give special consideration to referring to your medical group colleagues." If a physician checked the box indicating that they did not support or only partially supported this request, they were asked to comment. [*Id*. at 256–57]. The TAC does not specify whether this survey pertained to inpatient referrals.

Second, Defendants allegedly discouraged and interfered with physician referrals to NMOCH, and the TAC itself makes clear that at least some of these incidents did not occur while providing inpatient services. [*Id*. at 259–63, 267]. For example, non-physician staff at Presbyterian Hospital called NMOCH patients, who were presumably not admitted to the hospital at the time, and asked them to switch their treatment to an oncologist at Presbyterian. [*Id*. at 260]. Presbyterian Hospital staff also "pressure[d]" NMOCH patients while they were visiting Presbyterian Hospital for mammograms to see a Presbyterian employed oncologist instead, [*id.* at 262], including scheduling a NMOCH patient for an appointment with a Presbyterian employed oncologist after the mammogram, without the patient's knowledge or permission. [*Id*. at 263]. These allegations do not pertain to inpatient services, and, even if the Court were to view these allegations as true, Defendants did not rely on their monopoly in

12

inpatient hospital services in order to engage in this conduct with patients who were not admitted to the hospital.

Third, Defendants allegedly offered financial benefits to physicians who refused to refer patients to NMOCH. [Doc. 123 at 258]. Again, the TAC does not specify whether this incentive applies to inpatient services and/or outpatient services.

Finally, Defendants allegedly altered their internal computer system in order to make it difficult for Defendants to process referrals to NMOCH. [*Id.* at 266]. Again, the TAC does not specify whether this alteration affects inpatient and/or outpatient services.

Assuming *arguendo* that Defendants have a monopoly of the inpatient hospital services market and that the above conduct discouraging referrals to Plaintiff is exclusionary under Section 2, the Court is unable to find that Defendants are using their alleged monopoly power to injure Plaintiff because the alleged exclusionary conduct does not pertain Defendants' alleged monopoly in inpatient services. Plaintiff's definition of the inpatient hospital services market focuses on the number of staffed beds and the percentage of inpatient discharges, [Doc. 123 at 56–61], but the above allegations do not clearly pertain, and some plainly are not at all related, to the number of staffed hospital beds at Defendants' hospitals. However, antitrust standing requires a causal connection between the alleged antitrust violation and Plaintiff's injury. *Alberta Gas Chems., Ltd.*, 826 F.2d, 1240; *accord Reazin*, 899 F.2d at 961. In short, Plaintiff does not allege that Defendants are using their large number of hospital beds to bolster their oncology clinic and drive out Plaintiff's oncology services. Having failed to allege a causal connection between the alleged monopoly and Plaintiff's injury, Plaintiff has not established an antitrust injury.

In essence, Plaintiff's monopolization claims are based on the theory that Defendants are using their diagnostic facilities, which provide the opportunity to solicit new patients, in conjunction with their dominance of the private health insurance market, to pursue a monopoly of the comprehensive oncology services market and drive Plaintiff out of business. [Doc. 156 at 9]. The Court has already upheld Plaintiff's antitrust claims that are based on Defendants' alleged monopoly of the private health insurance market. However, with respect to Plaintiff's new claims, without successfully alleging a monopoly that encompasses the alleged exclusionary conduct, Plaintiff has alleged only ordinary business losses and not an antitrust injury. *Reazin*, 899 F.2d at 962 n.15 ("An antitrust injury is an 'injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.'") (internal citations omitted). Accordingly, because Plaintiff has not alleged an antitrust injury, Plaintiff lacks standing to pursue monopolization claims pertaining to Defendants' alleged monopoly of the inpatient hospital services market.

The Court's dismissal of Plaintiff's newly alleged monopolization claims pertaining to the inpatient hospital services market does not alter the Court's earlier decision upholding Plaintiff's monopolization claims pertaining to the private health insurance market. Plaintiff's allegations concerning Defendants' efforts to discourage and prevent physician referrals from Presbyterian Hospital to NMOCH may support Plaintiff's original monopolization claims, under the theory previously upheld by this Court, by suggesting that Defendants utilized their monopoly in the private health insurance market to bolster their oncology clinic and push Plaintiff out of the market for comprehensive oncology services. [Doc. 79 at 17–53].

## **CONCLUSION**

For the foregoing reasons, IT THEREFORE IS ORDERED that the Partial Motion of

Defendants Presbyterian Healthcare Services and Presbyterian Network, Inc. to Dismiss the Third Amended Complaint with Prejudice and Memorandum in Support, filed April 20, 2015, [Doc. 141], is **granted**.

Dated this 14th day of March, 2016.

_____
MARTHA VÁZQUEZ
UNITED STATES DISTRICT JUDGE