**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

NEW MEXICO ONCOLOGY AND
HEMATOLOGY CONSULTANTS, LTD.,

       Plaintiff,

v.                                                                  No. 1:12-cv-00526 MV/GBW

PRESBYTERIAN HEALTHCARE SERVICES, *et al.*,

       Defendants.

## FINDINGS AND RECOMMENDED DISPOSITION OF PLAINTIFF'S MOTION FOR SANCTIONS

    This matter comes before the Court upon Plaintiff's Motion for Sanctions (*doc. 673*). The Court held a hearing on the motion on July 25, 2017,[1] and heard oral argument on the motion on August 2, 2017. *Docs. 732, 736.* For alleged discovery violations, Plaintiff seeks a default judgment or, in the alternative, an adverse jury instruction at trial. Based on the findings laid out below, I recommend denial of these severe sanctions. However, I conclude that certain costs should be assessed against Defendants.

---

[1] Prior to the hearing, Plaintiff filed three motions in limine. *See docs. 697-99.* The Court has considered the evidence presented at the hearing as well as the evidence referenced herein. To the extent that it has considered evidence Plaintiff sought to exclude, those motions are denied.

# I. LEGAL STANDARD

## a. *Spoliation*

Under Rule 37 of the Federal Rules of Civil Procedure, the Court may sanction a party "[i]f electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery." FED. R. CIV. P. 37(e). Parties to a lawsuit are under an "obligation to preserve evidence when the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation." *Browder v. City of Albuquerque*, 209 F. Supp. 3d 1236, 1243 (D.N.M. 2016) (citations omitted). This duty to preserve evidence arises "when litigation is imminent." *U.S. ex rel. Baker v. Cmty. Health Sys., Inc.*, No. CIV. 05-279 WJ/ACT, 2012 WL 12294413, at *3 (D.N.M. Aug. 31, 2012), *objections overruled*, No. CIV. 05-279 WJ/ACT, 2012 WL 5387069 (D.N.M. Oct. 3, 2012). "Spoliation includes the intentional or negligent destruction or loss of tangible and relevant evidence which impairs a party's ability to prove or defend a claim." *Id.*

A party may be sanctioned for spoliation when "(1) a party has a duty to preserve evidence because it knew, or should have known, that litigation was imminent, and (2) the adverse party was prejudiced by the destruction of the evidence." *Turner v. Pub. Serv. Co. of Colorado*, 563 F.3d 1136, 1149 (10th Cir. 2009). In order for a court to sanction a party for spoliation, the moving party must show by a

preponderance of evidence that the other party destroyed evidence.[2] *In re Krause,* 367 B.R. 740, 764 (D. Kan. 2007) ("The burden is on the moving party to prove, by a preponderance of the evidence, that the opposing party failed to preserve evidence or destroyed it.").

### b. *Default Judgment*

Plaintiff requests that the Court sanction Defendants by ordering default judgment against them. Under Rule 37, the Court may enter a default judgment "only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation." FED. R. CIV. P. 37(e)(2). A default judgment is considered a "harsh sanction" requiring some demonstration of "willfulness, bad faith, or some fault of the offending party rather than inability to comply." *EBI Sec. Corp. v. Net Command Tech, Inc.,* 85 F. App'x 105, 108 (10th Cir. 2003) (unpublished). "Because default judgment deprives a litigant of his or her day in court, it is appropriate only where a lesser sanction would not serve the interest of justice." *In re Rains,* 946 F.2d 731, 733 (10th Cir. 1991) (internal quotations omitted).

---

[2] At oral argument, Defendants contended that the proper standard of proof for default judgment or an adverse jury instruction regarding spoliation should be "clear and convincing." While I recognize that there is support for Defendants' argument, I find that Plaintiff's motion should be denied on the merits even under a preponderance of evidence standard. *See, e.g., Gates Rubber Co. v. Bando Chem. Indus., Ltd.,* 167 F.R.D. 90, 108 (D. Colo. 1996) (clear and convincing evidence required to order a dismissal or default judgment, but preponderance of evidence sufficient to impose lesser sanctions); *In re DaimlerChrysler AG,* No. CIV.A. 00-993-JJF, 2003 WL 22951696, at *2 (D. Del. Nov. 25, 2003) ("The burden of establishing prejudice must be shown by direct evidence which is clear and convincing when dispositive sanctions are sought, and by a preponderance of the evidence when non-dispositive sanctions are sought.") (internal quotations omitted). Therefore, I will presume that the preponderance of evidence standard applies.

In considering sanctions, the Court should consider a number of factors, including: (1) "the degree of actual prejudice" to the other party; (2) "the amount of interference with the judicial process;" (3) "the culpability of the litigant;" (4) "whether the [C]ourt warned the party in advance that dismissal of the action would be a likely sanction for noncompliance;" and (5) "the efficacy of lesser sanctions." *Ehrenhaus v. Reynolds*, 965 F.2d 916, 921 (10th Cir. 1992). Default judgement is an appropriate sanction "[o]nly when the aggravating factors outweigh the judicial system's strong predisposition to resolve cases on their merits." *EBI Sec. Corp.*, 85 F. App'x at 108.

**c. *Adverse Jury Instruction***

Plaintiff alternatively requests that the Court sanction Defendants by ordering an adverse jury instruction. As with default judgment, the Court may "instruct the jury that it may or must presume the information was unfavorable to the party" "only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation." FED. R. CIV. P. 37(e)(2). An adverse inference instruction is " a powerful sanction[,] as it brands one party as a bad actor and necessarily opens the door to a certain degree of speculation by the jury, which is admonished that it may infer the presence of damaging information in the unknown contents [of the missing documents]." *Henning v. Union Pac. R. Co.*, 530 F.3d 1206, 1219 (10th Cir. 2008). "[I]f the aggrieved party seeks an adverse inference to remedy the spoliation, it must also prove bad faith." *Turner*, 563 F.3d at 1149; *see also Vick v. Texas Employment Comm'n*, 514 F.2d

734, 737 (5th Cir. 1975) ("Mere negligence is not enough, for it does not sustain an inference of consciousness of a weak case.").  Unless the aggrieved party can demonstrate bad faith, the Court may only impose lesser sanctions.  *Henning*, 530 F.3d at 1220.

