# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW MEXICO

NEW MEXICO ONCOLOGY AND
HEMATOLOGY CONSULTANTS, LTD.,

        Plaintiff,

v.                                                                      Civ. No. 12-00526 MV/GBW

PRESBYTERIAN HEALTHCARE SERVICES,
PRESBYTERIAN NETWORK, INC.,
PRESBYTERIAN INSURANCE COMPANY, INC.,
and PRESBYTERIAN HEALTH PLAN, INC.

        Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Defendants' Motion for Summary Judgment

[Doc. 624]. The Court, having considered the motion, briefs, and relevant law, and being

otherwise fully informed, finds that the motion is well-taken and will be granted.

## BACKGROUND

Plaintiff New Mexico Oncology and Hematology Consultants, Ltd. ("NMOHC") was

founded in 1987 by partners Dr. Barbara McAneny and Dr. Clark Haskins. Plaintiff's ("P.") Ex.

1-35. Dr. McAneny is now the Chief Executive Officer ("CEO") of NMOHC. *Id.* NMOHC is

an independent, physician-owned practice that offers patients a full range of oncology-related

services, including medical oncology, radiation oncology, diagnostic imaging, laboratory testing,

genetic counseling, pharmacy services, and hematology services. Defendants' Statement of

Material Facts ("SMF") 1, Third Amended Complaint ("TAC") ¶ 24; P. Ex. 4-A ¶ 9. NMOHC

operates the New Mexico Cancer Center ("NMCC") in Albuquerque, as well as satellite facilities

in Gallup, New Mexico and Silver City, New Mexico. P. Ex. 2-A ¶ 14. Currently, NMOHC

employs ten medical oncologists and three radiation oncologists, as well as six nurse practitioners certified in medical oncology.  P. Ex. 4-A ¶ 9.

Presbyterian Healthcare Services ("PHS") is an integrated healthcare system in New Mexico that participates in multiple markets, including the private health insurance market, the oncology market, and the inpatient hospital services market.  SMF 2, TAC ¶¶ 37, 39, 46. Specifically, PHS owns eight hospitals, including its flagship facility Presbyterian Hospital in Albuquerque, Presbyterian Medical Group ("PMG"), a physician practice with over 800 physicians and over 2,500 nurses, and the Southwest Health Foundation.  P. Ex. 4-A ¶ 10.  The Southwest Health Foundation, in turn, owns Presbyterian Network, Inc., which is the parent company of both Presbyterian Insurance Company, Inc. and Presbyterian Health Plan, Inc. ("PHP").  *Id.*

Plaintiff filed its Complaint against PHS and Presbyterian Network on May 16, 2012 [Doc. 1], and its Second Amended Complaint ["SAC"] against those same Defendants on February 13, 2013 [Doc. 24].  In the SAC, Plaintiff asserted monopolization and attempted monopolization antitrust claims under Section 2 of the Sherman Act, 15 U.S.C. § 2, and under the New Mexico Antitrust Act ("NMAA"), N.M. Stat. Ann. § 57-1-2.  Plaintiff's monopolization claims arise out of Defendants' alleged willful maintenance of a monopoly and/or monopsony[1] in the market for private health insurance services through the alleged anticompetitive acts of lowering Plaintiff's reimbursement rates, threatening to terminate Plaintiff's provider contract, and entering into an exclusive arrangement with United HealthCare ("United").  Doc. 24 ¶¶ 471-76, 483-89.  Plaintiff's attempted monopolization claims arise out of Defendants' alleged attempt

---

[1] "Monopsony power is market power on the buy side of the market.  As such, a monopsony is to the buy side of the market what a monopoly is to the sell side and is sometimes colloquially called a 'buyer's monopoly.'"  *Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co., Inc.*, 549 U.S. 312, 320 (2007).

to monopolize the comprehensive oncology services market by engaging in the same acts that maintained their monopoly in the private health insurance markets and by committing the additional acts of limiting referrals to Plaintiff's physicians and requiring Plaintiff's patients to purchase chemotherapy drugs from Presbyterian Hospital's pharmacy. *Id.* ¶¶ 477-82, 490-95.

Additionally, Plaintiff asserted state law claims for tortious interference with existing and prospective contractual relationships arising out of Defendants' alleged use of improper means to prevent and prohibit referrals to Plaintiff and to prevent Plaintiff's patients from purchasing chemotherapy drugs from Plaintiff and using Plaintiff's chemotherapy infusion center. *Id.* ¶¶ 496-503, 517-25. Plaintiff further asserted state law claims of injurious falsehood and unfair competition arising out of Defendants' alleged misrepresentation of Plaintiff's provider status to patients, Defendants' coercion of patients to switch to Presbyterian Hospital's physicians, their pressure on their physicians to refer patients in-house instead of to Plaintiff, their interference with the ability of their physicians to make referrals to Plaintiff, and their alleged illegal receipt and sale of drugs purchased at a discount from pharmaceutical manufacturers under the federal 340B program[2] (referred to herein as the "340B drugs" and the "340B program") and sold in violation of program guidelines to reap inflated profits. *Id.* ¶¶ 8, 12, 505. Finally, Plaintiff asserted a claim under the federal Racketeer Influenced and Corrupt Organizations Act ("RICO") arising out of Defendants' aforementioned alleged illegal receipt and sale of 340B drugs, and Defendants' issuance of a "mandate" requiring seniors covered by PHP's health insurance to purchase their chemotherapy drugs (including 340B drugs) from Presbyterian Hospital's pharmacy instead of from Plaintiff (hereinafter referred as the "Mandate"). Doc. 24 ¶¶ 8-12.

---

[2] This program is codified at 42 U.S.C. § 256b.

PHS and Presbyterian Network moved to dismiss with prejudice all claims in the SAC pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim. Doc. 33. In a Memorandum Opinion and Order entered on August 22, 2014 ("2014 Opinion"), the Court granted the motion to dismiss only as to Plaintiff's state law claim for injurious falsehood and Plaintiff's RICO claim. Doc. 79. The Court denied the motion as to Plaintiff's remaining claims. *Id.*

Thereafter, Plaintiff filed the TAC, adding Presbyterian Insurance Company and PHP as Defendants. Doc. 123. PHS, Presbyterian Network, Presbyterian Insurance Company, and PHP are now Defendants in this action, and are referred to herein collectively as "Defendants." In the TAC, Plaintiff added federal and state monopolization antitrust claims, alleging that Defendants willfully maintained a monopoly in the inpatient hospital services market and used that monopoly to drive Plaintiff out of the market for oncology services. Defendants moved to dismiss these new antitrust claims. Doc. 141. In a Memorandum Opinion and Order entered on March 14, 2016 ("2016 Opinion"), the Court granted the motion to dismiss, finding that Plaintiff failed to allege an antitrust injury as to the inpatient hospital services market, and thus lacked standing to bring a monopolization claim based on Defendants' alleged monopoly of the inpatient hospital services market. Doc. 316.

As a result of the Court's rulings in the 2014 Opinion and the 2016 Opinion, the claims remaining in this action are: Plaintiff's monopolization claims under Section 2 of the Sherman Act and the NMAA arising from Defendants' alleged monopolization of the private health insurance markets (Counts I and IV); Plaintiff's attempted monopolization claims under Section 2 of the Sherman Act and the NMAA arising from Defendants' alleged attempt to monopolize the oncology market (Count III and VI); Plaintiff's state law tortious interference claims arising

from Defendants' alleged referral practices (Count VII) and the Mandate (Count X); and Plaintiff's state common law unfair competition claim arising from Defendants' alleged coercion of patients to switch to Presbyterian Hospital's physicians, their pressure on their physicians to refer patients in-house instead of to Plaintiff, their interference with the ability of their physicians to make referrals to Plaintiff, and their alleged illegal receipt and sale of drugs purchased at a discount from pharmaceutical manufacturers under the federal 340B program and sold in violation of program guidelines to reap inflated profits (Count VIII).[3]

## STANDARD

The court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party need not "produce evidence showing the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Rather, "the burden on the moving party may be discharged by 'showing' – that is, point out to the district court – that there is an absence of evidence to support the nonmoving party's case." *Id.*; *see also Sports Unltd., Inc., v. Lankford Enter., Inc.*, 275 F.3d 996, 999 (10th Cir. 2002) (Although "[t]he burden of showing that no genuine issue of material fact exists is borne by the moving party," when "the moving party does not bear the ultimate burden of persuasion at trial, it may satisfy its burden by pointing to a lack of evidence for the nonmovant on an essential element of the nonmovant's claim"). Once the moving party has met this burden, the nonmoving party must "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine

---

[3] Rather than set forth the entirety of the voluminous facts in this background section, the Court provides the facts relevant to each of Plaintiff's claims in the context of discussing each claim.

issue for trial." *Id.* at 324. In making this showing, the nonmoving party may not rely on "the mere pleadings themselves." *Id.*

For purposes of Rule 56(a), a dispute is genuine "if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Becker v. Bateman*, 709 F.3d 1019, 1022 (10th Cir. 2013). "An issue of fact is material if under the substantive law it is essential to the proper disposition of the claim." *Id.* (citation omitted). In other words, "[t]he question . . . is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* (citation omitted). On summary judgment, the court "construe[s] the factual record and the reasonable inferences therefrom in the light most favorable to the nonmoving party." *Mata v. Saiz*, 427 F.3d 745, 749 (10th Cir. 2005).

## DISCUSSION

I.    Monopolization Claims (Counts I and IV)

"Illegal monopolization under § 2 of the Sherman Act has two distinct elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *SOLIDFX, LLC v. Jeppesen Sanderson, Inc.*, 841 F.3d 827, 841 (10th Cir. 2016) (citation omitted). [4] To establish its

---

[4] In evaluating Plaintiff's New Mexico Antitrust Act claims, the Court generally follows authority interpreting claims under Section 2 of the Sherman Act. The NMAA specifically directs courts to construe the state act "in harmony with judicial interpretations of the federal antitrust laws." N.M. Stat. Ann. § 57-1-15; *accord Smith Machinery Corp. v. Hesston, Inc.*, 694 P.2d 501, 505 (N.M. 1985) (recognizing that the NMAA specifically provides that it is to be construed "in harmony with judicial interpretations of the federal antitrust laws") (citing N.M. Stat. Ann. § 57-1-15); *Romero v. Philip Morris, Inc.*, 242 P.3d 280, 291 (N.M. 2010) (explaining that "[t]o prove a cause of action under the Antitrust Act the Legislature requires that 'the Antitrust Act *shall* be construed in harmony with judicial interpretations of the federal antitrust laws'" and that "'[t]his construction shall be made to achieve uniform application of the state and

monopolization claims, Plaintiff thus must show both "power in a relevant market" and "anticompetitive," or exclusionary conduct. *Christy Sports, LLC v. Deer Valley Resort Co., Ltd.*, 555 F.3d 1188, 1192 (10th Cir. 2009). Defendants ask the Court to grant summary judgment in their favor on Plaintiff's monopolization claims on the ground that there is no evidence to demonstrate either of these elements.

A.    Possession of Monopoly Power

To establish that Defendants possess monopoly power, Plaintiff must first "identify[] the relevant product market," and then demonstrate that Defendants have "both power to control prices and power to exclude competition" in that market. *Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*, 762 F.3d 1114, 1119-20 (10th Cir. 2014); *Reazin v. Blue Cross & Blue Shield of Kansas, Inc.*, 899 F.2d 951, 966-67 (10th Cir. 1990). "Power over price and competition may depend on various market characteristics, such as market trends, number and strength of competitors, and entry barriers." *Cohlmia v. St. John Med. Ctr.*, 693 F.3d 1269, 1282 (10th Cir. 2012). Market share, while "relevant to the determination of the existence of [] monopoly power," is not alone dispositive. *Reazin*, 899 F.2d at 967. In *Reazin*, the Tenth Circuit specifically stated that "market share percentages may give rise to presumptions, but will rarely conclusively establish or eliminate [] monopoly power." *Id.* at 968; *Cohlmia*, 693 F.3d at 1282 ("[T]he absence of market share may give rise to a presumption that market power does not

_____

federal laws prohibiting restraints of trade and monopolistic practices'") (quoting N.M. Stat. Ann. § 57-1-15) (additional citation omitted). Moreover, New Mexico courts have specifically held that they draw upon federal interpretations of the Sherman Act to define the scope of liability under the NMAA, *see Smith Machinery Corp.*, 694 P.2d at 505 ("In the absence of New Mexico decisions directly on point, we look to federal cases involving allegations of antitrust arrangements under Section 1 of the Sherman Act."), and that "[i]t is the duty of the courts to ensure that New Mexico antitrust law does not deviate substantially from federal interpretations of antitrust law," *Romero*, 242 P.3d at 291. Thus, throughout this opinion, the Court relies on federal authority interpreting the Sherman Act in deciding the NMAA claims.

exist."). Accordingly, in *Reazin*, the Court found that the defendant health insurer's market share, estimated to be between 45 percent and 62 percent of the relevant market, was "such that there could be at most a presumption of a lack of monopoly or market power." *Id.* at 970. The Court "disagree[d] with [the insurer] that such a market share *prohibits*, as a matter of law, a conclusion of market or monopoly power." *Id.* at 970 (emphasis in original). The Court then turned "to other characteristics of the private health care financing market at issue and to more specific evidence of [the insurer's] power over price and competition," including the maintenance of its "dominant position in the market." *Id.* The *Reazin* Court found the following non-exclusive factors relevant to the monopoly power inquiry: "the number and strength of the defendant's competitors, the difficulty or ease of entry into the market by new competitors, consumer sensitivity to changes in prices, innovations or developments in the market, [and] whether the defendant is a multimarket firm." *Id.* at 967 n.23.

Here, Plaintiff's expert, Dr. Bradley N. Reiff, identified two markets relevant to Plaintiff's monopolization claims.[5] First, Dr. Reiff determined that "commercial health insurance purchased by employers based in Albuquerque" is a relevant market. P. Ex. 2-A ¶ 31. He then identified two subsets of this relevant market: (1) commercial fully insured covered lives, which "generally applies to smaller employers and individuals" – "where the employer or the individual is fully insured from the insurance company" – and (2) commercial self-insured covered lives, which "generally corresponds to larger employers and does not include individuals" – "where the insurance company is really administering a policy." P. Ex. 2-A ¶ 67-68; P. Ex. 1-12 at 11-12. Dr. Reiff also determined that Medicare Advantage – a program

---

[5] For purposes of their motion, Defendants accept Dr. Reiff's identification of the relevant markets in connection with Plaintiff's monopolization and attempted monopolization claims. Doc. 624 at 6 n.7. Accordingly, there is no dispute of fact as to this issue.

providing premium support for beneficiaries signing up with private health companies, which is generally not available to individuals under the age of 65 – is "a separate relevant market." *Id.* ¶ 36-40.