## II.  ANALYSIS

### a.  *Litigation Hold*

Plaintiff alleges that Defendants should be sanctioned for failure to implement a proper litigation hold.  *Doc. 673* at 30-32.  A litigation hold is "an affirmative act taken by a party's attorney or management directing the party's employees or agents to take affirmative steps to preserve evidence which otherwise might be lost.  The purpose of the hold is to avoid the loss of evidence through intentional or negligent actions, or even through routine document management."  *Helget v. City of Hays*, No. 13-2228-KHV-KGG, 2014 WL 1308893, at *3–4 (D. Kan. Mar. 31, 2014).  "Once a party reasonably anticipates litigation, it must suspend its routine document retention/destruction policy and put in place a litigation hold to ensure the preservation of relevant documents."  *U.S. ex rel. Baker*, 2012 WL 12294413, at *2 (internal quotations omitted).  Then, "[o]nce a litigation hold is in place, a party and her counsel must make certain that all sources of potentially relevant information are identified and placed on hold."  *Cache La Poudre Feeds, LLC v. Land O'Lakes, Inc.*, 244 F.R.D. 614, 627–28 (D. Colo. 2007) (internal quotations omitted).

Such a litigation hold applies not only to physical documents but also to electronic data. *Browder*, 209 F. Supp. 3d. at 1243; *see also Cache La Poudre Feeds*, 244 F.R.D. at 620. However, a corporation in not required to, "upon recognizing the threat of litigation, preserve every shred of paper, every e-mail or electronic document, and every backup tape." *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 217 (S.D.N.Y. 2003). Rather a party must preserve "any documents or tangible things (as defined by Rule 34(a)) made by individuals likely to have discoverable information that the disclosing party may use to support its claims or defenses. *Id.* at 217-18 (internal quotations and citation omitted).

Plaintiff filed its initial Complaint on May 16, 2012. *See doc. 1.* On May 22, 2012, Defendants issued a legal hold directive to thirty-five employees whom it believed most likely to have relevant information based on Plaintiff's Complaint. *Doc. 685* at 2. This first litigation hold directed employees that they "must make diligent and reasonable efforts to preserve responsive documents in all locations where they may be found." *Doc. 685-1* at 2. The litigation hold covered an expansive list of subject matters for which employees must retain relevant emails. *Id.* at 2-3. Employees were also directed to send to Defendants' counsel a list of additional employees not on the original list "who may have relevant documents, data[,] or information." *Id.* at 3. Several individuals were so identified and were then issued the legal hold directive soon thereafter. *Id.* Plaintiff filed its first Amended Complaint on June 5, 2012, and then filed

its Second Amended Complaint on February 13, 2013.  *See docs. 12, 24.*  In March 2013,

Defendants issued an updated litigation hold directive to an additional 174 individuals

whom Defendants believed may have responsive information.  *Doc. 685* at 3.

Plaintiff alleges that Defendants' original May 2012 litigation hold was

inadequate because (1) it did not account for the "email jail," a function which required

that employees delete or archive emails when they run out of inbox space; (2) it covered

only thirty-five employees and improperly excluded several key witnesses; (3) it

allowed employees to determine which emails were irrelevant to the lawsuit and could

be deleted; and (4) it did not apply to Defendants' Live Exchange Server and therefore

did not preserve documents deleted by individual employees  *Doc. 673* at 3-4; *doc. 695* at

1-4.  The Court will consider each argument in a slightly different order.

      i.    <u>Employee Discretion in Determining Relevance</u>

Plaintiff's most broad argument is its contention that the litigation hold

impermissibly gave discretion to employees to determine what documents, email, and

other information might be relevant to the lawsuit and thus subject to the hold.  *Doc.

695* at 3-4.  Plaintiff contends that permitting such discretion is *per se* inadequate.

However, an entity is not required to, "upon recognizing the threat of litigation,

preserve every shred of paper, every e-mail or electronic document, and every backup

tape."  *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 217 (S.D.N.Y. 2003).  Rather a party

"must not destroy unique, relevant evidence that might be useful to an adversary."  *Id*.

Indeed, courts have found a litigation hold in which a party "directed employees to produce all relevant information[] and then relied upon those same employees to exercise their discretion in determining what specific information to save" can be sufficient as long as routine procedures which might eliminate relevant information are no longer continued. *Cache La Poudre Feeds*, 244 F.R.D. at 629; *see also Concord Boat Corp. v. Brunswick Corp.*, No. LR-C-95-781, 1997 WL 33352759, at *6 (E.D. Ark. Aug. 29, 1997) ("The fact that Defendant allowed individual employees to use discretion whether to retain e-mail is simply not indicative of bad faith."). Of course, as recognized by the cases cited by Plaintiff, a party cannot defend against a spoliation charge by blithely (and self-interestedly) claiming that all destroyed documents were irrelevant. But those cases do not stand for the proposition that employees subject to a litigation hold are forbidden from any discretion. In this case, Defendant's employees were not given a generic "retain relevant documents" instruction. Instead, they were directed to retain documents and data "that mention or discuss or relate to any of" an exhaustive list of subjects. *See doc. 707-1* at 47-52. They were also directed that if "you are unsure about the relevance of a document, be cautious and preserve it." *Id*. This court cannot conclude that the limited discretion permitted to the subjects of the litigation hold in this case rendered the hold inadequate.

ii.   Email Jail

Plaintiff also alleges that due to the existence of an email jail, which required employees to delete or archive emails once they ran out of inbox space, Defendants' employees did not adhere to the litigation hold and deleted relevant emails.  *Doc. 673* at 3, 31.  Plaintiff points out that a number of deponents who were subject to the litigation hold experienced email jail during the relevant time period and admitted to deleting emails in response.  *Id.* at 31.  However, none of them testified that they believed that the requirements of "email jail" overrode their obligations under the hold, or that they in fact deleted items they otherwise would have retained pursuant to the hold.  *See doc. 685-7* at 2-3 (Anna Marie Garcia); *doc. 685-5* at 2 (Jay Olive); *doc. 685-9* at 1-2 (Lora Allpass); *doc. 685-10* at 2-3 (Louanne Cunico); *doc. 685-11* at 2-3 (Ann Greenberg); *doc. 685-12* at 2-3 (Matthew Nagy).  To prove the contrary, Plaintiff points to two pieces of evidence: (1) a letter from Defendants' counsel stating that certain emails which pre-date the second litigation hold "may have been deleted in the ordinary course of business" by employees not covered by the first litigation hold and (2) a letter from Defendants' counsel stating that certain emails identified by Plaintiff may have been "deleted in the ordinary course of business, with each custodian believing that they were not relevant to the instant litigation."  *Doc. 552-1*; *doc. 673-3* at 133.