Defendants argue that Plaintiff's monopolization claims fail because Defendants' share of these markets, as calculated by Dr. Reiff, "is well below the level that could support a claim of monopolization." Doc. 624 at 17. Specifically, as to commercial fully insured health insurance (the first subset of the market of commercial health insurance), Dr. Reiff identified the following health insurers as participants in the market from 2008 to 2015: Defendant PHP, Blue Cross Blue Shield ("BCBS") of New Mexico, Lovelace Health, United, out of state BCBS, Cigna, New Mexico Health Connections ("NMHC"), and Aetna. *Id.* at 52 (Table IV-1). From 2009 through 2015, PHP consistently had the highest market share in this category. *Id.* At its highest point in 2013, PHP's share was 54.7 percent. *Id.* Most recently, in 2015, PHP had a 49.6 percent share of the market, followed by BCBS with 24.9 percent, NMHC with 8.3 percent, United with 5.6 percent, out of state BCBS with 3.6 percent, Aetna with 1.7 percent, and Cigna with .8 percent. *Id.* According to Dr. Reiff, this data may "understate PHP for employer-based fully insured" lives, because it includes self-insured individuals. P. Ex. 1-12 at 111-12.

Next, as to commercial self-insured health insurance (the second subset of the market of commercial health insurance), Dr. Reiff identified the following health insurers as participating in the market from 2008 to 2015: PHP, BCBS, United, Cigna, Lovelace Health, Aetna, and out of state BCBS. P. Ex. 2-A at 53 (Table IV-2). At its highest point, in 2008, PHP had the highest share of 33.8 percent, followed by Cigna with a 27.3 percent share. *Id.* Although its share declined thereafter, PHP continued to have the highest share in this category through 2013, at which point its share was 26.8 percent, followed by BCBS with a 26.3 percent share. *Id.* In

2014 and 2015, however, BCBS had the highest share. *Id.* Specifically, in 2014, BCBS had a 34.6 percent share and PHS had a 26.3 percent share, and in 2015, BCBS had a 35.2 percent share and PHP had a 26.8 percent share. *Id.* United was third in 2014 and 2015 with shares of 21.6 percent and 20.7 percent, respectively. *Id.*

Third, as to the Medicare Advantage market (the second relevant market identified by Dr. Reiff), Dr. Reiff identified the following health insurers as participants from 2008 to 2015: PHP, Health Care Service Corp. (BCBS), United, Cigna, Lovelace Health, Aetna, and out of state BCBS. *Id.* (Table IV-3). From 2011 to 2015, PHP had the highest share in this market. *Id.* Most recently, in 2015, at its highest point, PHP had a share of 48.2 percent, followed by BCBS with a 32 percent share, United with a 9 percent share, and out of state BCBS with a 2.4 percent share. *Id.*

Defendant is correct that, according to Dr. Reiff's calculations, PHP's most recent share in each of the relevant markets and submarkets is below 50 percent. Doc. 624 at 17. The Court cannot agree, however, that this is fatal to Plaintiff's monopolization claims. As explained in the 2014 Opinion, Defendants' theory that a threshold market share percentage must be met in order to sustain a monopolization claim is inconsistent with binding Tenth Circuit precedent. *See* Doc. 79 at 20-23. Indeed, as noted above, *Reazin* specifically held that a 45 percent to 62 percent share of a health insurance market – a range virtually identical to the one calculated here – does not foreclose a conclusion of monopoly power. Accordingly, consistent with *Reazin*, the Court determines that Dr. Reiff's market share calculations do not as a matter of law disprove that PHP possesses monopoly power, but rather give rise to a presumption that PHP lacks monopoly power.

In the 2014 Opinion, applying three of the four factors identified in *Reazin*, this Court held that several allegations in the SAC, if proven, would establish that despite its market share, PHP possesses monopoly power. *See id.* at 23-26. As to the first *Reazin* factor, number and strength of competitors, the Court noted the following allegations: "the private insurance market is concentrated and includes only PHP, Lovelace, Blue Cross, United HealthCare, and Cigna"; two of Plaintiff's competitors "each have less than a ten percent market share"; "Defendants have tied up additional health insurers – *i.e.*, United HealthCare and Cigna – with exclusive dealing arrangements in order to prevent their working with rivals and potential entrants, thus causing further concentration of the private health insurance market"; and "Blue Cross is planning to exit the market for private health insurance." *Id.* at 23-24. The Court found that these allegations, taken together, "demonstrate that Defendant PHP effectively has only one competitor, Lovelace, whose market share is, construing the allegations in the complaint in Plaintiff's favor, significantly less than PHP's . . . market share." *Id.* at 24.

Plaintiff's allegations of market concentration are not borne out by the evidence. There are, in fact, more than five health insurers in each of the relevant markets and submarkets, PHP has less than 50 percent of the shares in each of those markets and submarkets, and PHP does not even have the highest share in one of the markets. As detailed above, in the commercial fully insured health insurance submarket, Dr. Reiff identified eight health insurers. Although this submarket includes both Lovelace Health and BCBS, in June 2014, BCBS purchased the membership of the Lovelace Health Plan. P. Ex. 1-7 at 115. Accordingly, for 2014 and 2015, Lovelace did not participate in this submarket, leaving seven health insurers. In 2015, PHP had a share of nearly 50 percent of this submarket, followed by BCBS, with a share of nearly 25 percent. Similarly, in the commercial self-insured health insurance submarket, Dr. Reiff

identified seven health insurers. Again, after BCBS's purchase of the Lovelace Health Plan membership, Lovelace no longer participated in this market, leaving six health insurers. In 2015, BCBS was the market leader with a share of approximately 35 percent of this submarket, followed by PHP, with a share of approximately 27 percent. United followed with a share of approximately 21 percent. Dr. Reiff noted that "United, Cigna and Aetna . . . all have substantial shares" of this market. P. Ex. 2-A ¶ 68. Finally, in the Medicare Advantage market, Dr. Reiff identified five health insurers. When BCBS purchased Lovelace's membership in 2014, the number reduced to four health insurers. In 2015, PHP had a share of approximately 48 percent, followed by BCBS with a share of 32 percent. Plaintiff has provided no evidentiary basis for its conclusion that this data demonstrates that the relevant markets are "concentrated." Indeed, President of BCBS, Kurt Shipley, testified that, "if anything, [the health insurance market] is more competitive now than it's been in a while. We have other carriers that are pretty aggressive at the moment." Defendants' ("D.") Ex. 8 at 145. Mr. Shipley further testified that PHP and BCBS "are both pretty strong in the Albuquerque market at this point." P. Ex. 1-7 at 146.

Further, there is no evidence that PHP has "exclusive dealing arrangements" with United or Cigna. Plaintiff alleges in the TAC that "through contractual and/or tacit agreements," United and Cigna are "adjuncts to PHP," and in its opposition to Defendants' motion continues to argue that the market share of United and Cigna should be discounted as a result of these agreements. TAC ¶ 65; Doc. 677 at 29. The undisputed evidence, however, demonstrates that neither Cigna nor United has ever had any agreement with PHP, and that both Cigna and United view PHP as a competitor. Specifically, Pamela Braun, who was Director of Network Management at Cigna during the relevant time period, testified that Cigna did not have a partnership or any other type of affiliation with PHP, because it was a competitor. D. Ex. 28 at 156. Similarly, when Dustin

Taylor, testifying on behalf of UHC, was asked, "Are you aware of any relationship or arrangement between United Healthcare and Presbyterian Health Plan," he responded, "We have none. They are a competitor." D. Ex. 29 at 37. Moreover, Julie Nickerson, Director of Finance/Operations at NMOHC, testified that she understood that United and Cigna each competed with PHP, that none of these was the same company, and that each had different contracts with NMOHC. D. Ex. 27 at 63. Dr. McAneny also provided similar testimony that, in terms of competing for employers to buy their product, United and Cigna compete against PHP. D. Ex. 3 at 311.

Admittedly, there is evidence that both United and Cigna have contracts with Presbyterian Hospital, as a provider, whereby Cigna and United are prohibited from contracting with Lovelace Hospital, one of the three hospitals in the Albuquerque area, and other non-PHS providers. *See* P. Ex. 2-A ¶ 83 ("In Albuquerque, PHS will not contract with an insurer that contracts with Lovelace, and often requires that Albuquerque Health Partners or certain other non-Presbyterian providers be excluded from plans contracting with PHS.") For example, Dr. McAneny testified that "United will only work with Presbyterian Hospital. And in contract negotiations with United I was told that they were working with Presbyterian." P. Ex. 1-7 at 20-21. Further, the contract between PHS and Cigna provides that "Cigna will not offer in its network of Participating Providers any services rendered at any general hospital located in the Service Area other than Presbyterian and the University of New Mexico Health Sciences Center facilities." P. Ex. 1-101 at 4. Similarly, an internal Cigna email states: "The Presby hospital LOA includes Presby Medical Group and is exclusive except for UNM and specialty types not owned or contracted with PMG." P. Ex. 1-102.

While Plaintiff's expert opines that PHS's practice of negotiating semi-exclusive[6] contracts with insurers, such as Cigna and United, protects Presbyterian Hospital from competition, P. Ex. 2-A ¶ 82, he provides no similar opinion that this practice protects PHP, as a health insurer, from competition. Nor does Plaintiff provide any evidentiary support for its theory that PHS's contracts with United and Cigna prevent them from effectively competing against PHP. In short, Plaintiff has failed to demonstrate that PHS's contracts with Cigna and United render Cigna and United "adjuncts to PHP," or cause further concentration of the relevant markets.[7]

Finally, BCBS did not exit the the relevant health insurance markets, but rather, as Dr. McAneny testified, has "become a very significant player in Albuquerque." D. Ex. 7 at 19. As discussed above, in June 2014, BCBS purchased the membership of the Lovelace Health Plan. Mr. Shipley testified that BCBS is "stronger than [it was] prior to that acquisition," and that "Presbyterian is surprised at how much of their business [BCBS] is capturing." P. Ex. 1-7 at 146; D. Ex. 20; *see also* D. Ex. 15 ("BCBSNM appears to have a definite opportunity to write PHP and possible UHC business."); D. Ex. 22 ("[BCBS] well positioned in NM and showing competitive strength in products and rates."). And as Dr. Reiff's calculations demonstrate, BCBS has the second highest share of both the commercial fully insured health insurance submarket and the Medicare Advantage market, and the highest share of the commercial self-insured health insurance market. Nor are BCBS's shares of these three markets "significantly

---

[6] The contracts are only semi-exclusive because University of New Mexico ("UNM") is part of the insurance network for all major insurers with insureds located in Albuquerque, with the exception of PHP insureds. P. Ex. 2-A ¶ 19. Accordingly, PHS's contracts with insurers prevent those insurers from contracting with Lovelace Hospital and other non-PHS providers, but do not prevent them from contracting with UNM.

[7] There is similarly no evidentiary support for Plaintiff's contention that PHS allowed United and Cigna to include it in their network only in return for "discriminatory reimbursement rates." Doc. 677 at 32.

less" than PHP's shares. Accordingly, based on the undisputed evidence, the first *Reazin* factor does not support finding possession of monopoly power.

As to the second *Reazin* factor, the difficulty or ease of entry into the market by new competitors, the 2014 Opinion noted the following allegations: "significant barriers to entry exist in the private health insurance market and entering this market even under normal conditions requires significant capital, expertise, and time"; "Blue Cross does not have enough enrollees to independently facilitate entry"; "firms that currently exist have not been able to challenge Defendants' market position for many years (particularly given Defendants' alleged monopoly power of hospital inpatient services)"; "no meaningful entry has occurred in decades"; "entry by new firms has failed because Defendants have closed significant market segments to these entrants"; and "Defendants have maintained their dominant position over many years and have expanded their market position with the acquisition of hundreds of physician practices." Doc. 79 at 24-25.

Plaintiff does not present evidence to substantiate most of these allegations, and mistakenly suggests that it is Defendants' burden to disprove them. *See* Doc. 677 at 30. Nonetheless, there is some evidence in the record that there are significant and continuing barriers to entry into the relevant markets. First, there can be no dispute that any new insurer would need to build a provider network. As discussed above, because Presbyterian Hospital "is perceived as higher quality than other hospitals in Albuquerque," PHS is able to negotiate semi-exclusive contracts with insurers seeking access to its network in Albuquerque. P. Ex. 2-A ¶ 82. With the exception of certain carve outs, PHS (as a provider) does not contract with BCBS for BCBS's insured patients living in Albuquerque. *Id.* Thus, PHS is able to segment the market: an insurer is limited to entering the market with PHS in its network or with Lovelace in its

network, but never with both. According to Mr. Shipley, this "segmentation" of the market, whereby an insurer effectively must choose between having Presbyterian Hospital or Lovelace Hospital in its provider network, "still exists today." P. Ex. 1-7 at 145. And for BCBS, "lack of a Presbyterian delivery system in Albuquerque is the major barrier to writing more business in the larger group segment." P. Ex. 1-22 (emphasis in original).

Further, and perhaps as a result of this market segmentation, as Dr. Reiff's report demonstrates, PHP was able to maintain its lead of the commercial fully insured health insurance submarket and Medicaid Advantage market during the eight-year period analyzed. While PHP is second in the commercial self-insured health insurance submarket, it had the highest share in that submarket market for six years, from 2008 to 2013, and since then, has followed closely in second place.

As to historical evidence of actual entry, in the commercial self-insured health insurance submarket and the Medicaid Advantage market, there have been no new entrants during the relevant time period. There has been one new entrant in the commercial fully insured health insurance submarket: NMHC, which entered that submarket in 2014, when health insurance exchanges were implemented in New Mexico under the Affordable Care Act ("ACA"). Notably, NMHC was able to increase its share from 2 percent in 2014 to 8.3 percent in 2015. There is conflicting evidence, however, regarding the financial strength and sustainability of NMHC. *Compare* D. Ex. 23 at 78, 82-83, 59 (testimony of Anne Brennan, CEO of NMHC, that, as of November 2015, NMHC was "financially very strong" and has "a sustainable model to operate in New Mexico for a long time, that NMHC was profitable in the first quarter of 2016 and anticipated being profitable in 2016, and that NMHC's products are competitive from a premium standpoint, offering plans with high quality for a competitive price) with P. Ex. 1-31 at 107-08

(testimony of Mr. Taylor of United that while NMHC has grown, "given the financials we've seen for the past years on exchange providers, they're not long for the game unless they make some significant changes") and P. Ex. 1-11 at 369 (testimony of Lisa Farrell Lujan, President of PHP and Presbyterian Network, that "there's a question around" whether NMHC will be able to continue operating in the long term"). Further, Dr. Reiff opines that while "it is possible that subsidized premiums at exchanges have a constraining effect on commercial premiums charged to small group employers who have significant numbers of employees with income below the ACA eligibility thresholds, . . . the evidence indicates that the availability of exchanges has [had and may have] no constraining effect on PHP's behavior." Ex. 2-A ¶ 34. Dr. Reiff further notes that plans like NMHC that entered the market through the ACA "have a relatively small share of the overall commercial insurance market, and are not an option for employers." *Id.* ¶ 71. Thus, NMHC's sole entrance into the commercial fully insured health insurance submarket does not foreclose the conclusion that significant and continuing barriers to entry exist in the relevant health insurance markets. Because the evidence supports, at least in part, Plaintiff's allegations of barriers to entry, the second *Reazin* factor weighs in favor of finding monopoly power.