However, these circumstances do not carry the weight Plaintiff assigns them. With respect to the first example, it is not a surprise that employees not covered by the

litigation hold would delete items in the ordinary course of business. It certainly does not prove that, when they were brought within the litigation hold, they did not follow those instructions with or without the existence of "email jail."[3] With respect to the second example, Plaintiff provides no evidence to controvert Defendants' counsel's description of the apparently deleted items as "relat[ing] to tangential or peripheral issues that have only tenuous relevance to the underlying claims of the litigation." *Doc. 673-3* at 133. Consequently, their deletion by some custodians fails to establish that employees covered by the litigation hold did not perform their obligations under the litigation hold in good faith notwithstanding the "email jail."

### iii.　Limited Number of Employees

Plaintiff further argues that the May 2012 litigation hold was inadequate because it failed to cover several important witnesses. *Doc. 673* at 4. Specifically, Plaintiff contends that the original litigation hold improperly excluded the following employees: (1) Anna Maria Garcia; (2) Jay Olive; (3) Lora Allpass; (4) Dean Putt; (5) Nicki Evans; (6) Jaimie Martin (7) Mike West; and (8) any of the Nurse Navigators. *Doc. 673* at 4. In response, Defendants argue that any key employees not originally included in the litigation hold were added through the reference process. *Id.* at 26. In fact, Defendants specifically note that Anna Maria Garcia, Lora Allpass, Jay Olive, and relevant Nurse

---

[3] Whether they should have been included in the earlier litigation hold will be addressed in a later section.

Navigators were added to the litigation hold through this process prior to the issuance of the second expanded litigation hold in March 2013. *Doc. 685* at 2. Further, Defendants confirmed that, although the documents were collected from the incorrect Mike West, the litigation hold was sent to the correct Mike West. *Id*. at 25 n.28; Ex. 1 at 51.

Therefore, we are left with three individuals Plaintiff identifies as important witnesses were not included in the first litigation hold: Dean Putt, Nicki Evans, and Jaimie Martin. However, Defendants explained that Dean Putt had already left his employment by the time the litigation hold was issued, which explains why he was not included. *Doc. 685* at 25-26. Defendants contend that neither Nicki Evans nor Jaimie Martin were considered to be relevant. *Id*. at 26. Having considered the parties' arguments on the matter, the Court is unpersuaded that either Ms. Evans or Ms. Martin was a "key player" such that the failure to include them in the original litigation hold was blameworthy. *See id*. at 256-27.

Even if Ms. Evans and Ms. Martin were important witnesses, Plaintiff could have objected to their names being excluded from the distribution list in November 2016, when Plaintiff received the names of all thirty-five employees who received the May 2012 litigation hold. *Doc. 673-1* at 45. Plaintiff failed to do so, and additionally chose not to depose either witness even after learning that they had been excluded from the

list. *Doc. 685* at 27. Furthermore, Ms. Evans was included in the March 2013 litigation hold. *Id.*

Plaintiff also argues that Defendant is guilty of spoliation because of the delay in adding 174 individuals to the original litigation hold which covered more than 40 individuals after the initial supplementation. *Doc. 673* at 5. Aside from pointing to the sheer number of the additional employees added to the hold in March 2013, Plaintiff does not establish that the newly-added individuals were so significant based upon the allegations in Plaintiff's original Complaint that failure to include them in the original hold violated Defendants' discovery obligations.

      iv.    <u>Transport Dumpster</u>

Plaintiff also argues that Defendants' litigation hold was insufficient because it "did not apparently put a litigation hold on the part of their Live Exchange Server (the Transport Dumpster) that would catch [] deleted emails." *Doc. 695* at 1-2. Whether a litigation hold was ever placed on the server and how such a hold would operate were hotly debated at the hearing and oral argument. In any event, emails would end up in the Transport Dumpster only if they were actively deleted by a user. As noted above, there is insufficient evidence that custodians subject to the litigation hold failed in their obligations. Consequently, the apparent failure to timely place a litigation hold on the Transport Dumpster would result in no spoliation.

v.    <u>Conclusion</u>

Without question, Plaintiff points out some imperfections with the litigation hold and its implementation.  First, given the relative cheapness of digital storage, parties will have less and less justification to permit key employees to utilize discretion in the retention of ESI.  Certainly, the best approach is to implement a server-side hold on all digital data utilized by key employees and to later use search algorithms to parse relevance.  Second, in the light most favorable to Defendants, they failed to timely implement a server-side litigation hold.  In fact, the Court is persuaded that either a server-side litigation hold never went into effect, or it was not properly applied. Relatedly, businesses that utilize email jail to conserve server space should shut down such features for employees subject to a litigation hold.  Defendants failed to do so. Third, Defendants failed to adequately explain the reason for the delay between the first and second waves of litigation hold recipients.  Certainly, the mere possibility of a settlement is insufficient.  However, as explained above, Plaintiff failed to establish that these imperfections were a result of bad faith or that they resulted in the spoliation of evidence.