As to the fourth factor,[8] whether the defendant is a multimarket firm, the Court noted the following allegations: "Defendants are part of a multimarket enterprise that competes in, at a minimum, the hospital inpatient services market, the private health insurance market, and the comprehensive oncology market"; "because Defendants are part of a multimarket firm, they can use their power in one market to impede entry in another market"; and "Blue Cross cannot act as a substitute for, or challenge the market position of, Defendant PHP because Blue Cross

---

[8] Because Plaintiff identified no allegations in the SAC relevant to the third *Reazin* factor, the Court declined to address it. Similarly, Plaintiff has not presented evidence relevant to this factor. Accordingly, the Court again declines to address it.

enrollees cannot receive covered treatment at Presbyterian Hospital and because Presbyterian's monopoly power over hospital inpatient services ensures that patients seeking treatment at Presbyterian will not purchase Blue Cross's products."  Doc. 79 at 25.  There is evidence in the record to support at least some of these allegations.  First, there is no dispute that PHS is an integrated health care system that participates in multiple markets, including the relevant health insurance markets identified by Dr. Reiff, the comprehensive oncology market, and the inpatient hospital services market, and that PHS makes decisions at an "enterprise level."  *See* P. Ex. 1-11 at 42-43, 46 (Lisa Farrell, then Vice President of PHS's Integrated Care Solutions ("ICS") department, testified that ICS was formed around 2010 to focus on "enterprise initiatives," that "[t]he goal of ICS was to lower the overall cost of care without harming quality," and that this goal was accomplished "through work in PHP and in our delivery system"); P. Ex. 1-11 at 166-67 (Ms. Farrell further testified that ICS decided at an enterprise level the rates at which PHP would reimburse the PHS delivery system, and that the pricing model would allow PHP and the delivery system to share in drug savings); *see also* P. Ex. 1-62 ("[A] key component to the *enterprise oncology strategy* is to establish parameters that say 'these are the terms under which we will contract for oncology services:  specific rate ranges, drug costs, quality standards, etc.' Once established we need to ensure that our own system falls within those parameters.") (emphasis added).  There is also no dispute that PHS prohibits insurers who contract with it from contracting with other providers, and thus uses its power as a health care provider to, at the very least, set limits on the terms of entry into the health insurance market.  And while there is evidence that BCBS is a strong competitor of PHP, there is also evidence that BCBS is prevented from expanding its market share because of its limited access to Presbyterian Hospital.

Defendants admit that the evidence shows that PHP is part of a multimarket firm, but attempt to argue away the significance of this evidence by noting that "courts universally recognize that 'leveraging' power in one market to gain an advantage in another is ***not*** inherently suspect under the antitrust laws." Doc. 624 at 19 (emphasis in original). This argument is inapposite, as *Reazin* specifically found the question of whether a defendant is a multimarket firm relevant to the determination of monopoly power. Because the evidence supports Plaintiff's allegations that Defendants comprise a multimarket firm and have used their dominance in one market to impede entry in another, the fourth *Reazin* factor weighs in favor of finding monopoly power.

Accordingly, there is evidence of significant and continuing barriers to entry and Defendants' power as a multimarket firm. There is also evidence that PHP holds a dominant position in the relevant health insurance markets. Given this evidence, the Court well might conclude that a genuine issue of fact remains as to PHP's possession of monopoly power despite its market share of less than 50 percent. The Court, however, need not make this determination. As set forth below, Plaintiff fails as a matter of law to establish the second element of its monopolization claims, and thus its claims cannot survive summary judgment.

B.    Exclusionary Conduct

To establish the second element of its monopolization claims, namely, that PHP willfully acquired or maintained its monopoly power, Plaintiff must demonstrate that PHP engaged in anticompetitive, or exclusionary conduct. *Christy Sports*, 555 F.3d at 1192. Because "the antitrust laws protect competition, not competitors, . . . the Sherman Act is not concerned with overly aggressive business practices, or even conduct that is otherwise illegal," but rather with

conduct that "unfairly tends to destroy competition itself." *JetAway Aviation, LLC v. Bd of Cty. Comm'rs of County of Montrose, Colo.*, 754 F.3d 824, 834-35 (10th Cir. 2014).

Although "anticompetitive conduct comes in too many forms and shapes to permit a comprehensive taxonomy, . . . the question [courts] often find [themselves] asking is whether, based on the evidence and experience derived from past cases, the conduct at issue before [them] has little or no value beyond the capacity to protect the monopolist's market power." *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1072 (10th Cir. 2013). Accordingly, the question of whether conduct is exclusionary "cannot be answered simply by considering its effect on [the plaintiff]." *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 605 (1985). Rather, the court must "consider its impact on consumers and whether it has impaired competition in an unnecessarily restrictive way." *Id.* Only "[i]f a firm has been attempting to exclude rivals on some basis other than efficiency, [is it] fair to characterize its behavior as [anticompetitive]." *Id.*

In the 2014 Opinion, this Court interpreted the SAC to allege two sets of acts as exclusionary conduct: first, that in the most recent provider contract, PHP lowered reimbursement rates to NMOHC below competitive levels and declined to cover services offered by NMOHC, with the intent to "financially strangle" and eliminate Plaintiff from the comprehensive oncology market; and second, that PHP entered into an exclusive arrangement with United, such that United will not take market actions without PHP's approval, causing significant concentration of the private health insurance market. Doc. 79 at 27-28, 33-34. Although not alleged in the TAC, Plaintiff now argues that a third category of conduct, the Mandate, is also exclusionary. As discussed herein, under binding precedent and based on the

undisputed evidence, none of these categories of conduct is exclusionary within the meaning of Section 2.

      1.    <u>PHP and United</u>

As discussed above, Plaintiff has failed to demonstrate any arrangement between PHP and United, let alone one whereby United will not take market actions without PHP's approval. Mr. Taylor's testimony on behalf of United specifically refuted the notion of any such arrangement and clarified that United views PHP as a competitor. Further, Plaintiff presented no evidence that the vertical contract between Presbyterian Hospital, as a health care provider, and United, as an insurer, constrains competition between the horizontal entities, United and PHP, two insurers. Nor did Plaintiff present evidence that the contract was "devised or encouraged" by PHP. *See U.S. Healthcare v. Healthsource, Inc.*, 986 F.2d 589, 594 (1st Cir. 1993). Accordingly, there is no basis for the Court to view any contractual terms between Presbyterian Hospital and United as effectively an exclusive dealing, horizontal agreement between PHP and United as competitors. *See id.* (rejecting argument that vertical agreement between doctors and insurance plan was implicitly horizontal agreement among doctor stockholders of insurance plan that, "if devoid of joint efficiencies, might warrant condemnation" where plaintiff "supplied [the court] with no evidence of such a masquerade"). It follows that the contract between Presbyterian Hospital and United cannot establish the anticompetitive conduct necessary to satisfy the second element of Plaintiff's monopolization claims.

      2.    <u>PHP's Reimbursement and Coverage Decisions</u>

      a.    <u>Relevant Facts</u>

To support its allegations regarding PHP's reimbursement rates and coverage decisions, Plaintiff points to evidence documenting the history of NMOHC's relationship with PHS, the

history of NMOHC's contract negotiations with PHP, and the intersections of each. Originally, NMOHC and PHS had a cooperative relationship for the provision of oncology services. SMF 3, TAC ¶ 222. Through the 1990's, PHS did not employ any medical oncologists. TAC ¶ 223. Instead NMOHC physicians, who had (and continue to have) staff privileges at Presbyterian Hospital, provided oncology services (other than radiation oncology services) to enrollees of PHP. *Id.*

By late 1998, Dr. McAneny started to talk to her partners about creating a freestanding cancer center with radiation and imaging. P. Ex. 1-35. The original plan was to work a joint venture with PHS, which the doctors at NMOHC regarded as "their hospital." *Id.* NMOHC and PHS disagreed as to PHS's potential role in a new cancer center. *See* P. Ex. 1-9 (Jim Hinton, President and CEO of PHS, testified that "one of the original offers was that we would be an owner of some physical assets, . . . and that doesn't really create a sustainable relationship to own a piece of a building"); *see also* P. Ex. 1-33; P. Ex. 1-49; P. Ex. 1-50. Ultimately, NMOHC opened NMCC in 2002, without any PHS involvement. P. Ex. 1-35. Even after completion of the cancer center, NMOHC continued discussions with PHS as it "really expected a JV." P. Ex. 1-35. PHS gave NMOHC a contract for radiation oncology services, but the joint venture, as envisioned by NMOHC, never came to pass. *Id.*

In or about 2005, PHS began planning for a comprehensive cancer center. *See* P. Ex. 1-53. PHS realized that while it led Albuquerque's "slowly declining inpatient oncology market with [a] 44% share," this was in contrast to its 17 percent share in all other oncology services, and thus PHS's role had "not kept pace with market need or ha[d] declined due to competitor inroads." *Id.* Peter Snow, Vice President for Strategy at PHS, testified that at that time, "inpatient activity" in oncology services "was being shifted to an outpatient arena." P. Ex. 1-5 at

103. While there was "less and less need for inpatient services," PHS "was being niched into an inpatient-only role. That was the concern." *Id.* This led to PHS's "desire to develop a more comprehensive, full-service oncology program." *Id.*

By October 2005, PHS concluded that it needed to develop a comprehensive oncology program in Albuquerque. *See* P. Ex. 1-34. This conclusion was based on its assessment that: PHS was not then positioned to participate in the most rapidly growing and profitable oncology service segments, including medical oncology and "an increasing array of oncology related pharmaceuticals" that could offer a "big opportunity to decrease PHP costs"; that PMG and PHP could "support PHS migration to new segments; and that PHS had a "unique opportunity to provide continuum of care patients demand." *Id.*

In 2007, PHS rolled out its plan to "provide multi-disciplinary, coordinated oncology care." D. Ex. 5. To that end, PHS established a medical oncology practice, hired Dr. Mitch Binder to serve both as a medical oncologist and the program medical director, and hired three additional medical oncologists to work at the practice. *Id.*; *see also* P. Ex. 1-35. Effective April 27, 2007, PHS contracted with MD Anderson to provide radiation oncology services. D. Ex. 5. It was PHS's intention "to build a one-stop shop cancer center so patients [could] come to one location for all of their outpatient cancer care." *Id.*

Once PHS decided to develop its own oncology program, joint venture discussions between PHS and NMOHC refocused on "PHS's vision of oncology and how NMOHC fits into that vision." D. Ex. 4. PHS's goal was to "create the most effective integrated cancer delivery system in the nation." P. Ex. 1-36.

According to Dr. McAneny, sometime in 2005, Jim Hinton, President and CEO of PHS, Mark Reifsteck, Senior Vice President of PHS, and Lauren Cates, COO of PHS, came to NMCC

to meet with her, Dr. Steven Bush, and their office manager and, during the meeting, Mr. Hinton

told them that they had two choices:  sell to them and become employees or they would pull

$30M out of reserves [to hire medical and radiation oncologists] and put them out of business.

P. Ex. 1-35; P. Ex. 1-4 at 69.  Specifically, Dr. McAneny testified, Mr. Hinton advised that,

under PHS's proposal, the physicians at NMOHC would become individual employees of PHS

and PHS would acquire NMCC.  P. Ex. 1-4 at 70.

Thereafter, on June 6, 2005, Mr. Reifsteck sent a letter to Dr. McAneny and Dr. Bush

containing a "preliminary term sheet," that "outlines PHS' current thinking as to elements of a

proposed transaction with NMOHC and its physicians."  D. Ex. 2.  The term sheet indicates that

PHS would "offer employment to physicians associated by NMOHC," and indicates that "PHS

will commit to capital and other investments in the Presbyterian Oncology Program (not

including acquisition consideration payable to NMOHC or compensation amounts payable to

NMOHC physicians or other personnel), in the amount of $30 million over the three-year period

commencing upon the closing of a transaction [between NMOHC and PHS]."  *Id.*

By 2009, the volume at the PHS cancer center in both medical oncology and radiation

oncology increased significantly; however, PHS realized that both groups were headed toward

reaching capacity.  P. Ex. 1-163.  In order to address its impending capacity constraints and

reduce costs for PHP (whose costs of insuring oncology patients of non-PHS providers was

higher than its costs of insuring oncology patients of PHS providers) while also effectuating its

goal of becoming the "dominant" central New Mexico cancer provider, PHS determined that its

best option was to continue, or revisit, its pursuit of an acquisition of NMOHC.  *Id.*; P. Ex. 1-36.

PHS envisioned a scenario whereby PMG would "assimilate all or most of the NMOHC

docs," and "the NMOHC facility would become the flagship facility."  P. Ex. 1-163, P. Ex. 1-36.

PHS reasoned that NMOHC would be willing to consider an acquisition on these terms because NMOHC was "financially vulnerable" due to several factors, including the fact that "the independent practice of oncology is/has become marginally viable (at best)," NMOHC had lost its contract with Lovelace Health Plan, and NMOHC had been losing significant business to the PHS cancer center.  P. Ex. 1-36.  During the period from 2009 to 2010, Dr. Dava Gerard, business manager for the PHS cancer center, met monthly with Dr. McAneny of NMOHC, and reported that Dr. McAneny informed her that "NMOH[C] physician partners voted to consider Pres the #1 choice for a 'closer relationship' including a partnership/purchase."  *Id.*  Dr. Gerard further reported that Dr. McAneny and she both agreed that "these severe economic times are compromising the sustainability of freestanding facilities which we both agree will unlikely survive the current climate."  P. Ex. 1-164.  Dr. Gerard anticipated that the acquisition of NMOHC would result in many additional patients and a significant savings to PHP.  P. Ex. 1-36.

In February 2010, Dr. Gerard and others from PHS met with Dr. McAneny and others from NMOHC.  D. Ex. 4.  During the meeting NMOHC expressed its continued concerns "about becoming employed physicians and what that means to [PHS] and [NMOHC]."  *Id.*

Until 2012, NMOHC wished to pursue a collaboration or affiliation with PHS.  D. Ex. 4, D. Ex. 3 at 75.  Ultimately, however, no agreement was reached, as NMOHC doctors did not want to become employees of PHS.  D. Ex. 3 at 75.  It was important to NMOHC "to maintain the separateness."  *Id.* at 142; *see also* P. Ex. 1-9 at 56-57 (Mr. Hinton testified that "employment was always an option, and that was rejected by Dr. McAneny").