The litigation hold provided Defendants' employees comprehensive guidelines for retaining relevant documents and information.  For example, the litigation hold (1) directed that employees preserve all relevant documents and data; (2) described the various forms of documents that must be retained; (3) detailed seventeen subject

matters for which information must be retained; (4) directed the employees to err on the side of retention if they had any doubt as to the relevance of information; (5) directed employees to suspend any automatic deletion programs; (6) directed employees to identify any other employees who may have relevant information; and (7) required the recipient to sign an acknowledgement promising to comply with the litigation hold. *Doc. 707-1.* This litigation hold was imposed on approximately 40 key employees on or about May 2012. *Doc. 685* at 2. By March 2013, another 174 employees were made subject to the hold. *Id.* at 2-3.

Admittedly, the discretion afforded employees under the hold and the delay in implementing the expanded hold created the theoretical possibility that an employee could have deleted a relevant email. However, even if an individual employee were to delete an email that might be relevant to the case, it is extremely likely that such an email would be preserved by another employee due to the overlapping nature of emails. In business settings such as that of Defendants, inter-company emails typically involve multiple recipients. For example, any individual email would appear in the inbox of (1) the employee who sent the email; (2) each employee who received the email; (3) each employee who received a carbon copy of the email; and (4) each employee who received a blind carbon copy of the email. Moreover, earlier emails are routinely included in later responsive threads. For the litigation hold to fail to result in the retention of such an email, it would be necessary for every employee in every

14

address field to violate the litigation hold and delete that email. Given the breadth of the topics included in the litigation hold letter, its directive to err on the side of retention and the large number of employees eventually subject to the hold, any conclusion that a unique and relevant email was completely deleted would be pure speculation. *See also Centrifugal Force, Inc. v. Softnet Commc'n, Inc.*, 783 F. Supp. 2d 736, 742-43 (S.D.N.Y. 2011) ("the mere fact that a single email was deleted in contravention of the instruction to preserve does not reflect either bad faith, the intentional destruction of evidence, or gross negligence"). In short, Plaintiff cannot show any prejudice from the litigation hold that was put into place by Defendants.

**b. *Gerard PST Issue***

    i. <u>Generally</u>

The most serious allegation levelled by Plaintiff is that Defendants intentionally deleted discoverable emails received or sent by Dr. Dava Gerard. *Doc. 673* at 16-23. A severe sanction such as default judgment or an adverse jury instruction would certainly be warranted if this possibility were accepted by the Court.

In September 2016, Plaintiff discovered documents belatedly disclosed from the custodianship of Mike West which should have also appeared earlier in the documents from the custodianship of Dr. Gerard. *Doc. 673* at 18. Plaintiff questioned Defendants about this issue. *Id.* On November 15, 2017, Defendants sent a letter to Plaintiff explaining that they had "identified an error that occurred in Dr. Gerard's original

export." *Doc. 552-1* at 3. In short, Defendants claim that the failure to disclose a large number of Dr. Gerard's emails was the result of a computer glitch which went undetected until November 2017. *Doc 685* at 31-32. Plaintiff claims that some agent of Defendants intentionally deleted the emails after the server export was completed. *Doc. 695* at 7-13.

Generally speaking, the collection of emails in this case starts with an export from a computer or the server. The export creates a PST file. The PST file is then opened by Defendants' e-discovery vendor, Epiq. Search algorithms are run against the emails and documents included therein. From the subset of "hits," the documents are then reviewed further for privilege and other issues which may affect their discoverability. Epiq collected the PSTs which would be found on discrete workstations such as laptops and desktops. *Doc. 735* at p. 170:3-11; *doc. 673-1* at 10. T-Systems, the contractor who runs Defendants' Live Exchange Server, collected the PSTs for each custodian off the server. *Doc. 673-1* at 10. For Dr. Gerard, Epiq collected 15 PSTs from various workstations, and T-Systems collected the single PST from the server. *Doc. 735* at p.172:5-10. The Gerard PST at issue was the PST collected from the server by the T-Systems' employee, Ron Narvaez. *Doc. 695* at 7-13. In October 2014, after the server exports had been conducted by T Systems, Epiq eDiscovery Solutions, Inc. took custody of the hard drives containing the server PSTs (included the hard drive containing the

Gerard PST at issue) and maintained custody until it was eventually sent to DriveSavers for forensic analysis.  *Doc. 735* at p. 282:1-5.

ii.    <u>Plaintiff's Evidence of Intentional Deletion</u>

The two primary pillars of Plaintiff's case for intentional deletion are: (1) the data found within the "free space" of the Gerard PST file, and (2) the data found in the unallocated space on the hard drive on which the Gerard PST file was saved.  *See doc. 673* at 21; *doc. 695* at 8.  According to Plaintiff, such data would only be found if an individual, after completing the export from the server, deleted emails from the exported PST.  *673* at 21; *doc. 695* at 8.

(1) *Data in free space of Gerard PST*

The Gerard PST was 9.2 GB in size.  *Doc. 685-2* at 7.  However, when it was opened by Epiq, only 128 MB of materials were readable by native software.  *Id.*  This result is unusual because "[a] typical email dataset will expand about 50% or more during processing, but [the Gerard] PST decreased in size substantially."  *Id.* at 8.  Rene Novoa, the court-appointed forensic examiner, analyzed the hard drive containing the Gerard PST file.  *See doc. 645* at 1-2.  Mr. Novoa testified that during the course of his analysis, he found approximately 37,000 emails residing in the free space of the PST.  *Doc. 735* at p. 18:4-21.  Mr. Novoa concluded that these items could be the result of deletion of emails.  *Id.* at pp. 23:19-24:6.

While Mr. Novoa expresses that intentional deletion is a possibility given his analysis, Mr. Wilson, Plaintiff's expert, goes further. He opines that, "there is no way to place data in the free space of a PST during a client-side export," and that "[t]he only way a client-side PST can have data in the free space of the PST is when it is deleted from the PST after creation." *Doc. 673-1* at 17. Moreover, Defendants' expert, Mr. Aaron Read, testified that under a client-side collection, data could only exist in the free space of the PST through either deletion or corruption. *Doc. 735* at p. 166:12-19.