In her April 9, 2009 PHS Cancer Service Line Strategic Analysis, Dr. Gerard also proposed alternatives to an NMOHC acquisition, one of which was enhancing the PHS cancer center volume by changes in PHP contracts.  P. Ex. 1-36.  Similarly, a worksheet entitled "Cost

Reduction Initiatives" was circulated internally at PHS that included as an option for reducing

oncology costs the termination of PHP's contract with NMOHC and the simultaneous transition

of all NMOHC business to PHS and UNM. P. Ex. 1-57. Presentation materials for a PHS July

2011 oncology strategy meeting further demonstrate that PHS was considering various options

from a central delivery system ("CDS") and PHP perspective, to arrive at an "enterprise view."

P. Ex. 1-59. Those options included allowing organic growth by the PHS cancer center, having

PHP narrow its network to the PHS cancer center alone, or having PHP narrow its network to the

PHS cancer center for capitated patients only.[9] *Id.* Ms. Cates suggested that instead of having

PHP narrow its network, PHS could develop "an intentional PMG internal referral strategy" for

capitated patients. P. Ex. 1-89. Ms. Cates' "summary of decisions" from the meeting reflects

the decision that the "long term" strategy "should be to bring all oncology services into the CDS

Cancer SL (PMG/MDACC) for all PHP product lines," and the "short term" strategy "should

focus on things PHP can implement," including "pursu[ing] savings via recontracting in the four

county area." *Id.*

It is against this backdrop of PHS's strategic development of its cancer center that

NMOHC asks the Court to evaluate PHP's contract negotiations with NMOHC. Originally, in

2003, Dr. McAneny "negotiated a billed charges contract with PHP, with a five-year term." D.

Ex. 3 at 65. It is an "evergreen" contract with a 90-day termination clause. *Id.* In negotiating

_____

[9] "Capitated" patients are those patients insured by PHP for whom PHP pays PMG a
predetermined rate for all services, regardless of the amount of treatment required. P. Ex. 2-A ¶
95. When a PMG capitated patient is treated by an outsider provider, PHP pays that provider in
accordance with the terms of the contract between PHP and that provider; PMG is then
responsible to reimburse the cost of treatment to PHP. P. Ex. 1-18 at 101-103. The amount that
PMG pays to PHP is considered by PHS to be a "purchased medical cost." *Id.* When a capitated
patient is treated outside of the PHS system, the payment for the treatment represents a reduction
in PHS's "profit equal to the amount of the payment." P. Ex. 2-A ¶ 95. Accordingly, it is a cost
savings to the PHS enterprise to retain capitated patients for treatment by PMG physicians.

the contract, NMOHC explained to PHP that it provided many services for which there are no fees. P. Ex. 1-4 at 64-68. As a result, NMOHC negotiated a higher drug margin (the amount by which the reimbursement rate for prescription drugs exceeds actual costs), based on a list of drugs and pricing calculated by NMOHC, that would cover the costs of services for which it was unable to bill, including social work, nutrition counseling, and patient education. *Id.* Dr. McAneny recalled Mr. Reifsteck telling her, "We'll just let you use the drug margin to pay for the rest of the services." D. Ex. 3 at 181. In exchange for the higher drug margin, NMOHC agreed to bill "evaluation and management" services at lower, Medicare rates, which was akin to "giving them away." P. Ex. 1-4 at 64-68.

Discussions to renegotiate the 2003 contract began in 2008. According to Dr. McAneny, in negotiating a new contract, NMOHC knew that PHP "was not happy with the drug margin," so NMOHC wanted to "get paid more for thinking about patients and talking to patients and counseling patients, . . . in exchange for a lower drug margin." P. Ex. 1-2 at 262-65. NMOHC also "wanted to come up with other services that [its] patients needed," such as "rehab, interventional radiology and oncology; surgeons." *Id.* Dr. McAneny explained, "Our contract was written in such a way that we had this very defined box of codes that we were allowed to bill for, and it said everything else is Medicare rates. So that was stopping us from being able to offer more services to patients that we felt that they needed." *Id.* In particular, Dr. McAneny testified that she "tried very hard to get a contract with [PHP] to be able to offer [interventional oncology] services to health plan patients," but PHP "refused to negotiate that." P. Ex. 1-4 at 93-95. PHP agreed only to pay NMOHC "at Medicare rates," which "made it financially nonviable," and NMOHC was "forced to close the program." *Id.* Similarly, Dr. McAneny testified that Navitas set up physical therapy at NMCC but PHP would not contract with it, and it

ended up closing.  P. Ex. 1-20 at 37-40.  According to Dr. McAneny, PHP's refusal to add an interventional oncologist or physical therapist to the NMOHC plan "stop[ed] [NMOHC] from being able to expand the services that [it] wanted to deliver to [its] patients."  P. Ex. 1-4 at 93-95.

The parties first met to discuss new contract terms in February 2008.  P. Ex. 1-46.  The original goal was to have an agreement finalized by May 2008.  *Id.*  According to a PHP chronology of contract negotiations created in October 2009, PHP initially proposed an evergreen agreement with a 120-day notice of term provision and a reduction in drug reimbursement.  NMOHC initially proposed a five-year initial term and moving away from billed charges for drugs to 160 percent of ASP (average selling price) methodology.  P. Ex. 1-136.

NMOHC and PHP met again on May 6, 2008.  P. Ex. 1-47.  At that point, NMOHC proposed a multi-specialty agreement to include oncology, rheumatology, dispensing pharmacy, physical therapy, behavioral health, and an ambulatory surgery center.  P. Ex. 1-136.  NMOHC indicated that a long-term agreement was mandatory, and that it could not agree to drug reimbursement cuts, as this profit was used to cost shift for Medicare.  *Id.*

In August 2008, PHP gave NMOHC a counter-offer that estimated $1.5 million in savings to PHP on drugs alone.  *Id.*  PHP offered a two- or three-year initial term with one blended rate for all CPT codes for both Medicare and commercial products, one blended rate for all drugs for both Medicare and commercial products, and acceptance of dispensing pharmacy.  *Id.*  PHP also agreed to add a rheumatologist and his practice to the contract.  *Id.*

In September 2008, NMOHC agreed to the concept of the August proposal but countered with higher rates.  *Id.*  PHP agreed to review the counter-offer.  *Id.*  An internal PHP review of

NMOHC's counter-offer revealed that accepting would be "very close to neutrality."  P. Ex. 1-44.

Accordingly, in October 2008, PHP sent NMOHC a "best offer" letter conceding on slightly higher rates for CPT and drugs, but with the same one blended rate offer.  *Id.*  This offer would have resulted in savings to PHP of $1 million, "achieved by deep discounts on drugs and an increase on professional charges."  *Id.*

In December 2008, NMOHC and PHP met to discuss the best offer letter.  *Id.*  The parties indicated that they were comfortable with the offer and agreed to move to drafting an agreement. *Id.*  In March 2009, PHP approved a draft agreement, which was sent to NMOHC.  *Id.*

On May 1, 2009, at the request of Dennis Batey, President of PHP, Gail Blackwell, the PHP network contractor who had primary responsibility for negotiating the NMOHC contract, sent an email message to Mr. Hinton with "an update on the status of the NMOH[C] contract negotiations and terms of the proposed agreement."  P. Ex. 1-45.  The message indicates that the agreement had "not been finalized," and that pursuant to a recent "enterprise oncology meeting" and a follow-up meeting with Mr. Snow on April 22, 2009, she had "placed the finalization of this agreement on hold."  *Id.*  She explained that the terms of the proposed agreement, which was for a three-year non-terminable term, would "equate to a net savings to PHP of $1 million for the first contract year."  *Id.*  She further explained that she had done a financial comparison analysis of NMOHC versus PHS rates and costs, and wrote:

> Although there is a reduction to PHP of $1 million under the proposed agreement, NMOH[C] remains more costly than services through PHS at 12% higher.  Said another way, if that agreement was to cease, there would be an additional savings of approximately $2.1 million annually to PHP.  That however, is with the caveat that we could absorb/accommodate the care of those additional members into our system.

*Id.*

A few days later, on May 4, 2009, Dr. McAneny sent a letter to Ms. Blackwell and others at PHP, providing comments on PHP's proposed offer, and asking for several specific changes. P. Ex. 1-135. In her letter, Dr. McAneny notes that, based on PHP's calculations, the contract "will remove about 1 M of reimbursement from us. (Savings for you, shortfall for us)." *Id.* She writes, "We need to verify that the amount removed will be that million. We think these changes will make for a very workable contract that is to the benefit of the Plan, the practice and will allow us to continue to provide the best service and care to PHP patients." *Id.*

On July 13, 2009, Ms. Blackwell circulated to Ms. Farrell a draft letter responding to Dr. McAneny's letter. P. Ex. 1-110. The letter states, in part:

> The conditions outlined in your letter raised concerns over a variety of items which PHP believed to have been previously discussed and closed. In meeting with Lisa [Farrell] last week to review the new contract requests contained in your letter, she expressed a generalized concern about the need to again analyze PHP's rate proposal and contract terms offered in October of 2008. Subsequent events have transpired to somewhat alter PHP's financial picture, such as the 2009 Medicare rate filing reductions, Salud contract negotiations, the strong potential for healthcare reform and the potential impact on our entire industry. The magnitude of these actual and impending changes raises a concern related to entering into "long term" agreements with fixed rates. Our prior proposal has not changed at this time, however we do feel the need to rerun our numbers with more current data, examine your contract language changes from your letter of May 4 and to determine the additional financial impact to PHP which might result from NMOHC's request for contract changes and terms.

*Id.*

In August 2009, NMOHC and PHP met to discuss the terms proposed by Dr. McAneny. P. Ex. 1-136. At that point, PHP informed NMOHC that "with the changing economic climate," its offer had changed. *Id.* PHP responded to each of NMOHC's proposals and countered "with an increase in reimbursement cuts to equate to a projected $3 million." *Id.*; *see also* P. Ex. 1-2 (Dr. McAneny testified: "I was willing to take a million dollars a year less in payment in exchange for security that the practice would be able to continue to survive. And survive meant

30

a continued Presbyterian contract. . . . As soon as I agreed to the 1 million they came back with new terms that would have taken away 3 million"). NMOHC responded that it could not "accept this new amount and that the last proposal was the deepest they could afford, provided [PHP] accepted the counter proposed provisions in May 2009." P. Ex. 1-136. "Both parties agree[d] to collect data and share with each other and set up a follow up meeting." *Id.* As of October 2009, neither party had completed its data collection. *Id.*

In an email message on March 22, 2010, Ms. Farrell provided an update to Mr. Batey on the negotiations with NMOHC. P. Ex. 1-112. She stated that she had talked with Ms. Cates about her discussions with Dr. McAneny about a potential acquisition of NMOHC by PHS, and that those discussions "were not progressing," and that PHP should "continue to move forward" with its own discussions regarding insurer/provider contract negotiations. *Id.* She explained that the way she had "left it with NMOH[C] is that we wanted approx. 3 million in savings (they had agreed preliminarily to $1 million reduction)." *Id.* She indicated that she was planning on picking up speed "in finalizing the contract." *Id.* Lastly, she wrote that it "remain[ed] unclear whether our oncology group can take the volume – we get inconsistent answers." *Id.*

There is no evidence in the record of any further contract negotiations beyond this point. To date, NMOHC remains a provider in PHP's network, pursuant to the terms negotiated in the 2003 contract, which remains in effect on an "evergreen" basis. D. Ex. 3 at 65. Accordingly, the original formula for drug pricing used to negotiate the contract in 2003 continues to be the formula that PHP uses to reimburse NMOHC. *Id.* This reimbursement rate is higher than the drug reimbursement rate that NMOHC receives from other health plans. *Id.*; *see also* D. Ex. 3 at 179 (Dr. McAneny testified that NMOHC receives a higher amount of compensation for prescription drugs from PHP than it does when compared to its compensation from other

contracted health plans).  Overall, its contract with PHP remains NMOHC's "best paying contract."  D. Ex. 19; *see also* D. Ex. 7 at 93 (NMOHC's reimbursement rate pursuant to its contract with BCBS is lower than its PHP contract reimbursement rate, for both the prescription drug and physician components).

b.  <u>Legal Standard</u>

The actions that Plaintiff challenges as anticompetitive, namely, PHP's reimbursement and coverage decisions, are unilateral, rather than concerted, conduct.  The Sherman Act's treatment of unilateral conduct is fundamentally different from its treatment of concerted conduct.  *See Verizon Commc'ns, Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 410 n.3 (2004) (distinguishing two early refusal to deal cases because those "cases involved *concerted* action, which presents greater anticompetitive concerns and is amenable to a remedy that does not require judicial estimation of free-market forces") (emphasis in original).  According, "as a general rule, purely unilateral conduct does not run afoul of section 2 – businesses are free to choose whether or not to do business with others and free to assign what prices they hope to secure for their own products."  *Novell*, 731 F.3d at 1072 (citations omitted); *Pac. Bell Tel. Co. v. Linkline Commc'n*, 555 U.S. 438, 448 (2009) ("As a general rule, businesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing."); *Trinko*, 540 U.S. at 408 ("[A]s a general matter, the Sherman Act does not restrict the long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal.").  It follows that "[a] firm that has substantial power on the buy side of the market (*i.e.*, monopsony power) is generally free to bargain aggressively when negotiating the prices it will pay for goods and services."  *West Penn Allegheny Health Sys. v. UPMC*, 627 F.3d 85, 103

(3d Cir. 2010); *see also Kartell v. Blue Shield of Mass, Inc.*, 749 F.2d 922, 927 (3d Cir. 1973)

("Ordinarily . . . even a monopolist is free to exploit whatever market power it may possess when

that exploitation takes the form of charging uncompetitive prices."). "This reflects the general

hesitance of courts to condemn unilateral behavior, lest vigorous competition be chilled." *West

Penn*, 627 F.3d at 103; *see also Four Corners Nephrology Assoc., P.C. v. Mercy Med. Center of

Durango*, 582 F.3d 1216, 1221 (10th Cir. 2009) ("Allowing a business to reap the fruits of its

investments is an important element of the free-market system; it is what induces risk taking that

produces innovation and economic growth.") (citations omitted). "Put another way, it is the

investor's potential pay-off that breeds risk-taking investment. To deny the payoff is to deter the

investment." *Four Corners*, 582 F.3d at 1222.

Nonetheless, and "[t]hough rare, liability can sometimes be assigned even when the

monopolist engaged in purely unilateral conduct." *Novell*, 731 F.3d at 1073 (citations omitted).