Of course, the conclusion that data residing in the PST's free space is only the result of deletion rests on the assumption that the export was conducted via the "client-side" method, rather than the alternative "server-side" method. Indeed, Mr. Wilson's assumption on this point is unsurprising because the T-Systems employee who conducted the export has repeatedly described conducting a client-side export. *Doc. 673-1* at 6; *doc. 695-2* at 3 (Mr. Wilson stating that "Mr. Narvaez stated during his interview that he performed a client-side collection and . . . walked through a detailed description of that process including a number of details that could only apply to a client-side collection"); *doc. 735* at p. 157:19-21 (Mr. Read confirming that "the process [Mr. Narvaez] described was a client-side collection"). So, should the Court conclude that the export of Gerard's server PST was conducted via the "client-side" method, the existence of data in the free space of that PST is strong evidence of post-export deletion.

(2) *Data in unallocated space of hard drive*

Mr. Novoa explained that "[i]nformation was recovered from the unallocated space of Hard Drive-I and recovered lost data in [the Gerard PST file]." *Doc. 673-3* at 1. He also testified that he was able to extract forty-eight email messages from the unallocated space of the hard drive which related to the Gerard PST. *Doc. 735* at pp. 21:4-22:2. Mr. Novoa testified that although he found "deleted fragments" in the unallocated space of the hard drive, he "[could] not determine where they came from." *Id.* at p. 24:13-22.

In fact, Mr. Novoa concluded that "either [the email messages] were deleted from other e-mail accounts or [the data] was previously there on the hard drive." *Doc. 735* at p. 25:3-5. Mr. Novoa then explained that the files could have been on the hard drive from a previous case, as this "dirty target media" could remain on the hard drive if it were not properly sanitized. *Id.* at pp. 25:21; 44:24-45:12 (Mr. Novoa confirming that these are the only two options to explain how data could reside on the unallocated space of the hard drive). Mr. Novoa further explained:

> "In best practices, when we reuse target media for collections, it is our process to wipe it or wiping zeros or sanitizing the drive so there would be no residual data at all on the target drive. If there is data in the unallocated space, it could be from deletion. It could be there from a previous case . . . ."

*Id.* at p. 26:6-11.

Both Mr. Wilson and Mr. Novoa testified that, assuming a clean hard drive was used at the start of the collection process, the only way data could reside on the unallocated space of the hard drive is through post-export deletion. *Doc. 735* at pp. 24:7-26-11; 117:23-118:28. So, should the Court conclude that Mr. Narvaez exported the Gerard's server PST to a cleanly formatted hard drive, the existence of data in the unallocated space of that hard drive is strong evidence of post-export deletion.

      iii.    <u>Plaintiff's Key Assumptions Are Undermined by Evidence or Lack Thereof</u>

        (1) *No evidence that Mr. Narvaez began Gerard PST export with clean drive*

It is uncontroverted that it is the best practice to export a PST in these circumstances to a clean hard drive. However, Plaintiff has provided no evidence that Mr. Narvaez did so. First, Plaintiff did not ask Mr. Narvaez if he did so, and Mr. Narvaez never indicated either way. *Doc. 735* at p. 26:13-22. Second, Mr. Novoa testified that he was unable to make such a determination through his analysis of the hard drives. *Id.* at p. 119:7-21. Finally, as Mr. Wilson testified, there were several "deficiencies in the collection process used by Mr. Narvaez." *Id.* at pp. 74:18-75:5. For example, Mr. Wilson testified that Mr. Narvaez did not follow "best practices" such as (1) failing to maintain any documentation for his collection; (2) failing to note the total message count on the server; (3) failing to include messages from the Transport Dumpster; (4) failing to restore recoverable items; (5) failing to create log files and check

them for errors; (6) failing to generate a digital signature for the PST files; (7) failing to create an acquisition document log; (8) failing to establish a chain of custody; and (9) failing to use a forensic sound copy process.[4]  *Id.* at pp. 78:20-80:7.  While several of Mr. Wilson's noted deficiencies are in dispute, his criticism of Mr. Narvaez's work is inconsistent with Plaintiff's assumption that Mr. Narvaez followed best practices in using a clean hard drive.

In summary, Plaintiff suggests despite all these noted deficiencies in Mr. Narvaez's collection process, the Court should assume that he followed best practices in using a clean hard drive to conduct the export of the Gerard PST file.  I cannot reach such a conclusion based on the evidence and testimony provided, as it is very possible that Mr. Narvaez used a hard drive which contained dirty target media.  Further, it is possible that Mr. Narvaez used a clean hard drive and encountered an error in his first attempt to export the PST file.  Mr. Wilson testified that during the interview Mr. Narvaez stated that "if a collection failed, he would re-collect it."  *Doc.* 735 at 80:11-15.  While Mr. Narvaez did not state whether he performed a second collection after an error occurred, Mr. Read stated that the existence of data on the unallocated space of the hard drive "is likely a result of the process used by Mr. Narvaez and may include an action such as interrupting the export process, deleting the contents of the PST, and

---

[4] Additionally, as described above, it seems that Mr. Narvaez failed to accurately explain his export process, as he explained a client-side collection instead of the server-side collection he performed.

then restarting the export." *Doc. 707-3* at 5; *see also doc. 735* at pp. 80:8-15, 135:18-136:1.

In his declaration, Mr. Read stated that "[t]he items in the unallocated space of Hard Drive-I are likely artifacts of the method employed by T-Systems to export the PST files." *Doc. 685-3* at 3.

For all these reasons, the Court finds that the presence of data in the unallocated hard drive space does not prove by a preponderance of evidence that intentional deletion occurred.