Predatory pricing/bidding and refusal to deal are recognized as unilateral, anticompetitive

conduct. *Id.* at 1073-74. In a predatory "bidding scheme", a purchaser of services "bids up the

market price" of the services "to such high levels that rival buyers cannot survive (or compete as

vigorously) and, as a result, the predating buyer acquires (or maintains or increases its)

monopsony power." *Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co., Inc.*, 549 U.S.

312, 320 (2007). "Once the predatory bidder has caused competing buyers to exit the market for

purchasing [services], it will seek to restrict its [service] purchases below the competitive level,

thus reducing the unit price for the remaining [services] it purchases." *Id.* at 320-21.

In the instant case, there is no argument or evidence that PHP, in the first instance, "bid

up the market price" of oncology provider services – or any other health provider services – with

the goal of eliminating competing insurers from the health insurance market. To the contrary,

Plaintiff argues, and the evidence shows, that in the course of renegotiating the terms of its contract with NMOHC, PHP insisted on increasingly *lower* reimbursement rates for NMOHC's services. Further, Plaintiff argues that PHP's motivation was not to drive other insurers out of the health insurance industry, but rather to drive NMOHC out of the oncology services industry. Accordingly, this is not a predatory bidding case, and Plaintiff's monopolization claims turn on whether PHP's reimbursement and coverage decisions fall within the "refusal to deal" exception to "the general rule protecting unilateral conduct." *Novell*, 731 F.3d at 1074.

The leading case for Section 2 liability based on the refusal to deal is *Aspen Skiing*. There, the defendant, who owned three of the four mountain areas in Aspen, and the plaintiff, who owned the fourth, "had cooperated for years in the issuance of a joint, multiple-day, all-area ski ticket." *Trinko*, 540 U.S. at 408. The defendant, "[a]fter repeatedly demanding an increased share of the proceeds, [] canceled the joint ticket." *Id.* The plaintiff, who was "concerned that skiers would bypass its mountain without some joint offering, tried a variety of increasingly desperate measures to re-create the joint ticket, even to the point of in effect offering to buy the defendant's tickets at retail price." *Id.* at 408-09. The Supreme Court "upheld a jury verdict for the plaintiff, reasoning that '[t]he jury may well have concluded that [the defendant] elected to forgo these short-run benefits because it was more interested in reducing competition . . . over the long run by harming its smaller competitor." *Id.* at 409 (quoting *Aspen Skiing*, 472 U.S. at 608).

"Since *Aspen*, the Supreme Court has refused to extend liability to various other refusal to deal scenarios, emphasizing that *Aspen* represents a 'limited exception' to the general rule of firm independence." *Novell*, 731 F.3d at 1074. And in *Trinko*, the Supreme Court clarified that "*Aspen Skiing* . . . is at or near the boundary of § 2 liability." 540 U.S. at 409. The Court

specifically noted that in *Aspen Skiing*, it had "found significance in the defendant's decision to cease participation in a cooperative venture," noting that "[t]he unilateral termination of a voluntary *(and thus presumably profitable)* course of dealing suggested a willingness to forsake short-term profits to achieve an anticompetitive end. Similarly, the defendant's unwillingness to renew the ticket *even if compensated at retail price* revealed a distinctly anticompetitive bent." *Id.* (emphasis in original).

In keeping with *Trinko*, the Tenth Circuit in *Novell* held that "[t]o invoke *Aspen's* limited exception, . . . at least two features present in *Aspen* must be present in the case at hand." 731 F.3d at 1074. "First, as in *Aspen*, there must be a preexisting voluntary and presumably profitable course of dealing between the monopolist and the rival." *Id.* "Second, as in *Aspen*, the monopolist's discontinuation of the preexisting course of dealing must 'suggest[] a willingness to forsake short-term profits to achieve an anti-competitive end.'" *Id.* (quoting *Four Corners*, 582 F.3d at 1224-25; *Christy Sports*, 555 F.3d at 1197). This second prong requires both a showing that "the monopolist decided to forsake short-term profits" and a showing that "the monopolist's conduct [is] irrational but for its anticompetitive effect." *Novell*, 731 F.3d at 1075.

c.    Analysis

As an initial matter, the first essential component of the refusal to deal doctrine presupposes the termination of "[a] voluntary and profitable relationship" between the parties. *Id.* at 1076. Here, the evidence falls short of demonstrating the *termination* of any relationship between the parties. As detailed above, when efforts to renegotiate the 2003 contract between PHP and NMOHC ceased, the relationship between PHP and NMOHC did not also cease. Rather, the 2003 contract between PHP and NMOHC continues in effect on an evergreen basis.

Pursuant to that contract, NMOHC remains a provider in PHP's network. Thus, PHP continues to deal with NMOHC on the same terms as it has since 2003, including the rates at which it reimburses NMOHC and the services for which it will provide reimbursement.

Assuming *arguendo* that PHP's renegotiation efforts can be construed as the termination of a voluntary and profitable relationship, there must be "evidence from which a reasonable jury could infer" that PHP's efforts to renegotiate the 2003 contract "suggested a willingness to sacrifice short-term profits . . . in a manner that was irrational but for its tendency to harm competition." *Id.* The record is devoid of any such evidence. To the contrary, all the evidence suggests that PHP's renegotiation efforts "came about as a result of a desire to maximize the company's immediate and overall profits." *Id.*

From the first meeting, PHP made clear its intention to reduce its reimbursement rates to NMOHC, the result of which would have been immediate and overall cost savings to PHP. PHP's August 2008 offer estimated $1.5 million in savings to PHP on drugs alone. When NMOHC came back with a counter-offer, it was rejected after an internal PHP review revealed that accepting would be very close to no cost savings at all for PHP. PHP's October 2008 "best offer" letter contemplated savings to PHP of $1 million. Even after that offer was made, PHP continued to consider the financial impact of the NMOHC contract, analyzing the estimated cost savings to PHP that would result from terminating the NMOHC contract entirely and absorbing the care of its members into the PHS delivery system. After receiving a letter from Dr. McAneny in which she sought to confirm that the savings to PHP and the concomitant loss to NMOHC would not exceed $1 million, PHP retreated from its October 2008 offer, ultimately countering with an increase in reimbursement cuts equal to a projected $3 million. Despite evidence that NMOHC told PHP that it could not accept this new amount, there is no evidence

that PHP backed down from its position that it wanted $3 million in savings in order to finalize the contract. Nor did Plaintiff present any evidence that PHP's refusal to negotiate for additional services, such as interventional oncology and physical therapy, would result in a sacrifice of short-term profits to PHP.

Similarly, to the extent that it is even relevant to this analysis, there is no evidence that any of the enterprise level decisions made by PHS surrounding the expansion of its cancer center meet the second requirement of the refusal to deal doctrine. To the contrary, internal PHS strategic analyses and discussions uniformly address cost savings to the PHS enterprise as a whole or to PHP in particular. *See, e.g.*, P. Ex. 1-34 (discussing the "big opportunity to decrease PHP costs" created by developing a comprehensive oncology program in Albuquerque); P. Ex. 1-163 (discussing how acquisition of NMOHC would reduce PHP costs); P. Ex. 1-36 (discussing how acquisition of NMOHC would result in a significant savings to PHP); P. Ex. 1-57 (considering terminating PHP's contract with NMOHC as a "cost reduction initiative"); P. Ex. 1-54 (discussing short-term strategy of pursuing savings through PHP contract renegotiations).

Accordingly, "[f]or all that appears from the [evidence], [PHP expected] to increase (not forsake) short-term profits" by renegotiating the NMOHC contract on terms which, by Plaintiff's own account, was financially favorable to PHP and financially unfavorable to NMOHC. *Christy Sports*, 555 F.3d at 1197. Whether PHP believed that this was possible because PHS had its own cancer center is beside the point. The "refusal to deal doctrine specifically and section 2 generally seek to protect, not penalize, such prosaic profit-maximizing (and presumptively procompetitive) conduct," even by "dominant firms." *Novell*, 731 F.3d at 1076.

The crux of Plaintiff's monopolization claims is that PHP, in refusing to renegotiate on competitive terms its contract with NMOHC, brought to bear its monopoly power in the health

insurance market merely to achieve a competitive advantage for its sister organization, the PHS cancer center, in the comprehensive oncology market. Indeed, a reasonable juror well might infer from the evidence that PHP's negotiation strategy was informed by PHS's vision for its cancer center as the dominant oncology services provider in central New Mexico. The law is clear, however, that such a monopoly "leveraging" claim cannot establish anticompetitive conduct.

In *Four Corners*, the plaintiff doctor, who had declined the defendant hospital's offer to join its staff to provide nephrology services, sued the hospital when, after hiring a different doctor, the hospital made the new doctor the exclusive provider of nephrology services at the hospital. 582 F.3d at 1217. The plaintiff "described his claim as one for 'monopoly leveraging,' with the hospital allegedly using its monopoly over inpatient nephrology services in the 'Durango area' to inhibit competition in outpatient dialysis services in the same geographic area." *Id.* at 1222. The Court explained that, "[b]efore *Trinko*, some courts of appeals held that a monopolist could violate Section 2 by using monopoly power in one market to achieve a competitive advantage in another market." *Id.* "But *Trinko* undid that, explaining that 'there must at least be a "dangerous probability of success" in monopolizing a second market.'" *Id.* (quoting *Trinko*, 540 U.S. at 415 n.4). Further, *Trinko* clarified that "'[i]n any event, leveraging presupposes anticompetitive conduct,' rather than providing an excuse for establishing such conduct." *Four Corners*, 582 F.3d at 1222 (quoting *Trinko*, 540 U.S. at 415 n.4). Applying this principle to the case before it, the Court in *Four Corners* held that, "[w]here, as here, the only possible candidate for anticompetitive conduct could be 'the refusal-to-deal claim we have rejected,' denominating one's claim as sounding in 'monopoly leveraging' won't do anything to save it." *Id.* (quoting *Trinko*, 540 U.S. at 415 n.4).

Indeed, in both *Trinko* and *Pacific Bell*, the Supreme Court rejected the notion that monopoly leveraging might constitute anticompetitive conduct in the absence of a duty to deal. Specifically, in *Trinko*, the plaintiff, a customer of one of Verizon's rivals, asserted that Verizon denied its competitors access to interconnection support services, making it difficult for those competitors to fill their customers' orders. *Pac. Bell Tel.*, 555 U.S. at 449. The complaint alleged that this conduct in the upstream market violated Section 2 of the Sherman Act by impeding the ability of independent carriers to compete in the downstream market for local telephone service. *Id.* And in *Pacific Bell*, the plaintiffs, independent internet service providers that compete with AT&T in the retail DSL market and also lease DSL transport service from AT&T in the wholesale market, argued that AT&T squeezed their profit margins by setting a high price for the plaintiffs to purchase DSL transport and a low price for AT&T customers to purchase DSL internet service. *Id.* at 443. In *Pacific Bell*, the Supreme Court explained, "[t]he nub of the complaint in both *Trinko* and this case is identical – the plaintiffs alleged that the defendants (upstream monopolists) abused their power in the wholesale market to prevent rival firms from competing effectively in the retail market. *Trinko* holds that such claims are not cognizable under the Sherman Act in the absence of an antitrust duty to deal." *Id.* at 450.

As explained above, Plaintiff can establish neither a predatory bidding claim nor a refusal to deal claim. Accordingly, whether Defendants' conduct may be described as "monopoly leveraging" is of no moment, as such a description provides no independently valid basis for challenging PHP's reimbursement and coverage decisions. *Four Corners*, 582 F.3d at 1222. In the absence of evidence that one of the limited exceptions to the general rule protecting unilateral conduct applies here, PHP had no duty to negotiate with NMOHC, much less a duty to negotiate with NMOHC under the terms and conditions preferred by NMOHC. *See Trinko*, 540 U.S. at

409-410.  It follows that, as a matter of law, PHP's reimbursement and coverage decisions cannot establish the anticompetitive conduct necessary to satisfy the second element of Plaintiff's monopolization claims.

### 3. The Mandate

In the TAC, Plaintiff indicates that its allegations regarding Defendants' issuance of the Mandate form, in part, the basis for its claims of tortious interference and unfair competition. Nowhere in the TAC does Plaintiff indicate that its monopolization claims also arise in part from these allegations.  Consequently, the Court did not consider whether Plaintiff's allegations regarding the Mandate adequately allege exclusionary conduct for purposes of Plaintiff's monopolization claims.  In response to Defendants' motion for summary judgment, Plaintiff now argues that PHP imposed the Mandate "as part of its scheme to cripple NMOHC by stripping away its drug revenue," and that the Mandate "has disrupted NMOHC's ability to provide coordinated care to its Medicare Advantage Patients, and has put added burdens on these patients."  Doc. 677 at 35.

### a. Relevant Facts

Effective April 1, 2012, PHP changed its pharmacy plan for members enrolled in its Medicare Advantage program. D. Ex. 69 ¶ 4.  Pursuant to the new policy, PHP covered Medicare Advantage members for certain drugs only if those drugs were obtained from the Presbyterian Specialty Care Pharmacy.  *Id.* ¶ 5.  PHP decided to include in the Mandate "chemotherapy support drugs."  D. Ex. 67 at 14.

Affected members were informed by letter from Louanne Cunico, Director of PHP's Pharmacy Services that, pursuant to the change, "certain medications covered under Medicare Part B, if administered through a doctor's office or facility must be obtained through the

designated specialty network provider, Presbyterian Specialty Care Pharmacy." D. Ex. 66. The letter indicated that "[t]he Presbyterian Specialty Care Pharmacy will deliver the medication to your chosen facility or doctor's office for administration." *Id.* The letter further indicated that, if the member's "doctor wishes not to receive medication from the designated specialty pharmacy," the member or the member's "doctor should contact Presbyterian Pharmacy Services" who would then "coordinate administration of the medication through an infusion center." *Id.* The Mandate was approved by Centers for Medicare and Medicaid Services ("CMS") in January 2012, prior to its implementation. *Id.*

The Mandate was conceived by ICS. In a memo dated May 10, 2011, ICS explained that there were "three Medicare Advantage HMO members receiving a high cost infusion drug at network oncology providers at payment rates substantially above those that can be achieved through 340B pricing and substantially above Medicare allowable." P. Ex. 1-170. The memo explained that the Central Delivery System was "at risk for these members through a global capitation arrangement." *Id.* The memo stated that "the providers have been unwilling to accept Medicare allowable reimbursement for drugs," but that they could instead "specify that these drugs be acquired from a designated 'Specialty Pharmacy Network Provider' . . . in the benefit design." *Id.* "Because of the significant additional cost to the Medicare program (and impact to premiums charged to members)," the memo explained, "PHP will incorporate into its bid for 2011 a requirement that all HMO and PPO Medicare Advantage members receive designated maintenance infusion drugs through the 'Specialty Pharmacy Network Provider.'" *Id.* The memo noted that this requirement "will not impact the clinical outcomes or quality of care of the member as the oversight of the patient can be continued through the Oncology provider." *Id.* The memo further noted that potential risks or barriers to this requirement include member

dissatisfaction and provider contract termination, if the provider so chose. *Id.* The memo estimated that the opportunity of the requirement is a "$750,000 annual reduction in purchased services under PDS capitation." *Id.*; *see also* D. Ex. 70 at 273 (in discussing the impetus for the Mandate, Ms. Cates testified: "I know there was some concern about the escalating price of oncology drugs with independent physicians in the community, NMOHC being one of them. . . . It was a broad concern, about the escalation of oncology drug prices").