### (2) *Export logs reflect a "server-side" export*

In March 2017, Defendants retained a forensic consulting firm, Stroz Friedberg, to review the Gerard PST. *Doc. 685-1* at 11. As part of that review, Stroz Friedberg discovered logs which Defendants claim were generated as a result of T Systems's collection. *Doc. 673* at 22; *doc. 673-3* at 68; *doc. 685-1* at 11. For all but two of the forty-three employees, the log results state "Search Succeeded." *Doc. 685-3* at 20-64. The only logs which suggest errors are those of Dr. Gerard, which states "Search failed," and of Todd Sandman,[5] which states "Search partially succeeded." *Id.* at 29, 64. The logs "confirm that the collection included deleted items," which is indicative of a server-side collection. *Doc. 685-3* at 2, 20-64 (logs showing "Search Dumpster: True"). Experts for

---

[5] Defendants explain that after a recollection of Mr. Sandman's PST, both Epiq and Stroz Friedberg confirmed that all email fragments have an active copy within Mr. Sandman's PST. *See doc. 685* at 15-16; ; *doc. 685-2* at 12; *doc. 685-3* at 8. Plaintiff does not contest this conclusion with regard to Mr. Sandman. *See generally doc. 695*.

both Plaintiff and Defendants agree that the logs, if genuine, were created by a server-side export.  *See doc. 673-1* at 18 (Mr. Wilson stating that "[t]he export logs appear to have been created by the Multi-Mailbox Search function of Exchange 2010 which would mean that a server-side export was performed"); *doc. 685-3* at 2 (Mr. Read stating that "the export logs associated with T Systems' collection process show that a server-side collection was performed").

Admittedly, Plaintiff contends that the Court should not accept that the logs are genuine.  It points to Mr. Narvaez's repeated statements that describe a client-side export.  Further, Mr. Wilson testified that Mr. Narvaez "said he had no logs available, [and] did not generate logs for these collections."  *Doc. 735* at pp. 77:23-78:1.  Mr. Wilson also noted several inconsistencies with the logs found by Stroz Friedberg, including: (1) the time stamps indicate that the exports occurred in the evening and nighttime, whereas Mr. Narvaez stated that he conducted the exports during daytime hours; (2) the exports were email only and did not include calendar and task items; and (3) some of the logs had did not contain full logging information.  *Doc. 735* at pp. 95:12-96:21.

Notwithstanding these valid points, the Court finds that the logs discovered by Stroz Friedberg are valid and reliable.  First, it is uncontroverted that the logs were found where automatically generated server-side export logs would be saved.  *Doc 735* at pp. 98:7-14; 255:4-11.   Second, all experts agree that, on their face, the logs appear consistent with such automatically generated logs.  *Id.* at pp. 128:2-23; 237:8-238:5.

Finally, the only alternative – that the logs are a complete fraud and forgery – is simply not believable in these circumstances. It is not that the Court cannot imagine such willful conduct by a party faced with litigation of this scope. But in this case, such a claim is particularly difficult to accept. First, as Mr. Read testified, forging such logs this well would be nearly impossible. *Id.* at pp. 274:18-275:9. Second, forging these logs at the beginning on the off-chance that they could be used to prove a server-side export years in the future seems impossibly prescient. Third, if one were to go to all the trouble of creating such a forgery, one would expect them to easily avoid some of the odd inconsistencies pointed out by Mr. Wilson. Finally, if one were to forge logs to prove a server-side export, you would expect them to ensure that Mr. Narvaez made sure to describe such an export.

Having concluded that the logs are reliable, they prove that Mr. Narvaez conducted a server-side export of Dr. Gerard's PST. Consequently, the existence of free space in that PST does not establish intentional deletion of emails from it. Instead, the log shows that there was a massive error in the export of the Gerard PST. Consequently, when the flawed Gerard PST was opened by Epiq, it contained about 1% of the data it should have contained.

iv.   <u>Conclusion</u>

Plaintiff has not demonstrated by a preponderance of the evidence that Defendants intentionally deleted emails that should have been disclosed. While the

errors in collection were either avoidable or immediately rectifiable, they were unintentional.

     **c.**      *Privilege Designations*

Plaintiff argues that Defendants used privilege designations for the purpose of concealing documents and information. *Doc. 673* at 23-26. On November 17, 2014, Plaintiff served Defendants with its First Set of Document Requests. *Doc. 604* at 4. Defendants served its responses and objections to the document requests on January 23, 2015. *Id.* On January 22, 2016, Defendants produced their privilege and redaction logs to Plaintiff. *Id.* at 5; *doc. 673* at 23. On March 15, 2016, Plaintiff objected to 2,831 of the 4,143 entries to which Defendants included in the logs. *Doc. 604* at 5; *doc. 673* at 23. After conducting a re-review, Defendants produced 1,095 documents which were originally listed on the privilege log and 864 documents which were originally listed on the redaction log. *Doc. 604* at 5; *doc. 673* at 23. Plaintiff then objected to all 1,312 remaining listings on the privilege and redaction logs, stating that it no longer had confidence in Defendants' privilege designations. *Doc. 445-11*; *doc. 604* at 5-6. Defendants then conducted a second re-review, and produced an additional 861 documents. *Doc. 604* at 65-6.

On July 14, 2016, Plaintiff filed a Motion to Compel and for Sanctions against Defendants, which included a request "that the Court appoint a Special Master to conduct an independent *in camera* review" of the remaining records withheld and

redacted by Defendants. *Doc. 445* at 3. On August 11, 2016, the Court appointed a Special Master to review Defendants' privilege designations. *See doc. 470.* The Special Master found that 197 additional documents "are not protected by the attorney client privilege or work product doctrine or are to be produced as part of a subject matter waiver." *Doc. 604* at 30; *doc. 604-1.* On February 17, 2017, the Court adopted the Special Master's Report and Recommendations and ordered Defendants to produce the additional documents. *Doc. 606.*

Plaintiff argues that Defendants abused their privilege by continuously misrepresenting the contents of documents which were incorrectly designated as privileged. *Doc. 673* at 25-26; *see also doc. 445.* However, as discussed above, the harsh sanctions of default judgment or an adverse jury instruction require a finding of "willfulness, bad faith, or some fault of the offending party." *EBI Sec. Corp.*, 85 F. App'x at 108. Here, although the Special Master found that Defendants had over-designated documents as privileged, he did not find that Defendants were "unduly or unjustifiably delayed in responding to and trying to resolve the dispute, acted in bad faith[,] or otherwise engaged in inexcusable conduct." *Doc. 604* at 20. The Special Master incorporated this finding into his conclusion, as he specifically "recommend[ed] a finding that neither party acted in bad faith." *Id.* at 29.