Prior to the Mandate, PHP had a "specialty injectable program," pursuant to which PHP would not reimburse a practitioner for specialty injectable drugs administered in the practitioner's office. P. Ex. 1-25 at 139-40. NMOHC "demanded to be exempt" from that program, and, as a result, its contract with PHP exempted it from the program. *Id.* That exemption "costs PHS $2 million per year." P. Ex. 1-73. In a January 2004 email message, David Scrase, then COO of PHS, wrote: "How long we want to continue [to allow NMOHC the exemption] should be revisited on a regular basis, in my opinion, particularly when we come close to the end of the current contract period." *Id.*

Ms. Farrell testified that Defendants were concerned that NMOHC would have a negative reaction to the Mandate based on "history." P. Ex. 1-11 at 267-68. Further, Defendants were aware that the Mandate would have an impact on NMOHC of about $1.5 million. *Id.* Accordingly, implementing the Mandate accomplished the same result as renegotiating NMOHC's contract to reduce NMOHC's profits by $1 or $2 million, without the need for negotiation and without having to make a contractual change. *Id.* NMOHC was the provider most significantly impacted by the Mandate. *Id.*

Most of the providers in PHP's network would accept drugs from the Presbyterian Specialty Care Pharmacy, but NMOHC would not accept the drugs, and Hematology Oncology

Associates ("HOA") would accept only some of the drugs. P. Ex. 1-15 at 202-203. NMOHC took the position that receiving and administering medications from any suppliers other than its own "trusted sources" would fall below the standard of care that NMOHC had created for its patients. D. Ex 73. Accordingly, NMOHC advised its patients that they would need to contact the Presbyterian Infusion Center to arrange to receive their injectable medications. *Id*. Specifically, by letter dated May 19, 2012, NMOHC informed its patients as follows:

> Presbyterian has now created a specialty pharmacy that will allow them to make a profit of about 30% on each of the medications they provide for you. They are expecting that you will fill all of your prescriptions for oral medication and for injectable medication at that pharmacy. They have requested that we take these medications and inject them into you, but we are unable to do that.
>
> Presbyterian will tell you that we could do this and that we are simply refusing. However, we cannot compromise our patient safety and quality standards. We feel strongly that the patient safety process that we have put in place is destroyed by this new arrangement. For that reason, we will no longer be able to inject your medication. Since we do not know where Presbyterian purchases their medications, and we do not know how they have handled their medications, and because there is such an increasing occurrence of counterfeit medications, we are not going to take responsibility for any medication into a person that we did not purchase from a reliable, trusted source.
>
> Therefore, you will need to call the Presbyterian Infusion Center to make arrangements to receive your Neupogen shots or other injectable medication. We will not be able to provide this function for you.

P. Ex. 1-181.

In terms of coordination of injections for NMOHC patients, Defendants described NMOHC as "difficult to deal with" and "uncooperative." D. Ex. 67 at 27. According to Defendants, NMOHC would not fax prescriptions or provide a history and physical/lab work, which was necessary in order to administer the drugs to the patient. *Id.* Dr. McAneny, however, testified that she "faxed the labs that are[] necessary for a patient's safety." P. Ex. 1-182 at 248.

Dr. McAneny complained to both CMS and the Department of Justice ("DOJ") about the Mandate, and lobbied members of Congress about it.  D. Ex. 74; D. Ex. 7 at 73, 198.  There is no evidence in the record that any governmental entity has taken any action against PHS.  CMS responded to Dr. McAneny with a letter stating that, based on the materials she had provided and "further discussion with Presbyterian Health Plan, we do not believe that Presbyterian Health Plan's new policy, whereby certain medications must be obtained through their specialty pharmacy, violates Medicare rules."  D. Ex. 75.  The letter also indicated that federal HIPAA rules do not prohibit the sharing of lab results by NMOHC with the infusion provider, and that "confirming the clinical appropriateness of therapy prior to infusion via that lab work, even by an infusion provider, does not constitute a referral of care from the prescribing physician."  *Id.*  The letter continued, "Consequently, we would not expect to see delays by NMOHC in sharing such information in the future."  *Id.*

Several NMOHC patients filed complaints with PHP and CMS regarding the Mandate, reflecting that it was a hardship for them to receive support medication at a facility other than their provider's office.  P. Ex. 1-180.  Similarly, Plaintiff's expert, Dr. Phillip Stella, opined that:

> By requiring elderly NMOHC patients to purchase and receive certain oncology drugs at PHS's specialty pharmacy, Presbyterian effectively fragmented patient care by diverting these patients away from their oncology team at NMOHC who monitored all other aspects of their care, and outside of the facility where they receive all other cancer testing, diagnoses, and support services.

P. Ex. 4-A ¶ 36.  Dr. Stella further opined that "[s]uch disruption could not only create confusion among patients, but also result in sub-optimal management of treatment, and put the patients at risk."  *Id.*  According to Dr. Stella, shipping the drugs to NMOHC was not a viable option.  *Id.* ¶ 37.

b.    Analysis

Just as with PHP's reimbursement and coverage decisions, PHP's decision to change its pharmacy plan to require certain members to obtain injectable drugs from the PHS Specialty Pharmacy constitutes anticompetitive conduct only if it fits into one of the limited exceptions to the general rule protecting unilateral conduct. *Novell*, 731 F.3d at 1074. There is no suggestion that the Mandate involves predatory bidding. And as demonstrated herein, there is no evidence that the Mandate constitutes a refusal to deal by PHP.

First, the PHP pharmacy plan is not an agreement between NMOHC and PHP, but rather between PHP and its members. The decision to change the terms of that plan thus cannot be construed as the discontinuation of a "preexisting voluntary and presumably profitable course of dealing" between PHP and NMOHC. *Id.* Second, even if the Court were to so construe it, there is no evidence that the change to PHP's pharmacy plan reflects a decision by PHP "to forsake short-term profits." *Id.* To the contrary, the record demonstrates that ICS conceived the Mandate as a cost-saving measure. Indeed, Defendants understood that the Mandate would result in a loss to NMOHC, and a corresponding savings to PHP, of between $1 to $2 million. The change to the pharmacy plan thus would achieve the same cost savings as renegotiating the NMOHC contract, either by reducing reimbursement rates or by requiring NMOHC to participate in the specialty injectable program. Accordingly, the Mandate meets neither the first nor the second element necessary to establish PHP's refusal to deal. Indeed, this is true regardless of whether the Mandate violated any Medicare laws. *See JetAway Aviation,* 754 F.3d at 834-35 (holding that the "Sherman Act is not concerned with . . . conduct that is otherwise illegal"); *Wichita Clinic, P.A. v. Columbia/HCA Healthcare Corp.*, 45 F. Supp. 2d 1164, 1192 (D. Kan. 1999) (holding that evidence that defendants violated Medicare rules "would not establish that plaintiffs have suffered an antitrust injury").

Essentially, Plaintiff's argument is that Defendants used the Mandate to further their "scheme" of crippling NMOHC, both from a financial and a patient-care perspective. Just as with its argument regarding PHP's reimbursement and coverage decisions, the crux of this argument is that PHP, by prohibiting some of its members from obtaining injectable drugs from NMOHC, brought to bear its monopoly power in the health insurance market merely to achieve a competitive advantage for its sister organization, the PHS cancer center, in the comprehensive oncology market. And again, a reasonable juror well might infer from the evidence that the PHS enterprise-level decision to impose the Mandate was informed by PHS's ambitions for its own cancer center. But, as explained above, such a "leveraging" claim "presupposes anticompetitive conduct, rather than providing an excuse for establishing such conduct." *Four Corners*, 582 F.3d at 1222. Accordingly, evidence that PHP leveraged its power as a health insurer provides no independently valid basis for challenging the Mandate. As a matter of law, the Mandate cannot establish the anticompetitive conduct necessary to satisfy the second element of Plaintiff's monopolization claims.

II.     Attempted Monopolization Claims (Counts III and VI)

To prove its attempted monopolization claims, Plaintiff "must show '(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power,' with the third element requiring 'consideration of the relevant market and the defendant's ability to lessen or destroy competition in that market.'" *Christy Sports*, 555 F.3d at 1192 (quoting *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993)). As with a monopolization claim, Plaintiff thus must "plead both power in a relevant market and anticompetitive conduct." *Christy Sports*, 555 F.3d at 1192. Notably, Defendants' "specific intent" to monopolize need not be proven by

direct evidence, but instead may be inferred from a finding of both monopoly power and exclusionary conduct. *Lenox*, 762 F.3d at 1130. Defendants ask the Court to grant summary judgment in their favor on Plaintiff's attempted monopolization claims on the ground that there is no evidence to demonstrate that PHS has a dangerous probability of achieving monopoly power, or that PHS has engaged in predatory or anticompetitive conduct.

A.    Dangerous Probability of Achieving Monopoly Power

Plaintiff's expert has identified outpatient oncology services as the relevant market for purposes of Plaintiff's attempted monopolization claims. P. Ex. 2-A ¶¶ 4, 59. Within this market, "physicians are central to the provision of oncology services." *Id.* ¶ 59. Today, four organizations provide outpatient medical oncology services in the Albuquerque area: NMOHC, UNM, PHS, and HOA. TAC ¶ 70. Similarly, four organizations provide outpatient radiation oncology services in the Albuquerque area: NMOHC, UNM, PHS, and Radiation Oncology Associates ("ROA"). *Id.* ¶ 78. Neither party provided a calculation of how many Albuquerque patients across all insurers utilize each of these providers, and Dr. Reiff testified that there was inadequate data available to him to do such a calculation. P. Ex. 1-112 at 71.

Plaintiff's expert, Bruce A. Strombom, created a chart reflecting the number of oncologists employed by oncology service providers in Albuquerque from 2007 to 2017. P. Ex. 3-A at Ex. 1. For each year, NMOHC employed more oncologists than did PHS. UNM had the highest number of oncologists each year. Since 2007, PHS has increased from four oncologists to 12 oncologists; NMOHC has decreased from 17 oncologists to 13 oncologists. In 2016, PHS had 14 oncologists and NMOHC had 17 oncologists. In 2017, PHS had 12 oncologists and NMOHC had 13 oncologists, HOA/Lovelace[10] had six oncologists, ROA had one oncologist, and

---

[10] Lovelace acquired HOA in early 2015.

UNM had 28 oncologists.  In terms of percentages, the most recent shares of the market were as follows, in descending order:  UNM – 47 percent; NMOHC – 22 percent; PHS – 20 percent; HOA – 10 percent; and ROA – 2 percent.

Defendants concede that because UNM is a teaching hospital whose physicians engage in research, these numbers may overrepresent UNM's share of the market.  Dr. Cheryl Willman, Director and CEO of UNM's Comprehensive Cancer Center, testified that 20 of the hematologists and oncologists employed at UNM Cancer Center spend 60 percent of their time or more on patient work, and that of the five radiation oncologists at the UNM Cancer Center, two spend 60 percent of their time on patient work, and two spend 80 percent of their time on patient work.  D. Ex. 32 at 73-74, 83-84.  Based on this testimony, UNM employs at least 16.8 medical oncologists and radiation oncologists total, which results in percentages of the market as follows: UNM – 35 percent; NMOHC – 27 percent; PHS – 24 percent; HOA – 12 percent; and ROA – 2 percent.

While asserting that outpatient oncology services is the relevant market, Plaintiff argues that these percentages, as calculated based on Mr. Strombom's chart, do not accurately reflect market share for purposes of determining PHS's potential monopoly power.  Rather, Plaintiff argues, to "evaluate market power and changes in market power," the Court should consider an entirely different market, namely, the market of oncologists serving only those patients on a PHP insurance plan, as this market is where providers are competing "head to head" for patients.  P. Ex. 1-12 at 68.  To that end, Dr. Reiff created a chart entitled, "Provider Shares for Outpatient Oncology, PHP Commercial Patients."  P. Ex. 2-A at 65 (Table IV-11).  This chart shows that PMG Oncology's share increased over time from 36.4 percent in 2008 to 57.8 percent in 2015.  NMOHC's share decreased over time from 25.5 percent in 2008 to 11.5 percent in 2015.

UNM's share also decreased from 12.7 percent in 2008 to 10.9 percent in 2015. Lovelace's share decreased from 1.8 percent to 1.3 percent, and "other" decreased from 20.8 percent to 18.5 percent.

As Dr. Reiff acknowledges, however, the market of PHP insureds is not a relevant market. P. Ex. 1-12 at 65. Indeed, he admits that he is "not defining the PHP market." *Id.* And as noted above, Dr. Reiff identified the relevant market to be outpatient oncology services in Albuquerque. Plaintiff thus asks the Court to determine the probability that PHS will achieve monopoly power in the relevant market – for which Dr. Reiff has not calculated any shares – based on Dr. Reiff's calculations of the shares of an entirely different market. The Court declines this invitation.

Plaintiff further argues that UNM is not a "direct" competitor of NMOHC and PHS and is thus not a participant in the relevant market. Doc. 677 at 36-37. Accordingly, Plaintiff's argument continues, any market share assigned to UNM in Mr. Strombom's chart should be discounted entirely. *Id.* There is no factual basis to support Plaintiff's argument, and, indeed, the record evidence is to the contrary.

As an initial matter, Plaintiff's experts, Dr. Strombom and Dr. Reiff, both include UNM in their analyses of the oncology services market. Indeed, Dr. Reiff specifically testified that based on his market definition, UNM and NMOHC are in the same relevant market, *i.e.*, oncology services. D. Ex. 88 at 167.

Further, the record is replete with evidence that NMOHC has historically viewed UNM as a direct competitor. For example, in her May 4, 2009 letter to Ms. Blackwell, Dr. McAneny wrote: "Having adequate numbers of specialists available for the health plan is important as we [PHS and NMOHC] both compete with the ever stronger UNM." D. Ex. 3. Similarly, in a June

5, 2010 email to Ms. Cates, Dr. McAneny noted with respect to a potential joint venture: "We would become a service line that would make UNM far more nervous than we can imagine!!" D. Ex. 34. And in an April 8, 2013 email from Dr. McAneny to a prospective hire, she noted that NMOHC's "non-compete . . . is in all our contracts so that we don't recruit people for Pres or UNM to steal!!" D. Ex. 35. Further, Dr. McAneny testified that NMOHC, for a period of time, lost its contract with Lovelace Health Plan to UNM. D. Ex. 18 at 172-73.