In fully adopting the Special Master's Report and Recommendation and considering the entire history of Defendants' over-designations and re-reviews, I agree

that Defendants did not act in bad faith.  Therefore, I recommend that the sanctions of

default judgment or an adverse jury instruction are not warranted.  However, this does

not mean that Defendants are free from blame.  It is clear that Defendants over-

designated documents as privileged, and that even their re-reviews were insufficient to

fix their own errors.  As a result, Plaintiff was required to repeatedly assert objections

until the Special Master ultimately resolved the issue.  Therefore, as discussed below, I

find that a lesser sanction against Defendants is warranted and would "serve the

interest of justice." *In re Rains*, 946 F.2d at 733.

### d. *Billing and Claims Data Production*

Plaintiff argues that Defendants failed to produce usable billing and claims data

in a timely manner.  *Doc. 673* at 9-13.  Specifically, Plaintiff claims that the billing and

claims data produced by Defendants on February 18, 2016 was unusable.  *Id.* at 10.

Plaintiff alleges that Defendants were required to produce new billing data, and that

they did so on June 24, 2016.  *Id.*  However, Plaintiff argues that Defendants did not

produce a complete set of billing data until February 7, 2017.  *Id.* at 10-12.  Likewise,

Plaintiff alleges that Defendants did not produce a complete set of claims data until

September 2, 2016.  *Id.* at 12-13.

Defendants argue that they produced all requested billing data on July 21, 2016,

and produced all requested claims data on July 28, 2016.  *Doc. 685* at 17.  Defendants

claim that the delay in producing all of the requested data occurred because Plaintiff

continuously requested additional data and was unclear in its requests. *Id.* at 18.

Defendants argue that once Plaintiff clarified its requests, Defendants sent the

additional billing and claims data. *Id.*

Regardless of whether Defendants intentionally delayed in producing usable

billing and claims data, sanctions are not warranted because Plaintiff has suffered no

prejudice. The parties agree that by February 7, 2017, Defendants had produced a

complete usable set of billing and claims data as requested by Plaintiff. *Doc. 673* at 12;

*doc. 685* at 18. On February 8, 2017, Plaintiff filed an unopposed motion to extend the

expert deadlines "so as to incorporate [the additional data sent by Defendants]." *Doc.*

*597*. On February 14, 2017, the Court granted this unopposed motion and extended the

expert deadlines. *Doc. 600.* Therefore, the Court has already provided a remedy for any

unnecessary delays by Defendants in producing usable billing and claims data. As

Plaintiff can demonstrate no prejudice resulting from any such delays, I find that the

severe sanctions requested by Plaintiff are not warranted.

### e. *Mike West Documents*

Plaintiff alleges that Defendants should be sanctioned for their mistake of

disclosing ESI for the wrong Mike West. *Doc. 673* at 15-16. Plaintiff claims that

Defendants failed to provide a proper explanation as to how the error occurred, and

should have discovered the error much earlier than they did. *Id.* Plaintiff states that

Defendants originally produced zero documents from Mike West, but after the error

was resolved Defendants produced 1,836 documents.  *Id.* at 16.  Defendants explain that they did not discover the error until after Plaintiff sent them a letter inquiring as to a specific email.  *Doc. 685* at 6.  Defendants maintain that this issue has been fully resolved, as Defendants immediately produced the documents from the correct Mike West and Plaintiff conducted a second deposition on October 26, 2016.  *Id.*

The Court finds that the collection of documents from the wrong Mike West was an inadvertent error and not done in bad faith.  The ESI was collected not by Defendants' counsel but instead by Defendants' IT department, and such an error may not have been obvious to those employees who conducted the collection.  Plaintiff has received the documents from the correct Mike West, and the Court granted Plaintiff the opportunity to conduct a second deposition.  *See doc. 504* at 2-3; *doc. 532* at 2. Additionally, the Court granted Plaintiff the opportunity to conduct five additional depositions as a follow-up to the information obtained in the Mike West disclosures. *Doc. 557*; *see also doc. 555* at 3.  Further, the correct Mike West was subject to the original litigation hold put in place by Defendants in May 2012.  *Doc. 685-1* at 3.  Therefore, I find that the severe sanctions requested by Plaintiff are not warranted for this mistake.

### f.  *Production of Hard Copy Documents*

Plaintiff alleges that Defendants did not properly collect hard copy documents in discovery.  *Doc. 673* at 13.  Plaintiff states that multiple employees testified that they took handwritten notes and that those documents were never collected and produced to

Plaintiff until late in discovery. *Id.* at 13-15. Specifically, Plaintiff asserts that Defendants failed to collect hard copy documents from Dennis Batey, Anne Greenberg, Jennifer Ellis, Mike West, and Dean Putt. *Id.* at 13-15. Defendants assert that they asked employees "to identify any hard copy documents that could potentially contain responsive material," and then collected any such material. *Doc. 685* at 19.

Although Defendants may not have produced all hard copy documents prior to the depositions of their employees, almost all of the hard copy documents were produced following the depositions. *Doc. 673* at 13-15. Plaintiff states that Defendants produced hard copy documents from employees Anne Greenberg, Jennifer Ellis, and Mike West following their depositions. *Id.* Further, Defendants have asserted that they produced all non-privileged hard copy documents from Dennis Batey. *Doc. 685-1* at 15. Had Plaintiff objected to the late production of these hard copy documents, Plaintiff could have requested that the Court allow additional depositions of these employees. Plaintiff did not do so. Given Plaintiff's decision not to seek less severe sanctions which could remedy these issues, more severe sanctions are not warranted.

The only remaining issue relates to Plaintiff's suggestion that Defendants may have failed to search for hard copy documents of the referral cards described by Dean Putt in his deposition. *See doc. 673* at 14-15. However, Plaintiff notes that Defendants did represent that they searched for the referral cards, and is concerned because Defendants "did not say whether they searched for any physical copies." *Id.* at 15.