A report prepared by a consultant, Marc Halley, hired by NMOHC similarly reflects NMOHC's view of UNM as a direct competitor. Specifically, the report notes that one of the "strategic interview themes" during Mr. Halley's discussions with NMOHC was UNM Cancer Center, and that NMOHC identified UNM as a "threat." D. Ex. 36. Mr. Halley testified that NMOHC indicated that it viewed both UNM and Presbyterian as "legitimate competitors," and that NMOHC identified its competitors as PHS, Lovelace, and UNM. D. Ex. 37 at 98-99. Mr. Halley's "NMOHC Strategic Planning Retreat Summary," which he created based on information collected from NMOHC staff, states that "[i]n 2005 UNM became a National Cancer Institute ('NCI')-designated cancer research and treatment center. Dr. McAneny believes that this NCI designation has been one of the most significant contributors to the loss of patient volume from NMCC to UNM." D. Ex. 39 at 5. The summary further states that "NMCC faces direct competition from the following local groups who employ medical and/or radiation oncologists: Pres, UNM, HOA, ROA." *Id.*

The evidence also demonstrates that PHS has historically viewed UNM as a direct competitor in the oncology services market, and that UNM has historically viewed itself as directly competing in the oncology services market with NMOHC. For example, the April 9, 2009 PHS Cancer Service Line Strategic Analysis and Recommendations lists under the heading,

"Threats," "UNM, UNM, UNM," notes the "growing recognition by independent oncologists and PHS that the key threat is UNM," and states that the "current oncology groups . . . are all concerned that the 'real' competition is UNM with its aggressive marketing, state support, expansion into Santa Fe and Rio Rancho markets, multidisciplinary subspecialty teams, and advanced technology." P. Ex. 1-36. Additionally, in a Declaration, Anthony Masciotra, Jr., CEO of UNM Medical Group, states that "Presbyterian and NMOHC are UNMMG's and the UNM Cancer Center's largest competitors for comprehensive oncology services." D. Ex. 41 ¶ 7. Dr. Willman of UNM testified that she agrees with that statement. D. Ex. 32 at 118. She further testified that when NMOHC opened its cancer center in 2002, UNM "competed for patients" with NMOHC for oncology services. *Id.* at 38. Dr. Willman similarly testified that a patient can choose to go to NMOHC or UNM for the same oncology services. *Id.* at 44.

Admittedly, when asked whether today she views NMOHC as a competitor of UNM for cancer care, she answered, "Yes and no," noting that she "didn't feel a lot of competition from Dr. McAneny's practice," and stating that UNM was "complementary more than competitive." *Id.* at 38, 42. Dr. Willman, however, clarified that this testimony reflected her opinion that UNM's specialty services "are somewhat unparalleled in our community," and that a patient, although having a choice between NMOHC and UNM, would choose to go to UNM because its services are better. *Id* at 42. She further clarified that the "case mixes" at UNM and NMOHC are different, not because UNM does not offer the same cancer services as does NMOHC, but because UNM is able to go beyond those services, by treating more advanced stages of cancer and conducting clinical trials. Accordingly, Dr. Willman's testimony creates no factual dispute as to whether UNM is in the relevant market of outpatient oncology services.

For purposes of Plaintiff's attempted monopolization claims, the undisputed evidence thus demonstrates that outpatient oncology services in Albuquerque is the relevant market, and that the most recently calculated shares of this market are as follows: UNM – 35 percent; NMOHC – 27 percent; PHS – 24 percent; HOA – 12 percent; and ROA – 2 percent. Defendants argue that, based on market share alone, this Court should conclude that there is no dangerous probability that PHS will achieve monopoly power. Doc. 624 at 23-24. Just as with Plaintiff's monopolization claims, however, Tenth Circuit precedent forecloses Defendant's argument that a threshold market share percentage is required in order to sustain an attempted monopolization claim. *See Reazin*, 899 F.2d at 970. Consistent with *Reazin*, the Court determines that PHS's share of the outpatient oncology services market does not prove as a matter of law the absence of a dangerous probability that PHS will achieve monopoly power, but rather gives rise to a presumption that there is no such probability.

In the 2014 Opinion, applying three of the four factors identified in *Reazin*, this Court held that several allegations in the SAC, if proven, would establish that despite its market share, there is a dangerous probability that PHS will achieve monopoly power. As to the first *Reazin* factor, number and strength of competitors, the Court noted the following allegations: "the comprehensive oncology market includes only Plaintiff, Presbyterian Hospital, and UNM Hospital, and [] UNM Hospital is not a significant participant in the market," and "within this three-firm structure, Presbyterian has a significant market share – *i.e.*, between 28.5 percent and 43 percent of the medical oncologists and between 25 and 50 percent of the radiation oncologists." Doc. 79 at 51. These allegations of market concentration are not supported by the evidence.

First, as discussed above, there is no factual basis for Plaintiff's allegation that UNM is not a "significant participant" in the relevant market. Further, in addition to PHS, NMOHC, and UNM, the relevant market also includes HOA/Lovelace and ROA. Thus, the market is not a "three-firm structure." Further, PHS's share, after discounting UNM's share to reflect its oncologists' dual role as research professors and practitioners, is no higher than 24 percent and is not the dominant share in the market, but rather is third after UNM and NMOHC. Accordingly, based on the undisputed evidence, the first *Reazin* factor does not support finding a dangerous probability that PHS will achieve monopoly power.

As to the second *Reazin* factor, the difficulty or ease of entry into the market by new competitors, the 2014 Opinion noted Plaintiff's allegation that NMOHC "is one of the only of a few remaining independent medical practices in Albuquerque." Doc. 79 at 51. The evidence confirms that no independent oncologists have entered the market during the relevant time period. Accordingly, other than HOA and ROA, NMOHC is the only independent oncology practice in Albuquerque. According to Dr. Reiff, entry into the oncology services market "requires recruitment of new oncologists, affiliation with the insurance providers and development of a reputation and capacity to provide quality of care." P. Ex. 2-A ¶ 73. And Defendants' internally generated documents describe an "economic environment" where "[t]he independent practice of oncology is/has become marginally viable (at best)," state that oncology care for the community will be compromised "if vulnerable groups dissolve with loss of competent oncologists," and note an "anticipated severe oncology shortage," citing an American Society of Clinical Oncology Medical Oncology Workforce Study from 2008 (predicting that the "medical oncology workforce will not meet demands in next 5-10 years"). P. Ex. 1-36. Indeed, PHS – which is not an independent oncology group but rather part of an integrated healthcare

system – was the only new entrant into the market during the relevant time period. The evidence thus suggests that there are significant and continuing barriers to entry.

As to the fourth factor, in the context of its analysis of Plaintiff's monopolization claims, the Court explained that the evidence demonstrates that Defendants comprise a multimarket firm and have used their dominance in one market to impede entry into another. This analysis holds equally true in the context of Plaintiff's attempted monopolization claims.

Accordingly, there is evidence of significant and continuing barriers to entry and Defendants' power as a multimarket firm. There is not, however, evidence that PHS holds a dominant position in the outpatient oncology services market. It thus is questionable whether a genuine issue of fact remains as to the dangerous probability that PHS will achieve monopoly power despite its market share of only 24 percent. The Court need not make this determination. As set forth below, Plaintiff fails as a matter of law to establish the second element of its attempted monopolization claims, and thus its claims cannot survive summary judgment.

B.    Exclusionary Conduct

Plaintiff argues that PHS engaged in two categories of conduct that are exclusionary for purposes of their attempted monopolization claims: (1) the Mandate; and (2) PHS's efforts to retain oncology patients in its own delivery system by: (a) implementing an enhanced referral management program; (b) entering into an agreement with Radiology Associates of Albuquerque ("RAA") whereby RAA agreed to refer patients to PMG oncologists; (c) excluding NMOHC physicians from PHS's provider guide; and (d) developing a nurse navigator program to prevent the outmigration of oncology patients. For the reasons set forth above in the context of Plaintiff's monopolization claims, the Mandate cannot establish the exclusionary conduct elemental to Plaintiff's attempted monopolization claims. And as set forth herein, none of the

actions that Plaintiff identifies as part of PHS's strategy to retain oncology patients is exclusionary within the meaning of Section 2.

>1.     Relevant Facts

>>a.     Referral Management Program

On January 16, 2009, Michael McGrail, Executive Medical Director of PMG, sent an email message to PMG physicians, practice administrators, and executive council regarding "financial update and call to action."  P. Ex. 1-120.  The message indicates that there is "an evolving economic crisis with dramatic decreases in revenue for our organization."  He then writes:

> We remain firm in our intention to avoid layoffs if at all possible.  Our ability to both decrease our cost and to increase revenue with our current workforce represents our chief remaining strategy to mitigate these events.  Our greatest opportunity lies in the capitated patient population for whom PMG has assumed responsibility.  Our opportunity with this population is directly proportional to our ability to accept patients, and provide high-value care that is high-quality and affordable.  One limiting factor is our current capacity to accept patients into our practices.  We also spend more for care of our PMG patients for services outside of our group than we do for care that is provided within our own group.

*Id.*  The message next asks for the recipients' "help" and "agreement and action" on certain enumerated items, including the following item:  "Please review your referral patterns and give special consideration to referring to your medical group colleagues when services are available within PMG."  *Id.*

PHS performed an analysis to "identify what physicians are referring patients to non-PMG professional providers for the Hematology Oncology and Radiation specialties."  P. Ex. 1-90.  This analysis found that from March 2009 through January 2010, "the largest Provider Group referring patients to Non-PHS Hematology Oncology and Radiology Oncology providers

is Presbyterian, followed closely by Linda M Smith, MD," resulting in a combined "out-of-network" cost of $845,000.  *Id.*

Robert West was placed in charge of PHS referral management.  P. Ex. 1-26 at 200-201. Mr. West created a standardized "referral module" for tracking and recording patient referrals by primary care physicians.  *Id.* at 35, 38-40.  As of October 2010, "a new initiative" was "underway", called the Tapestry/Referral module implementation, to provide PHS "with the ability to incorporate 'provider steering' in the referral process and custom tailor the list of available specialists based on the patient's coverage."  P. Ex. 1-92.  Pursuant to this new "PMG Referral Enhancement" computer program, when making a referral, providers and staff would "see all PMG-employed physicians in a given specialty and their addresses first."  P. Ex. 1-82. The list could "be expanded to show all available providers" by clicking on the "Next Level" button.  *Id.*  Mr. West testified that, in structuring the computer referral program, PHS "wanted the PMG providers at the top of the list, but everybody would have complete freedom to go anywhere on the list."  D. Ex. 46.  As of September 2013, PHS had implemented a new initiative described as follows:

> When we are referring outside of PMG we would like to have data as to why. This information is useful to understand what services we are not providing in PMG that may be necessary.  The options we wish you to choose from are: specialty not at PMG; access/availability of an appointment; provider preference; patient preference; PMG specialty location; PMG provider does not provide test and/or service.  This reason field will be a hard stop, NOT for our provider, but in our workflow to complete and approve the referral.

*Id.*

As discussed above, after a July 1, 2011 oncology strategy meeting, Ms. Cates drafted a "summary of decisions" that reflects the decision to "[a]ggressively pursue current referral strategy (aggressive organic growth focused on purchased medical reduction and getting

indep[endent] physicians to refer to our program).” P. Ex. 1-54. Other documents similarly reflect that PHS implemented a plan to reduce purchased medical services costs through the referral management program, which included developing reports for physicians to reduce outmigration referrals, developing reports for PMG management to monitor outmigration referrals, and reviewing with providers who are referring externally to determine if the referral could have been performed by a PMG specialist. P. Ex. 1-94. In particular, the referral management program targeted medical oncology, with areas of significant risk for the PHS budget being identified as both “[s]uccessful implementation of referral management program,” and “[s]uccessful growth of medical oncology program.” P. Ex. 1-37.

A December 2011 presentation explained the objectives of the referral management program as follows: “[r]etain all outmigration referrals for which Presbyterian Medical Group (PMG) routinely provides services to patients,” “[r]etain patients in PMG which might otherwise be lost forever to providers outside PMG,” and “[r]educe the Purchased Medical Expense costs for capitated patients by a minimum of $3.87 million in fiscal 2012.” P. Ex. 1-124. The presentation specifically addressed a “Referral Management Plan for Oncology,” which included:

> Requirement by PMG management (supported by PHS leadership) that all capitated patients requiring medical, radiologic and surgical oncology services be referred to PMG Oncology for navigation; Obtain sustainable support from the Oncology Service Line for all necessary activities which will result in patient referrals; Using the detailed EPIC report which identifies all Oncology leakage by specific physician, the Service Line Lead Physician/MikeWest/Mike Bowers/Dr. Stern will meet to discuss reasons for outmigration with each individual physician.

*Id.*

When asked about referral policies, Dr. Binder testified that he recalled “the issue of capitated patients, and trying to convince physicians that with capitated patients, it didn’t make

sense to refer them out to another provider, when in a way the employed oncology physicians are already being paid for that service." P. Ex. 1-29 at 275-78. Dr. Binder further testified that "it's logical to try and keep anybody for whom you can provide that service within PMG so that you are not sending money out of the system." *Id.*

Administrators of PHS and PMG uniformly testified that: (1) there was never any *requirement* that PMG physicians refer patients to PMG oncologists; and (2) PMG physician compensation was not tied in any way to internal referrals. For example, Michael Fitzgerald, former interim CEO of PMG, testified that management "clarified there would be no compensation incentives or disincentives associated with [internal referrals]." D. Ex. 44 at 261. Mr. Fitzgerald further testified: "We wanted people to be able to still do what was in the best interests of the patient clinically. . . [T]hey still had to have that right and option." *Id.* at 263. Similarly, Paul Briggs, former VP and COO of PHS, testified that "[t]here was never any prohibition to refer patients to physicians outside of the Presbyterian Medical Group. Never any requirement put in . . . place to do so." D. Ex. 45 at 226. Mr. West similarly testified that no part of a PMG doctor's compensation was based on how he or she referred patients, there was no connection between referral practices of a physician and compensation levels, and there was no policy within Presbyterian that required PMG doctors to refer patients to other PMG doctors or prohibited physicians from referring outside of Presbyterian. D. Ex. 46 at 250-251. And Dr. David Arredondo, PMG Medical Director, testified that "[t]here was no policy requiring internal referrals within PMG." D. Ex. 60 at 157. He further testified:

> I consistently told providers on many occasions that they were to refer patients to whomever they felt provided the best care, and if they felt that our – if their internal referral option was not of sufficient quality or in any particular way that they would choose to refer outside, then I would want to know about it, because then I would want to take steps to escalate or elevate the quality of our internal referral, such that they would view that – that internal referral opportunity as

being equivalent or better. There was no policy or directive by me as their medical director to refer internally if they felt that it was in the better interests of the patients to be referred outside of PMG or they felt a preference for whatever reason they might have. My directive to all of the PMG providers was that they can refer patients . . . according to their belief about where patients . . . can receive the best care.