Defendants are hereby ordered to certify to Defendants that they searched for physical copies of such items and the results of said search. At this time, no further sanctions related to this issue are appropriate.

### III.  CONCLUSION

The Court concludes that the harsh sanctions of default judgment or an adverse jury instruction are not warranted. While Defendants made many mistakes and were often uncooperative in attempting to resolve issues raised by Plaintiff, the I find that they did not act in bad faith. Therefore, I recommend that the Court deny Plaintiff its requested sanctions of default judgment or an adverse jury instruction. However, I find that Defendants are responsible for the many issues that arose during the course of discovery, and conclude that lesser sanctions are appropriate. *See Browder*, 187 F. Supp. 3d at 1295-96 (D.N.M. 2016) ("Among [the Court's] inherent powers is the ability to fashion an appropriate sanction . . . include[ing], for example: "an award of attorney fees; an order that the culpable party produce related documents regardless of any claims of privilege or immunity; excluding evidence or striking part of a party's proof; allowing the aggrieved party to question a witness in front of the jury about the missing evidence; and imposing costs for creating a substitute for spoliated data.") (internal quotations and citations omitted).

Defendants' over-designation of documents as privileged, as discussed above, constitutes their most egregious discovery violation. Defendants over-designated

documents in their original privilege and redaction logs, then did so a second time after

conducting their first re-review, and then did so a third time after conducting their

second re-review. Despite multiple chances to correct their errors, Defendants

continued to withhold documents and information on an improper claim of privilege.

Because of Defendants' continued violations, Plaintiff was forced to file a Motion to

Compel and for Sanctions (*doc. 445*), and a Special Master finally resolved the issue over

a year after Defendants' produced their initial privilege and redaction logs. Therefore,

Defendants shall pay Plaintiff costs associated with its Motion to Compel and for

Sanctions (*doc. 445*), which was denied by the Court without prejudice due to the

assignment of the Special Master to resolve the issue. *See doc. 453* at 1-2. Defendants

shall also pay Plaintiff costs associated with its briefing of the issues resolved by the

Special Master's first Report and Recommendations. *See doc. 604*. Finally, Defendants

shall also pay Plaintiff's costs in preparing objections to Defendants' privilege

designations throughout the course of this lawsuit.

Next, I find that Defendants were negligent in their production of ESI in the

course of litigation. Moreover, their response to the issues raised by Plaintiff were

inadequate to quell Plaintiff's justifiably rising suspicion. As discussed more fully

above, Defendants committed the following errors in producing ESI:

a. Defendants' IT department failed to implement the May 2012 litigation hold

on ESI. It is undisputed that Defendants' IT department did not implement

the litigation hold on Defendants' Live Exchange Server at that time, and it is uncertain whether the IT department even implemented the March 2013 litigation hold at any point.

b. Defendants failed to ensure that the export process would create quality information for use in litigation.  Defendants failed to notice T Systems's error until Plaintiff asked for the location of an email which it believed should have been located within the Gerard PST.  Defendants should have ensured that the exports were conducted successfully and immediately performed a recollection of any exports which either resulted in negative expansion or produced logs containing an error message.

c. Defendants, through T Systems, likely either used a hard drive containing dirty target media or conducted a recollection on a hard drive which contained email fragments from a previous failed collection.

d. Defendants, through T-Systems and Mr. Narvaez, failed to properly record the chain of custody for the hard drives containing the server PST exports.

e. Defendants, through T Systems and Mr. Narvaez, failed to accurately describe the collection method used to export the Gerard PST.  Mr. Narvaez described a client-side collection, yet the logs demonstrate that he actually conducted a server-side collection.

f.  Defendants failed to discover the export logs until March 2017, which was several months after Plaintiff began questioning the efficacy of Defendants' expert procedures and the existence of such logs.  This delay necessitated Plaintiff's filing of the Motion for Sanctions without the benefit of a crucial piece of evidence.

g.  Defendants' collected documents from the wrong Mike West, which caused the Court to order a second deposition of Mike West as well as additional depositions of other employees in order to follow-up on information gathered during the second Mike West deposition.

Considering all of this evidence in conjunction, I find that Defendants' negligence resulted in many of the errors in producing ESI which caused Plaintiff to believe the instant motion to be necessary.  While this negligence does not support the severe sanctions of default judgment or an adverse jury instruction as requested by Plaintiff, a lesser sanction against Defendants is warranted and would "serve the interest of justice."  *In re Rains*, 946 F.2d at 733.  Therefore, I recommend that Defendants be ordered to pay Plaintiff 75% of the costs associated with its Motion for Sanctions (*doc. 673*),[6] including all fees paid to expert witnesses to prepare reports and testify at the motion hearing.

---

[6] However, this total shall not include the fees and costs associated with the preparation and filing of the motions in limine found at *docs. 697* and *doc. 699*.

Plaintiff's motion for sanctions seeks dispositive relief and, in the alternative, relief related to the conduct of the trial. Those requests fall within the authority of the presiding judge to grant or deny. *See* 28 U.S.C. § 636(b)(1). Consequently, the undersigned has herein recommended denying the severe sanctions but instead granting costs associated with the motion for sanctions. Both these recommendations are subject to *de novo* review should a party file written objections with the Clerk pursuant to 28 U.S.C. § 636(b)(1). If these recommendations are accepted by the presiding judge, a subsequent order will direct the filing of affidavits outlining the costs and fees to be charged to Defendants and will set a timeline for objections to such affidavits.

In contrast, the ruling above directing Defendants to pay the costs associated with privilege over-designation relates to a pre-trial matter. Consequently, the undersigned possesses the authority to order those costs under 28 U.S.C. § 636(b)(1)(A). While that order may of course be appealed to the presiding judge, there is no need to await the ordering of affidavits. Therefore, within ten days of the filing of this document, Plaintiffs shall file an affidavit outlining expenses ordered in connection with the privilege over-designation. Defendants' objections to the amount claimed, if any, shall be filed within ten days of the filing of the affidavits.

**IT IS SO ORDERED.**

_____
GREGORY B. WORMUTH
UNITED STATES MAGISTRATE JUDGE