*Id.* at 158-60.

### b. Alleged Agreement between RAA and PMG

The only evidence in the record regarding a purported agreement between RAA and PHS or PMG is the testimony of Dr. Brian Potts, former President of RAA. Dr. Potts testified that he is not aware of: any agreements between RAA and Presbyterian concerning referrals; any arrangement between RAA and Presbyterian whereby RAA would direct referrals to Presbyterian-employed physicians; or any agreement between Presbyterian and RAA concerning a process for making referrals to a Presbyterian-employed surgeon. Ex. D. 102 at 83, 97.

### c. PMG Referral Guide

Dr. Binder testified that PMG was not "very user friendly to [its] own members." P. Ex. 1-29 at 98-100. Specifically, he explained, "if you were a Presbyterian physician, employed by the Presbyterian Medical Group, and you wanted to refer a patient to somebody, it was very hard to figure out who within your group you could refer the patient to." *Id.* As a result, he further explained, a decision was made to update a PMG Referral Guide, so that if somebody wants to refer to a PMG physician, they know how to access that PMG physician." *Id.* Dr. Binder recalls that "a booklet came out," providing a list of PMG providers, sometime in 2008. *Id.* His understanding is that "this was strictly a PMG Referral Guide, so no independent physician would have been in this referral guide." *Id.* at 102. His "guess would be some independent physicians would say, 'How come? We're on the staff.'" *Id.* But, he testified, the book "wasn't meant to be a Presbyterian Referral Guide, it was meant to be a PMG Referral Guide." *Id.* An

email from Ms. Blackwell to Mr. Batey also indicated that NMOHC "(and all non-PMG providers where PMG resources exist) were excluded" from the PMG Referral Guide. P. Ex. 1-166.

d.    <u>Nurse Navigation Program</u>

In her April 2009 strategic analysis for the PHS cancer center, Dr. Gerard proposed that PHS "initiate [a] breast cancer nurse navigator program linking newly diagnosed patients to PMG," which she described as a "targeted revenue enhancement activit[y] [to] increas[e] oncology patient volume." P. Ex. 1-36. Dr. Gerard noted that one of the weaknesses of PMG is approximately "50% outmigration of PMG patients for surgery or oncology service, and that one of the opportunities for PMG is "navigators to ensure patients remain in system and care is integrated and effective." *Id.* The analysis also included as a "revenue enhancement" goal "breast cancer nurse navigator to navigate patients from diagnosis through PMG sur[gery], med[ical oncology] and radiation oncology care," citing study findings that "nurse navigator is the second most important value added cancer program feature as reported by cancer patients." *Id.* Under "dynamics of cancer care referral," Dr. Gerard noted that "nurse navigators can effectively keep most patients in the system." *Id.*

PHS did, in fact, initiate a nurse navigator program. Pursuant to that program, PHS nurse navigators met with patients to do an "initial needs assessment," both at PHS facilities and at the RAA facility, where they leased space. P. Ex. 1-14 at 47, 51. Nurse navigators would be advised once a patient had scheduled an appointment with a PMG surgeon, and would then contact the patient and schedule additional appointments for that patient with a PMG oncologist. *Id.* at 65-67. Nurse navigators did not tell patients about the oncology services provided by NMOHC and HOA. *Id.* at 52. Colleen Sullivan-Moore, a PHS nurse navigator testified that

because she "work[s] for PMG," she "would send them to" a PMG oncologist. *Id.* at 26. When Ms. Sullivan-Moore left PHS, Dr. Gerard sent an email message to another nurse navigator, Gloria Medina, as follows: "What is the volume of new breast cancer patients this month compared to Aug, July. We should watch this very closely with Colleen leaving." P. Ex. 1-169.

Ms. Sullivan-Moore testified that, if a patient expressed a preference to see a provider outside of the PHS system, she would not discourage the patient from pursuing that option, and that no one at PHS ever instructed her to discourage patients from leaving the PHS system. D. Ex. 57 at 132-33. There is, however, evidence that on one occasion, Ms. Sullivan-Moore "tried to retain" and "spoke extensively" to a patient who was "unhappy with her oncology appointment at PMG," and accordingly, was staying with her PMG surgeon but switching to medical and radiation oncologists at NMOHC. P. Ex. 1-168. Further, there is evidence that on another occasion, a PHP nurse navigator told an NMOHC patient that because of changes in PHP's insurance plans, he/she would no longer be able to go to NMOHC; this was not accurate, and the patient was able to continue care at NMOHC. P. Ex. 1-130. On at least two other occasions, NMOHC patients reported to NMOHC staff that PHS nurse navigators scheduled appointments for them with PMG oncologists, although were already established patients of oncologists at NMOHC. P. Ex. 1-129.

2. Analysis

The actions allegedly taken by PHS to further its patient retention goals are unilateral rather than concerted, save PHS's alleged agreement with RAA. There is no factual support for Plaintiff's contention that an exclusive agreement between PHS and RAA existed. Accordingly, Plaintiff's attempted monopolization claims turn on whether the remainder of PHS's patient retention efforts fall within one of the limited exceptions to the general rule protecting unilateral

conduct. *Novell*, 731 F.3d at 1074. There is no suggestion that PHS's patient retention efforts involved predatory bidding. And as demonstrated herein, there is no evidence that PHP's patient retention efforts constitute a refusal to deal by PHS.

As explained above, the first essential component of the refusal to deal doctrine presupposes the termination of "[a] voluntary and profitable relationship" between the parties. *Id.* at 1076. Plaintiff points to no relationship between PHS and NMOHC that PHS has terminated. Regardless of whether PHS excluded NMOHC from its PMG Referral Guide – a book designed not to include all providers in the PHP network, but rather to provide an internal resource identifying PMG physicians – NMOHC continues to be an in-network provider of PHP and, as such, continues to have admitting privileges at Presbyterian Hospital. Nor does the evidence support Plaintiff's argument that PMG physicians were prohibited from referring patients to NMOHC, or that their compensation was tied to their referral decisions.

The evidence demonstrates, however, that for PHP patients, PMG physician referrals to PMG oncologists rose from 63 percent in 2008 to 92 percent in 2015. P. Ex. 3-A, Ex. 6. In contrast, during the same period, PMG physician referrals to NMOHC declined from 37 percent in 2008 to 8 percent in 2015. *Id.* The evidence thus suggests that PHS's efforts to retain oncology patients, through its referral management and nurse navigator programs and its publication of a PMG Referral Guide, effectively reduced the number of patients referred by PMG to NMOHC for oncology services.

Assuming *arguendo* that, for this reason, PHS's retention efforts can be construed as the termination of a voluntary and profitable relationship, those efforts will satisfy the second element of the refusal to deal doctrine only if there is "evidence from which a reasonable jury could infer" that PHS's efforts "suggested a willingness to sacrifice short-term profits . . . in a

manner that was irrational but for its tendency to harm competition." *Novell*, 731 F.3d at 1074. The record is devoid of any such evidence. "To the contrary, all the evidence suggests that PHS's retention efforts "came about as a result of a desire to maximize the company's immediate and overall profits." *Id.*

The evidence demonstrates that PHS implemented a referral management system to "steer" PMG physicians toward making internal referrals (and oncology referrals in particular), and prevent "outmigration referrals" in areas, including oncology, where PMG had the capacity and expertise to treat those patients. To that end, the PMG computer referral system and the PMG Provider Guide were designed to facilitate referrals by PMG physicians to other PMG physicians. The nurse navigator program, too, was part of PHS's overall effort to prevent outmigration and increase the volume of PHS oncology patients, and to that end nurse navigators aggressively steered, if not pressured, patients of PMG surgeons toward PMG oncologists.

From the first email message asking PMG physicians to "give special consideration" to referring to their PMG colleagues, PHS administrators made clear that this internal referral strategy was designed to address an "economic crisis." Indeed, a PHS analysis of oncology referral patterns demonstrated that PMG's external referrals along with referrals from one independent practitioner cost PHS $845,000 in less than one year, and external oncology referrals were identified as a "significant risk" for the PHS budget. The nurse navigator program was implemented to, *inter alia*, enhance PHS's revenue. PHS was particularly concerned about reducing external referrals for its capitated patient population, including its capitated oncology patients, precisely because those referrals increased PHS's costs. Indeed, much of the evidence discusses the referral management program as a means of reducing purchased medical costs for capitated patients. Thus, it is clear from the record that PHS's patient retention strategies all

were designed with the goal of decreasing costs and increasing revenue. Accordingly, "[f]or all that appears from the [evidence], [PHS expected] to increase (not forsake) short-term profits" by increasing internal referrals and reducing outmigration of oncology patients - actions that, by Plaintiff's own account, had financially favorable results for PHS and financially unfavorable results for NMOHC. *Christy Sports*, 555 F.3d at 1197. Indeed, this is true regardless of whether PHS's retention practices, including its nurse navigators' tactics, were "overly aggressive." *JetAway Aviation*, 754 F.3d at 834-35 (holding that the "Sherman Act is not concerned with overly aggressive business practices").

Plaintiff argues that PHS's "controlling" of its internal referrals was anticompetitive, as it "target[ed] NMOHC" and furthered PHS's efforts to "monopolize" the relevant market. Doc. 677 at 39. But "[t]he Sherman Act does not force [PHP] to assist a competitor in eating away its own customer base, especially when the competitor is offering [PHP] nothing in return." *Novell*, 731 F.3d at 1076. In the absence of any existing exception to the general rule, PHS "has no duty to aid competitors," including NMOHC. *Trinko*, 540 U.S. at 411.

In *Four Corners*, the Court determined that an analogous claim failed to establish anticompetitive conduct. There, the plaintiff doctor argued that the defendant hospital, "after having entered the inpatient nephrology business by hiring [a nephrologist] and investing considerable sums to ensure the success of its practice, engaged in anticompetitive conduct by refusing to share its facilities with a potential rival for inpatient nephrology services." 582 F. 3d at 1223. The Court held that, "[h]aving made a substantial investment in developing its own nephrology practice – indeed, having even tried to secure [the plaintiff's] services for that practice – [the defendant hospital] is entitled to recoup its investment without sharing its facilities with a competitor." *Id.* In the absence of evidence that the defendant refused to deal

with the plaintiff "to avoid an *unprofitable* relationship," the Court found that the defendant had no duty to deal with its competitors, including the plaintiff. *Id.* at 1225 (emphasis in original).

Similarly, in *Christy Sports*, the defendant had, when originally developing its ski resort, sold parcels of land within the resort village to third parties, while reserving the right of approval over the conduct of certain ancillary businesses on the property, including ski rentals. 555 F.3d at 1190. After having for several years granted permission to the plaintiff to rent skis in competition with its own ski rental outlet, the defendant revoked that permission. *Id.* The plaintiff claimed that the revocation of its permission to sell skis at the defendant's resort constituted anticompetitive conduct. *Id.* at 1192. The Court held that, "[h]aving invested time and money in developing a premier ski resort that attracts skiers from across the nation, [the defendant] could recoup its investment in a number of ways," including, as it chose, to "delve more deeply into the rental ski market." *Id.* at 1195. The Court noted that "allowing resorts to decide for themselves what blend of vertical integration and third party competition will produce the highest return may well increase competition in the ski resort business as a whole, and thus benefit consumers." *Id.* The Court rejected the plaintiff's argument that, under *Aspen Skiing*, the defendant's "refusal to deal" violated Section 2, noting that the "critical fact in *Aspen Skiing*," namely, that "there were no valid business reasons for the refusal," was missing in the case before it. *Id.* at 1197.

Here, after entering the oncology business by building its own cancer center, PHS was entitled to "recoup its investment in a number of ways," including, as it chose, to pursue strategies to reduce external referrals and outmigration of oncology patients. *Id.* at 1195. So long as its retention efforts were based on "valid business reasons," PHS did not violate Section 2, as "antitrust will not force [PHS] to share its internal profit-making opportunities [including its

referrals] with competitors [including NMOHC]." *Id.* at 1196. Just as the Court found in *Christy Sports*, allowing Defendants here "to decide for themselves what blend of vertical integration and third party competition will produce the highest return may well increase competition in the [health services] business as a whole, and thus benefit consumers." *Id.* at 1195. As a matter of law, PHS's retention practices cannot establish the anticompetitive conduct necessary to satisfy the second element of Plaintiff's attempted monopolization claims.

III.    Remaining State Law Claims (Counts VII, VIII, and X)

In addition to Plaintiff's federal and state antitrust claims, which have been disposed of herein, the TAC includes claims arising solely under state law, namely Plaintiff's tortious interference claims (Count VII and Count X), and an unfair competition claim (Count VIII). The Court's pendent jurisdiction over these state law claims "is exercised on a discretionary basis," and the Tenth Circuit has generally held that "if federal claims are dismissed before trial, leaving only issues of state law, the federal court should decline the exercise of jurisdiction by dismissing the case without prejudice." *Brooks v. Gaenzle*, 614 F.3d 1213, 1229 (10th Cir. 2010) (citations omitted). The Tenth Circuit has explained its general disinclination "to exercise pendent jurisdiction in such instances because notions of comity and federalism demand that a state court try its own lawsuits, absent compelling reasons to the contrary." *Id.* at 1230.

Having determined that summary judgment is warranted as to Plaintiff's antitrust claims, only the supplemental state law issues of tortious interference and unfair competition remain. The Court finds that these issues are best left for the state court's determination. *Id.* Accordingly, the Court declines to exercise jurisdiction over Plaintiff's remaining state law claims and dismisses them without prejudice. *Id.*

## CONCLUSION

There is no evidence in the record that Defendants engaged in anticompetitive conduct within the meaning of Section 2 of the Sherman Act.  Accordingly, as a matter of law, Plaintiff cannot establish an essential element of its monopolization and attempted monopolization claims.  Defendants thus are entitled to summary judgment on those claims (Counts I, III, IV, and VI).  The Court declines to exercise supplemental jurisdiction over Plaintiff's additional claims arising under state law (Counts VII, VIII, and X).  The Court thus dismisses those claims without prejudice.

**IT IS THEREFORE ORDERED** that Defendants' Motion for Summary Judgment [Doc. 624] is **GRANTED**.

DATED this 14th day of November, 2019.

_____
MARTHA VAZQUEZ
United States District Judge